1    KEKER & VAN NEST, LLP
     Jeffrey R. Chanin (No. 103649)
2    Daralyn J. Durie (No. 169825)
     Ashok Ramani (No. 200020)
3    Eugene M. Paige (No. 202849)
     Email:  jrc@kvn.com
4            ddurie@kvn.com
             axr@kvn.com
5            emp@kvn.com

6    Attorneys for Plaintiff and Counterdefendant,
     Netflix, Inc.
7
     ALSCHULER GROSSMAN STEIN & KAHAN LLP
8    Marshall B. Grossman (No. 35958)
     William J. O'Brien (No. 99526)
9    Tony D. Chen (No. 176635)
     Dominique N. Thomas (No. 231464)
10   The Water Garden
     1620 26th Street
11   Fourth Floor, North Tower
     Santa Monica, CA  90404-4060
12   Telephone:  310-907-1000
     Facsimile:  310-907-2000
13   Email:  mgrossman@agsk.com
             wobrien@agsk.com
14           tchen@agsk.com
             dthomas@agsk.com
15
     Attorneys for Defendant and Counterclaimant,
16   Blockbuster Inc.

17                  UNITED STATES DISTRICT COURT

18                NORTHERN DISTRICT OF CALIFORNIA

19   NETFLIX, INC., a Delaware corporation,    CASE NO. C 06 2361 WHA

20              Plaintiff,                      Magistrate Judge Joseph C. Spero

21        vs.                                   **JOINT STIPULATION RE
                                                PROTECTIVE ORDER**
22   BLOCKBUSTER INC., a Delaware
     corporation, DOES 1-50,
23
                Defendants.
24

25   AND RELATED COUNTER ACTION.

26

27        The parties, Plaintiff and Counterdefendant Netflix, Inc., and

28   Defendant and Counterclaimant, Blockbuster Inc., stipulate as follows:

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP                                       JOINT STIPULATION RE PROTECTIVE
                                                ORDER C 06 2361 WHA

                                                                    Dockets.Justia.com

1 | **I    STIPULATION FOR EXPEDITED ENTRY OF PROTECTIVE**
2 | **ORDER**

3    1.    The parties agree that a protective order is needed in this case.

4 Pending and future disclosures in this case under Rule 26 of the Federal Rules of

5 Civil Procedure and this Court's Patent Local Rules, as well as responses to

6 pending and anticipated discovery requests directed to parties and to third-parties,

7 will require disclosure of trade secrets and confidential and proprietary

8 information.

9    2.    Counsel for the respective parties have conferred on numerous

10 occasions in an attempt to reach agreement on the provisions of an appropriate

11 protective order for this case.  They have succeeded in reaching agreement on all

12 except three issues with respect to the provisions of the protective order.  Having

13 been unable to reach agreement on three remaining issues, the parties have agreed

14 to submit these disputed issues for decision by this Court.  By submitting this

15 Stipulation, the parties hope to obtain an expedited decision from the Court on the

16 three remaining disputed issues while avoiding the delay, expense, and

17 inconvenience of pursuing competing protective-order motions.

18    3.    The three remaining disputed issues with regard to the protective

19 order for this case are:

20    a.    Whether to permit one in-house attorney for each side to

21 have access to information that receives the highest designation of

22 confidentiality ("Attorneys Eyes Only")(a provision proposed by

23 Blockbuster, with which Netflix disagrees);

24    b.    Whether to impose restrictions on computer source code

25 produced in this case beyond the restrictions applicable to other "Attorneys

26 Eyes Only" information (a provision proposed by Netflix, with which

27 Blockbuster disagrees);

28 ///

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

2

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1       c.     Whether to include in the protective order a representation

2 by the parties' respective law firms of record that they are not engaged, and

3 will not engage, in "patent prosecution work" on behalf of their respective

4 clients (a provision proposed by Netflix, with which Blockbuster disagrees).

## II    ALTERNATIVE PROTECTIVE ORDERS

6       4.     With this Joint Stipulation, the parties provide alternative

7 protective orders, attached as Exhibits A and B. Blockbuster's proposed

8 protective order is Exhibit A, while Netflix's proposed order is Exhibit B. The

9 only substantive differences between the alternative proposed orders are with

10 respect to the two disputed points listed above. [1]

11       5.     Sub-Paragraph 7a on Page 4 of Blockbuster's proposed

12 protective order (Exhibit A) includes, in the list of persons allowed to receive

13 "Attorneys Eyes Only" information:

14       One in-house counsel employed by each of the parties,

15       such counsel to be Bryan P. Stevenson in the case of

16       Blockbuster Inc. and an in-house attorney to be promptly

17       designated in writing by Netflix, Inc., but only after each

18       such in-house counsel, paralegal, or secretary executes an

19       Undertaking in the form of Attachment "A," a copy of

20       which shall be provided forthwith to counsel for each

21       party.

22 Netflix's proposed protective order (Exhibit B) contains no such provision.

23       6.     Paragraph 8 on Pages 5 and 6 of Netflix's proposed protective

24 order provides the following additional restrictions on source code:

25       All material produced by any party pursuant to pretrial

26       discovery in this action which is designated by the

27

---

[1] The protective orders also differ in form with respect to the identification of the parties and counsel submitting them.

28

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

3

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1    Designating Party as containing or comprising source

2    code shall be subject to the restrictions contained in

3    Paragraph 7, above, for AEO Material.  In addition, the

4    following restrictions shall apply, absent contrary

5    agreement among the parties, to ensure secure access to

6    source code:

7    a.    A single electronic copy of source code or

8    executable code shall be made available for inspection on

9    a stand-alone computer.

10    b.    The stand-alone computer shall be password

11    protected and supplied by the Designating Party.

12    c.    The stand-alone computer shall be located at the

13    office of outside counsel for the requesting party.

14    d.    Access to the stand-alone computer shall be

15    permitted, after notice to the Designating Party and an

16    opportunity to object, to two (2) outside counsel

17    representing the requesting party and two (2) experts

18    retained by the requesting party, who shall have complied

19    with the provisions of Paragraph 7 above.

20    e.    Source code may not be printed or copied without

21    the agreement of the Designating Party or further order of

22    the Court.

23    Blockbuster's proposed protective order contains no such provision.

24        7.    Sub-Paragraph 7a on Page 4 of Netflix's proposed protective

25    order, immediately after listing Alschuler Grossman Stein & Kahan, LLP and

26    Keker & Van Nest, LLP (Blockbuster and Netflix's respective counsel in this case)

27    as being entitled to receive "Attorneys Eyes Only" information, adds a parenthetical

28    recitation:  "(each of which represent that they are not engaged, and will not

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

4

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1  engage, in patent prosecution work on behalf of their respective clients)."

2  Blockbuster's proposed protective order contains no such statement.

3  **III    FURTHER PROCEEDINGS**

4          8.      For the sake of expedition and efficiency and the convenience of

5  the Court, the parties have set forth their positions and arguments in this

6  Stipulation rather than undergoing a full motion procedure.  The parties stipulate

7  and request that the Court rule on this matter and enter an appropriate protective

8  order without any further documentary submissions.[2]  Because inter-party

9  discovery, third-party discovery, and completion of initial disclosures are being

10  delayed by the absence of a protective order, the parties respectfully request entry

11  of a protective order as soon as possible.

12          9.      The parties disagree on one aspect of the procedure related to

13  this Stipulation.  Netflix believes that the Magistrate Judge should hear oral

14  argument on the disputed issues with respect to the protective order.  Blockbuster,

15  however, believes that oral argument on the issues presented is unnecessary and

16  would delay entry of the badly-needed protective order, thereby also delaying

17  pending discovery of information designated as confidential.  The parties stipulate

18  that the decision whether to hold oral argument should be decided by the

19  Magistrate Judge in his sole discretion.  The parties respectfully request that, if

20  oral argument is to be conducted, it be scheduled as soon as possible.

21          10.     Accordingly, for each of the two disputed issues as to the

22  protective order, each party sets forth its position below, followed by a response

23  by each party to the other party's statement of position.

24  **IV    STATEMENTS REGARDING IN-HOUSE COUNSEL'S ACCESS TO**

25      **"ATTORNEYS EYES ONLY" INFORMATION**

26      **A.    Blockbuster's Statement**

27          11.     Blockbuster has a vital need to afford access to information

28  ────────────────
[2] The parties reserve all rights under Fed. R. Civ. Proc. 72(a).

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

5

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1   designated "Attorneys Eyes Only" ("AEO") to at least one of its in-house counsel.

2   As an accommodation to concerns expressed by Netflix, Blockbuster has placed

3   special safeguards in Sub-Paragraph 7a on Page 4 of Blockbuster's proposed

4   protective order (Exhibit A).  Blockbuster's proposed order limits access to

5   "AEO" information in this case to only one Blockbuster in-house attorney,

6   Blockbuster's senior litigation counsel, Bryan P. Stevenson.  Blockbuster's

7   proposed order also requires Mr. Stevenson to sign a detailed written undertaking

8   to protect all "AEO" and other confidential information.

9          12.     Bryan Stevenson is an experienced litigator who supervises –

10  and, in some cases, personally conducts – litigation on behalf of Blockbuster.  As

11  a major corporation with thousands of retail outlets around the country,

12  Blockbuster is involved in a vast array of cases, ranging from complex business

13  disputes to landlord-tenant litigation, employment disputes, and premises liability

14  claims.  Mr. Stevenson is fully engaged with this busy caseload.  Other

15  Blockbuster in-house counsel handle corporate and transactional matters and

16  patent prosecution.

17         13.     Blockbuster's in-house litigation counsel are accustomed and

18  expected to be closely involved in litigation affecting the company.  They have

19  been permitted access to "Attorneys Eyes Only" information on multiple previous

20  occasions without problems.  They have a duty to their client and its shareholders

21  to exercise direction and control over this important and costly litigation and to

22  provide knowledgeable legal advice about the case.

23         14.     Mr. Stevenson will be legally and ethically bound to observe all

24  restrictions imposed by the protective order.  He is a court officer subject to the

25  same ethical and professional strictures as outside counsel.  As litigation counsel

26  responsible for retaining and supervising outside counsel, Mr. Stevenson is not a

27  "competitive decisionmaker" who should be excluded from access to "AEO"

28  information.  *See Volvo Penta of the Americas, Inc. v. Brunswick Corp.*, 187

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

6

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1   F.R.D. 240, 241-45 (E.D. Va. 1999) (permitting in-house litigation counsel the

2   same access to trade secrets and confidential information as outside counsel);

3   *Fluke Corp. v. Fine Instruments Corp.*, No. C94-573C, 1994 WL 739705 at *4-*5

4   (W.D. Wash. Oct. 6, 1994) (same); *Amgen, Inc. v. Elanex Pharm., Inc.*, 160

5   F.R.D. 134, 139 (W.D. Wash. 1994).

6           15.     This is an important and complex case, in which Netflix is

7   essentially attempting to shut down the entire online business unit of Blockbuster.

8   Under the circumstances of this case, lack of access to "Attorneys Eyes Only"

9   information for Mr. Stevenson would make it impossible for Blockbuster to fully

10  participate in important decisions.  In the absence of such information,

11  Mr. Stevenson would be in the position of reviewing and editing court filings that

12  are interrupted by redacted "black holes," the contents of which could not be

13  explained to him.  He would be excluded from any deposition proceedings

14  designated as "AEO," and he could not even be told the full reasons for discovery

15  requests, responses, and legal contentions resulting from "AEO" information.  The

16  result would be to create a major disconnect between the head of Blockbuster's

17  litigation team and the rest of the attorneys on that team, as well as to disrupt

18  Blockbuster's ability to direct, control, and assist in this litigation.

19          **B.     Netflix's Statement**

20          16.     This case involves patent infringement claims and antitrust

21  counterclaims made between two direct competitors.  Discovery will therefore

22  entail the production of not only highly confidential documents relating to patents

23  that the parties have obtained or applied for, but also competitively sensitive

24  information regarding both parties' current and future business plans, including

25  how the parties intend to compete with one another in the marketplace.

26  Competitively sensitive, confidential business information such as this qualifies

27  for trade secret protection.  *See, e.g.*, *SI Handling Sys., Inc. v. Heisley*, 753 F.2d

28  1244, 1260 (3d Cir. 1985) (affirming district court's holding that "information

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

                                          7                    JOINT STIPULATION RE PROTECTIVE
                                                               ORDER C 06 2361 WHA

1    contained in [patent] applications, which are treated as confidential by the patent

2    office . . . is [a] trade secret"). Ordinarily, competitively sensitive trade secret

3    information would not be discoverable in the absence of a list that complies with

4    California Code of Civil Procedure § 2019.210, to protect against a fishing

5    expedition. *See, e.g.*, *Pixion, Inc. v. Placeware Inc.*, 421 F. Supp. 2d 1233, 1242

6    (N.D. Cal. 2005) (explaining that one of the objectives of § 2019 is to "prevent[]

7    plaintiffs from using the discovery process as a means to obtain the defendant's

8    trade secrets"). However, as there are no trade secret misappropriation claims

9    alleged in this case, Blockbuster is not constrained by the § 2019 rule, and it has

10   already commenced fishing with a vengeance in hopes of finding something to

11   support its antitrust counterclaims.

12          17.    Blockbuster, for example, has demanded that Netflix produce

13   documents relating to its patent applications, *see* Falla Decl. ¶ 2, including patent

14   applications that are still pending before the U.S. Patent and Trademark Office;

15   such applications contain and reflect Netflix's future confidential business plans

16   and intellectual property. Blockbuster has also served subpoenas upon no fewer

17   than ten companies with which Netflix has a business relationship, seeking

18   materials that include "financial statements, revenue statements, or financial or

19   business projections" received from Netflix; Netflix's "online business plans,

20   business models, business proposals, strategies or projections"; and Netflix's

21   "competitive or marketing analyses." *See id.* ¶ 3. Blockbuster has likewise

22   subpoenaed the law firms that Netflix has consulted and retained to provide patent

23   prosecution assistance and consultation. *See id.* ¶ 4. Some of the materials that

24   Blockbuster has requested are so sensitive that some personnel *within Netflix itself*

25   are not given access to them. *See id.* ¶¶ 5-7.

26          18.    Yet, under Blockbuster's proposed protective order, all the

27   materials it has subpoenaed or demanded in discovery could be freely accessed by

28   Blockbuster employee Bryan P. Stevenson, an in-house attorney. In resolving this

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

8

1    protective order dispute, this Court should balance the "risk of inadvertent

2    disclosure of trade secrets to competitors" against "the risk . . . [of impairing]

3    prosecution of [the discovering parties'] claims." *Brown Bag Software v.*

4    *Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992).  The damage that could

5    result from disclosure to Blockbuster's in-house counsel, which creates the

6    possibility of further inadvertent disclosure, is severe, given the parties' direct

7    competition.  On the other hand, any risk of impairing Blockbuster's ability

8    effectively to conduct this litigation is minimal because the outside counsel it has

9    hired are well-qualified to handle this case.  Netflix's version of the proposed

10    Protective Order is therefore appropriate.

11           19.    Courts have recognized that there is an inherent risk that in-

12    house counsel may disclose confidential information inadvertently because of the

13    nature of their job.  *Brown Bag*, 960 F.2d at 1471; *see also U.S. Steel Corp. v.*

14    *United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984).  This concern is only

15    heightened by the fact that Blockbuster apparently intends to allow Mr. Stevenson

16    to have access to Netflix's competitively sensitive information at his Dallas office,

17    Blockbuster's corporate headquarters: its proposed protective order allows those

18    documents to be seen not only by Mr. Stevenson, but also in-house "paralegals"

19    and "secretaries."  Blockbuster's Proposed Order ¶ 7.b.  It is difficult to say who

20    might access or copy Netflix's most sensitive documents when they sit on the

21    desks, copy machines, or computers used by Mr. Stevenson and Blockbuster's

22    unidentified paralegals and secretaries.  But it is easy to understand that allowing

23    Mr. Stevenson and Blockbuster's support personnel access to those documents

24    creates a risk of inadvertent disclosure that otherwise would not exist, and would

25    never be discovered by Netflix were it to occur.[3]

26    ///

27    _____

28    [3] This is undoubtedly one reason that the litigants in *Brown Bag* kept their sensitive documents "in a locked file cabinet."  *Brown Bag*, 960 F.2d at 1470.

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP
                                    9             JOINT STIPULATION RE PROTECTIVE
                                                       ORDER C 06 2361 WHA

20.    In order to determine whether in-house access to highly sensitive documents is appropriate, courts generally consider whether the person concerned is involved in "competitive decision making." "The term 'competitive decision making' is 'shorthand for a counsel's activities, association and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor.'" *Intel Corp. v. Via Technologies, Inc.*, 198 F.R.D. 525, 529 (N.D. Cal. 2000) (citing *U.S. Steel*); *Brown Bag*, 960 F.2d at 1470. Blockbuster has represented to Netflix's counsel that Mr. Stevenson is a senior litigation counsel for Blockbuster, responsible for supervising and conducting litigation on behalf of Blockbuster. Blockbuster has made no representation that Mr. Stevenson and his support personnel do nothing more than supervise litigation, or that they are not involved with persons who do. Blockbuster has not informed Netflix of the person(s) to whom Mr. Stevenson and his support personnel report, whether he reports to the Board of Directors, or whether any mechanisms exist to create a "Chinese wall" between Blockbuster's decisionmakers on the one hand, and Mr. Stevenson and his support personnel who will have access to Netflix's most sensitive competitive information on the other.

21.    On these facts, *Intel* provides a road map for the proper decision. There, plaintiff sought to allow the disclosure of confidential information to a senior attorney in its litigation group, Ms. Fu. As with Mr. Stevenson, her responsibilities included managing "intellectual property litigation as well as other general commercial litigation and legal disputes." *Intel*, 198 F.R.D. at 529-30. Ms. Fu, however, also was involved in intellectual property licensing, to the "extent that it resolves litigation or a legal dispute." Ms. Fu also was "actively involved in negotiating the terms of licensing agreements as part of settling lawsuits." The *Intel* court noted that Via's licensing agreements, technical

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

10

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1    information, and marketing materials would be produced in discovery, that Ms.

2    Fu's access to and knowledge of this information "would be directly relevant to

3    her evaluation of licensing agreements of related products of Intel," and that

4    "[c]onfidential information in this case may provide Intel a competitive advantage

5    in negotiating relating licenses in the future." 198 F.R.D. at 529-30. Moreover,

6    Ms. Fu interfaced with internal business personnel in the course of evaluating and

7    negotiating license agreements. Thus, to the extent that a license agreement

8    involved any information covered by the protective order, her knowledge of the

9    confidential information would necessarily influence the negotiations, as well as

10   any advice that she rendered about the license. *Id.* The court concluded,

11   therefore, that even though Ms. Fu's job scope was only to manage general

12   commercial and intellectual property litigation, that necessarily involved her in

13   competitive decision-making and presented a unacceptable risk of inadvertent

14   disclosure. *Id.* at 530.

15       22.    Blockbuster has provided few specifics regarding Mr.

16   Stevenson's job responsibilities, let alone where they end. It has provided no

17   information regarding the responsibilities of the support personnel at Blockbuster

18   to whom it proposes to provide access to Netflix's sensitive information. But,

19   even assuming all that Mr. Stevenson does and will do is manage litigation, like

20   Ms. Fu he presumably negotiates settlement agreements on behalf of Blockbuster.

21   In that role, like Ms. Fu, he will likely interface with internal business personnel in

22   the course of evaluating and negotiating license agreements, and his knowledge of

23   Netflix's confidential information would necessarily influence the negotiations, as

24   well as any advice that he rendered about any license. Mr. Stevenson may also be

25   called upon to take on other legal tasks for Blockbuster relating to patent

26   evaluation or other competitive aspects of Blockbuster's business, the

27   performance of which would be influenced by his knowledge of Netflix's

28   confidential information -- information that he cannot simply "lock-up . . . in his

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

11

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1    mind." *Brown Bag*, 960 F.2d at 1471.  And there is no guarantee that Mr.

2    Stevenson will remain in his current position as in-house counsel to Blockbuster

3    indefinitely.  If his responsibilities are changed to encompass more business

4    duties, he will not be able simply to forget what he has learned about Netflix's

5    competitively sensitive information.  These concerns apply with as much or more

6    force to the unidentified support personnel whom Blockbuster insists should have

7    access to Netflix's confidential and trade secret information.

8            23.    The direct competition between Blockbuster and Netflix makes

9    the consequences of potential inadvertent disclosure significant.  "Even a

10   seemingly insignificant risk of disclosure cannot be ignored due to the threat of

11   significant potential injury." *Intel*, 198 F.R.D. at 531.  In *Intel*, this Court

12   considered Intel's request to allow Intel's in-house counsel to view Via's

13   confidential and highly confidential "Attorney's Eyes Only" documents.  *Id.* at

14   527.  It explained the potential injury that would result from disclosure:

15               Intel and Via are direct competitors, and confidential

16               information about products that compete against each

17               other in the market will be involved in this litigation . . .

18               Disclosure of trade secrets to Intel of Via's competing

19               products and Via's marketing information, strategies, and

20               customer related data could have dire consequences for

21               Via.

22   *Id.* at 531.  So too here.

23           24.    There exists little or no prejudice to Blockbuster that might

24   outweigh the serious risk to Netflix from disclosure or misuse of its most

25   sensitive, confidential business information.  Blockbuster is represented in this

26   litigation by Alschuler Grossman Stein & Kahan LLP ("Alschuler") of Santa

27   Monica, California.  Alschuler markets itself as having particular expertise with

28   patent litigation.  The firm's website states:

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

                                    12              JOINT STIPULATION RE PROTECTIVE
                                                    ORDER C 06 2361 WHA

1  Alschuler Grossman Stein & Kahan LLP understands that

2  a business's most prized assets frequently are its

3  inventions, good name, the manner in which its products

4  and services are identified in the marketplace, customer

5  and other confidential information that give it an edge

6  over its competitors, and related intangibles. We know

7  how to protect these intangible assets, from the U.S.

8  Patent and Trademark Office to the manufacturing plant

9  and to the courtroom, and from the United States to

10  Canada, Mexico, and around the world.[4]

11      25.    Blockbuster's lead counsel, Marshall Grossman, presents

12  himself as having experience in high-profile patent litigation.  His biography on

13  Alschuler's website states that he "represented Apple Computer, Inc. and Packard

14  Bell NEC, Inc. in defense of patent infringement and Lanham Act litigation,

15  including the highly publicized battle between Compaq and Packard Bell."[5]  And

16  Bill O'Brien, who also appears on the pleadings on behalf of Blockbuster, has

17  significant experience litigating patent disputes.[6]  Plainly, Blockbuster's outside

18  counsel are competent, to say the least, with respect to intellectual property

19  litigation.  Alschuler attorneys will have unrestricted access to all confidential

20  information produced by Netflix and can advise Blockbuster regarding the steps it

21  should take in this litigation without the need to reveal the substance of Netflix's

22  "Attorneys' Eyes Only" information.  Nor will Alschuler need specialized

23  [4] *See* http://www.agsk.com/showarea.aspx?Show=69.
    [5] *See* http://www.agsk.com/showbio.aspx?Show=63.

24  [6] The firm's website states:

25      "Bill O'Brien is a partner in Alschuler Grossman Stein & Kahan
        LLP's Intellectual Property and Patent Litigation Groups. He has

26      extensive experience in complex litigation involving patents,
        trademarks, trade dress, trade secrets, copyrights, and other intellectual

27      property. . . . [Bill acted] as trial counsel in one of the largest patent
        infringement proceedings ever conducted by the U.S. International

28      Trade Commission . . . ."
    *See* http://www.agsk.com/showbio.aspx?Show=150.

1    technical information from in-house counsel as might occur in some cases, as the

2    patents here involve business methods and systems for implementing them.

3           26.     Accordingly, as in *Intel* and other similar cases, Blockbuster's

4    in-house counsel should be denied access to Netflix's "Attorney's Eyes Only"

5    documents.  *See Brown Bag*, 960 F.2d at 1471 (holding that the district court did

6    not abuse its discretion in refusing in-house counsel access where in-house

7    counsel was a competitive decision maker); *United States v. Dentsply Int'l, Inc.*,

8    187 F.R.D. 152, 162 (D. Del. 1999) (denying in-house counsel access to

9    confidential documents); *Sullivan Mktg., Inc. v. Valassis Comms., Inc.*, No. 93

10   Civ. 6350, 1994 U.S. Dist. LEXIS 824 at *9 (S.D.N.Y. May 5, 1994) (refusing to

11   permit in-house counsel to view confidential information when prejudice to

12   litigant from that decision was small).[7]  Instead, Netflix's proposed protective

13   order for attorneys' eyes only information should be entered.  Under Netflix's

14   proposed order, those at Blockbuster who need to know may have access both to

15   non-confidential and confidential Netflix information, but only outside counsel

16   may access attorneys' eyes only information.  Further, the order provides for

17   modification by the parties if need be.  *See* Netflix's Proposed Order ¶ 7.e.

18

19   _____

[7] Blockbuster may seek to reassure the Court that, despite the possibility of
20   disclosure created by Mr. Stevenson's access to this information, he is of the
     highest professional integrity and would strive to maintain the confidentiality of
21   information.  Courts confronting this issue head-on have held that this is not a
     solution:

22           [Such] good intentions are insufficient to prevent
             inadvertent disclosure of confidential information because
23           it is not possible for counsel to 'lock-up trade secrets in
             [his/her] mind,' as the court in Brown Bag observed.  In
24           that case, counsel's promise to maintain the
             confidentiality of the information coupled with a promise
25           to keep the information locked up was held to be
             insufficient to offset the risk of inadvertent disclosure.
     *Intel*, 198 F.R.D. at 531 (quoting *Brown Bag*, 960 F.2d at 1471-77) (emphasis
26   added); *see also U.S. Steel*, 730 F.2d at 1467 (highly confidential information is
     "intermixed with nonconfidential information, . . . [and] its nature and volume place
27   it beyond the capacity of anyone to retain [it] in a consciously separate category"
     such that it is "humanly impossible to control the inadvertent disclosure of some of
28   this information in any prolonged working relationship").

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

14                                    JOINT STIPULATION RE PROTECTIVE
                                      ORDER C 06 2361 WHA

C.    **Blockbuster's Response to Netflix's Statement**

27.    Netflix ignores Blockbuster's need – and right – to control the work of its outside counsel on important, high-profile, and costly litigation.  The crucial issue raised by Netflix's attempt to exclude Blockbuster's in-house counsel from any access whatsoever to "Attorneys Eyes Only" information is not the "competen[ce]" of Blockbuster's outside counsel but whether Blockbuster should be denied access to information necessary to participate in such important functions as making strategic and tactical decisions about the litigation, reviewing and editing drafts of court filings, attending depositions, and reviewing and approving fees of outside counsel, consultants, and expert witnesses.  Netflix's statement fails to provide any adequate justification for refusing to permit even a single Blockbuster in-house attorney to have access to the information needed for these legitimate and important purposes.

28.    Netflix indulges in a wild irrelevancy by invoking California Code of Civil Procedure § 2019.210, which requires trade-secret plaintiffs to identify an allegedly misappropriated trade secret before obtaining discovery on a trade-secret claim.  Netflix provides no explanation of how § 2019.210 could possibly apply to this case.  (*See* ¶ 16, *supra* (admission by Netflix that "there are no trade secret misappropriation claims alleged in this case . . . .")  Further, if § 2019.210 somehow did apply, it would limit only discovery by Netflix – the intellectual property plaintiff here – and not by Blockbuster.

29.    Netflix posits another nonexistent issue when it conjures up images of "Netflix's most sensitive documents . . . sit[ting] on . . . desks, copy machines, or computers . . . ."  (¶ 19, *supra*.)  To begin with, the sole Blockbuster in-house attorney who would be authorized to receive "Attorneys Eyes Only" information, Bryan P. Stevenson, does not intend to receive or review most "Attorneys Eyes Only" documents, such as routine document productions by Netflix for third-parties.  (Stevenson Decl. ¶ 3 (to be filed concurrently with this

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

15

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1    Joint Stipulation).)  Instead, Mr. Stevenson needs personal access to selected,

2    important documents that may contain information designated "Attorneys Eyes

3    Only," such as Blockbuster and Netflix's court filings and important deposition

4    testimony.  (*Id.* ¶ 4.)  Any such documents in Mr. Stevenson's possession will be

5    appropriately handled and stored so that they are seen only by him and by

6    paralegals and support staff working under his direction and will not be shared

7    with any other Blockbuster personnel.  (*Id.* ¶ 7.)[8]  Mr. Stevenson also needs to be

8    able to discuss all aspects of the case with Blockbuster's outside counsel –

9    including all significant issues, evidence, and testimony, even if designated

10   "Attorneys Eyes Only."  (*Id.* ¶ 4.)

11           30.    Access to such information is vitally important to permit

12   Mr. Stevenson to fully understand and fully participate in important functions such

13   as strategic and tactical decision-making, preparation of court filings, and the

14   taking of depositions and other discovery.  (*Id.* ¶ 5.)  Being unable to review court

15   filings in their entirety, attend important depositions, and read transcripts of

16   important testimony in full would have a highly detrimental impact on

17   Mr. Stevenson's ability to carry out his duty to his client and its shareholders to

18   exercise direction and control over this case.  (*Id.* ¶¶ 3-4.)  Without such

19   information, he would also be deprived of information relevant to his review and

20   approval of legal and expert fees.  (*Id.* ¶ 5.)

21           31.    Mr. Stevenson is a litigation attorney with a background in

22   general commercial litigation.  He is not a Registered Patent Attorney.  (*Id.* ¶ 2.)

23   He is not responsible for "competitive decision making" functions such as

24   designing products, setting prices, conceiving marketing campaigns, or making

25   hiring decisions outside the legal department.  (*Id.*)  Other Blockbuster attorneys

26

27   ──────────────
     [8] Netflix has never proposed any special provisions related to use of filing cabinets,
28   copy machines, or the like by Mr. Stevenson, nor is there any need for such
     restrictions.

1    are assigned to handle business transactions and intellectual property prosecution

2    for the Company.  (*Id.*)

3         32.    Under these circumstances, allowing Mr. Stevenson access to

4    "AEO" information is not only reasonable and appropriate but consistent with

5    decisions of other courts that have analyzed similar situations.  *See Volvo*, 187

6    F.R.D. at 241-45 (permitting in-house litigation counsel the same access to trade

7    secrets and confidential information as outside counsel); *Fluke*, 1994 WL 739705

8    at *4-*5 (same); *Amgen*, 160 F.R.D. at 139 (W.D. Wash. 1994) (same).

9         33.    Contrary to Netflix's assertion, no "roadmap" is provided by

10   *Intel Corp. v. VIA Technologies, Inc.*, 198 F.R.D. 525, 529 (N.D. Cal. 2000) (*cited

11   in* ¶¶ 20, 21, 23, 26, *supra*).  On the contrary, *Intel* involved a completely

12   different procedural situation than the one here.  In *Intel*, there was already a

13   stipulated protective order governing access to confidential information.  The

14   court held that *Intel* had failed to meet the burden of showing the need for a

15   change in that existing order.  *See Intel*, 198 F.R.D. at 528 ("To modify a

16   protective order a party must establish good cause by demonstrating how the

17   protective order will prejudice the party's case."  (citing *Brown Bag Software v.*

18   *Symantec Corp.*, 960 F.2d 1465, 1472 (9th Cir.1992)).)  In contrast, the present

19   Joint Stipulation involves establishment of a protective order for the first time, not

20   modification of an existing protective order.  Netflix, as the party proposing to

21   impose restrictions on access to information, bears the burden of showing the

22   appropriateness of such restrictions.  *See* Fed.R.Civ.P. 26(c)(protective orders

23   should issue "for good cause shown" and when "justice [so] requires").)  Netflix

24   has failed to make any such showing.  The Court should adopt Blockbuster's

25   narrowly tailored provision allowing only one Blockbuster in-house litigation

26   attorney access to "AEO" information.

27   ///

28   ///

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

17

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1

**D.    Netflix's Response to Blockbuster Statement**

2          34.    Netflix's direct competitor -- Blockbuster -- has provided no

3    justification sufficient to warrant an order allowing Mr. Stevenson and

4    Blockbuster's in-house paralegals and secretaries to possess and review Netflix's

5    most competitively sensitive information.  As an initial matter, Blockbuster has

6    not provided a sworn statement by Mr. Stevenson (let alone its unidentified

7    support personnel) that he (or they) do not participate in any competitive

8    decisionmaking, or matters relating to intellectual property, such as patent

9    prosecutions.  Nor has Blockbuster provided any declaration to support its other

10   claims, such as that its in-house staff has had access to Attorneys Eyes Only

11   information in previous cases "without problems."  Instead, Blockbuster provides

12   the Court with only the most general attorney argument.  Blockbuster's failure to

13   provide any evidentiary support for an order permitting in-house access to its

14   competitor Netflix's most competitively sensitive information is reason enough to

15   adopt Netflix's proposed Protective Order.

16          35.    Even Blockbuster's conclusory justifications for permitting

17   Netflix's most sensitive information to enter its competitor's house, and

18   Blockbuster's legal staff's memories, are woefully insufficient.  To begin, the

19   mere fact that Mr. Stevenson is "a court officer subject to the same ethical and

20   professional strictures as outside counsel"[9] was held by this Court in *Intel* to be

21   insufficient to ensure against inadvertent disclosure or use of its opponent's

22   competitively sensitive information.  Once Mr. Stevenson or his staff have been

23   exposed to Netflix's information, the bell cannot be unrung.  For example, even

24   should he confine his duties to those performed by an in-house litigation director,

25   such as negotiating licensing agreements or comparable arrangements when

26   settling cases, Mr. Stevenson may, at least subconsciously, take Netflix's

27   ─────────────
[9] Of course, the secretaries and paralegals with whom Blockbuster apparently also

28   wishes to share Netflix's competitively sensitive information are not officers of the
     court.

1   competitively sensitive information into account when performing such activities.

2   Blockbuster, moreover, has not foreclosed the possibility that Mr. Stevenson and

3   its other in-house personnel may perform other tasks of a corporate or

4   transactional nature in the course of Blockbuster's business and competition with

5   Netflix -- where knowledge of Netflix's most confidential information may be put

6   to use.

7       36.    Blockbuster's counsel also baldly assert that it would be

8   "impossible for Blockbuster to fully participate in important decisions" about this

9   litigation without Mr. Stevenson and its in-house staff having access to Netflix's

10  most sensitive information.  Yet Blockbuster has given no reason why this would

11  be impossible, nor why Mr. Stevenson has any "vital need" to possess and review

12  Netflix's competitively sensitive information.  Blockbuster's position amounts to

13  an argument that *in every litigation*, in-house counsel must be provided a copy of

14  its opponent's highly confidential information in order to assist outside counsel.

15  This is simply not true as a matter of law, as held by the courts in the *Intel*, *Brown*

16  *Bag*, *Dentsply*, and *Sullivan Marketing* cases cited by Netflix in its opening

17  statement. [10]

---

18  [10] Blockbuster's position that in-house counsel must be given access to attorneys'
    eyes only documents in every litigation is also disproven by protective orders that
19  have previously been entered by this Court in case after case.  *See, e.g.*, Stipulated
    Protective Order at ¶ 3.2, *Matsushita Elec. Indus. Co. v. Siliconix Inc.*, No. C 06-
20  01953 WHA (N.D. Cal. entered July 17, 2006) (Docket Index 36) (Alsup, J.);
    Stipulation and Protective Order at ¶ 7, *Yamashita, et al. v. Wilbur Ellis Co.*, No.
21  06-01690 WHA (N.D. Cal. entered June 13, 2006) (Docket Index 84) (Alsup, J.);
    Stipulated Protective Order at ¶ 3.2, *Siliconix Inc. v. Denso Corp.*, No. 05-01507
22  WHA (N.D. Cal. entered Feb. 14, 2006) (Docket Index 68) (Alsup, J.); Stipulated
    Protective Order at ¶ 7.3, *Chiron Corp. v. SourceCF, Inc., et al.*, No. C 05-01938
23  WHA (N.D. Cal. entered Jan. 17, 2006) (Docket Index 74) (Alsup, J.); Stipulated
    Protective Order at ¶ 7.3, *General Nanotechnology, LLC v. KLA-Tencor Corp., et*
24  *al.*, No. C 05-01403 WHA (N.D. Cal. entered Dec. 1, 2005) (Docket Index 65)
    (Alsup, J.); Stipulated Protective Order at ¶ 4, *Taiwan Semiconductor Mfg. Co. v.*
25  *Semiconductor Mfg. Int'l Corp., et al.*, No. C-03-5761 MMC (N.D. Cal. entered
    July 15, 2004) (Docket Index 104) (Spero, J.); Stipulated Protective Order at ¶ 5,
26  *FCI USA, Inc., et al. v. Hon Hai Precision Indus. Co., et al.*, No. C-03-4519 JCS
    (N.D. Cal. entered Feb. 23, 2004) (Docket Index 44) (Spero, J.); Stipulated
27  Protective Order at ¶ 1, *Keytrak v. Key Register, et al.*, No. C-03-00870 WHA
    (N.D. Cal. entered 9/17/03) (Docket Index 166) (Alsup, J.); Stipulated Protective
28  Order at ¶ 4(c), *Quantum Corp. v. Storage Tech. Corp.*, No. 03-1588 (WHA) (N.D.

---

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

37.    Blockbuster's cited cases from other jurisdictions do nothing to help it; the party seeking access by its in-house counsel in each of the cited cases had provided evidence sufficient for the court to conclude that the in-house attorney having access to the documents was not engaged in competitive decisionmaking.  *See, e.g.*, *Volvo Penta v. Brunswick Corp.*, 187 F.R.D. 240, 241 (E.D. Va. 1999) (noting that "the Court cannot overlook the unrebutted and sworn assertions that Ms. Behnia has no role whatsoever in Brunswick's competitive decisionmaking"); *Amgen, Inc. v. Elanex Pharms., Inc.*, 160 F.R.D. 134, 139 (W.D. Wash. 1994) (referring to affidavits in support of request to share highly confidential documents with in-house counsel); *Fluke Corp. v. Fine Instrum. Corp.*, No. C94-573C, 1994 U.S. Dist. LEXIS 16286, at *16 (W.D. Wash. Oct. 6, 1994) (finding case similar to *Amgen* because counsel at issue was "not involved in competitive decision-making").  Here, Blockbuster did not provide any sworn information about Mr. Stevenson's responsibilities with its initial submission. Moreover, each case must further be determined by balancing in-house counsel's asserted need to possess and review the adversary's confidential information against the risk that such information may be disclosed or misused by in-house personnel, or other personnel who might learn of it.

38.    To be sure, the stakes are high for Blockbuster in this case, though not so high as to warrant the exaggerated claim that Netflix "is essentially attempting to shut down the entire online business unit of Blockbuster."  Rather, Netflix is attempting to enforce its patents, which claim the *particular methods* of conducting an online rental business that Netflix invented, not all online rental methods. [11]  At the same time as Blockbuster has failed to articulate any need for

Cal. entered 9/17/03) (Docket Index 35) (Alsup, J.); Stipulation and Protective Order at ¶ 7, *Camelbak Prods., Inc. v. Blackhawk Indus., Inc.*, No. 3:01-cv-01491-WHA (N.D. Cal. entered July 10, 2001) (Docket Index 24) (Alsup, J.).
[11] Blockbuster blatantly copied Netflix's patented methods when Netflix's online business began making inroads into the brick-and-mortar in-store video rental business that Blockbuster has dominated for years.

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

20

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1    its in-house counsel to review Netflix's competitively sensitive information, it is

2    hard even to imagine one.  Whether Blockbuster infringes Netflix's method

3    patents will be proved, in part, from the face of Blockbuster's website which

4    describes and implements its online rental methods, and from Blockbuster's own

5    documents -- neither of which require Blockbuster's counsel to review Netflix

6    information.  If whether Netflix practices its own patented methods of doing

7    business is put in issue, that also can be determined largely from a review of

8    Netflix's public website, where its patented business methods are described and

9    carried out.  Blockbuster's in-house legal personnel have *no* need, let alone a vital

10   need, to review Netflix's source code or other internal business operation

11   information to assist Blockbuster's outside counsel regarding that issue.  Even

12   Blockbuster's allegations of inequitable conduct and *Walker Process* antitrust

13   violations will not turn on highly confidential Netflix materials; these claims are

14   rooted in the contention that Netflix did not disclose certain prior art to the PTO,

15   which by definition involves public material.

16          39.    In short, Blockbuster has articulated no need, and certainly no

17   "vital need," why Mr. Stevenson and its in-house personnel should receive and

18   review Netflix's competitively sensitive information, and Netflix cannot conceive

19   of any such need.  Should such a need arise, however, Netflix's proposed order

20   allows in ¶ 7.e for the modification of the Protective Order to permit access by

21   Blockbuster's in-house counsel to the needed information.  But such in-house

22   access to all of Netflix's most sensitive information should not be permitted on a

23   wholesale basis from the outset.  And contrary to Blockbuster's assertion, there

24   are no "special safeguards" in ¶ 7.a of Blockbuster's proposed Protective Order, or

25   in any other subparagraph, that would ensure against the inadvertent, in-house

26   disclosure or misuse of Netflix's most sensitive information.

27   ///

28   ///

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

21                JOINT STIPULATION RE PROTECTIVE
                  ORDER C 06 2361 WHA

# V    STATEMENTS REGARDING RESTRICTIONS ON SOURCE CODE

## A.    Netflix's Statement

40.    The parties have not been able to agree regarding how source code will be handled under the protective order.  Source code may or may not become relevant to the issues in this case; the patent claims do not involve source code and there are likely documents other than source code that could prove whether the patented methods and systems at issue in this case are being practiced by each of the parties.  But the parties' respective document requests embrace source code, and to the extent it is eventually produced, the ground rules under which it will be kept and accessed should clearly be defined at the outset. Netflix's source code contains details regarding the particular manner in which Netflix's computer programmers have chosen to craft the programs that implement Netflix's business methods; the source code is far more detailed than any claim or claim element described in the patents in suit.  Netflix's source code is extremely sensitive, in that it helps create a competitive advantage for Netflix in terms of operating efficiency and user experience; that advantage would be lost if the code were known to a competitor.  *See* Falla Decl. ¶ 8.  To the extent that Blockbuster, the alleged infringer in this case, has any need for its expert to inspect Netflix's source code, that need must be balanced against the highly sensitive nature of the source code, which (especially in its native format) can be copied to create the basis for an exact duplicate of what Netflix has spent so much time and effort creating.  Netflix's proposed protective order protects both parties' source code that might be produced in the litigation by providing that the native version of the source code shall only be available at a specified location, and that the parties shall not be permitted to print out or otherwise create copies of the source code without permission from the producing party, or by order of the Court.

///

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

22

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

41.    Courts routinely enter protective orders containing restrictions above and beyond those accorded to attorneys' eyes only information to prevent disclosure of source code. *See, e.g.*, *Collaboration Props. v. Tandberg ASA*, No. C 05-01940 MHP, 2006 U.S. Dist. LEXIS 13966, at *1 (N.D. Cal. March 28, 2006); *Northrop v. Inventive Comms., L.L.C.*, 199 F.R.D. 334 (D. Neb. 2000). This Court in *Collaboration Properties* granted a motion to compel the production of source code, subject to the submission of a suitable protective order. The Court found that the protective order proposed by the plaintiff provided for an "excessive" number (three) of electronic copies of source code to be produced and therefore held that "[a] single electronic copy is sufficient." *Id.* The Court further held that the copy of that source code should be placed onto the hard drive of a non-networked computer. *See also* Confidentiality Stipulation and Proposed Order, *BTG International Inc. v. Amazon.com, et al.*, No. 04-1264-SLR, at ¶ 14.a (D. Del. entered 6/28/05) (Docket Index 148) (requiring that source code be accessed only on a stand-alone computer maintained by an independent escrow agent). These restrictions are quite similar to the restrictions that Netflix has proffered in its Proposed Protective Order; namely, that a single electronic copy of any source code that is produced be made available on a stand-alone computer.

42.    In *Northrup*, which also involved a motion to compel production of source code, the court implemented requirements for secure source code production that were arguably more stringent than those involved in *Collaboration Properties* and the *BTG* case, or those requested by Netflix. Specifically, the plaintiff was required to sign a restrictive covenant agreeing not to compete with the defendant during the pendency of the lawsuit, all appeals, and for one year thereafter. The *Northrup* court also required the plaintiff to post a $500,000 bond to be paid out if the plaintiff violated the protective order in the case or the restrictive covenant. *Id.* at 336. The orders in *Collaboration Properties*,

///

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

23

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

*Northrup*, and *BTG* provide strong support for affording stringent additional protections for highly sensitive, competitively valuable source code.

43.    Blockbuster has complained, however, that the prohibitions on printing out source code would require its experts to travel to its counsel's offices in order to use the source code and would prevent it from attaching the source code to motions and expert reports. But experts regularly meet with counsel at their offices, and the cost of having an expert travel is a small price to pay compared to the risk of native source code being lost or inadvertently disclosed when multiple copies are permitted to be made. As to the second argument, there is little reason why either party would need to attach source code to pleadings, as the subject matter of the case is infringement of method patents, not the precise structure of either party's source code. Should a need ever arise to attach source code to a pleading, the parties can either stipulate to a modification of the protective order, or seek a modification if they cannot agree. Until such an event ever arises, this Court should adopt Netflix's version of the Protective Order in order to safeguard the parties' respective source code.

## B.    Blockbuster's Statement

44.    Netflix proposed to go beyond the ample protections provided by both parties' proposed protective orders for information designated "Attorneys Eyes Only," by imposing additional, extremely onerous restrictions on all computer source code produced in discovery in this case. (*See* Ex. B, ¶ 8.) These additional restrictions are unnecessary and would make it extremely difficult – even impossible – for Blockbuster and its expert witnesses to perform the tasks necessary for preparation and presentation of this case.

45.    Blockbuster's proposed protective order already gives Netflix the ability to designate source code "Attorneys Eyes Only." Under the provisions of Blockbuster's protective order, access to source code so designated is limited to counsel, to witnesses shown to have authored the code or to have received it in the

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

24

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1    ordinary course of business, and to experts and consultants whose identities and

2    backgrounds are disclosed in advance.  (*See* Ex. A, ¶ 7.)

3            46.    Before disclosing "AEO" material to an outside expert, each

4    party would be required by Paragraph 7 of Blockbuster's proposed protective

5    order to provide ten working days' written notice to the attorneys for the other

6    side, including "a copy of such persons' *curriculum vitae* and . . . information

7    sufficient to determine such persons qualifications, current and prior business

8    affiliations, and any current or prior work performed for actual or potential

9    competitors of the Designating Party whose AEO Material is sought to be

10   disclosed . . . ."  (*See* Ex. A, ¶ 7.)  If a party objects to disclosure of "AEO"

11   information to an expert, no such disclosure will be permitted without a court

12   order or subsequent agreement.  (*Id*.)  If no objection is made, the party wishing to

13   disclose "AEO" material to an expert still must obtain a signed undertaking in the

14   form of Attachment A to the protective order and must provide a copy of the

15   completed and signed undertaking to opposing counsel.  (*Id*.)

16           47.    Netflix has accepted these same provisions as sufficient for the

17   protection of all "Attorneys Eyes Only" information, however sensitive, besides

18   source code.  (*See* Ex. B, ¶ 7.)  There is no reason why these agreed provisions are

19   not equally adequate to protect source code under the circumstances of this case.

20           48.    Given the subject matter under dispute and the nature of the

21   businesses conducted by Netflix and Blockbuster, the sensitivity of any source

22   code to be produced is not as high as it might be in other cases.  This is not a case

23   involving a claimed breakthrough in software technology that is being  protected

24   as a trade secret.  Instead, this case involves business method patents used in

25   ecommerce.  Netflix's patents do not assert that Netflix has accomplished a

26   breakthrough in the art of programming, but instead that Netflix is entitled to

27   patent protection on business methods that include such features as renting videos

28   on a subscription basis and allowing customers to list in order the videos they

1  would like to receive.  These are features that any programmer of ordinary skill

2  could readily implement.  Blockbuster has already invested millions of dollars in

3  developing software to perform the numerous functions involved in its online

4  rental business and has no need or incentive to copy code written by Netflix.

5  Further, any such copying would be prevented by the strict protections provided to

6  all "Attorneys Eyes Only" information in Blockbuster's proposed protective order.

7        49.    In addition to being unnecessary, Netflix's proposed restrictions

8  would be extremely burdensome and disruptive.  For example, Netflix would

9  impose a total ban on any printing out or copying of source code.  (*See* Ex. B, ¶ 8.)

10  Such a ban would make it virtually impossible for an expert to conduct a proper

11  analysis or to maintain a meaningful record of that analysis.

12        50.    The source code for operating a large scale online rental service

13  is massive and highly complex by virtue of its sheer scale.  Features and functions

14  of such programs may be extremely difficult to trace, analyze, and record, as

15  different segments of code interact and as code is revised, added, or deleted from

16  version to version.  Document productions in this case are likely to include, for

17  example, every version of Netflix's source code.  An expert charged with

18  searching for discrete features in such a mass of interrelated code may have to

19  study it for weeks, or even longer.  He or she cannot be expected to keep track of

20  this complex work by memory.  As a practical matter, merely keeping track of his

21  or her findings and being able to resume work at the beginning of each day will

22  require printing out and annotating relevant pages of code or cutting and pasting

23  relevant portions of the code into a master document – probably both.  Netflix's

24  proposed source code provisions, however, would prohibit both of these necessary

25  functions.

26        51.    Additionally, the restrictions imposed by Netflix would make it

27  difficult or even impossible to prepare expert reports, expert declarations, expert

28  testimony, and expert demonstrative exhibits required for this case.  In order to

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

26

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1    establish the facts concerning disputed issues related to source code, an expert will

2    be required to identify relevant portions of the code and to prepare a detailed

3    analysis of that code along with factual support for the analysis. Frequently, this

4    requires quoting from and appending portions of code that demonstrate that one

5    side is right and the other side is wrong about a disputed issue. If, for example,

6    Blockbuster contends that a certain version of Netflix code performed a certain

7    function in a certain way and Netflix contends that the code did not perform that

8    function – or performed it in a different way – the only way to equip the trier of

9    fact to resolve the issue on its merits will generally be for Blockbuster's expert to

10   quote the portion of the code that performs the disputed function and explain why

11   and how it does so. Netflix's proposed order, by banning printing and copying of

12   code, would prevent Blockbuster from effectively presenting its case.

13          52.    Netflix's proposed source code restrictions would also make it

14   impractical to take depositions about issues involving source code. Netflix's

15   proposed order would permit source code to be maintained only on a single stand-

16   alone computer located in the offices of counsel. If a witness being deposed at

17   any other location (for example, a Netflix inventor, employee, or former

18   employee, or a Netflix expert witness) testifies about Netflix's software, it would

19   be impossible for Blockbuster's counsel to effectively impeach or otherwise cross-

20   examine the witness using contradictory excerpts of the source code. Being

21   unable to print out or copy any portion of the source code, counsel would be faced

22   with the superhuman task of trying to remember specific code routines and

23   features in order to conduct a cross-examination.

24          53.    The restriction in Netflix's proposed order requiring that source

25   code be kept in a single computer at counsel's offices would also create severe and

26   unjustified logistical burdens. Any time that an expert is required to review source

27   code, he or she would be required to travel to counsel's office, likely from another

28   city or even across the country. This extremely inefficient process would be likely

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

27

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1    to impose enormous additional expenses, as well as numerous delays.  Whenever

2    any of Netflix's inventors, employees, or experts is deposed, or whenever

3    additional documents are received from Netflix, Blockbuster's counsel are likely

4    to have related questions about Netflix's source code.  If depositions are scheduled

5    close together – as is often the case – counsel may need this information quickly.

6    It would be highly unreasonable to require travel by Blockbuster's software

7    experts every time counsel has a question, no matter how small and easily

8    answered, about the source code.

9        **C.    Netflix's Response to Blockbuster Statement**

10        54.    The patent claims alleged to be infringed in this case describe

11    business methods for renting movie DVDs and comparable items, and computer

12    systems for carrying out the claimed methods, not source code.  For example,

13    Claim 1 of the '381 Patent describes:

14            a.    A computer-implemented method for renting movies to

15                customers, the method comprising:

16                providing electronic digital information that causes

17                one or more attributes of movies to be displayed;

18                establishing, in electronic digital form, from

19                electronic digital information received over the

20                Internet, a movie rental queue associated with a

21                customer comprising an ordered list indicating two

22                or more movies for renting to the customer;

23                causing to be delivered to the customer up to a

24                specified number of movies based upon the order of

25                the list;

26                in response to one or more delivery criteria being

27                satisfied, selecting another movie based upon the

28                order of the list and causing the selected movie to

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

28

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1          be delivered to the customer; and

2          in response to other electronic digital information

3          received from the customer over the Internet,

4          electronically updating the movie rental queue.

5    While Claim 44 describes a computer system for carrying out the steps of the

6    method recited in Claim 1, it does so at a comparably high level, nowhere near

7    describing source code.

8          55.    The parties apparently agree, therefore, as they must, that this

9    case will not turn on either side's in-depth analysis of the other's source code, or,

10   in the case of Claim 44 of the '381 Patent for example, on implementation details

11   more particularized than those claimed.[12]  Nevertheless, as Netflix noted in its

12   opening statement, both parties' document requests seek production of the other's

13   source code.  Indeed, Blockbuster goes so far as to state that it is likely to seek

14   "every version of Netflix's source code."

15         56.    While source code may be probative, it is highly sensitive,[13] and

16   its minimal relevance in this business methods case should be balanced against the

17   potential damage caused by the risk that it will be inadvertently revealed or

18   misused if additional safeguards are not provided, as they routinely are in cases in

19   which source code will be discovered.  Simply because the patents in this case do

20   not claim breakthroughs in source code, that does not mean that no

21   implementation or source code architecture breakthroughs are contained in

22   Netflix's source code (or Blockbuster's).  Mindful of this need for balancing,

23   Netflix has proposed additional, reasonable and reciprocal terms to safeguard each

24   side's source code.

25   ///

26   _____

27   [12] Blockbuster concedes that this "is not a case involving a claimed breakthrough in software technology."

28   [13] Indeed, Blockbuster claims in its opening statement of position that it has "invested millions of dollars in developing software" related to this case.

57.     In opposition, Blockbuster has conjured up a parade of horribles that it says could take place if source code is subjected to additional protections, from its experts not being able to create printouts or excerpts from Netflix's source code, to not being able to impeach a witness at deposition with those same printouts, to not being able to attach copies of the source code to motions papers when some hypothetical heated dispute arises about how a party's source code works.  The hypothetical problems that Blockbuster identifies would arise in any case in which special protections are granted to source code, and yet such protections are routinely granted, as demonstrated by the *Collaboration Properties*, *BTG*, and *Northrop* Protective Orders cited by Netflix, in some of which cases -- like *BTG* -- computer code was directly at issue.  Here, however, the hypothetical scenarios can hardly be squared with the reality of this case, where source code will play a very small role, if any, in this litigation, and where other documents can be used to establish whether Netflix's patented business methods are being infringed by Blockbuster or practiced by Netflix.

58.     In light of the marginal relevance of source code to this case, and the omnipresent possibility of competitive harm if source code is not properly protected, this Court should enter Netflix's proposed protective order safeguarding source code.  Should an actual need arise to print out source code for use at a deposition, or in expert reports, the parties surely can work cooperatively to resolve such a need.

## D.     Blockbuster's Response to Netflix's Statement

59.     Netflix's position with respect to the source code suffers from at least two fundamental flaws.  First, Netflix fails to show that its source code requires any special protections above those that it agrees are adequate for other "Attorneys Eyes Only" information.  Second, Netflix fails to acknowledge or accommodate the practical necessity for Blockbuster's experts to analyze source code, record the results of their analyses, prepare expert reports, prepare

1    declarations and exhibits and participate in other aspects of discovery, case

2    preparation, and trial.

3        60.    Netflix's citation to the Declaration of Charlotte Falla does

4    nothing to support its contention that special protection is required for source code

5    in this case.  Ms. Falla's declaration indicates that she is an attorney but fails to

6    identify her in any other respect.  The declaration fails to provide any basis, in

7    personal knowledge or otherwise, for Ms. Falla's statements about Netflix source

8    code.  The declaration does not even indicate whether Ms. Falla is employed by

9    Netflix.  It does not set forth – or even hint at – any circumstances that qualify

10    Ms. Falla to describe the source code or to make the statements about it that

11    appear in her declaration.

12        61.    As far as one can tell from her declaration, Ms. Falla has never

13    read a line of the source code and knows nothing about how Netflix's software

14    works or how Netflix's source code would or would not useful to Blockbuster or

15    any other person or entity.  Ms. Falla's references to Netflix's source code

16    providing "a competitive advantage in terms of operating efficiency and user

17    experience," and her assertion that this advantage would somehow "be lost if that

18    code were disclosed to a competitor" (Falla Dec. ¶ 8) are not only breathtakingly

19    vague but constitute unqualified opinions of someone who is apparently not a

20    software designer and provides no basis whatsoever for these assertions.  Her

21    testimony is inadmissible under Federal Rules of Evidence 602 and 701.  (*See*

22    Blockbuster's Objections to Falla Decl. ¶¶ 1-2 (to be filed concurrently).)

23        62.    The fundamental baselessness of Netflix's objections are

24    illustrated by its misplaced expression of concern about "the native version of the

25    source code . . . ." (¶ 40, *supra*.)  Netflix expresses special concern about this

26    supposed "native version," saying that "source code . . . (especially in its native

27    format) can be copied to create a basis for an exact duplicate of what Netflix has

28    spent so much time and effort creating." (*Id.*)  Netflix even goes so far as to imply

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

31                JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1    that the severe restrictions that it would impose on source code would apply only

2    to such "native" versions. (*See id.* ("Netflix's proposed protective order . . .

3    provid[es] that ***the native version*** of this source code shall only be available at a

4    specified location . . . ." (Emphasis added)).)

5         63.    In reality, Netflix's proposed protective order would impair the

6    ability of Blockbuster's counsel and expert witnesses to work with ***any*** source

7    code, not merely some "native version." (*See* Exhibit B, ¶ 8.) In fact, Netflix's

8    reference to a "native" version of source code makes no sense. "Native" code is

9    ***object*** code, not source code. "Source code and object code refer to the 'before'

10   and 'after' versions of a computer program that is compiled . . . before it is ready

11   to run in a computer." (Whatis.com, definition of "source code"

12   (http://searchwebservices.techtarget.com/sDefinition/0,290660,sid26_gci213030,0

13   0.html).) On the other hand, "Native code is computer programming (code) that is

14   compiled to run with a particular processor . . . and its set of instructions." (*Id.*,

15   definition of "native code" (http://searchwebservices.techtarget.com/sDefinition/

16   0,,sid26_gci871064,00.html); *see also id.* definition of "native"

17   (http://whatis.techtarget.com/definition/0,289893,sid9_gci212624,00.html).) In

18   other words, "native code" is inherently code that has already been compiled –

19   object code – rather than human-readable "source code." Netflix's expressed

20   concerns about "native" code are irrelevant to the severe restrictions that it is

21   attempting to impose source code.

22        64.    Moreover, Netflix's expressed concerns are highly unrealistic.

23   It is absurd to posit that, having spent millions of dollars for the creation of the

24   complete code for a major e-commerce business, Blockbuster would or could

25   somehow swap out all of that work for a verbatim copy of Netflix's code.

26        65.    The real issue with regard to source code in this case is, not

27   whether Blockbuster attorneys and experts will obtain access to some super-

28   sensitive form of "native" code, but whether they will be permitted to perform the

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

32

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1    basic functions necessary to analyze relevant aspects of Netflix's software, record

2    the results of their analyses as necessary for future use, and prepare expert reports,

3    declarations, exhibits, and testimony about relevant aspects of Netflix's software.

4    In order to perform these vital functions, Blockbuster's experts need to be able to

5    preserve the results of their searches of Netflix code by copying, printing out, and

6    annotating relevant portions of the code.  In order to prepare proper expert reports

7    setting forth their proposed testimony, the experts will have to quote or append

8    portions of code that perform disputed functions, and they will need to do the

9    same in order to prepare proper declarations and demonstrative exhibits as well as

10   to deliver their testimony.  By interfering with these vital functions, Netflix would

11   seriously impede Blockbuster's ability to develop and present its case, without

12   presenting any need or plausible justification for doing so.

13        66.    None of the cases cited by Netflix provides meaningful support

14   for its attempt to limit the development and presentation of Blockbuster's case.

15   *Northrop v. Inventive Comms., L.L.C.*, 199 F.R.D. 334 (D. Neb. 2000), involved

16   an extreme situation in which access to source code was to be provided to an

17   individual plaintiff, who was apparently engaged in the business of developing

18   software of that type.  This is completely different from the circumstances of our

19   case, where access to "Attorneys Eyes Only" information will be limited to

20   counsel and to designated experts.  As noted, Netflix will receive advance notice

21   of any expert to whom Blockbuster proposes to show "AEO" information, and

22   will have an opportunity to object.  (*See* Exh. A ¶ 7.)

23        67.    The unpublished orders cited by Netflix from the cases of

24   *Collaboration Props. v. Tandberg ASA*, No. C 05-01940 MHP, 2006 U.S. Dist.

25   LEXIS 13966, at *1 (N.D. Cal. March 28, 2006) and *BTG International Inc. v.*

26   *Amazon.com, et al.*, No. 04-1264-SLR, at ¶ 14.a (D. Del. entered 6/28/05) (Docket

27   Index 148) cannot be assessed in the absence of additional information about those

28   cases in the context of the orders in question.  *Collaboration Props.* appears to

1    have merely imposed a limit on making full electronic copies of the source code.

2    While Blockbuster sees no need for such a limit under the circumstances of this

3    case, the more important question is the ability of Blockbuster's attorneys and

4    experts to make partial copies as necessary to preserve and record their findings

5    and prepare expert reports, testimony, and exhibits.

6          68.    Netflix contradicts itself by saying, on the one hand, that "the

7    ground rules under which [source code] will be kept and accessed should clearly

8    be defined at the outset" (¶ 40, *supra*) and, on the other hand, arguing that

9    Blockbuster's ability to present testimony about Netflix's source code should be

10   left subject to some future order "[s]hould a need ever arise . . . ." (¶ 43, *supra*.)  It

11   would be inappropriate, unjust, and inefficient to impose an unduly restrictive

12   protective order on Blockbuster merely on the grounds that the restrictions could

13   be changed later.  The Court should reject the source code restrictions imposed by

14   Netflix.[14]

15   **VI    STATEMENTS REGARDING REPRESENTATIONS AS TO PATENT**

16   **PROSECUTION WORK**

17        A.    **Netflix's Statement**

18          69.    Netflix's request that the parties' outside counsel commit not to

19   engage in patent prosecution work on behalf of their clients is a reasonable

20   protection that ensures that both parties' highly sensitive information will not be

21   misused.  As discussed above, Netflix and Blockbuster directly compete with one

22   another.  Netflix has accused Blockbuster of willfully copying Netflix's patented

23   methods for the online rental of DVDs in order to dominate the online rental

---

24   [14] Netflix is mistaken in suggesting that "there is little reason why either party
25   would need to attach source code to pleadings, as the subject matter of the case is
     infringement of method patents, not the precise structure of either of either party's
     source code." (¶ 43, *supra*.)  As Netflix knows, Blockbuster's defenses include that
26   claims of Netflix patents are invalid under 35 U.S.C. § 112 ¶ 1 for failure to "set
     forth the best mode contemplated by the inventor of carrying out his invention."
27   The best mode defense provides one example of the importance of Netflix's source
     code for this case.  To the extent that Netflix's source code discloses "best modes"
28   that Netflix failed to include in its patent applications, its patents are invalid.

1   portion of the movie rental market, in addition to its dominance of the in-store

2   portion of the market.  Either of the two parties may seek to secure patents in that

3   area or related areas in the future, and Blockbuster is seeking to discover all of

4   Netflix's patent applications, past and present.  As discussed above, Blockbuster

5   has already submitted document requests that expressly call for materials relating

6   to patents for which Netflix has applied but have not yet been issued.  Those

7   requests therefore seek information that has not yet been publicly revealed on

8   Netflix's future patent plans.  Moreover, the patents at issue in this lawsuit are

9   business method patents, which describe how to provide a unique rental service

10  that consumers find appealing.  Therefore the sort of materials that will be

11  produced in this case -- materials that relate to issues such as consumer research

12  and preferences -- are also likely to be useful for, and highly relevant to,

13  Blockbuster's own patent prosecution activities, and how the claims of pending

14  and future patents might be shaped.  Outside counsel's exposure to the other

15  party's information that might be used for patent prosecution presents an

16  unacceptable risk that counsel may, even subconsciously, utilize what they have

17  learned should such counsel assist with future patent prosecution work on behalf

18  of their client.  Accordingly, outside counsel for each side should commit not to

19  become involved in the prosecution of patents on behalf of their clients for at least

20  a reasonable time period after the litigation has concluded.  Netflix proposes a two

21  year restriction.

22          70.    Magistrate Judge Larson previously ordered that just such a

23  provision be included in a protective order.  In *Chan v. Intuit, Inc.*, 218 F.R.D. 659

24  (N.D. Cal. 2003), the litigants disputed the necessity of a proposed provision in

25  the protective order preventing counsel in the litigation from giving their clients

26  advice about patent prosecution in the relevant fields for a period of two years

27  following completion of the litigation.  *See id.* at 661.  This Court considered

28  whether giving advice on the scope of claims that might be filed in the future was

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

35

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1    "sufficiently related to competitive decision-making to justify the restriction
2    imposed on counsels' future services to their clients," and concluded that it was.
3    The Court, therefore, ordered that "counsel who view confidential information
4    shall be restricted from patenting for a party for the pendency of the trial and for
5    two years after its conclusion." *Id.* at 662. Court after court has agreed that such
6    restrictions are appropriate. *See, e.g.*, *Andrx Pharms., LLC v. GlaxoSmithKline,*
7    *PLC*, 236 F.R.D. 583 (D. Del. 2006) (barring prosecution counsel from having
8    access to sensitive documents, and explaining that many "courts have determined
9    that advice related to patent prosecution and advice on the scope of patent claims
10   constitute competitive decision-making"); *Commissariat a l'Energie Atomique v.*
11   *Dell Computer Corp.*, No. 03-484-KAJ, 2004 U.S. Dist. LEXIS 12782, *8
12   (barring patent prosecution attorneys who had access to highly confidential
13   information from prosecuting patents in the field for a year after conclusion of the
14   litigation, because of the "high risk of inadvertent disclosure of the Defendants'
15   highly confidential information"); *Cummins-Allison Corp. v. Glory Ltd.*, No. 02 C
16   7008, 2003 U.S. Dist. LEXIS 23653, at *23 (N.D. Ill. Jan 2, 2004) (barring
17   counsel who review confidential information from prosecuting patents; "intimate
18   involvement in the shaping and revision of patent applications . . . provides for the
19   risk that patent counsel inadvertently will use information obtained from a party in
20   patent litigation in shaping the application").

21        71.    Blockbuster has failed to explain why it would need its litigation
22   counsel to prosecute patents on its behalf in the future, or why the commonplace
23   restriction against such activity is not appropriate in this case. The Court should
24   therefore adopt Netflix's proposed protective order.

25        **B.    Blockbuster's Statement**

26        72.    Blockbuster believes that the parenthetical representation in
27   Sub-Paragraph 7a of Netflix's proposed protective order concerning "patent
28   prosecution work" is unnecessary and inappropriate.

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

36

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

73.     Alschuler Grossman Stein & Kahan, LLP, is not presently engaged in the business of preparing patent applications, filing patent applications, or appearing as counsel of record at the United States Patent and Trademark Office for patent applications. Of the Alschuler Grossman Stein & Kahan attorneys who have appeared for Blockbuster in this case or who have regularly been involved in working on this case, only one, Tony D. Chen, is a registered patent attorney. Mr. Chen has not prepared, filed, or been counsel of record for any Blockbuster patent applications. It is not anticipated that Mr. Chen or any other Alschuler Grossman Stein & Kahan attorney will take on such a role in the future.

74.     Counsel are forbidden by Blockbuster's proposed protective order from using "Confidential" or "Attorneys Eyes Only" information for any purpose other than this litigation. There is no realistic danger that this prohibition will be violated, and there is no reason why the protections afforded by Blockbuster's proposed protective order are not sufficient under the circumstances of this case.

75.     In the communications between counsel leading up to this Joint Stipulation, Netflix has not identified any specific or realistic risk or misuse of confidential or "AEO" information for purposes of patent prosecution. For a party to seek a patent on features already used by the other party and disclosed by it in discovery would be prohibited and unethical but self-defeating. If such a patent ever issued, it would be invalid, and the patentee's violation of the protective order would be easily proven.

76.     The representation proposed by Netflix is troublingly vague. Netflix fails to define the term "patent prosecution work," which is unclear in ways that could lead to unforeseen consequences. For example, if litigation counsel became aware of prior art that needed to be submitted to prosecution counsel for possible disclosure in connection with a pending application, would

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

37

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

1  forwarding the art constitute "patent prosecution work"?

2          77.    Netflix's proposal is also extremely overbroad. Netflix includes

3  a sweeping representation about the future, with no temporal limit whatsoever.

4  Even one hundred years after this litigation has concluded, the parties' present law

5  firms (or perhaps their successors in interest) would have to beware of accepting

6  "patent prosecution work" from their respective clients (or, perhaps, the clients'

7  successors-in-interest).[15] Netflix's proposal is similarly overbroad in its failure to

8  place any restriction on the subject matter of the excluded "patent prosecution

9  work." Netflix's proposal is not even limited to patents for Blockbuster's online

10  business, although most of Blockbuster's business is conducted through thousands

11  of retail stores all around the country. Obtaining a patent on a new candy display

12  or on a popcorn vending machine for use in Blockbuster stores would be covered

13  by Netflix's proposed exclusion.

14          78.    The manner in which Netflix has framed its proposed restriction

15  is also problematical. Netflix proposes a representation by each law firm, but it is

16  not appropriate for a court order to recite representations that have not in fact been

17  made. Nor is it clear what the effect would be of reciting representations by

18  counsel about future events. In all these respects, Netflix's proposal is a highly

19  problematical solution to a non-existent problem. The Court should adopt

20  Blockbuster's proposed protective order.

21      **C.**    **Netflix's Response to Blockbuster Statement**

22          79.    Blockbuster's position on Netflix's requested restriction that

23  outside litigation counsel be prohibited from engaging in patent prosecution

24  activities for the parties is puzzling. Though admitting that its outside counsel of

25  record are "not presently engaged in the business of preparing patent applications,

26  filing patent applications, or appearing as counsel of record" in patent

27  

28  _____
[15] Blockbuster's counsel suggested that Netflix's counsel include a temporal limit, but they have declined to do so.

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

JOINT STIPULATION RE PROTECTIVE
ORDER C 06 2361 WHA

prosecutions, it nonetheless claims that the requested restriction is "inappropriate." One might ask why Blockbuster objects, given that prohibitions against patent prosecution by counsel who are exposed to competitively sensitive information have routinely been applied in the many other cases cited by Netflix in its opening statement, and the fact that Blockbuster's outside litigation counsel do not currently prosecute patents? The answer may be discerned from reports that Blockbuster's outside counsel is considering a merger with Cooley Godward LLP, a firm that does have an established patent prosecution practice, which firm might seek to engage in patent prosecution for Dallas-based Blockbuster in the future. *E.g.*, http://www.law.com/jsp/article.jsp?id=1156511802970. This possibility that part of a newly merged firm might need to refrain for a time from engaging in patent prosecution work from the client of its merger partner does not justify Blockbuster's objection to the limitation. Blockbuster's proposed order's prohibition on the use of confidential information "other than for purposes of this litigation" does not provide adequate protections, absent a time bar to patent prosecution. As with in-house counsel, outside counsel who later prosecute patents may inadvertently or subconsciously use the knowledge that they have learned through discovery in this case, without having any intention to violate the "litigation-only" term of the protective order.

80.     As for Blockbuster's hypothetical concerns about whether its outside counsel could properly send prior art references uncovered in the course of litigation to Blockbuster's patent prosecution counsel, that rhetorical question answers itself. If the prior art is publicly available (as nearly all such information must be in order to qualify as prior art), there would be nothing improper about sharing such art with Blockbuster's prosecution counsel. But, given litigation counsel's anticipated exposure to Netflix's most sensitive information, including some of Netflix's pending patent applications, outside counsel in this litigation

///

1    should not be keeping one eye on Netflix's sensitive information, and the other on

2    Blockbuster's prosecution of its patents.

3        81.    With respect to Blockbuster's insistence that it could take no

4    advantage of exposure to Netflix's information in prosecuting Blockbuster's

5    patents, Netflix's concern does not simply involve the rote copying of patent

6    applications that have already been submitted, or of patented inventions that are

7    currently in use by Netflix.  Rather, given the vast array of information that

8    Blockbuster has sought in this litigation regarding Netflix's patent applications,

9    business plans, and consumer studies, access to this information would afford

10    Blockbuster important insight into the direction which it should take in

11    prosecuting its own patents, either to thwart Netflix's future plans, or to craft

12    interfering claims.

13        82.    Apparently realizing that restrictions should be (and typically

14    are) placed on patent prosecution activities,[16] Blockbuster complains that Netflix's

15    has not proposed a fields-of-endeavor limitation regarding its outside counsel's

16    prosecution of Blockbuster patents.  But Blockbuster has proposed none either,

17    and Netflix cannot contemplate any field-of-use for which Blockbuster might

18    apply for a patent in which its direct competitor's information, including Netflix's

19    patent prosecution strategy, would not prove useful.  A further problem with such

20    a limitation is that it requires speculation regarding what claims will be

21    encompassed within any field(s), and how Netflix's confidential information

22    _____

[16] That such restrictions are common is once more demonstrated by many
23    protective orders entered by this Court previously.  *See, e.g.*, Stipulated Protective
Order at ¶ 3.2, *Matsushita Elec. Indus. Co. v. Siliconix Inc.*, No. C 06-01953 WHA
24    (N.D. Cal. entered July 17, 2006) (Docket Index 36) (Alsup, J.); Stipulated
Protective Order at ¶ 3.2, *Siliconix Inc. v. Denso Corp.*, No. 05-01507 WHA (N.D.
25    Cal. entered Feb. 14, 2006) (Docket Index 68) (Alsup, J.); Stipulated Protective
Order at ¶ 7.3, *General Nanotechnology, LLC v. KLA-Tencor Corp., et al.*, No. C
26    05-01403 WHA (N.D. Cal. entered Dec. 1, 2005) (Docket Index 65) (Alsup, J.);
Stipulated Protective Order at ¶ 5, *FCI USA, Inc., et al. v. Hon Hai Precision Indus.
27    Co., et al.*, No. C-03-4519 JCS (N.D. Cal. entered Feb. 23, 2004) (Docket Index 44)
(Spero, J.); Stipulation and Protective Order at ¶ 7, *Camelbak Prods., Inc. v.
28    Blackhawk Indus., Inc.*, No. 3:01-cv-01491-WHA (N.D. Cal. entered July 10, 2001)
(Docket Index 24) (Alsup, J.)

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP
                                                                40              JOINT STIPULATION RE PROTECTIVE
                                                                                        ORDER C 06 2361 WHA

1   might be utilized, even inadvertently, in prosecuting such claims. Thus, Netflix

2   has proposed a two year temporal limitation on the restriction, rather than carving

3   out a field of use. Its proposed order is therefore appropriately limited, and should

4   be entered.

5         **D.**    **Blockbuster's Response to Netflix's Statement**

6         83.    In its statement of position, Netflix implicitly admits that its

7   proposed protective order would go too far by purporting to exclude "patent

8   prosecution work" for an infinite period of time and without any subject matter

9   restriction. Departing from its previous refusal to impose a time limit, Netflix

10  now refers to "a reasonable time period after the litigation has concluded." (¶ 49

11  *supra*.) For the first time, "Netflix proposes a two year restriction." (*Id.*)

12  However, Netflix's newly adopted two year restriction is nowhere to be found in

13  its proposed protective order. (*See* Exh. B ¶ 7a.)

14        84.    Moreover, Netflix's statement now focuses on "patents in [the]

15  area [of "online rental of DVDs"] or related areas . . . ." (¶ 60, *supra*.) Netflix's

16  proposed protective order, however, provides no field restriction whatsoever in its

17  exclusion of "patent prosecution work." As noted, even patenting of a popcorn

18  maker would be covered by Netflix's provision. (*See* Exh. B ¶ 7a.)

19        85.    More broadly, Netflix fails to provide any showing of

20  reasonable need for a restriction on "patent prosecution work." Of course,

21  everyone receiving "AEO" information would already be prohibited, under

22  Blockbuster's proposed protective order, from using that information for purposes

23  other than this litigation. Netflix presents no plausible scenario under which

24  Blockbuster's proposed protective order would not provide ample protection. (*See*

25  ¶ 60, *supra*.) Netflix refers to information about Netflix's pending patent

26  applications and "materials that relate to issues such as consumer research and

27  preferences . . . ." (*Id.*) But even apart from all of the protections accorded to

28  "Attorneys Eyes Only" information, it simply is not realistic to posit that

1   Blockbuster, having somehow learned of a pending Netflix patent application,

2   would belatedly attempt to patent the same subject matter itself.  Even in the

3   absence of any protective order at all, any such attempt would be futile, as Netflix

4   would demonstrably be the prior inventor, and since, under such circumstances,

5   Blockbuster would not qualify as an inventor at all.  *See e.g.*, 35 U.S.C. § 102.

6   Similarly, it is not realistic to suppose that, having learned of some consumer

7   preference reflected in consumer research materials produced by Netflix,

8   Blockbuster could or would attempt to patent the use of those results.  In addition

9   to being excessive and highly prejudicial, the special source-code restrictions

10   proposed by Netflix are simply unnecessary.

11   DATED: October 3, 2006          KEKER & VAN NEST, LLP

12

13                                    By_____/s/_____

14                                       Ashok Ramani
                                         Attorneys for Plaintiff and Counterdefendant,
15                                       Netflix, Inc.

16   DATED: October 3, 2006          ALSCHULER GROSSMAN STEIN & KAHAN
                                     LLP
17

18

19                                    By_____/s/_____
                                         William J. O'Brien
20                                       Attorneys for Defendant and Counterclaimant,
                                         Blockbuster Inc.

21

22

23

24

25

26

27

28

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

42          JOINT STIPULATION RE PROTECTIVE
            ORDER C 06 2361 WHA