1 | Alan Himmelfarb
LAW OFFICES OF ALAN HIMMELFARB
2 | 2757 Leonis Blvd
Los Angeles, CA 90058
3 | Telephone: (323) 585-8696
Fax: (323) 585-8198
4 | consumerlaw1@earthlink.net

5 | Scott A. Kamber
Ethan Preston
6 | KAMBER & ASSOCIATES, LLC
19 Fulton Street, Suite 400
7 | New York, NY 10038
Telephone: (877) 773-5469
8 | Fax: (212) 202-6364
skamber@kolaw.com
9 | epreston@kolaw.com

10 | *Counsel for proposed intervenor,
Dennis Dilbeck*

11

12 | **IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

13

14 | NETFLIX, INC. a Delaware corporation,     No. C 06 2361 WHA
                                              Judge William Alsup
15 |                 Plaintiff,                **(PROPOSED) COMPLAINT IN
                                              INTERVENTION**
16 | v.

17 | BLOCKBUSTER INC., a Delaware
     corporation, and DOES 1-50,

18 |                 Defendants.

19 | DENNIS DILBECK, an individual, on his
     own behalf and on behalf of all
20 | similarly situated,

21 |                 Plaintiff in Intervention

22 |         v.

23 | NETFLIX, INC. a Delaware corporation

24 |                 Defendant in Intervention.

25 | **DILBECK'S PROPOSED COMPLAINT IN INTERVENTION**

26 |         Dennis Dilbeck ("Dilbeck" or "Intervening Plaintiff"), for his complaint, alleges as

27 | follows upon information and belief, based upon, *inter alia*, investigation conducted by and

28 | through their attorneys, except as to those allegations pertaining to Intervening Plaintiff and his

Exhibit A to Motion for Leave to Intervene,          1                              06 2361
Proposed Complaint in Intervention

counsel personally, which are alleged upon knowledge:

## Nature of the Claim

1.    This is a national antitrust class action brought on behalf of a class of all persons and entities who subscribed to Netflix, Inc. ("Netflix" or "Defendant in Intervention"). The class action concerns two patents obtained by Netflix: U.S. Patent No. 6,584,450 (the "'450 Patent") and U.S. Patent No. 7,024,381 (the "'381 Patent"). The '450 Patent was issued on June 23, 2003 and the '381 Patent was issued on April 4, 2006.

2.    As further alleged below, these Patents were obtained by fraud on the Patent Office and the fraudulent concealment of prior art. Because prior art anticipates some or all of the claims in the the '450 and '381 Patents, and Netflix knew of this prior art, but failed to disclose it to the Patent Office, the '450 and '381 Patents are invalid and unenforceable. But for Netflix's fraud and fraudulent concealment, the Patent Office would have never issued either the '450 Patent or the '381 Patent.

3.    Through its control of the '450 and '381 Patents, Netflix monopolized the online DVD rental market by deterring other competitors from entering that market. But for the threat of liability for infringing on the '450 and '381 Patents, there would be more competition (and, hence better services and lower prices) in the online DVD rental market. The '450 and '381 Patents have deterred and continue to deter competitors and delay the introduction of competition in the market for online DVD rentals and related subscription services. As a consequence of Netflix's exclusion of competitors and constraint of competition, Dilbeck and the other class members have paid supracompetitive online DVD rental subscription rates to Netflix.

4.    To maintain its monopoly, Netflix has sued Blockbuster for allegedly infringing on the '450 and '381 Patents by operating its Blockbuster Online rental service ("Blockbuster Online"). The instant proceeding has had both the effect of impairing Blockbuster Online's competitive impact on the market and of deterring other competitors from entering the online DVD rental market. Blockbuster has counterclaimed for Sherman Act violations.

5.  Netflix's acts in obtaining and enforcing the '450 and '381 Patents to exclude and restrain competition constitute an unlawful trust prohibited under California's Cartwright Act. Netflix's use of the '450 and '381 Patents to delay, deter, and destroy competition in the online DVD rental market also established and maintained a monopoly prohibited under the Sherman Act.

6.  Netflix's actions violate the Sherman Act (15 U.S.C. § 2), California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16726), and California's unfair competition law (Cal. Bus. & Prof. Code § 17200). This lawsuit seeks remedies for consumers against Netflix's anticompetitive acts, including damages (and treble damages under the Sherman Act and the Cartwright Act), restitution, and other injunctive relief restraining Netflix from similar anticompetitive acts in the future under the Clayton Act (15 U.S.C. § 15, 26), the Cartwright Act (Cal. Bus. & Prof. Code § 16750), and the unfair competition law (Cal. Bus. & Prof. Code § 17203).

### Parties

7.  Dennis Dilbeck is a resident of Los Angeles, California. Dilbeck has been a Netflix subscriber since October 2002.

8.  Defendant Netflix, Inc. is a Delaware corporation which maintains its headquarters at 100 Winchester Circle, Los Gatos, CA 95032. Founded in 1999, Netflix claims to be the world's largest online DVD movie rental service. Netflix now claims to have 5.2 million subscribers.

### Jurisdiction and Venue

9.  Intervening Plaintiff asserts a claim under the Sherman Antitrust Act and seeks damages and injunctive remedies under the Clayton Act on behalf of himself and all others similarly situated. This Court has federal subject matter jurisdiction over this case under 28 U.S.C. § 1331.

10. The aggregate claims of Intervening Plaintiff and the proposed class members substantially exceed the sum or value of $5,000,000, and the proposed class members are scattered throughout the fifty states and other countries: there is diversity of citizenship

1
2      between proposed class members and Defendant in Intervention. This Court also has
       subject matter jurisdiction over this case under 28 U.S.C. § 1332(d).
3
4   11.  This Court has personal jurisdiction over the Defendant in Intervention under Cal. Code
       Civ. Proc. § 410.10 because Netflix maintains its corporate headquarters in, and the
5
       majority of acts alleged herein were committed in, California and, specifically, the
6
       Northern District of California.
7
8   12.  Venue is also proper before this Court under 28 U.S.C. § 1391(b)(1) ,(2), (c).

9                            **Intradistrict Assignment**

10  13.  This is an Intellectual Property Action subject to district-wide assignment under N.D.
       Cal. Civil L.R. 3-2(c).
11
12                            **Netflix's Patents**

13  14.  **The '450 Patent Application:** At issue in this case are two patents U.S. Patent No.
       6,584,450 (the "'450 Patent") and U.S. Patent No. 7,024,381 (the "'381 Patent"). Netflix
14
       filed its application for the '450 patent with the Patent Office on April 28, 2000 ("'450
15
       Patent Application"). The '450 Patent Application was designated Serial No. 09/561,041
16
       and listed W. Reed Hastings, (Netflix's Chief Executive Officer and President), Marc B.
17
       Randolph, and Neil Duncan Hunt as the inventors ("Netflix Inventors").
18
19  15.  Claim 1 of the '450 Patent Application covered:

20               A method for renting items to customers, the method comprising the
         computer-implemented steps of:
21               receiving one or more item selection criteria that indicates one or more
                     items that a customer desires to rent;
22               providing to the customer up to a specified number of the one or more
                     items indicated by the one or more item selection criteria; and
23               in response to receiving any of the items provided to the customer,
                     providing to the customer one or more other items indicated by the
24                   one or more item selection criteria, wherein a total current number
                     of items provided to the customer does not exceed the specified
25                   number.

26       Claims 14, 29, 49, 65, 79, 94, and 96 of the '450 Patent Application all describe
       iterations of the claimed method adjusted to the rental of movies.
27
28  16.  **The '381 Patent Application:** On or about, April 7, 2003 the Patent Office gave Netflix
       notice that the '450 Patent would be allowed and would issue shortly (and the '450 Patent

---

indeed issued on June 24, 2004). Five weeks later, on May 14, 2003, Netflix applied for

the '381 Patent (the "'381 Patent Application"). The '381 Patent Application was

designated Serial No. 10/438,727 and, again, listed the Netflix Inventors as the inventors.

17.    Claim 1 of the '381 Patent Application covered:

> A computer-implemented method for renting movies to customers, the method comprising:
> providing electronic digital information that causes one or more attributes of movies to be displayed;
> establishing, in electronic digital form, from electronic digital information received over the Internet, a movie rental queue associated with a customer comprising an ordered list indicating two or more movies for renting to the customer;
> causing to be delivered to the customer up to a specified number of movies based upon the order of the list;
> in response to one or more delivery criteria being satisfied, selecting another movie based upon the order of the list and causing the selected movie to be delivered to the customer; and
> in response to other electronic digital information received from the customer over the Internet, electronically updating the movie rental queue.

18.    Despite the startling breadth of its claims, the '450 Patent Application made no reference

to any prior art.

19.    Conversely, the '381 Patent Application listed over 100 references to prior art, the

volume of which Dilbeck alleges on information and belief was sufficient to "swamp" the

Patent Office's examiners by burying any references which would limited the '381 patent

application's claims in a plurality of innocuous, plausibly relevant references. Further, as

alleged below, the '381 patent application completely omitted other prior art known to

the Netflix patent applicants.

**Netflix Patent Applicant's Duty of Candor
and Good Faith to the Patent Office**

20.    To qualify for protection under the patent laws, an invention must be both novel and

nonobvious. To prior art, or knowledge already publicly available, anticipates an

invention, the invention is not novel and cannot be patented. Where the difference

between the invention and prior art is such that the invention as a whole would have been

obvious at the time the invention was made, the invention is obvious and cannot be

patented.

21. **The Netflix Patent Applicants:** Under 37 C.F.R. § 1.56 and federal common law, each individual "associated" with the filing and prosecution of a patent application has a duty of candor and good faith to the Patent Office. Per Patent Office regulation, individuals "associated" with the filing and prosecution of a patent application include each inventor named in the application, each attorney or agent who prepares or prosecutes the application; and

> [e]very other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

Each of the following were associated with the '450 and '381 patent applications: W. Reed Hastings, Marc B. Randolph, and Neil Duncan Hunt (the listed inventors), Edward A. Becker and Hickman Palermo Truong & Becker LLP (the prosecuting attorneys), Netflix (the assignor), and any of Netflix's other employees, directors, officers, or agents substantively involved in the '450 and '381 patent applications (collectively, the "Netflix Patent Applicants").

22. **Patent Applicants' Duty of Candor and Good Faith:** The Netflix Patent Applicants' duty of candor and good faith to the Patent Office has public implications:

> A patent by its very nature is affected with a public interest. The public interest is best served . . . when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability.

37 C.F.R. § 1.56(a). The Netflix Patent Applicants' duty of candor and good faith to the Patent Office specifically included "a duty to disclose to the Office all information known . . . to be material" to the '450 and '381 patent applications' subject matter. Thus, the Netflix Patent Applicants had a duty to disclose material prior art to the Patent Office.

23. 37 C.F.R. § 1.51(b) requires all patent applicants submit an oath or declaration with their application. The declaration includes an acknowledgment of the duty to disclose to the Office "all information known to the person to be material to patentability" defined in 37 C.F.R. § 1.56.

24. The Netflix Inventors submitted a declaration in which they acknowledged the duty to

disclose material information to the Patent Office. The declaration indicates that W. Reed Hasting signed on September 28, 2000, by Neil Duncan Hunt signed on September 29, 2000, and Marc B. Randolph signed on October 3, 2000.

## Material Prior Art to the '450 and '381 Patents

25.   The information alleged below (the "Prior Art") to constitutes prior art to the '450 and '381 Patents, and anticipates at least some , if not all, of the claims contained in the '450 and '381 Patents.

26.   **The NCR Patents:** A number of patents assigned to the NCR Corporation ("NCR Patents") predate, anticipate, and are prior art to the '450 and/or '381 Patents:

(a)   U.S. Patent No. 5,699,526 (the "'526 Patent"), entitled "Ordering and Downloading Resources from Computerized Repositories," issued on December 16, 1997, whose subject matter concerns, *inter alia*,

a system for managing resources, comprised of multiple servers and one or more PCs coupled to the servers. The servers are grouped into local servers and regional servers, wherein each of the local servers stores resources, and each of the regional servers stores profiles of the resources. The profiles contain descriptive information about the resources stored on the local servers. The local and regional servers are linked together so that profiles and resources can electronically transferred therebetween. A PC coupled to server can view profiles stored in the regional servers, and then electronically order delivery of any resource described in a profile viewed by the PC);

(b)   U.S. Patent No. 5,951,643, entitled "Mechanism for Dependably Organizing and Managing Information for Web Synchronization and Tracking Among Multiple Browsers," issued September 14, 1999;

(c)   U.S. Patent No. 5,991,791, entitled "Security Aspects of Computer Resource Repositories," issued November 23, 1999; and

(d)   U.S. Patent No. 6,026,403, entitled "Computer System for Management of Resources," issued on February 15, 2000;

(e)   U.S. Patent No. 6,169,997, entitled "Method and Apparatus for Forming Subject (Context) Map and Presenting Internet Data According to the Subject Map," issued January 2, 2001;

(f)   U.S. Patent No. 6,253,203, entitled "Privacy-Enhanced Database," issued June 26, 2001;

(g)   U.S. Patent No. 6,502,096, entitled "Managing a Resource on a Network Where Each Resource Has an Associated Profile with an Image," issued December 31, 2002; and

(h)   U.S. Patent No. 6,714,931, entitled "Method and Apparatus for Forming User Sessions and Presenting Internet Data According to the User Sessions," issued March 30, 2004.

27.   The '526 Patent is, in particular, plainly prior art to the '450 and '381 Patents: the '450 and '381 Patents claim methods for selecting preferred items (in particular DVDs) to be delivered to a computer user. Likewise, the '526 Patent claims a system of selecting preferred resources that would then be delivered to a computer user.

28.   **Other Prior Art:** In addition, a good deal of other information predates, anticipates, and is prior art to the '450 and '381 Patents (the "Other Prior Art"). This prior art includes:

(a)   more than 100 references included the '381 Patent Application which predate the '450 Patent Application and could have been included in the '450 Patent Application (the "Omitted '381 Patent Application References"); as well as

(b)   subscription systems, including libraries for the blind and other subscription libraries, cable and satellite television services, pay television services, as well as TiVo and other video and film subscription services; the wide-spread use of waiting lists and/or reservation lists for out-of-stock videos in the video rental industry; and prior art in the electronic description, selection and ordering of items via the Internet ("Miscellaneous Prior Art").

**Netflix Patent Applicants Fraudulently
Concealed Prior Art From the Patent Office**

29.   The Netflix Patent Applicants learned of at least some of the Prior Art before the '450 Patent issued. Further, the Netflix Patent Applicants knew that some of this Prior Art anticipated and was material to the pending '450 and '381 Patents Applications, and knew that they had a duty to disclose the such material prior art to the Patent Office under 37 C.F.R. § 1.56.

30.   Despite their acknowledged duty to disclose all material prior art to the Patent Office, the Netflix patent applicants fraudulently concealed at least some of the Prior Art alleged above.

31.   **The NCR Patents:** The most telling evidence of the Netflix Patent Applicants' fraudulent concealment of Prior Art from the Patent Office involves the NCR Patents. Netflix has filed documents before this very Court which demonstrate that Netflix knew about the NCR patents well before either the '450 or the '381 patent issued. Netflix filed a

1

2    declaratory judgment action against NCR on March 10, 2006.

32.    In that case (titled *Netflix, Inc. v. NCR Corp.*, No. C 06 1892), Netflix alleged in its

complaint for declaratory action:

> On January 7, 2003, Bruce A. Langos, Vice President of Business Operations and
> Intellectual Property Management at NCR, wrote to Reed Hastings, the Chief
> Executive Officer of Netflix claiming notice "that various Netflix.com offerings
> infringe at least the following patents owned by NCR Corporation." The letter
> identified ten separate patents that NCR claimed were infringed, and enclosed
> several exemplary claim charts, each of which accused Netflix of infringing the
> claims described therein. . . .
>
> On August 1,2005, Mr. Langos once again wrote to Mr. Hastings of Netflix
> concerning "your company's infringements of NCR patents." The letter enclosed
> updated claim charts that again accused Netflix of infringing the claims described
> therein, and threatened that should Netflix refuse to license the technology NCR
> was "prepared to pursue other options." . . .
>
> In late 2005, counsel for NCR contacted counsel for Netflix in San Francisco,
> California, seeking to schedule a face-to-face meeting in San Francisco to discuss
> NCR's allegations of infringement. . . . [D]uring [a November 28, 2005] meeting
> NCR's counsel once again asserted that Netflix infringed the NCR patents . . .
> [O]n January 11, 2006, counsel for NCR sent via email . . . revised charts
> purporting to show that Netflix was currently infringing the claims described
> therein.

Thus, Netflix's own pleadings in *Netflix, Inc. v. NCR Corp.* allege and establish that the

Netflix patent applicants had notice of the NCR patents no later than January 7, 2003.

33.    Netflix further alleged that it has a reasonable apprehension that NCR would sue Netflix

for infringing on the NCR Patents and, therefore, an actual and justiciable controversy

existed between Netflix and NCR concerning whether Netflix infringes any valid claim of

the NCR patents.

34.    Despite acknowledging that it knew of the NCR Patents, that it had an apprehension that

NCR would actually sue Netflix for infringing the NCR Patents, Netflix failed to disclose

the NCR Patents to the Patent Office.

35.    Further, *none of the other Netflix Patent Applicants ever disclosed the NCR Patents to

the Patent Office*, either in respect to the '450 Patent Application (which was pending

until June 24, 2003) or in respect to the '381 Patent Application (which was pending until

April 24, 2006).

36.    The Netflix Patent Applicants' duty of candor and good faith obliged them to notify the

Patent Office of any material prior art under 37 C.F.R. § 1.56(a). The Netflix Patent

Applicants should have notified the Patent Office of the NCR Patents because the NCR

Patents were material to the '450 and '381 Patent Applications:

    (a)    neither the '450 nor the '381 Patent Applications contained references to the NCR Patents, so the NCR Patents could not be cumulative to any information contained in the '450 nor the '381 Patent Applications;

    (b)    the NCR Patents were inconsistent with the Netflix Patent Applicants' position that the '450 and '381 Patent Applications' subject matter was novel and nonobvious (and therefore patentable); and

    (c)    the NCR Patents established a *prima facie* case that the subject matter of the '450 and '381 patent applications was not novel (and therefore not patentable).

    (d)    the NCR Patents (notwithstanding whether they do in fact cover Netflix's rental service, or whether they indeed valid), their applications, and the references cited in those applications, contain information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent.

37.    **The Other Prior Art:** To the extent that the Netflix Patent Applicants knew or learned

of the Other Prior Art during the pendency of either the '450 or the '381 Patent

Applications, they had a duty to disclose the Other Prior Art under 37 C.F.R. § 1.56(a).

38.    The Netflix Patent Applicants' duty of candor and good faith obliged them to notify the

Patent Office of any material prior art under 37 C.F.R. § 1.56(a). The Netflix Patent

Applicants should have notified the Patent Office of the Other Prior Art because the

Other Prior Art was material to the '450 and '381 Patent Applications:

    (a)    Neither the '450 nor the '381 Patent Applications contained references to the Miscellaneous Prior Art, so the Miscellaneous Prior Art could not be cumulative to any information contained in the '450 nor the '381 Patent Applications;

    (b)    Likewise, the '450 Patent Application did not contain any reference to the Omitted '381 Patent Application References, and so the Omitted '381 Patent Application References could not be cumulative to any information contained in the '450 Patent Application;

    (c)    the Other Prior Art was material to the '450 and '381 Patent Applications because the Other Prior Art is inconsistent with the Netflix Patent Applicants' position that the '450 and '381 Patent Applications' subject matter was novel and nonobvious (and therefore patentable); and

    (d)    the Other Prior Art was material to the '450 and '381 Patent Applications because they established a *prima facie* case that the subject matter of the

'450 and '381 patent applications was not novel (and therefore not patentable);

(e)    the Other Prior Art contains information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent.

39.    Dilbeck alleges on information and belief that the Netflix Patent Applicants knew or learned of the Other Prior Art during the pendency of the '450 and '381 Patent Applications, but did not disclose the Other Prior Art to the Patent Office.

40.    But for the Netflix Patent Applicants' concealment of the Prior Art (including the NCR Patents, the Omitted '381 Patent Application References, and Miscellaneous Prior Art), the Patent Office would not have issued either the '450 or the '381 Patent.

41.    **Fraudulent Intent:** The '450 and the '381 Patents are invalid and unenforceable because of the Prior Art alleged above establishes that the '450 and the '381 Patents' subject matter was not novel. Further, the '450 and the '381 Patents are invalid and unenforceable because the Netflix Patent Applicants breached their duty of candor and good faith to the Patent Office.

42.    Dilbeck alleges on information and belief that the Netflix Patent Applicants intended that the Patent Office rely on their concealment of the Prior Art alleged above, and concealed the Prior Art as part of an intentional and deliberate scheme to deceive and induce the Patent Office into issuing the '450 or the '381 Patents. In the alternative, the Netflix Patent Applicants breached their duty to disclose material prior art to the Patent Office in a manner so reckless that it is sufficient to allege fraud.

43.    Blockbuster's counterclaim alleges objective evidence that the Netflix Patent Applicants knew  the '450 or the '381 Patents were invalid and unenforceable:

In January 2005, Netflix CEO and Named Inventor Reed Hastings met with Blockbuster's then-Executive Vice President and General Counsel, Edward Stead. Hastings praised Blockbuster's competitive position in the online rental business and asked Stead when he had figured out that Netflix's '450 patent was a "joke."

(Def.'s Countercl. ¶ 40.) Dilbeck alleges on information and belief that Hasting indeed said the '450 Patent was a "joke."

44.    **The Instant Sham Litigation:** On April 4, 2006, the '381 Patent issued. On the same

day, Netflix sued Blockbuster for allegedly infringing on the '450 and '381 Patents by operating Blockbuster Online.

45.    The instant proceeding has had both the effect of impairing Blockbuster Online's competitive impact and of deterring other competitors from entering the relevant market, alleged below.

46.    Objectively, Netflix's litigation against Blockbuster is a sham. Netflix should have known that the '450 and '381 Patents are invalid and unenforceable because they are anticipated by Prior Art or because the Netflix Patent Applicants breached their duty of candor and good faith to the Patent Office by concealing the Prior Art from the Patent Office.

47.    Subjectively, Netflix's litigation against Blockbuster is a sham. Netflix indeed knew that the '450 and '381 Patents were invalid and unenforceable when it sued Blockbuster, and its CEO even further went so far as to call the '450 Patent a "joke."

## The Relevant Market

48.    As defined by Blockbuster's counterclaim against Netflix, the relevant product market is "the market for online DVD rentals and related subscription services" and the relevant geographic market is "the United States and its territories as a whole." (Def.'s Countercl. ¶ 89.) In the alternative, Dilbeck alleges that the relevant product market is the market for monthly DVD rental subscription services which rent a set number of DVDs to consumers by mail (collectively, the "Relevant Market").

49.    The Relevant Market represents several significant inelastic demands which create both significant barriers to entry and clear borders between the Relevant Market and putative substitute markets.

50.    First, consumers in the Relevant Market demand a vast inventory of DVDs from which consumers can select their rentals. (For instance, Netflix claims to have more than 55,000 titles and more than 25 million DVDs.) Because brick-and-mortor stores have a centralized inventory and a centralized customer base, they do not have a sufficient inventory and cannot substitute for the Relevant Market. (Moreover, brick-and-mortor stores offer immediate gratification, while the Relevant Market's fulfillment of customer

orders is necessarily delayed by the mail. In order to compete with brick-and-motor stores, Relevant Market must compensate with a significantly better selection and variety of DVD titles.)

51. Second, consumers in the Relevant Market demand that the delay between rental order and subsequent fulfillment be reasonably short. Because consumers in the Relevant Market are dispersed throughout the nation, this requires a service in the Relevant Market to store its DVD inventory in a geographically distributed network of shipping centers. This way, a subscriber will be relatively close to at least one shipping center and the rental DVDs' time in transit will not be overly long. (For instance, Blockbuster Online has 30 specialized distribution centers, and also processes rental fulfillments through approximately 1,000 of its brick-and-motor stores.)

52. Both the vast DVD inventory and the geographically distributed network of shipping centers demanded by the Relevant Market represent serious capital expenditures and constitute significant barriers to entry into the Relevant Market.

## Netflix's Market Power

53. Netflix has competed in the Relevant Market since 1999. Dilbeck alleges that on information and belief, Netflix has used the implicit or express threat of liability for infringing on the '450 and '381 Patents to exclude competitors from the market.

54. Dilbeck alleges on information and belief that the Netflix Patent Applicants' scheme to deceive and induce the Patent Office into issuing the '450 or the '381 Patents was specifically intended to buttress Netflix's efforts to deter, delay, and destroy competition and competitors from its market and to monopolize its market.

55. Specifically, Dilbeck alleges that Wal-Mart Stores, Inc. also competed in the Relevant Market from June 2004 to June 2005, and Dilbeck alleges on information and belief that Netflix used the '450 and '381 Patents to induce Wal-Mart Stores, Inc. to withdraw from the Relevant Market. Nonetheless, Blockbuster entered the Relevant Market on August 11, 2004. As alleged below, the impact of competition on prices in the Relevant Market has been substantial and immediately visible.

56.    Netflix has maintained significant market power throughout the course of the events alleged in this Complaint in Intervention. Netflix's market power can be measured by the differential between subscription rates before and after Blockbuster's entry into the Relevant Market, and the proportion of its subscribers to the total number of consumers on the market.

57.    **Netflix's Pricing Power in the Relevant Market:** The market power Netflix derived from the '450 and the '381 Patents is, in part, evident in the fluctuation of the monthly price of a standard three (3) DVD subscription package over the course of events alleged in this Complaint in Intervention.

58.    From October 2000 to June 2004, Netflix offered a standard three (3) DVD subscription package for $20 per month. In June 2004, Netflix raised the subscription rate on its standard subscription package to $22 per month. Blockbuster Online entered the Relevant Market in August 2004, pricing a similar three (3) DVD subscription package for $17.50 per month.

59.    Since November 2004, Netflix priced its standard subscription package at $18 per month. The competitive price for a standard subscription package cannot exceed (but is by no means as high as) $18 per month. This allegation is based, in part, on comments made in Netflix's 2004 form 10-K filed with the SEC:

> [C]ompetition has intensified significantly since Blockbuster officially launched its online service in August 2004. In particular, Blockbuster has been aggressive in pricing its standard three-out service at a monthly charge of approximately twenty percent lower than ours. . . . [E]ffective November 2004, in response to the changing competitive landscape, we lowered the price of our standard service to $17.99.

(emphasis supplied).

60.    If Netflix succeeds in inducing Blockbuster to exit the Relevant Market, consumers in the Relevant Market will again be exposed to supracompetitive subscription prices, because there will be no significant competitor to restrain Netflix from raising its subscription prices again.

61.    **Netflix's Market Share:** Netflix's subscriber base has grown dramatically of the course

of the events alleged in this Complaint in Intervention:

| Quarter Ending: | Netflix's Subscribers (Thousands) |
|---|---|
| December 31, 2001 | 456 |
| March 31, 2002 | 603 |
| June 30, 2002 | 670 |
| September 30, 2002 | 742 |
| December 31, 2002 | 857 |
| March 31, 2003 | 1,052 |
| June 30, 2003 | 1,147 |
| September 30, 2003 | 1,291 |
| December 31, 2003 | 1,487 |
| March 31, 2004 | 1,932 |
| June 30, 2004 | 2,093 |
| September 30, 2004 | 2,229 |
| December 31, 2004 | 2,610 |
| March 31, 2005 | 3,018 |
| June 30, 2005 | 3,196 |
| September 30, 2005 | 3,592 |
| December 31, 2005 | 4,179 |

62. Blockbuster Online had approximately 1.2 million subscribers at the end of 2005. Wal-Mart Stores, Inc. also competed in the Relevant Market until June 2005 (as a distant third to Blockbuster and Netflix), and had between 100,000 and 200,000 subscribers. Dilbeck alleges on information and belief that when Netflix induced Wal-Mart to withdraw from the Relevant Market, it prompted Wal-Mart to market Netflix's services to its former subscribers.

63. At present, Netflix has an estimated 80% share of the Relevant Market and, on information and belief, has maintained at least a 65% share throughout the course of event alleged in this Complaint in Intervention.

## Class Action Allegations

64. **Definition of Class and Class Period:** Pursuant to Federal Rule of Civil Procedure 23, Intervening Plaintiff brings this Complaint against Netflix on behalf of himself and all persons who subscribed to Netflix's DVD rental service, regardless of their residence, (the "Class") during the four year period prior to the filing of the motion to intervene (the "Class Period"). Excluded from the Class are 1) any Judge or Magistrate presiding over

this action and members of their families; 2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers and directors; and 3) persons who properly execute and file a timely request for exclusion from the class and 4) the legal representatives, successors or assigns of any such excluded persons.

65.     **Numerosity:** The exact number of Class members is unknown and is not available to Intervening Plaintiff, but it is clear that individual joinder of all Class members is impracticable. Netflix's subscriber base grew from more than 850,000 subscribers by the end of 2002 to more than 4 million subscribers by the end of 2005, and now apparently numbers over 5 million.

66.     **Class Commonality:** Common questions of fact and law exist as to all Class members and predominate over the questions affecting only individual Class members. These common questions include whether:

(a)     Whether Netflix Patent Applicants knew of the Prior Art alleged above while the '450 and '381 Patent Applications were pending;

(b)     Whether the Prior Art alleged above predates and anticipates the claims made in the '450 and '381 Patents, or was otherwise material to the '450 and '381 Patent Applications;

(c)     Whether the Netflix Patent Applicants formed a combination of capital, skill and/or acts for the purpose of creating restrictions and preventing competition in the Relevant Market;

(d)     Whether the Netflix Patent Applicants intentionally concealed the Prior Art from the Patent Office while the '450 and '381 Patent Applications were pending;

(e)     Whether Netflix acquired and used the '450 and '381 Patents to delay, deter, and destroy competition in the Relevant Market;

(f)     Whether and to what extent the subscription rates charged to the Class members constitute monopoly profits and antitrust damages;

(g)     Whether Netflix's acquisition, maintenance, and use of the '450 and '381 Patents violates Section 2 of the Sherman Act;

(h)     Whether Netflix's acquisition and maintenance of the '450 and '381 Patents violates the Cartwright Act;

(i)     Whether Netflix's acquisition and maintenance of the '450 and '381 Patents is unlawful and otherwise unfair, and thereby constitutes a violation of

California's unfair competition law; and

(j)    Whether plaintiff and the Class are entitled to relief, and the nature of such relief.

67.    **Typicality:** Intervening Plaintiff's claims are typical of the claims of other Class members, as the Intervening Plaintiff and other Class members sustained damages arising out of the wrongful conduct of Defendant in Intervention, based upon the same transactions which were made uniformly to the Intervening Plaintiff and the public.

68.    **Adequate Representation:** Intervening Plaintiff will fairly and adequately represent and protect the interests of the other Class members, and has retained counsel competent and experienced in complex class actions. Intervening Plaintiff has no interest antagonistic to those of the Class, and Defendant in Intervention has no defenses unique to Intervening Plaintiff.

69.    **Predominance and Superiority:** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by each individual Class member will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by the actions of Defendant in Intervention. It would be virtually impossible for the Class members individually to obtain effective relief from the misconduct of Defendant in Intervention. Even if the class members themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint in Intervention. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## Class Allegations

70.    **Fraud on the Patent Office:** As alleged above, the Netflix Patent Applicants

intentionally and fraudulently concealed Prior Art from the Patent Office which was
material to the pending '450 and '381 Patent Applications. In the alternative, the Netflix
Patent Applicants breached their duty to disclose material prior art to the Patent Office in
a manner so reckless that it is sufficient to allege fraud.

71.   **Knowledge of Fraud:** As alleged above, Netflix and the other Netflix Patent Applicants
knew that they had concealed material Prior Art from the Patent Office at the time they
filed the instant patent infringement action against Blockbuster.

72.   **Deceptive Intent:** As alleged above, the Netflix Patent Applicants knew the '450 and the
'381 Patents were invalid and unenforceable because the Prior Art established that the
'450 and the '381 Patents' subject matter was not novel. The Netflix Patent Applicants
intended that the Patent Office rely on their concealment of the Prior Art, and concealed
the Prior Art as part of an intentional and deliberate scheme to deceive and induce the
Patent Office into issuing the '450 or the '381 Patents. As further objective evidence that
the Netflix Patent Applicants intended to deceive and did deceive the Patent Office,
Netflix's CEO and President Reed Hasting indicated that the '450 Patent was a "joke."

73.   **Reliance by the Patent Office:** As alleged above, the concealed Prior Art was material
to the pending '450 and '381 Patent Applications. Had the Patent Office learned of the
concealed Prior Art, the Patent Office would not have issued the '450 and '381 Patents,
either because the Prior Art  rendered the subject matter of the '450 and '381 Patent
Applications non-novel (and unpatentable), or because the Netflix Patent Applicants
breached their duty of candor and good faith to the Patent Office by concealing
information known to be relevant to the '450 and '381 Patent Applications.

74.   **Objectively Meritless Litigation:** As alleged above, Netflix should have known that the
instant patent litigation against Blockbuster was meritless and that it had no probable
cause to bring the instant patent litigation. Further, Netflix should have known that any
threat of patent litigation against Wal-Mart was likewise meritless and had no probable
cause.

75.   **Subjectively Meritless Litigation:** As alleged above, Netflix indeed knew that the

instant patent litigation against Blockbuster was meritless and that it had no probable

cause to bring the instant patent litigation. The instant patent litigation is an attempt to

interfere with Blockbuster's ability to compete in the market. Further, Netflix knew that

any threat of patent litigation it made against Wal-Mart was likewise meritless and had no

probable cause, and was a successful attempt to eliminate Wal-Mart's competition from

the Relevant Market.

76.    **Monopoly Power:** As alleged above, Netflix had and has continually maintained

monopoly power in the Relevant Market by dint of its dominant market share and the

'450 and '381 Patents.

77.    **Willful Acquisition of Monopoly Power:** Netflix willfully obtained monopoly power in

the Relevant Market by obtaining the '450 and '381 Patents by fraudulent concealment of

Prior Art from the Patent Office, and the instant litigation based on the alleged

infringement of the invalid and unenforceable '450 and '381 Patents.

78.    **Causal Antitrust Injury:** Dilbeck and the other Class Members have sustained antitrust

injuries from Netflix's acquisition and exercise of monopoly power in the form of

supracompetitive subscription prices, the differential between Netflix's prices and the

competitive rate representing monopoly profits and recoverable antitrust damages.

Further, Netflix's conduct in this case threatens additional antitrust injury if Blockbuster

Online is excluded from the Relevant Market.

79.    **Unlawful Trust:** The Netflix Patent Applicants (including Edward A. Becker and

Hickman Palermo Truong & Becker LLP) formed a combination of capital, skill and/or

acts for the purpose of creating restrictions and preventing competition in the Relevant

Market: to wit, by fraudulently concealing material Prior Art from the Patent Office as

part of a scheme to have the Patent Office issue the '450 and '381 Patents.

## Count I: Violation of the Sherman Act, 15 U.S.C. § 2

80.    Intervening Plaintiff incorporates the above allegations by reference.

81.    Netflix and the other Netflix Patent Applicants intentionally and fraudulently concealed

Prior Art from the Patent Office that was material to the '450 and '381 Patent

Applications.

82. Had the Patent Office learned of the Prior Art, it would not have issued the '450 and '381 Patent Applications. Netflix and the other Netflix Patent Applicants fraudulently concealed the Prior Art in order to have the Patent Office issue the '450 and '381 Patents.

83. Netflix brought the instant patent litigation to deter and destroy competition in the Relevant Market. Objectively, Netflix should have known the instant patent litigation is meritless and without probable cause. Subjectively, Netflix knows the instant patent litigation is meritless and without probable cause.

84. Further, any threat of patent litigation Netflix made to Wal-Mart Stores, Inc. was intended to deter and destroy competition in the Relevant Market. Objectively, Netflix should have known any such threat was meritless and without probable cause. Subjectively, Netflix knew any such threat was meritless and without probable cause.

85. Netflix willfully obtained monopoly power in the Relevant Market by obtaining the '450 and '381 Patents by fraudulent concealment of Prior Art from the Patent Office, and the instant litigation based on the alleged infringement of the invalid and unenforceable '450 and '381 Patents.

86. Netflix's anticompetitive acts violate the Sherman Act (15 U.S.C. § 2).

87. Dilbeck and the other Class Members have sustained antitrust injuries from Netflix's violations of the Sherman Act and will suffer additional antitrust injury if Blockbuster Online is excluded from the Relevant Market.

88. Dilbeck, on his own behalf and behalf of the other Class members, seeks treble damages and the cost of this suit, including a reasonable attorneys' fee, and injunctive relief under the Clayton Act (15 U.S.C. § 15, 26).

## Count II: Violation of California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16726

89. Intervening Plaintiff incorporates the above allegations by reference.

90. The Netflix Patent Applicants include both Netflix, its employees, and its patent counsel, Edward A. Becker and Hickman Palermo Truong & Becker LLP.

91.   The Netflix Patent Applicants formed a combination of capital, skill and/or acts by two or more persons for the purpose of creating restrictions and preventing competition in the Relevant Market. Without the skill and acts of Netflix's patent counsel, Netflix could not have obtained or prosecuted either of the '450 or the '381 Patents. Without Netflix's capital and cooperation, Netflix's patent counsel would not have obtained or prosecuted either of the '450 or the '381 Patents.

92.   As a combination of capital, skill and/or acts for the purpose of creating restrictions and preventing competition in the Relevant Market, the Netflix Patent Applicants formed a trust prohibited by California's Cartwright Act (Cal. Bus. & Prof. Code § 16720, 16726).

93.   Dilbeck and the other Class Members have sustained injuries from Netflix's violations of the Cartwright Act and will suffer additional antitrust injury if Blockbuster Online is excluded from the Relevant Market.

94.   Dilbeck, on his own behalf and behalf of the other Class members, seeks treble damages, a reasonable attorneys' fee together with the costs of this suit, and injunctive relief under the Cartwright Act (Cal. Bus. & Prof. Code § 16750).

### Count III: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

95.   Intervening Plaintiff incorporates the above allegations by reference.

96.   Netflix's business acts and practices alleged above are unfair, unlawful and fraudulent.

97.   Dilbeck and the other Class Members have sustained injuries from Netflix's business acts and practices and will suffer additional injury if Blockbuster Online is excluded from the Relevant Market.

98.   Dilbeck, on his own behalf and behalf of the other Class members, seeks injunctive relief, including restitution, under California's unfair competition law (Cal. Bus. & Prof. Code § 17203)

WHEREFORE, Plaintiff prays that the Court enter judgment and orders in their favor and against Defendant as follows:

(a)   Declaring the action to be a proper class action and designating Plaintiff and his counsel as representatives of the Class;

1

2       (b)     With respect to Counts I and II, treble damages in an amount to be determined at trial against Netflix, an injunction against further anticompetitive acts, and statutory attorneys' fees;

3

4       (c)     With respect to Counts III, equitable relief including an accounting, a constructive trust and restitution, in an amount to be determined at trial, against Netflix;

5

6       (d)     Awarding pre- and post-judgment interest; and

7       (e)     Granting such other and further relief as the Court may deem just and proper.

8

### JURY TRIAL DEMAND

9

    The Intervening Plaintiff hereby demands a trial by jury of all issues so triable.

10

Dated: November __, 2006

11

12                          By:_____

13                              Alan Himmelfarb

14                              LAW OFFICES OF ALAN HIMMELFARB
                          2757 Leonis Blvd

15                              Los Angeles, CA 90058
                          Telephone: (323) 585-8696

16                              Fax: (323) 585-8198
                          consumerlaw1@earthlink.net

17                              Scott A. Kamber
                          Ethan Preston

18                              KAMBER & ASSOCIATES, LLC
                          19 Fulton Street, Suite 400

19                              New York, NY 10038
                          Telephone: (877) 773-5469

20                              Fax: (212) 202-6364
                          skamber@kolaw.com

21                              epreston@kolaw.com

22

23

24

25

26

27

28