1  Alan Himmelfarb
   LAW OFFICES OF ALAN HIMMELFARB
2  2757 Leonis Blvd
   Los Angeles, CA 90058
3  Telephone: (323) 585-8696
   Fax: (323) 585-8198
4  consumerlaw1@earthlink.net

5  Scott A. Kamber
   Ethan Preston
6  KAMBER & ASSOCIATES, LLC
   19 Fulton Street, Suite 400
7  New York, NY 10038
   Telephone: (877) 773-5469
8  Fax: (212) 202-6364
   skamber@kolaw.com
9  epreston@kolaw.com

10 *Counsel for proposed intervenor,*
   *Dennis Dilbeck*
11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NETFLIX, INC. a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BLOCKBUSTER INC., a Delaware corporation, and DOES 1-50,<br><br>Defendants. | No. C 06 2361 WHA JCS<br>Judge William Alsup<br>**DENNIS DILBECK'S CONSOLIDATED REPLY IN SUPPORT OF HIS MOTION FOR LEAVE TO INTERVENE**<br><br>Date: December 7, 2006<br>Time: 8:00 a.m.<br>Location: Courtroom 9, 19th Floor |

**DENNIS DILBECK'S CONSOLIDATED REPLY IN SUPPORT**
**OF HIS MOTION FOR LEAVE TO INTERVENE**

---

Dilbeck's Consolidated Reply                                                    06 2361
in Support of Motion for Leave to Intervene

# Table of Contents

Page

**I.**  **Netflix Attempts to Reargue Its Motion to Dismiss Blockbuster's Antitrust Claims**.................................................................1

    A.  Netflix Cannot Disregard the Proposed Complaint's Allegations ..........................2

        1.  Dilbeck States a Claim Under Rule 8(a)..................................................2

        2.  Dilbeck's Complaint Does Not Fail Because Netflix Simply Contradicts Its Factual Allegations ...............................4

    B.  Dilbeck Alleges Valid *Walker Process* Claims .........................................4

        1.  *Walker Process* Enforcement Element Does Not Require Actual Litigation ...............................5

        2.  A Valid Consumer *Walker Process* Claim Requires Supracompetitive Fees, Not Enforcement of Sham Patents ......................6

**II.**  **The Existing Parties' Oppositions Do Not Justify Denying Dilbeck Leave to Intervene** ...............................................................7

    A.  The Court Should Consider Dilbeck's Right to Intervene Under Rule 24(a)(2) .....8

        1.  Neither Existing Party Argues That Dilbeck Is Untimely Under the Standard Applicable Under Rule 24 ...............................8

        2.  Dilbeck Can Protect His Interest in Competition in the Relevant Market Through Intervention..................................9

        3.  Blockbuster Cannot Adequately Represent Dilbeck's Interests...............10

    B.  Dilbeck's Intervention Would Serve the Interests of Judicial Economy ...............11

        1.  Dilbeck's Claim Introduces Only Two Additional Factual Issues ...........11

        2.  Existing Parties' Fears About Class Action Practice Are Unfounded and Do Not Reflect the Realities of Dilbeck's Class Claims ...............................13

        3.  Dilbeck's Intervention Should Not Be Denied Because the Existing Parties Have Not Cooperated in Discovery .........................13

        4.  The Court Can and Should Grant Intervention Under Terms Tailored to Promote Judicial Economy.............................14

**Table of Authorities**

**Cases**          **Page**

*Agron, Inc. v. Chien-Lu Lin*, No. 03-05872,
    2004 U.S. Dist. LEXIS 26605 (C.D. Cal. Mar. 16, 2004) ................................3

*Alaniz v. Tillie Lewis Foods*, 572 F.2d 657 (9th Cir. 1978)................................11

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001) ..................................12

*Beckman Indus. v. Int'l Ins. Co.*, 966 F.2d 470 (9th Cir. 1992) ........................8 n.8

*Benavidez v. Eu*, 34 F.3d 825 (9th Cir. 1994) ........................................11

*Blake v. Pallan*, 554 F.2d 947 (9th Cir. 1977) ........................................10

*Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261 (7th Cir. 1984) ........................5

*Campos v. Ticketmaster Corp.*, 140 F.3d 1166 (8th Cir. 1998) ........................4 n.4

*Cent. Valley Chrysler-Jeep Inc. v. Witherspoon*, No. 04-6663,
    2005 U.S. Dist. LEXIS 26536, *26-27 (E.D. Cal. Oct. 5, 2005)......................14

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988)........................5

*Defenders of Wildlife v. Johanns*, No. 04-4512,
    2005 U.S. Dist. LEXIS 34455 (N.D. Cal. Dec. 1, 2005) ........................9 n.9

*Doe v. Abbott Labs.*, No. 04-1511,
    2004 U.S. Dist. LEXIS 29129 (N.D. Cal. Oct. 21, 2004) ........................4 n.4

*Feller v. Brock*, 802 F.2d 722 (4th Cir. 1986) ........................................10

*Goss Int'l Ams., Inc. v. MAN Roland, Inc.*, 2006 DNH 62,
    2006 U.S. Dist. LEXIS 36386 (D.N.H. June 2, 2006)........................5

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919 (9th Cir. 1980)......................3

*Fisher v. Gillette Co.*, No. 80-4415,
    1981 U.S. Dist. LEXIS 10405 (N.D. Ill. Jan. 20, 1981)......................10 n.11

*Indium Corp. of America v. Semi-Alloys, Inc.*, 591 F. Supp. 608 (N.D.N.Y. 1984) ......................5

*Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879 (Fed. Cir. 1985)......................5, 7, 12

*In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517 (D.N.J. 2004) ........................10 n.12

*Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094 (9th Cir. 2002) ........................14

*League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297 (9th Cir. 1997)......................9

*Louisiana Wholesale Drug Co. v. Hoechst Marion Roussel, Inc.*,
    332 F.3d 896 (6th Cir. 2003)........................10 n.12

*In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79 (E.D. Pa. 2003)......................12

1

## Table of Authorities

2

**Cases**                                                      **Page**

3

*Molecular Diagnostics Labs. v. Hoffmann-La Roche, Inc.*,
    402 F. Supp. 2d 276 (D.D.C. 2005) ....................................................6, 7

4

5

*Netflix, Inc. v. Blockbuster, Inc.*, No. 06-2361,
    2006 U.S. Dist. LEXIS 63154 (N.D. Cal. Aug. 22, 2006).................................1, 3 n.2, 14

6

*Nikon Corp. v. ASM Litho. B.V.*, 222 F.R.D. 647 (N.D. Cal. 2004)........................9, 10 n.11

7

*Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998).........................13

8

*Oneida Indian Nation v. New York*, 732 F.2d 261 (2d Cir. 1984)..................................................2

9

*Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006) ...........................................................................8

10

*Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775 (1st Cir. 1988)............................................11

11

*Rohm & Haas Co. v. Dawson Chemical Co.*, 635 F. Supp. 1211 (S.D. Tex. 1986)......................5

12

*Rohnert Park v. Harris*, 601 F.2d 1040 (9th Cir. 1979)...........................................................4 n.4

13

*Seide v. Prevost*, No. 81-6205, 1981 U.S. Dist. LEXIS 16222 (S.D.N.Y. Nov. 30, 1981)............9

14

*Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006) ..........................................2, 4

15

*Southwest Ctr. for Biological Diversity v. Berg*,
    268 F.3d 810 (9th Cir. 2001) ....................................................2, 3, 4, 9 n.10, 10

16

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)......................................................................2

17

*United States v. $129,374*, 769 F.2d 583 (9th Cir. 1985) ....................................................11 n.14

18

*United States v. Los Angeles*, 288 F.3d 391 (9th Cir. 2002) ...............................................11 n.14

19

*United States v. Washington*, 86 F.3d 1499 (9th Cir. 1996)..........................................................9

20

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341 (Fed. Cir. 2004) ....................4, 5

21

*In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279 (S.D. Fla. 2005) ......10 n.12

22

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003)............................................3 n.2

23

*Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100 (1969)........................................4 n.4

24

**Federal Rules**                                               **Page**

25

Fed. R. Civ. P. 23 .........................................................................................................................13

26

Fed. R. Civ. P. 24 ...................................................................................................................7, 8, 9

27

Fed. R. Civ. P. 62 ......................................................................................................................8 n.7

28

N.D. Cal. Civil L.R. 7-4 .............................................................................................................1 n.1

# Table of Authorities

**Miscellaneous**                                                                                         **Page**

Administrative Office of the United States Courts, Federal Judicial Caseload Statistics 2005,
    Table C-4 (Cases Terminated, by Nature of Suit and Action Taken) (2005), *available at*
    http://www.uscourts.gov/caseload2005/tables/C04mar05.pdf ................................10 n.13

Federal Trade Commission, To Promote Innovation: The Proper Balance of
    Competition and Patent Law and Policy (2003), *available at*
    http://www.ftc.gov/os/2003/10/innovationrpt.pdf .................................................6 nn. 5, 6

Manual for Complex Litigation (4th ed. 2004),
    *available at* http://www.fjc.gov/public/pdf.nsf/lookup/mcl4.pdf/$file/mcl4.pdf .............13

Dennis Dilbeck ("Dilbeck") respectfully files this Consolidated Reply in Support of his Motion for Leave to Intervene[1] and states as follows:

On April 4, 2006, Netflix filed its complaint alleging Blockbuster infringes on the '450 and '381 Patents. Blockbuster filed its *Walker Process* counterclaim on June 13, 2006. Dilbeck's counsel learned of this proceeding on September 8, 2006, and Dilbeck filed the instant motion to intervene on October 11, 2006. On November 16, Netflix and Blockbuster submitted their oppositions against Dilbeck's claims to the Court.

As stated below, the Court should disregard Netflix's opposition as an attempt to reargue its motion to dismiss Blockbuster's antitrust claims. This reply also provides a measured explanation of how Dilbeck's intervention will conserve judicial resources required by the misgivings about Dilbeck's intervention voiced in Blockbuster's opposition.

## I.     Netflix Attempts to Reargue Its Motion to Dismiss Blockbuster's Antitrust Claims

Dilbeck's Proposed Complaint in Intervention alleges that Netflix used the '450 and '381 Patents to monopolize the online DVD rental market (the "Relevant Market") by deterring and delaying competition with the threat of patent infringement. (Prop. Compl. ¶¶ 3, 5, 54, 85-87.) Specifically, Dilbeck alleges that "Netflix used the '450 and '381 Patents to induce Wal-Mart Stores, Inc. [previously a competitor in the Relevant Market] to withdraw from" competition. (*Id.* ¶ 55.) Finally, the Court can reasonably infer from Dilbeck's factual allegation that Netflix CEO "asked [Blockbuster's general counsel] when he had figured out that Netflix's '450 patent was a 'joke'" that Blockbuster indeed delayed its entry into the Relevant Market out of consideration of Netflix's sham patents. (*Id.* ¶ 43.)

Netflix argues that Dilbeck's intervention must fail because his proposed complaint, alleging the same antitrust claims sustained by this Court, fails to state a claim. (*Cf.* Pl.'s Opp'n 4-8 *with Netflix, Inc. v. Blockbuster, Inc.*, No. 06-2361, 2006 U.S. Dist. LEXIS 63154 (N.D. Cal.

---

[1] Dilbeck has consolidated his reply to Blockbuster and Netflix's separate oppositions to further judicial economy. This consolidated reply contains less than 15 pages of text, excluding tables of contents and authorities. A motion extend time to file this reply will be filed shortly. *Cf.* N.D. Cal. Civil L.R. 7-4.

Aug. 22, 2006)). These arguments failed in Netflix's motion to dismiss then and must fail now.

## A.    Netflix Cannot Disregard the Proposed Complaint's Allegations

Netflix expends much of its opposition in an attempt to gainsay Dilbeck's factual allegations. This attempt must be unavailing. "Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true." *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001) (this rule is especially appropriate where "propriety of intervention must be determined before discovery").

> [A]n application to intervene cannot be resolved by reference to the ultimate merits of the claims which the intervenor wishes to assert following intervention . . . but rather turns on whether the applicant has demonstrated that its application is timely, that it has an interest in the subject of the action, that disposition of the action might as a practical matter impair its interest, and that representation by existing parties would not adequately protect that interest.

*Oneida Indian Nation v. New York*, 732 F.2d 261, 264-265 (2d Cir. 1984). Dilbeck's complaint in intervention receives the same deference as any other complaint would receive in a Rule 12(b)(6) motion. *Cf. Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1046 (9th Cir. 2006) ("[a]ll allegations and reasonable inferences are taken as true, and the allegations are construed in the light most favorable to the non-moving party"). Netflix's opposition flouts these established pleading standards.

Dilbeck alleges that Netflix's patents deterred competition, not only with the instant action, but also by deterring third-party competitors. This allegation states a Sherman Act claim.

## 1.    Dilbeck States a Claim Under Rule 8(a)

Netflix claims Dilbeck's general allegation that it used its patents to exclude competitors from the market is "insufficient to state a claim" because it is a "conclusory statement without any supporting facts." (Pl.'s Opp'n 5.) Dilbeck alleges that Netflix (1) had sham patents and (2) used them to exclude competitors from the Relevant Market; the imposition of any higher standard of pleading is contrary to the law. (Prop. Compl. ¶¶ 53-54.) "[U]nder a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a *prima facie* case," *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002), and "[t]here is no special rule requiring

more factual specificity in antitrust pleadings." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980); *see also Agron, Inc. v. Chien-Lu Lin*, No. 03-05872, 2004 U.S. Dist. LEXIS 26605, at *17-18 (C.D. Cal. Mar. 16, 2004) (liberal pleading rules applies to antitrust claims against sham litigation).[2] Dilbeck's general allegation that Netflix used the patents to exclude competitors satisfies Rule 8(a)'s requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief." (*Cf.* Prop. Compl. ¶¶ 53-54 *with Southwest Ctr.*, 268 F.3d at 821(reversing district court's denial of intervention, where factual assertions were sufficient even without additional detail).)

Netflix also challenges Dilbeck's specific allegation as to Wal-Mart's withdrawal from the Relevant Market as "conclusory" because Dilbeck does not allege that Netflix actually took any action to enforce the '450 Patent against Wal-Mart. (Pl.'s Opp'n 6.) Actually, Dilbeck plainly makes that very allegation. To the extent that the allegation that "Netflix used [its] Patents to induce Wal-Mart Stores, Inc. to withdraw from the Relevant Market" needs any interpretation, the only reasonable interpretation is that Netflix threatened Wal-Mart with its patents. (Prop. Compl. ¶ 55.) Wal-Mart is not the shrinking violet of our national economy – it is very unlikely that Wal-Mart voluntarily quit the field and ceded its share of the Relevant Market to Netflix. (*Id*. ¶ 62.) Dilbeck adequately alleges Netflix used its patents to leverage Wal-Mart out of the market.

Netflix attempts to "disprove" the proposed complaint by offering up its own allegations in lieu of those offered by Plaintiff. Netflix argues that Wal-Mart's entry into the Relevant Market "a year after issuance of Netflix's '450 Patent plainly disproves his conclusory claim that Walmart was induced to withdraw by reason of that patent." (Pl.'s Opp'n 6.) The obvious inference is that *Wal-Mart was unaware of the '450 Patent when it entered into the Relevant Market and remained unaware until Netflix threatened Wal-Mart with the '450 Patent*. (By

---

[2] Rule 9(b) does apply to allegations of fraud on the Patent Office, but not to "allegations supporting a claim be stated with particularity when those allegations describe non-fraudulent conduct." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003). Netflix's challenges here are not based on Rule 9(b). *Cf. Netflix, Inc. v. Blockbuster, Inc.*, No. 06-2361, 2006 U.S. Dist. LEXIS 63154, at *11 (N.D. Cal. Aug. 22, 2006) (only "circumstances constituting the fraud" must be alleged with specificity).

1    comparison, Netflix itself only learned of NCR's patents after it entered the Relevant Market.)

2    These allegations state a *Walker Process* claim.[3]

3              **2.    Dilbeck's Complaint Does Not Fail Because Netflix Simply**
4                      **Contradicts Its Factual Allegations**

5              Netflix further argues that "Dilbeck . . . cannot [plead Netflix threatened to enforce the

6    sham patents] as no such threats of enforcement were ever made." (Pl.'s Opp'n 6.) Under

7    *Southwest Center* and *Simpson*, this Court must take Dilbeck's factual allegations as true. Our

8    judicial system does not resolve factual controversies on the basis of counsel's unsubstantiated

9    assertions. If it did, Blockbuster could quickly dispose of Netflix's own patent infringement

10   claims.

11         **B.    Dilbeck Alleges Valid *Walker Process* Claims**

12             Netflix claims that *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341 (Fed.

13   Cir. 2004) supports the "black-letter Federal Circuit law" proposition that "purported *Walker*

14   *Process* claims [must be] predicated on actual enforcement of the patents" and so Dilbeck

15   supposedly cannot state a *Walker Process* claim by alleging the "mere existence" of Netflix's

16   patents. (Pl.'s Opp'n 4, 5.)

17             Setting aside Netflix's faulty "reconstruction" of Dilbeck's complaint, Netflix's

18   application of *Unitherm* errs on a variety of points. At the outset, even if Dilbeck needed to

19   allege more enforcement of the Netflix patents than he does to establish *damages*, Dilbeck

20   would still have standing to pursue an injunction under Section 16 of the Clayton Act.[4] Further,

21   _____

22   [3] Likewise, Netflix asserts it is "factually impossible" for Netflix to use the yet-to-be issued
     '381 Patent to commit "any Walker Process violation" against Wal-Mart. (Pl.'s Opp'n 7.) It is not
23   unreasonable to suppose Netflix buttressed any threat against Wal-Mart under the '450 Patent
     with a claim regarding the pending '381 Patent.
24   [4] Section 16 of the Clayton Act "authorizes injunctive relief upon the demonstration of
     'threatened' injury[,] even though the plaintiff has not yet suffered actual injury." *Zenith Radio*
25   *Corp. v. Hazeltine Research*, 395 U.S. 100, 132 (1969). *See also Campos v. Ticketmaster Corp.*,
     140 F.3d 1166, 1172 (8th Cir. 1998) (all plaintiffs had to claim to establish standing for
26   injunctive relief was to have paid "monopolistic service fees"); *Rohnert Park v. Harris*, 601 F.2d
     1040, 1043-1044 (9th Cir. 1979). Dilbeck adequately alleges a claim under Section 16:
27   "Netflix's conduct in this case threatens additional antitrust injury if Blockbuster Online is
     excluded from the Relevant Market. (Prop. Compl. ¶¶ 78, 87, 93.) *Cf. Doe v. Abbott Labs.*, No.
28   04-1511, 2004 U.S. Dist. LEXIS 29129 (N.D. Cal. Oct. 21, 2004) (allowing antitrust claimants
     without standing for antitrust damages to proceed on claim for injunctive relief).

the proposition that Federal Circuit jurisprudence controls Dilbeck's *Walker Process* claims is a dubious one at best. *Cf. Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988) (no Federal Circuit jurisdiction over antitrust complaint raising a federal patent-law defense). Finally, the *Unitherm* standard would not bar Netflix's claims even if it controlled consumer *Walker Process* claims (which it does not).

### 1. *Walker Process* Enforcement Element Does Not Require Actual Litigation

*Walker Process* claims do not require actual litigation. "[E]nforcement actions are not a *sine qua non* of monopolizing by patent fraud." *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265, 266 (7th Cir. 1984); *Rohm & Haas Co. v. Dawson Chemical Co.*, 635 F. Supp. 1211, 1218 (S.D. Tex. 1986) (same, quoting *Brunswick*). *Unitherm* recognized that fraud on the Patent Office could violate the antitrust laws an innumerable variety of ways:

> *Walker Process* claims . . . relate to a single type of behavior capable of stripping a patentee's patent-law immunity and thereby exposing the patentee to liability under [antitrust] laws. . . . [W]e cannot enumerate the full range of activities capable of effecting such a loss of immunity . . .

*Unitherm*, 375 F.3d at 1357. *See Goss Int'l Ams., Inc. v. MAN Roland, Inc.*, 2006 DNH 62, 2006 U.S. Dist. LEXIS 36386, at *10 (D.N.H. June 2, 2006) (enforcement element of *Walker Process* claim "may . . . be met by action short of filing suit, for example sending warning letters to alleged infringers," citing *Unitherm*, 375 F.3d at 1344-45). In fact, the Federal Circuit has affirmed broad liability under a *Walker Process*-type claim:

> [I]t would be a mistake to interpret 'enforcement' too narrowly, and thereby limit the remedy of a *Walker Process* type antitrust action to competitors that have actually been sued or threatened with suit by the defendant. The concept must be broad enough to afford a remedy not only to those who actually produced an infringing article and were forced to stop by infringement suit or the threat thereof, but also to those who were ready, willing, and able to produce the article and would have done so but for the exercise of exclusionary power by the defendant. . . . "[E]nforcement" in the context of claim that the plaintiff was injured by the enforcement of a fraudulently procured patent, does not require proof that the defendant expressly threatened plaintiff with an infringement suit.

*Indium Corp. of America v. Semi-Alloys, Inc.*, 591 F. Supp. 608, 614 (N.D.N.Y. 1984), *aff'd* 781 F.2d 879 (Fed. Cir. 1985) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971)).

---

1

2
## 2.    A Valid Consumer Walker Process Claim Requires Supracompetitive Fees, Not Enforcement of Sham Patents

3      More critically, Netflix cannot apply rules governing competitors' *Walker Process* claims

4  to Dilbeck's consumer *Walker Process* claims. *Molecular Diagnostics Laboratories v.*

5  *Hoffmann-La Roche, Inc.* establishes that consumers have their own *Walker Process* claims,

6  separate and apart from a competitor's claim. 402 F. Supp. 2d 276, 281-82 (D.D.C. 2005)

7  (citing, e.g., *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476 (1982); *Unitherm*, 375 F.3d at

8  1362). There are compelling reasons for consumer intervention in *Walker Process* actions. The

9  Patent Office does not, at present, have sufficient resources to effectively screen out applications

10  for "bad patents"[5] which empower their holders to "suppress competition" and extract

11  monopolistic overcharges.[6] Only consumers (not competitors) have standing to recover these

12  monopolistic overcharges. Consumers can police bad patents more effectively than competitors

13  because they are typically not subject to the threat of injunctions and treble damages that can

14  induce competitors to settle prematurely. However, the rules controlling competitor's *Walker*

15  *Process* claims do not apply to consumers without any adaptation: consumers are the antitrust

16  counterparts of competitors, not their clones. *Cf. id.* at 280-82 (rejecting argument that

17  consumers have no standing for Walker Process claim until sued for patent infringement).

18  Consequently, there are fundamental differences between Dilbeck's *Walker Process* claims and

19  Blockbuster's *Walker Process* claims. *Id.* at 286 (recognizing "critical distinction" between

20  *Walker Process* claims of purchaser and competitor).

21      Netflix cannot meaningfully distinguish *Molecular Diagnostics* on the basis that there

22  was "actual" patent litigation in that case. (Pl.'s Opp'n 5.) *Molecular Diagnostics* makes plain

23

24  [5]    The PTO's resources also appear inadequate to allow efficient and accurate screening of questionable patent applications. . . . Hearings participants estimated

25  that patent examiners have from 8 to 25 hours to read and understand each application, search for prior art, evaluate patentability, communicate with the

26  applicant, work out necessary revisions, and reach and write up conclusions. . . . Hearings participants unanimously held the view that the PTO does not receive sufficient funding for its responsibilities.

27  Federal Trade Commission, To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy 9-10 (2003), *available at*

28  http://www.ftc.gov/os/2003/10/innovationrpt.pdf.
[6] *Id.* at 5-6.

that a consumer's *Walker Process* claim is grounded on the supracompetitive fee the patentee

extracts while it uses the patents to exclude competition, not any enforcement action on the

patents:

> [T]he enforcement of a patent [is not] the relevant injury. . . . [The consumer-plaintiff] asserts that its injury arose through the payment of supra-competitive prices resulting from an illegitimately obtained monopoly . . .

*Id*. at 285, 286. The measure of a consumer's *Walker Process* damages is the monopolistic

overcharge the patentee achieved through deterring and delaying competition with its ill-gotten

patents. Naturally, Dilbeck must still prove that Netflix's patents gave rise to a supracompetitive

fee by deterring potential competitors who were "ready, willing, and able to" enter the Relevant

Market but for the Netflix patents. *Indium Corp.*, 781 F.2d at 882. Dilbeck has alleged exactly

this, and those allegations state viable antitrust claims.

## II. The Existing Parties' Oppositions Do Not Justify Denying Dilbeck Leave to Intervene

Dilbeck's intervention would provide a seat at the table of any settlement between the

parties for a watchdog that could provide an independent review of such settlement's effect on

competition in the Relevant Market. Dilbeck's intervention is hence justified as either

permissive intervention under Rule 24(b)(2) or intervention as of right under Rule 24(a)(2).

Dilbeck's intervention would greatly enhance judicial economy because such a watchdog would

likely deter an anticompetitive settlement and preclude the necessity of a *post hoc* review of

such settlement in a separate antitrust action.

The existing parties do not expressly articulate any legal objection to Dilbeck's

intervention (aside from Netflix's ill-fated challenge to Dilbeck's antitrust claims). Rather, the

existing parties' objections to the proposed interventions concern its practical impact on the

case's timeline and its affect on a jury trial. Even though these objections cannot overcome

Dilbeck's legal right to intervene, Dilbeck's intervention will not derail the parties' existing

litigation. As set forth below, Dilbeck's intervention would only minimally alter the existing

litigation's scope and course.

1

### A. The Court Should Consider Dilbeck's Right to Intervene Under Rule 24(a)(2)

Dilbeck's primary aim in intervention is to secure an effective independent review of any settlement between the parties before any such settlement takes place, to avoid the judicial costs of a *post hoc* review by a separate antitrust action – an ounce of prevention being worth a pound of cure in antitrust law no less than in medicine. Dilbeck's focus on permissive intervention (rather than intervention as of right) reflects the practical reality that he has to convince this Court his intervention is well-founded in the first instance, rather than prevailing on appeal. Because his focus is on interceding in any settlement between the parties, Dilbeck's most expedient response to a denial of leave to intervene is to file a separate action to be consolidated with this case as quickly as possible – not to appeal.[7] This does not mean, as Netflix suggests, that the Court should not consider Dilbeck's arguments that he is entitled intervention as of right.[8]

Dilbeck has a right to intervene under Rule 24(a) because his motion is timely, and because Netflix's successful assertion of its sham patents would, as a practical matter, impair or impede Dilbeck's interest in competition in the Relevant Market. *Prete v. Bradbury*, 438 F.3d 949, 954 (9th Cir. 2006) (elements of right to intervene under Rule 24(a)). While Dilbeck bears the burden of showing his right to intervene, "the requirements for intervention are broadly interpreted in favor of intervention." *Id.*

### 1. Neither Existing Party Argues That Dilbeck Is Untimely Under the Standard Applicable Under Rule 24

Although existing parties devote most of their oppositions to arguing that intervention would prejudice the parties, neither party actually argues that Dilbeck is untimely under Rule 24. "Delay is measured from the date the proposed intervenor should have been aware that its

---

[7] Dilbeck could conceivably obtain a *supersedeas* bond to stay proceedings pending the appeal of a denial of his motion to intervene under Rule 62(d). Given Dilbeck's small individual stake as a consumer, the cost of such a bond would be onerous. More importantly, a stay of proceedings would be futile as it does nothing to stop the existing parties from *settling*.
[8] Netflix calls Dilbeck's argument for intervention of right "half-hearted" because it was raised in a footnote. Dilbeck adequately raised his argument for intervention as of right. *Cf. Beckman Indus. v. Int'l Ins. Co.*, 966 F.2d 470, 474 (9th Cir. 1992) (affirming holding that reference "only in one sentence in the intervenor's motion requesting intervention of right pursuant to Rule 24(a)" adequately raised argument for permissive intervention).

1

2

interests would no longer be protected adequately by the parties, not the date it learned of the

3

litigation." *United States v. Washington*, 86 F.3d 1499, 1503 (9th Cir. 1996). *See also League of*

4

*United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302, 1307 (9th Cir. 1997) (Rule 24

5

"timeliness clock [does not] begin[] ticking" until after proposed intervenor has actual notice of

6

the litigation *and* that interests were not protected). Dilbeck's counsel had notice a little over a

7

month before moving to intervene; neither existing party argues that *this* minimal delay actually

8

prejudices them, but rather that the Dilbeck's intervention at this stage of the proceedings will

9

cause prejudice. This "prejudice" is not legally cognizable under Rule 24.[9] *Cf. Nikon Corp. v.*

10

*ASM Litho. B.V.*, 222 F.R.D. 647, 649 (N.D. Cal. 2004) (intervention during discovery timely

11

even after litigation calendar set and many patent claims construed).

12

### 2.    Dilbeck Can Protect His Interest in Competition in the Relevant Market Through Intervention

13

Netflix challenges the existence of Dilbeck's protectable interest in competition in the

14

Relevant Market.[10] "[T]he Supreme Court has recognized that a mere interest in competition [is]

15

sufficient for intervention as a right." *Seide v. Prevost*, No. 81-6205, 1981 U.S. Dist. LEXIS

16

16222, at *5 (S.D.N.Y. Nov. 30, 1981) (citing *Cascade Natural Gas Corp. v. El Paso Natural*

17

*Gas Co.*, 386 U.S. 129, 135 (1967)).

18

19

20

21

> In *Cascade*, . . . the Supreme Court found that the State of California had sufficient interest . . . to intervene in divestiture hearings resulting from a civil antitrust suit brought by the federal government against a private gas company. California's interest was founded on a general "public interest" that the acquired company, which was "a substantial factor in the California market at the time it was acquired," be restored as an effective competitor in the state - an element

22

23

24

[9]    In assessing prejudice to the parties, the court considers whether existing parties may be prejudiced by the delay in moving to intervene not whether the intervention itself will cause the nature, duration or disposition of the lawsuit to change (otherwise, intervention would never be allowed because it inevitably prolongs the litigation).

25

*Defenders of Wildlife v. Johanns*, No. 04-4512, 2005 U.S. Dist. LEXIS 34455, at *11-12 (N.D. Cal. Dec. 1, 2005) (citations and quotation marks omitted).

26

[10] Netflix argues that Dilbeck cannot demonstrate that this outcome of this case would "impair

27

or impede [his] ability to protect [his] interest" because the ruling would not be binding on him. (Pl.'s Opp'n 9.) Netflix is mistaken because, in addition to the above, Rule 24(a) tests whether the outcome of this case would, "*as a practical*" matter, impair competition in the Relevant Market. Blockbuster's loss would eliminate Netflix's only competition and would permit Netflix

28

to resume charging supracompetitive rates. *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001) (articulating test for practical impairment).

1   which the Court did not feel was adequately handled by the federal government.

2   *Blake v. Pallan*, 554 F.2d 947, 952 (9th Cir. 1977) (citations omitted). Court have cited *Cascade*

3   for the proposition that "impact on competition is sufficient interest for intervention" by private

4   actors as well. *Feller v. Brock*, 802 F.2d 722, 730 (4th Cir. 1986) (citing *Cascade*, 386 U.S. at

5   135-36).[11] Dilbeck has an adequate interest in competition in the Relevant Market to justify

6   intervention under Rule 24(a)(2).

7                       **3.     Blockbuster Cannot Adequately Represent Dilbeck's Interests**

8        Both existing parties claim Blockbuster adequately represents Dilbeck's interests in this

9   litigation, and that "mere speculation about collusion provides no support for [Dilbeck's]

10  attempt to intervene." (Def.'s Opp'n 6; *see also* Pl's Opp'n 9, 12-13.) The parties quite misstate

11  the standard for intervention. "[T]he burden of showing inadequacy [of representation] is

12  'minimal,' and the applicant need only show that representation of its interests by existing

13  parties 'may be' inadequate." *Southwest Ctr.*, 268 F.3d at 823 (quoting *Trbovich v. United Mine*

14  *Workers*, 404 U.S. 528, 538 n. 10 (1972)). Dilbeck does more than speculate: he identifies a

15  specific danger of collusive settlement already manifested in several other patent cases.[12] It is

16  worth reiterating that, *as a statistical matter, this case is far more likely to settle than go to*

17  *trial.*[13] Rather than waiting for this scenario to play out and attempt to remedy the situation after

18  the fact, Dilbeck attempts to intervene to prevent the a collusive settlement from ever arising. *Id.*

19

20  _____

[11] Netflix complains that the possibility of collusive settlement "would justify consumer
21  intervention in virtually any patent litigation." (Pl's Opp'n 12.) (*See also* Def.'s Opp'n 2 n.1.)
    Consumers do indeed have such a right under *Cascade*. This is consistent with a variety of
22  decisions that have permitted intervention in patent infringement actions. *See Nikon Corp. v.*
    *ASM Litho. B.V.*, 222 F.R.D. 647, 649-51 (N.D. Cal. 2004) (component manufacturer permitted
23  to intervene in patent litigation against its sole customer); *Fisher v. Gillette Co.*, No. 80-4415,
    1981 U.S. Dist. LEXIS 10405 (N.D. Ill. Jan. 20, 1981) (granting exclusive patent licensee
24  intervention in suit alleging infringement on licensed patent, where license sought to invalidate
    patent or obtain injunction against defendant if patent were valid). Dilbeck's intervention would
25  not unduly expand consumers' rights to intervene to assure competitive markets.
[12] *Louisiana Wholesale Drug Co. v. Hoechst Marion Roussel, Inc.*, 332 F.3d 896, 909 (6th Cir.
26  2003); *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279 (S.D. Fla. 2005)
    (settlement of patent litigation allocated markets outside scope of patent); *In re K-Dur Antitrust*
27  *Litig.*, 338 F. Supp. 2d 517 (D.N.J. 2004) (same).
[13] In the twelve month period ending March 31, 2005, *only 1.5 percent of all cases before the*
28  *federal courts terminated in a trial.* Administrative Office of the United States Courts, Federal
    Judicial Caseload Statistics 2005, Table C-4 (Cases Terminated, by Nature of Suit and Action
    Taken) (2005), *available at* http://www.uscourts.gov/caseload2005/tables/C04mar05.pdf.

at 823-24 (finding inadequate representation element met where intervenor and party's interests "might diverge" even though they shared same "ultimate objective"). Further, the parties' arguments lay the groundwork for a Catch-22: if Dilbeck postponed his intervention until the parties settle because collusion was only hypothetical, they could claim intervention was untimely. *Alaniz v. Tillie Lewis Foods*, 572 F.2d 657, 659 (9th Cir. 1978) (would-be intervenors bear the risk of adverse settlements when they do not immediately intervene).

### B.    Dilbeck's Intervention Would Serve the Interests of Judicial Economy

Dilbeck's right to intervene takes priority over the existing parties' convenience and their trial date.[14] Nonetheless, Dilbeck recognizes his ability to convince the Court to grant his intervention in the first instance is, as practical matter, more important than laying the grounds for an appeal that would not protect his interests. To that end, Dilbeck avers that his intervention will impose only minimal additional adjudicative costs on the parties and the Court.

Blockbuster and Dilbeck's claims have much more in common than the basic elements of Netflix's *Walker Process* violation, contrary to Netflix's assertion. (Cf. Pl.'s Opp'n 10, 15.) Dilbeck's intervention will "promote[] judicial economy and preserve[] litigant resources" because Dilbeck and Blockbuster's claims have many factual and legal issues in common, particularly where a separate suit would only "inevitably bring the parties, at a much later date, to the point where they are now." *Benavidez v. Eu*, 34 F.3d 825, 830-31 (9th Cir. 1994). *See also Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 784-786 (1st Cir. 1988) (intervention causes "little prejudice to the existing parties" where it "pertains to a particularly discrete and ancillary issue"). Denying intervention would waste judicial resources because it would force Dilbeck and Netflix to duplicate much of the factual issues already before the court.

### 1.    Dilbeck's Claim Introduces Only Two Additional Factual Issues

Blockbuster's claim for lost profit requires it to prove it was prepared to enter the

---

[14] *See United States v. Los Angeles*, 288 F.3d 391, 404-05 (9th Cir. 2002) ("streamlining" litigation "should not be accomplished at the risk of marginalizing those . . . who have some of the strongest interests in the outcome," reversing denial of intervention); *United States v. $129,374*, 769 F.2d 583, 586 (9th Cir. 1985) ("principal focus of a motion to intervene under rule 24 is whether an applicant has shown that he has a protectable interest in the outcome of the litigation of sufficient magnitude to warrant inclusion in the action").

1   Relevant Market but delayed entry because of Netflix's patents. (*Cf.* Def's Countercl. ¶¶ 108,

2   117 *with Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 807, 817 (D.C. Cir. 2001).)

3   Dilbeck's case adds only one issue of fact which requires more than minimal discovery: the first

4   date on which any competitor (be it Blockbuster, Wal-Mart, or a third party) was ready and

5   willing to enter the Relevant Market and would have done so, but for Netflix's patents. *Id.*;

6   *Indium Corp.*, 781 F.2d at 882.[15] This inquiry will not be very extensive because the pool of

7   potential competitors is small. (Prop. Compl. ¶¶ 49-52, describing barriers to entry.)

8        With that date, Dilbeck can define the Class Period and the Class of Netflix customers

9   who paid supracompetitive charges to Netflix. Netflix's Form 10-K for 2004 allows Dilbeck to

10  calculate the monopolistic overcharge with ease and precision: Netflix charged $20 per month

11  (and from June to November 2004, $22 per month) for the standard 3-DVD package until

12  Blockbuster's entry into the Relevant Market forced it to drop its prices to $18 per month.[16] (*Id.*

13  ¶¶ 58-59.)

14
            [C]ompetition [in the Relevant Market intensified significantly since Blockbuster
15          officially launched its online service . . . [E]ffective November 2004, in response
            to the changing competitive landscape, we lowered the price of our standard
16          service to $17.99.

17  (*Id.* ¶ 59, quoting Netflix's 2004 Form 10-K Annual Report.) "[B]asic economic theory predicts

18  that the artificial absence of competition leads to less competitive prices." *In re Microcrystalline*

19  *Cellulose Antitrust Litig.*, 218 F.R.D. 79, 90 (E.D. Pa. 2003). Although Blockbuster and

20  Dilbeck's interests diverge on what the Relevant Market's competitive price was, there seems to

21  be little room for controversy, nor does Blockbuster suggest that there is.

22       Blockbuster's opposition expresses concern that intervention will delay claim

23  construction or "deprive the class of effective representation in connection with such important

24  matters." (Def's Opp'n 2.) However, the construction of the Netflix patent claims *per se* is

25  peripheral or entirely irrelevant to Dilbeck's claims. Dilbeck's only concern is whether Netflix

26  _____

27  [15]  In addition, both Blockbuster and Dilbeck must also prove fraud on the Patent Office and the
      definition of the Relevant Market.

28  [16]  Dilbeck's allegation of monopolistic overcharge flatly contradicts Netflix's assertion that its
      anticompetitive conduct "has [not] caused antitrust injury [or] any alleged effect on consumer
      prices." (Pl.'s Opp'n 8.)

concealed material information from the Patent Office when prosecuting the '450 and '381 Patents: any issue of patent invalidity short of fraud is irrelevant to Dilbeck's *Walker Process* claim. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069-70 (Fed. Cir. 1998). Thus, the *Markman* hearing and claim construction charts required under the local patent rules do little to advance Dilbeck's claims. (It is worth noting that the *Molecular Diagnostics* case has not scheduled any *Markman* hearings. A copy of the *Molecular Diagnostics* docket is attached and incorporated as Exhibit A.) For that reason, to the extent that the Court requires Dilbeck to construe the claims of the '450 or '381 Patents, Dilbeck has not information that would lead him to not adopt Blockbuster's construction.

### 2. Existing Parties' Fears About Class Action Practice Are Unfounded and Do Not Reflect the Realities of Dilbeck's Class Claims

Because the existing parties overstate the additional factual issues introduced by Dilbeck's claims, they drastically overestimate the judicial resources required by Dilbeck's class claims. Indeed, the existing parties' objections reflect unfounded fears about class action practice. For instance, Netflix asserts that "[c]onsumer class actions . . . take months, if not years, to prepare for trial," and that "[i]ntervention would also necessitate substantial discovery relating to the Rule 23 factors." (Pl.'s Opp'n 9-10, 11.) However, the only factual issue which requires pre-certification discovery is the Class Period. *Cf.* Manual for Complex Litigation § 21.14 (4th ed. 2004). To compare, class certification in the *Molecular Diagnostics* litigation took just over three months from the filing of the motion for certification on April 3, 2006 to the July 5, 2006 order granting certification. *See* Ex. A.

Blockbuster's opposition expresses concern about an increased "burden and complexity" if "additional class actions against Netflix . . . emerge, along with additional candidates for class representative and class counsel." (Def's Opp'n 6). This is not a viable objection because any valid class certification order would have to appoint lead counsel and one or more class representatives. Fed. R. Civ. P. 23(c)(1)(B); Manual for Complex Litigation §§ 21.26, 21.27.

### 3. Dilbeck's Intervention Should Not Be Denied Because the Existing Parties Have Not Cooperated in Discovery

Netflix complains that Dilbeck's intervention would "be hugely burdensome and

distracting," and "distract the parties from the task of taking and completing the enormous amount of discovery" already required. (Pl.'s Opp'n 9, 11.) However, Netflix can only identify two actual deadlines deferred by Dilbeck's intervention: 1) an April 27, 2007 deadline for fact discovery and 2) a June 14, 2007 deadline for dispositive motions. (*Id*. 9, 10.) To the extent Netflix is concerned about the burden of this litigation, it would better address that concern by eliminating its needless jousting over discovery with Blockbuster with its motions to compel and for a protective order (despite the parties' stipulation to protective order, entered on October 3, 2006). Netflix's inability to conduct discovery in a reasonably cooperative manner should not prejudice Dilbeck's motion to intervene.

### 4. The Court Can and Should Grant Intervention Under Terms Tailored to Promote Judicial Economy

The Court has enormous discretion over its docket and is free to set the terms of Dilbeck's intervention as it sees fit, to ensure the expeditious resolution of this case. Dilbeck has already agreed to comply with this case's existing deadline to a great extent, and to adopt Blockbuster's claim construction. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 n.10 (9th Cir. 2002) ("no issue whatsoever of undue delay" where intervenors said they could abide the court's briefing and procedural scheduling orders); *Cent. Valley Chrysler-Jeep Inc. v. Witherspoon*, No. 04-6663, 2005 U.S. Dist. LEXIS 26536, *26-27 (E.D. Cal. Oct. 5, 2005) (to ensure case was manageable after intervention, intervenors had to "coordinate their positions" with party and only file motions and/or briefs if the party refused to make a relevant argument).

Likewise, the Court may wish to consider bifurcating the case into a liability phase and a damages phase. The Court has already determined that "Blockbuster's *Walker Process* fraud counterclaim is closely related to a determination as to the validity of the patents in suit [and] the omitted [NCR] prior-art references will be relevant to both inquiries." *Netflix*, 2006 U.S. Dist. LEXIS 63154, at *26. Blockbuster already must show when it was ready to enter the Relevant Market to establish its claim for lost profits. The only additional factual inquiry relevant to Netflix's liability on Dilbeck's claim is whether someone else was ready to enter the

Relevant Market before Blockbuster.[17] However, to the extent the Court is concerned about overburdening the jury, bifurcating between antitrust liability and antitrust damages would be one way to lighten that burden.

WHEREFORE, Dilbeck prays that the Court enter judgment and grant Dilbeck leave to intervene, to become a party in the above-titled action as an intervening plaintiff against Netflix, Inc., and to file the proposed Complaint in Intervention submitted to the Court with the motion to intervene.

Dated: November 27, 2006

                                            LAW OFFICES OF ALAN HIMMELFARB
                                      By: /s/Alan Himmelfarb
                                            Alan Himmelfarb
                                            2757 Leonis Blvd
                                            Los Angeles, CA 90058
                                            Telephone: (323) 585-8696
                                            Fax: (323) 585-8198
                                            consumerlaw1@earthlink.net

                                            Scott A. Kamber
                                            Ethan Preston
                                            KAMBER & ASSOCIATES, LLC
                                            11 Broadway, 22d Floor
                                            New York, NY 10004
                                            Telephone: (212) 920-3072
                                            Fax: (212) 202-6364
                                            skamber@kolaw.com
                                            epreston@kolaw.com

---

[17] For these reasons, bifurcation along the lines Netflix suggests – one patent infringement trial and one antitrust trial – would plainly duplicate substantial swaths of factual issues and would be hugely counterproductive. (*Cf.* Pl's Opp'n 13-15.)