KEKER & VAN NEST, LLP
JEFFREY R. CHANIN - #103649
DARALYN J. DURIE - #169825
ASHOK RAMANI - #200020
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Plaintiff
NETFLIX, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETFLIX, INC., a Delaware corporation,<br><br>                              Plaintiff,<br><br>      v.<br><br>BLOCKBUSTER, INC., a Delaware corporation, DOES 1-50,<br><br>                              Defendant. | Case No. C 06 2361 WHA (JCS)<br><br>**NETFLIX'S OPENING CLAIM-CONSTRUCTION BRIEF**<br><br>Date:    January 31, 2007<br>Time:   TBD<br>Dept:   Courtroom 9, 19th Floor<br>Judge: Hon. William H. Alsup |
| AND RELATED COUNTERCLAIMS | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ...................................................................................................1

    A.    The patented method is a crucial component of Netflix's success. .........................1

    B.    Blockbuster, recognizing the success of Netflix's new business model, copied it................................................................................................................4

III.  LEGAL STANDARDS .........................................................................................5

IV.   ARGUMENT .........................................................................................................7

    A.    Movie/item rental queue. ....................................................................................7

        1.    A "queue" inherently includes an order. ....................................................8

        2.    The "movie/item rental queue" is used by the provider to rent movies/items. ..............................................................................................9

    B.    "Ordered list" ....................................................................................................12

    C.    "based upon the desired order," "in the desired order," and "based upon the order of the list" ...................................................................................14

        1.    "Based upon" and "in" are not interchangeable. .....................................15

        2.    The "desired order" is the order desired by the customer.........................16

    D.    "computer-implemented"...................................................................................17

    E.    "electronically updating" ..................................................................................20

    F.    "periodic fee" ....................................................................................................21

    G.    "game/item/movie selection criteria" ...............................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

### Statutes

*Abraxis Bioscience, Inc. v. Mayne Pharma, Inc.*,
  No. 06-1118, 2006 WL 3302663 (Fed. Cir. Nov. 15 1006) ........................................... passim

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
  340 F.3d 1298 (Fed. Cir. 2003) ........................................................................................ 22

*Bancorp Servs., L.L.C. v. Hartford Life Ins.*,
  359 F.3d 1367 (Fed. Cir. 2004) ........................................................................................ 15

*Callicrate v. Wadsworth Manufacturing*,
  427 F.3d 1361 (Fed. Cir. 2005) .......................................................................................... 6

*Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002) ......................................................................................... 19

*Flex-Rest, LLC v. Steelcase, Inc.*,
  455 F.3d 1351 (Fed. Cir. 2006) ................................................................................... passim

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
  381 F.3d 1111 (Fed. Cir. 2004) .......................................................................... 12, 15, 19, 20

*KSR Int'l v. Teleflex, Inc.*,
  No. 04-1350, slip op. (2006) ............................................................................................... 3

*Mars, Inc. v. H.J. Heinz Co.*,
  377 F.3d 1369 (Fed. Cir. 2004) ....................................................................................... 6, 9

*Nystrom v. TREX Co.*,
  424 F.3d 1136 (Fed. Cir. 2005) ................................................................................... 5, 6, 13

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ................................................................................... passim

*U.S. Surgical Corp. v. Ethicon, Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997) ...................................................................................... 17

### Treatises

35 U.S.C. § 101 ............................................................................................................. 14, 19

1

## I.    INTRODUCTION

Netflix revolutionized the movie-rental industry with a novel way to maximize customer convenience and flexibility, address long-standing inventory-management challenges, and eliminate the industry's historical reliance on late fees. Before Netflix's invention, a customer typically selected, rented, and watched a movie at substantially the same time. As a consequence, rental providers had a limited ability to predict in advance what customer demand for particular items would be, making it difficult for the provider to anticipate the appropriate inventory level. By allowing the customer to specify in advance the items she wished to rent and the order in which she wished to receive the items, and to update that list dynamically, Netflix's invention separated the selection, rental, and viewing of movies. This innovation simultaneously improved customers' rental experience and solved provider-side problems that had bedeviled the movie industry for decades.

When Blockbuster launched its own online movie-rental service, years after Netflix, it copied virtually every aspect of Netflix's patented methods. As a result, Blockbuster recognizes that it has no defense to infringement, and thus seeks claim constructions so broad as to render the claims of Netflix's patents meaningless. A couple of Blockbuster's proposals reveal the extent to which it is willing to go: Blockbuster insists that an "ordered list" and a "queue" need not reflect any ordering at all, and that "based upon the desired order" and "in the desired order" mean the exact same thing, even when those two different formulations appear in the same claim. In contrast, Netflix seeks constructions that are true to the ordinary meaning of the claim terms (particularly the many terms that are common English words), and that also reflect the meaning of those claim elements when understood in the context of the invention as a whole.

## II.    BACKGROUND

### A.    The patented method is a crucial component of Netflix's success.

Netflix was founded in 1997, and began renting movies to customers on April 14, 1998. Declaration of Ashok Ramani ("Ramani Decl.") Exh. 3 ¶ 3. At first, Netflix operated as an online version of a traditional video store, with a "pay-per-rental" model—customers would choose a particular movie to rent, request delivery of that movie, and pay a fixed fee per movie,

1    all at the same time.  Customers would also pay late fees if the movie were not returned in the

2    specified time period.  *Id.* ¶¶ 3-4.  This "online video store" floundered, and Netflix almost went

3    out of business.

4    At the end of 1999, Netflix rolled out its Marquee Program, a unique and novel approach

5    to renting DVDs that quickly propelled Netflix to success.  The Marquee Program offered

6    "Automatic Movie Replenishment," which permitted customers for the first time "to pre-select

7    an unlimited number of DVDs," such that when one DVD was returned, the next DVD in the

8    customer's list would be shipped.  *Id.* Exh. 4 at NFLIX0000293-294.  Customers paid a flat

9    monthly fee, and could keep out any movie as long as they wished, eliminating late fees.  Netflix

10   had created something attractive to consumers while at the same time addressing vexing

11   inventory-management problems.  Within six years of its innovation, Netflix's service has grown

12   to almost 6 million subscribers and nearly $1 billion in annual revenue.

13   Netflix filed for a patent on its invention on April 28, 2000; U.S. Patent No. 6,584,450

14   issued on June 24, 2003.  Ramani Decl. Exh. 1 ('450 patent) at NFLIX0000001.  On May 14,

15   2003, Netflix filed a continuation application that issued as U.S. Patent No. 7,024,381 on April 4,

16   2006.  *Id*. Exh. 2 ('381 patent) at NFLIX0000911.

17   Netflix's patents do not cover any and all ways to rent movies over the Internet.  Instead,

18   the patents address one particular way to solve a long-standing problem in movie rentals:  pre-

19   existing rental models forced customers to decide what movie to rent and to rent the movie at

20   roughly the time that they wanted to watch the movie (or pay exorbitant late fees).  Ramani Decl.

21   Exh. 1 at 1:27-29 and Exh. 2 at 1:37-39.  Thus, the patented invention seeks to provide a

22   "separation of customers' decisions of what items to rent from when to rent the items," while

23   also eliminating late charges and ensuring that, whenever a customer decides to watch a movie, a

24   movie chosen by the customer will be at the ready, waiting to be watched.  *Id.*, Exh. 1 at 1:34-37

25   and Exh. 2 at 1:44-47.

26   By allowing the customer to specify in advance what the customer desires to rent, the

27   patented inventions radically improved both customers' rental experience and inventory

28   management.  The "Field of Invention" explains that the "invention relates to inventory rental."

2

*Id.*, Exh. 1 at 1:6-8 and Exh. 2 at 1:16-18.  Because a provider knows in advance the movies that customers want to rent, the provider can factor in the anticipated customer demand when it buys movies.

In hindsight, the patents' basic methodology appears deceptively simple.[1]  A customer submits "item selection criteria" to the rental provider.  *Id.*, Exh. 1 at 4:14-16 and Exh. 2 at 2:49-51.  These criteria may specify particular movie titles, or they may relate more generally to the desired items' subject matter—action movies, for example, or movies directed by Bernardo Bertolucci.  *Id.*, Exh. 1 at 8:43-65 and Exh. 2 at 7:10-32.  The customer can also establish, via the item selection criteria, the order in which the customer wishes to receive the items:

> For example, customers may specify priorities for the items indicated by the item selection criteria. Thus, if a particular customer's first choice is not available, or already rented, then the item having the next highest priority can be rented to the particular customer.

*Id.* Exh. 1 at 11:18-22 and Exh. 2 at 9:50-54.

The rental provider uses the item selection criteria to create a "customer-specific order queue," which the rental provider uses in turn to rent items to the customer.  *Id.* Exh. 1 at 4:56-58 and Exh. 2 at 3:24-26.  The customer specific order queue includes the priority in which the customer wishes to receive items.  If an item is not available for immediate delivery, the rental provider can identify an alternative item to send.  *See id.*, Exh. 1 at 11:20-23 and Exh. 2 at 9:52-54.  When the customer returns the rented items to the rental provider (or upon satisfaction of other delivery criteria, including, for example, customer notification of return), the rental provider sends the next movie.

The elimination of late fees results from the method of payment: instead of paying a fee per movie rented, the customer pays a flat fee per unit of time.  In one embodiment of the invention, the customer can have a maximum number of movies rented at any one time ("Max

---

[1]The most innovative solutions are often those that, with the benefit of hindsight, seem the most obvious.  *See* Transcript of Oral Argument at 7, *KSR Int'l v. Teleflex, Inc.*, No. 04-1350, slip op. at 7 (2006) ("Of course, the reason that the Federal Circuit has devised this additional test or gloss on *Graham* is that they say *obviousness is, it's deceptive in hindsight. In hindsight everybody says, I could have thought of that; and that you need -- if you don't have the sort of constraint that their test imposes, it's going to be too easy to say that everything was obvious*.") (Roberts, CJ) (emphasis added).

Out").  In another embodiment, the customer can receive up to a predefined number of movies within a fixed period of time ("Max Turns").  *Id.* Exh. 1 at 4:35-40 and Exh. 2 at 3:3-8.

The PTO issued both patents after initial rejections, including rejections based on prior art.  To take one example, the examiner rejected the '381 patent's claims over two separate books-on-tape libraries, each of which required borrowers to submit a list of desired tapes and then receive the tapes based on current availability.  *See* Ramani Decl. Exh. 5 at NFLIX0000863-864.  The examiner was persuaded that neither reference anticipated or rendered obvious Netflix's invention because the references failed to "teach[] delivery according to the order of a list, or updating a list over the Internet."  *Id.*; *see id.* Exh. 6 at NFLIX0000903.  Nor did the references "teach or suggest rental queues" or "teach any way for a patron to self-manage a book list," all of which were key components of Netflix's invention.  *Id.* Exh. 5 at NFLIX0000863-864; *id.* Exh. 6 at NFLIX0000903.  Because the '381 patent is a business-method patent, it was subjected to secondary review, which means that a second examiner independently reviewed the patent application and references before issuance.  Thus, the '381 patent was reviewed and deemed fit for issuance by two separate PTO examiners.

**B.     Blockbuster, recognizing the success of Netflix's new business model, copied it.**

Blockbuster, which has long been and remains the market-share leader in the movie-rental industry, launched its online subscription service, Blockbuster Online, in 2004, several years after Netflix pioneered the Marquee Program.

Blockbuster Online is a Netflix clone:  the Blockbuster feature "My Queue" allows customers to prioritize movies in the order in which the customer would like to receive them, and the customer may update the queue by adding, deleting, or changing the movie order.  Ramani Decl. Exh. 7 at 3-5.  Although Blockbuster produced its first volume of confidential documents just last week, Netflix has already found evidence that Blockbuster intentionally copied virtually every aspect of Netflix's service.

### REDACTED PURSUANT TO PROTECTIVE ORDER

# III.    LEGAL STANDARDS

This Court already knows the rules governing claim construction, and thus we will not repeat them.  But it is worth discussing three principles that bear directly on the issues that this case presents:  *first*, claims must be read in the context of the problem that the invention was intended to solve; *second*, claim terms should be interpreted in light of the description of the invention as set forth in the specification; and *third*, the structure of the claims informs the correct claim construction.

*First*, the claims must be construed in light of the purpose of the invention and the problems the invention was trying to solve.  In *Flex-Rest, LLC v. Steelcase, Inc.*, the court construed the term "sidewall" in a patent that addressed a keyboard-support tray.  455 F.3d 1351, 1354-55 (Fed. Cir. 2006).  The *Flex-Rest* court affirmed the district court's construction requiring the sidewall to "extend upward" from the keyboard-support tray.  *Id.* at 1355.  While the claim language on its face did not require that the sidewall extend in any particular direction, the invention's purpose as explained in the specification was to provide a keyboard support— thus, a sidewall that went any direction other than up from the support tray would not solve the problem to which the invention was addressed.  *Id.* at 1361.  Similarly, in *Abraxis Bioscience, Inc. v. Mayne Pharma, Inc.*, the court narrowed the construction of the word "derivatives" to a sub-class of chemical compounds specifically described in the specification, because "the patentees' discovery [as described in the specification] focused on the unexpected effectiveness of [those narrower class of compounds] as antimicrobial agents."  No. 06-1118, 2006 WL 3302663, at *6 (Fed. Cir. Nov. 15, 2006).

*Second*, while dictionary definitions of ordinary English words are significant, they are not in themselves dispositive: the Court must also analyze the meaning of a claim term in the context of the invention and the patent as a whole.  For example, in *Nystrom v. TREX Co.*, the court construed the term "board" in a patent that addresses construction materials for use in outdoor flooring.  424 F.3d 1136, 1139 (Fed. Cir. 2005).  The *Nystrom* court affirmed the district court's construction of "board" to be limited to, in relevant part, "wood cut from a log."  The claims themselves did not limit "board" to wood at all—in fact, another claim actually included

the phrase "wood board," which the Court acknowledged could lead to a presumption that the term "board" alone is not limited to wood. *Id.* at 1143. But because the specification consistently discussed wood flooring materials, including analysis of water deterioration, processes used to cut lumber from logs, and growth rings, and consistently used the term "board" to refer to wood decking cut from logs, the Court was persuaded that the narrower definition of board was appropriate. *Id.* at 1143-44.

When looking to the specification, the Court must be careful to abide by the "distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005). While this can be a difficult distinction to apply, *Flex-Rest* illustrates the principle well: in construing the term "sidewall," the Court looked to the specification to confirm the invention's relevant purpose—to provide keyboard support. 455 F.3d at 1354-55. In contrast, the district court in *Callicrate v. Wadsworth Manufacturing* inappropriately construed the term "lever for deforming a grommet," in a patent addressing an animal-castration device, to require a "fulcrum pin" on which the lever would pivot. 427 F.3d 1361, 1367 (Fed. Cir. 2005). The *Callicrate* court rejected the fulcrum-pin definition because the claim itself did not require the limitation, and the specification passage on which the district court relied described a feature of the preferred embodiment. *Id.* at 1367-68. Thus, while an element of a particular embodiment should not ordinarily limit a claim's meaning, the purpose and description of the invention can make a narrower construction appropriate.

*Finally*, courts must consider the structure of the patent claim in which the term appears. The court in *Mars, Inc. v. H.J. Heinz Co.* reversed the district court's construction of the term "ingredients" to mean "only starting materials," in a patent addressing a type of pet food, because the district court in part failed to recognize that the broader claim language "a mixture of lipid and solid ingredients" implied that other components were first mixed together to form the "ingredients." 377 F.3d 1369, 1371, 1374 (Fed. Cir. 2004) As a result, "ingredients" wasn't limited just to starting materials. *Id.* at 1374-75.

# IV.    ARGUMENT

The Court allowed the parties jointly to submit eight claim terms from the '381 and '450 patents for construction.  The parties initially identified eight terms to construe, and have been unable to stipulate to any definitions.

**A.    Movie/item rental queue ('381:  all independent claims (1, 14, 24, 34, 44) and many dependent claims; '450:  claims 7, 22).**

| NETFLIX'S PROPOSED CONSTRUCTION | BLOCKBUSTER'S PROPOSED CONSTRUCTION |
| --- | --- |
| sequence of movies/items used by a rental provider to determine which movies/items to deliver[2] | Two or more items/movies for future rental or possible future rental, or the names or other representations of two or more such items/movies. |
| | Thus: |
| | "item rental queue": Two or more things of any kind for future rental or possible future rental, or the names or other representations of any two or more such things. |
| | "movie rental queue" Two or more movies for future rental or possible future rental, or the names or other representations of any two or more such movies.  For purposes of this definition, "movies" means anything consisting in whole or in part of moving pictures - for example, and without limitation, any motion pictures, television series, documentaries, cartoons, music videos, video recordings of concert performances, instructional programs, or educational programs. |
| | For purposes of the foregoing, "rental" means any arrangement permitting possession or use of a thing that involves a payment or other consideration. |

The parties' proposals differ in two ways:  (1) whether a "queue" is inherently ordered; and (2) whether a "rental queue" is a queue used by a rental provider to rent things.  Netflix's proposed construction comports with the customary understanding of a "rental queue," as well as the claim structure and specification.

---

[2]The proposed constructions cited throughout this brief are taken from the parties' Joint Claim Construction Statement, filed on November 15, 2006.  Netflix does not here re-submit that

1        **1.    A "queue" inherently includes an order.**

2        The word "queue" is a common English word with an ordinary meaning: a sequence that

3    is prioritized in some way. *See Phillips*, 415 F.3d at 1314 (holding that when "claim

4    construction involves little more than the application of the widely accepted meaning of

5    commonly understood words . . . general purpose dictionaries may be helpful").

6    Contemporaneous dictionaries support that ordinary meaning by defining "queue" to include an

7    order, either generally as in people waiting in line, or more specifically in the computer-science

8    world as a data structure that stores data entries in a particular order. Like Netflix's proposed

9    construction, one leading dictionary published in 2000 begins its definition of "queue" with the

10   word "sequence." Ramani Decl. Exh. 9 at 1436 (defining "queue" as "[a] sequence of stored

11   data or programs awaiting processing"). Similarly, another dictionary published in 2003 defines

12   "queue" in relevant part as "a data structure that consists of a list of records such that records are

13   added at one end and removed from the other." *Id.* Exh. 10 at 1020.

14       It is always appropriate to look to the specification for guidance to interpret a claim

15   term's meaning, and in particular to discern the invention's purpose. *See, e.g., Flex-Rest,* 455

16   F.3d at 1354-55 (narrowing claim construction on basis of invention's purpose, as gleaned from

17   specification); *Abraxis*, 2006 WL 3302663, at *6 (same). The order already inherent in a queue

18   is supported by the patents' specifications, which explain that the customer may specify the

19   priority of the items that she wishes to rent, and that the rental provider will take that priority into

20   consideration in creating the queue associated with that customer. According to the

21   specification, a customer provides "item selection criteria"—which for movies could include

22   attributes such as genre, title, or actor—to the rental provider, and those criteria "may specify

23   priorities for the items indicated." *Id.*, Exh. 1 at 11:18-20 and Exh. 2 at 9:50-52. The rental

24   provider uses the customer's item selection criteria—including the order in which the customer

25   wants the items—to prepare a queue, from which the provider fulfills the customer's order: "The

26   one or more item selection criteria provided by customer 102 to provider 104 indicate the

27   particular items that customer 102 desires to rent from provider 104. Thus, the item selection

28

Statement, but would of course do so should the Court request.

8

NETFLIX'S OPENING CLAIM-CONSTRUCTION BRIEF
CASE NO. C 06 2361 WHA (JCS)

criteria *define a customer-specific order queue that is fulfilled by provider* 104." Ramani Decl. Exh. 1 at 4:56-58 and Exh. 2 at 3:24-26 (emphasis added). The rental provider's use of the queue ensures that "the greatest number of customers are provided with their most preferred items." *Id.*, Exh. 1 at 11:17-18 and Exh. 2 at 9:49-50. Thus, for example, a customer wishing to rent the Lord of the Rings movie trilogy can specify that she wishes to receive the movies in order.

In contrast, Blockbuster's proposal leaves out the concept of order from "movie/item rental queue." Blockbuster defines a queue to be any "two or more things"—Blockbuster would not distinguish between a line of individuals waiting to purchase an item, and a disorganized, shoving mob. But the '381 patent and '450 patent do not specially define the term "queue," let alone in such a counter-intuitive way. Thus "queue" carries its ordinary meaning, and requires two or more things in a sequence.

### 2.    The "movie/item rental queue" is used by the provider to rent movies/items.

The terms "item rental queue" and "movie rental queue" are composed of common English words, each of which has an ordinary meaning. But while each word is easily understood, we are aware of no dictionary, for example, defining the phrase "movie rental queue." It is thus particularly appropriate to look to the structure of the claims and the specification to understand what "movie/item rental queue" means in the context of these patents. *See, e.g., Mars,* 377 F.3d at 1374 (defining claim term by reference to claim structure).

The claims' structure requires that a "rental queue" is a queue maintained by a rental provider. In the '450 patent, dependent claims 7 and 22 depend from independent claims 1 and 16, respectively. Taking claims 1 and 7 for illustration:

> **1**. A method for renting items to customers, the method comprising the computer-implemented steps of:
>
> > receiving one or more item selection criteria that indicates two or more items that a customer desires to rent;
> >
> > providing to the customer up to a specified number of the two or more items indicated by the one or more item selection criteria; and
> >
> > in response to receiving any of the items provided to the

9

customer, providing to the customer one or more other items indicated by the one or more item selection criteria, wherein a total current number of items provided to the customer does not exceed the specified number.

7. A method as recited in claim **1**, further comprising:

establishing, based upon the one or more item selection criteria, an item rental queue for the customer, wherein the item rental queue contains two or more entries that specify the two or more items that the customer desires to rent; and

in response to receiving back any of the items provided to the customer, selecting the one or more other items from the item rental queue.

Ramani Decl. Exh. 1 at cls. 1 & 7.  In Claim 1, the rental provider rents items to customers in part by "*receiving* one or more *item selection criteria* that indicates two or more items that a customer desires to rent."  *Id.* at cl. 1 (emphasis added).  Claim 7 adds "establishing, based upon the one or more item selection criteria, an item rental queue for the customer" and, after receiving back previously-rented items, "selecting the one or more other items from the item rental queue."  *Id.* at cl. 7.  The rental provider is thus the entity that establishes the item-rental queue based upon item selection criteria that the customer provides, receives back previously-rented items from the customer, and selects additional items to send the customer.  Indeed, the preamble to claims 1 and 16 explains that those claims address "a method for *renting* items *to customers*," which of course is what the rental provider does.  *Id.* at cls. 1 & 16 (emphasis added).

The '381 patent's claims are in accord.  Take claim 1:

1. A computer-implemented method for renting movies to customers, the method comprising:

providing electronic digital information that causes one or more attributes of movies to be displayed;

establishing, in electronic digital form, from electronic digital information received over the Internet, a movie rental queue associated with a customer comprising an ordered list indicating two or more movies for renting to the customer;

causing to be delivered to the customer up to a specified

10

number of movies based upon the order of the list;

in response to one or more delivery criteria being satis-
fied, selecting another movie based upon the order of
the list and causing the selected movie to be delivered
to the customer; and

in response to other electronic digital information
received from the customer over the Internet, electroni-
cally updating the movie rental queue.

*Id.* Exh. 2 at cl. 1. This claim—like every independent claim in the '381 patent—also requires "establishing . . . from electronic digital information received over the Internet, a movie rental queue associated with a customer . . . ." *Id.* Thus, these claims' structure confirms that the rental provider, after receiving information over the Internet from the customer, sets up a movie rental queue.

The specification is in accord. *See Phillips*, 415 F.3d at 1315 (explaining that the specification "is the single best guide to the meaning of a disputed term") (quotation marks and citation omitted). The '381 and '450 patents describe a specific way for a rental provider to rent movies/items to customers. As set forth above, the specification explains that the rental provider creates a "customer-specific order queue" after receiving item selection criteria from the customer, and that use of the queue ensures that the greatest number of customers will receive the item they most desire. Ramani Decl. Exh. 1 at 11:14-18 and Exh. 2 at 9:46-50. Reading the phrase "movie/item rental queue" in the context of the entire specification, a "movie rental queue" is a queue maintained by a rental provider for the purpose of renting movies to customers.

NETFLIX'S OPENING CLAIM-CONSTRUCTION BRIEF
CASE NO. C 06 2361 WHA (JCS)

## B.     "Ordered list" ('381:  all independent claims (1, 14, 24, 34, 44))

| NETFLIX'S PROPOSED CONSTRUCTION | BLOCKBUSTER'S PROPOSED CONSTRUCTION |
|---|---|
| list specifying the customer's desired rental order | Names or other representations of two or more items, arranged so that one or more of the items is before or after one or more other items |

The parties' dispute with respect to "ordered list" is similar to their dispute with respect to queue:  Blockbuster reads the word "ordered" out of the claims, whereas Netflix believes that an "ordered list" requires an ordering beyond just a "list," and that the specification and prosecution history make plain that the "ordered list" reflects a customer's desired rental order. The word "ordered" in the phrase "ordered list" must add meaning beyond that inherent in a "list," or there would have been no reason to include the word in the claim.  *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) (rejecting proposed construction in part because would "read[] the term 'operatively' out of the phrase 'operatively connected'").

"List" is a common English word with an ordinary meaning—a series of things recorded one after the other, such as a grocery list.  While a list is generally sequential, the ordinary meaning of "list" doesn't necessarily have any priority—taking the example of the grocery list, the shopper may write down, in order, "milk, yams, beer, goose liver" because those are the items that come to mind when he's mulling over what to buy.  *See* Ramani Decl. Exh. 9 at 1021 (defining "list" as "[a] series of names, words, or other items written, printed, or imagined one after the other: *a shopping list; a guest list; a list of things to do.*"); *id.* Exh. 10 at 726 (defining "list" as "a simple series of words or numerals (as the names of persons or objects) <a guest ~>"); *see Phillips*, 415 F.3d at 1314 (holding that when "claim construction involves little more than the application of the widely accepted meaning of commonly understood words . . . general purpose dictionaries may be helpful").

Blockbuster's proposal—a series of at least two items such that one of the items is before or after the other item(s)—might be fine if "list" were the only term for construction.  But Blockbuster's proposal ignores the adjective "ordered."  In contrast, Netflix's proposal

1   incorporates the ordinary meaning of the term "ordered," which is also a common English word,

2   and includes the concept of prioritization. *See* Ramani Decl. Exh. 10 at 873 (defining "ordered"

3   as "having elements arranged or identified according to a rule: as . . . having elements labeled by

4   ordinal numbers"); *id.* Exh. 9 at 1238 (defining "order" as "[a] sequence or arrangement of

5   successive things"); *see Phillips*, 415 F.3d at 1314 (holding that when "claim construction

6   involves little more than the application of the widely accepted meaning of commonly

7   understood words . . . general purpose dictionaries may be helpful")

8         While the term "ordered list" might have a broader meaning in the abstract, the

9   invention's purpose, as explained in the specification and prosecution history, makes plain that

10  the ordered list reflects the customer's desired rental order. *E.g.*, *Flex-Rest,* 455 F.3d at 1354-55

11  (narrowing claim construction on basis of invention's purpose, as gleaned from specification);

12  *Abraxis*, 2006 WL 3302663, at *6 (same); *see Nystrom*, 424 F.3d at 1139 (limiting construction

13  of "board" to wood cut from a log because patentee consistently referred to board cut from wood

14  in specification and prosecution history).

15        The '381 patent's specification repeatedly explains that the order must reflect the

16  customers' desires:

17   •   "For example, *customers may specify priorities for the items indicated by
         the item selection criteria.*  Thus, if a particular customer's first choice is
18       not available, or already rented, then the item having the next highest
         priority can be rented to the particular customer."  Ramani Decl. Exh. 2 at
19       9:50-54.

20   •   "The movie selection criteria may also *specify an order or priority in
         which customer 502 wishes to rent the movies.*"  *Id.* at 8:34-36 (emphasis
21       added).

22   •   "*Customers 502 may also specify an order or priority* for the specified
         item selection criteria."  *Id.* at 7:27-28 (emphasis added).

23

24  Nowhere does the specification discuss any other person's or entity's desire as providing the

25  requisite order.  Considering any desire but the customer's would contradict the invention's core

     purpose:  to ensure that customers receive what they want to watch in the order they want it.

26        The '381 patent's prosecution history confirms that the ordered list reflects the

27  customer's priority.  The Examiner originally rejected then-pending claims 55-94 in part because

28

---

13

the claimed invention allegedly addressed subject matter outside the technological arts, in violation of 35 U.S.C. § 101.  *See* Ramani Decl. Exh. 11 at NFLIX0000656.  In response, the prosecuting attorney described one of the features of the patent's invention as the ability to "remotely engage in the periodic renting of multiple movies to a customer *in the order of customer preference*."  *Id.* Exh. 12 at NFLIX0000684 (emphasis added).  None of the pending claims explicitly recited this "order of customer preference," but each included a reference to an "ordered list."  The examiner accepted the prosecuting attorney's explanation of the claim scope, which expressly described an "ordered list" as reflecting a customer's desired order, and the claims ultimately issued.

**C.    "based upon the desired order," "in the desired order," and "based upon the order of the list"**

➢**"based upon the desired order" and "in the desired order" ('450:  4, 5, 19, 20)**

| NETFLIX'S PROPOSED CONSTRUCTION | BLOCKBUSTER'S PROPOSED CONSTRUCTION |
|---|---|
| "based upon the desired order":  so as to provide the next-available movie(s) in the rental sequence specified by the customer<br><br>"in the desired order":  in the rental sequence specified by the customer | In the same sequence in which any person wants the items to be provided |

➢**"based upon the order of the list" ('381:  all independent claims (1, 14, 24, 34, 44))**

| NETFLIX'S PROPOSED CONSTRUCTION | BLOCKBUSTER'S PROPOSED CONSTRUCTION |
|---|---|
| so as to provide the next-available movie(s) in the order specified by the list | In the same sequence as that of the "ordered list" referred to earlier in the claim |

It makes sense to consider "based upon the desired order," "in the desired order," and "based upon the order of the list" together, because all three phrases share a single point of contention:  whether "based upon" and "in" are interchangeable.  There is an additional dispute as to whether "the desired order" is the order desired by the customer.  The claim structure and specification could not be more plain that it is the customer's desires that matter.

### 1.    "Based upon" and "in" are not interchangeable.

The words "based upon" and "in" are common English words, and mean different things. For items to be ordered "in" a desired order means that the desired order is followed literally. For items to be ordered "based upon" a desired order means that the desired order is used in ordering the items, but need not determine the order exclusively.  Contemporaneous dictionaries support this distinction between the ordinary meanings of "in" and "based."  *Compare, e.g.,* Ramani Decl. Exh. 10 at 101 (defining "base" as "a main ingredient <paint having a latex ~>") *and id.* Exh. 9 at 148 (defining "based" as "[t]o form or provide a base for" and "base" as "[a] fundamental ingredient; a chief constituent: *a paint with an oil base*") *with, e.g., id.* Exh. 10 at 627 (defining "in" as "used as a function word to indicate inclusion, location, or position with limits <~ the lake> <wounded ~ the leg><~ the summer>") *and id.* Exh. 13 at 1 (defining "in" as "[t]he preposition expressing the relation of inclusion, situation, position, existence, or action, within limits of space, time, condition, circumstances, etc.").

Moreover, when a patentee uses different words within a single claim or even across different claims, it is presumed that the patentee intended a distinction and thus that the terms should be construed to mean different things.  *See Bancorp Servs., L.L.C. v. Hartford Life Ins.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004) (holding that "the use of both terms in close proximity in the same claim gives rise to an inference that a different meaning should be assigned to each"); *Innova/Pure Water,* 381 F.3d at 1119 (holding that "when an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms").  Here, the claims use both "in" the desired order and "based upon" the desired order.  *Compare, e.g.,* Ramani Decl., Exh. 1, cl. 4 *with id.* cl. 5. There is nothing to rebut the presumption that these different terms mean different things.

The specification of the '381 patent makes plain that "based upon the desired order" means that the rental provider can take the availability of an item into consideration in selecting the next item to be sent:  "For example, customers may specify priorities for the items indicated by the item selection criteria.  Thus, if a particular customer's first choice is not available, or already rented, then the item having the next highest priority can be rented to the particular

NETFLIX'S OPENING CLAIM-CONSTRUCTION BRIEF
CASE NO. C 06 2361 WHA (JCS)

customer."  Ramani Decl. Exh. 1 at 11:18-23 and Exh. 2 at 9:50-54.  The specification does not describe any way to select a movie to be sent other than the order of the list and the availability of the movies on that list.  This makes sense, because two of the invention's main purposes are to let the customer divorce her decision about what to rent from when she rents it, and to allow rental providers better inventory control.  The two variables in that calculus are the customer's prioritization and whether the next item the customer wants is available.  As a result, Netflix's proposal accounts for the consideration of both the order of the list and movie availability.

### 2.     The "desired order" is the order desired by the customer.

The invention's purpose, as explained by the claims and specification of the '450 patent, make plain that the "desired order" is the order that is desired by the customer.  *See, e.g., Flex-Rest,* 455 F.3d at 1354-55 (narrowing claim construction on basis of invention's purpose, as gleaned from specification); *Abraxis*, 2006 WL 3302663, at *6 (same).  Nowhere in the specification or the claims is there any discussion of an order that is desired by anyone else.  The specification explains that "customers 502 may also specify an order or priority for the specified item selection criteria."  Ramani Decl. Exh. 1 at 8:60-61 and Exh. 2 at 7:27-28.  For example, "customers 502 may specify specific movie titles and the order in which they want to receive them."  *Id.* Exh. 1 at 8:61-63 and Exh. 2 at 7:27-30; *see also id.*, Exh. 1 at 10:1-3 and Exh. 2 at 8:34-36 (stating that the movie selection criteria—which the customer gives the provider—"may also specify an order or priority in which customer 502 wishes to rent the movies").  Nor would one expect the specification to call for consideration of anybody other than the customer's desired order, because the invention's purpose is to ensure that customers receive what they most want when they want it.

Blockbuster contends that the "desired order" can include an order that is desired by "any person," even if that order is different from the order desired by the customer.  According to Blockbuster, after the customer submits a list in the order desired by the customer, the rental provider could provide the movies in an entirely different order—even the exact opposite order—but still be providing the movies in the "desired order" because the provider desired the order that was used.  Blockbuster's construction effectively reads "desired" order out of the

claims because it would cover almost any system in which items were sent to customers over a period of time. Necessarily, the items would be sent in some order, and that order would have to be "desired" by someone.

**D.    "computer-implemented" (preamble of every '381 and '450 method claim)**

| NETFLIX'S PROPOSED CONSTRUCTION | BLOCKBUSTER'S PROPOSED CONSTRUCTION |
|---|---|
| '381 patent: method using provider computer(s) to facilitate each step;<br><br>'450 patent: use of provider computer(s) to facilitate each step | A method/steps accomplished using, in whole or in part, a programmable device that can store, retrieve, and process information.<br><br>Thus:<br><br>"computer-implemented method": A process or procedure accomplished using, in whole or in part, a programmable device that can store, retrieve, and process information.<br><br>"computer-implemented steps": Actions, proceedings, or measures accomplished using, in whole or in part, a programmable device that can store, retrieve, and process information. |

There are four key differences between the parties' proposals: (1) whether it is necessary to define "computer"; (2) whether computer refers to the provider's computer; (3) whether a computer must be used in each step, or only part of one step, and (4) whether the patents' preambles—where "computer-implemented" appears—are limiting.[3]

*First*, "computer" is a word that a jury would understand. There is no reason for the Court to provide a synonym for such a well-understood word. *See, e.g., U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("The Markman decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.").

---

[3] Though Netflix's proposal calls for one or more provider computers, this section discusses use of a single computer to avoid complication.

*Second*, the claim itself makes plain that the provider's computer carries out the method.

Taking claim 1 of the '381 patent as an example:

> **1**. A computer-implemented method for renting movies to customers, the method comprising:
>
>> providing electronic digital information that causes one or more attributes of movies to be displayed;
>>
>> establishing, in electronic digital form, from electronic digital information received over the Internet, a movie rental queue associated with a customer comprising an ordered list indicating two or more movies for renting to the customer;
>>
>> causing to be delivered to the customer up to a specified number of movies based upon the order of the list;
>>
>> in response to one or more delivery criteria being satisfied, selecting another movie based upon the order of the list and causing the selected movie to be delivered to the customer; and
>>
>> in response to other electronic digital information received from the customer over the Internet, electronically updating the movie rental queue.

Ramani Decl. Exh. 2 at cl. 1. The five claim elements require the rental provider to supply information that the customer uses (element 1), create and update a list of movies based on the customer's desired rental order (elements 2 and 5), and deliver movies to the customer based on that list and subsequent feedback received from the customer (elements 3 and 4). The claim language describes what the provider does *after* receiving information from the customer.

The specification is in accord. The '381 preamble, which is identical for every independent claim, states that the method's purpose is "renting movies *to* customers." Ramani Decl. Exh. 2 at cls. 1, 14, 24, 24 & 34 (emphasis added). That is a provider function.

*Third*, the parties dispute whether the preamble requires that each element be computer-implemented, or only some of them. There would be no reason to include "computer-implemented" in the preamble were it not to apply to every claim element; to hold otherwise would render the phrase superfluous, because many claim elements on their face require a computer. For example, three of five claim elements of '381 patent claim 1 either receive or provide "electronic digital information," in two cases explicitly "over the Internet." Ramani

18

Decl. Exh. 2 cl. 1 (elements 1, 2, & 5); *see, e.g., Innova/Pure Water*, 381 F.3d at 1119 (rejecting proposed construction in part because would "read[] the term 'operatively' out of the phrase 'operatively connected'").

The '381 patent's file history is in accord.  In response to an Office Action finding non-patentable subject matter under 35 U.S.C. § 101, the prosecuting attorney explained that the use of a computer with every '381-patent claim element was one of the invention's novel aspects:

> Thus, using *computer technology* and the Internet, an enterprise can remotely engage in the periodic renting of multiple movies to a customer in the order of customer preference.  *Technology is used to provide electronic digital information that causes attributes of movies to be displayed to the user [element one], to establish multiple, electronic movie rental queues each associated with a particular customer [element two], to store the movie rental queue information [element two], to update the movie rental queue [element five], and to cause the selection of movies to be delivered to the customer [elements three and four]*, all without any human mediation on the part of the renting enterprise.

Ramani Decl. Exh. 12 at 12 (emphasis added).  In sum, it is not sufficient for a computer to be used with fewer than all claim elements; the claims require that each element be implemented by a computer.

*Finally*, the patents' preambles must be limiting, because "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention."  *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).  The prosecuting attorney repeatedly distinguished prior art by referring to the invention's aspects that use a computer.  For example, the PTO rejected the '381 patent's claims in part over library references that identified books that borrowers desired by using written lists.  Ramani Decl. Exh. 12 at 16.  The prosecuting attorney distinguished these references because the '381 patent calls for a computer to perform certain of the claim steps.  *Id*. In keeping with *Catalina Marketing*, the Court therefore should construe the preambles to be claim limitations.

NETFLIX'S OPENING CLAIM-CONSTRUCTION BRIEF
CASE NO. C 06 2361 WHA (JCS)

E.    "electronically updating" ('381:  all independent claims (1, 14, 24, 34, 44))

| NETFLIX'S PROPOSED CONSTRUCTION | BLOCKBUSTER'S PROPOSED CONSTRUCTION |
|---|---|
| the provider's computer(s) changing | Adding or deleting information, or making corrections, using, in whole or in part, any electronic device.  For purposes of this definition, an "electronic" device is any device that uses a flow of electrons in a vacuum, in gaseous media, or in a semiconductor. |

The parties' proposals differ in one important way:  whether the provider's computer, as opposed to "any electronic device," performs the updating.  The issue here is the same as that presented above with respect to movie rental queue—as with that term, the '381 patent's claim structure, specification, and prosecution history make plain that the provider's computer carries out the updating.

The '381 patent's claim structure requires that the provider's computer carry out the updating.  For example, claim 1 of the '381 patent describes steps that the provider must carry out.  The last claim element provides that the "electronic[] updating" is carried out "in response to other electronic digital information received from the customer over the Internet."  Ramani Decl. Exh. 2, cl. 1.  It would hardly make sense, in describing a "method for renting movies *to customers*," for the customer to send the information to anybody other than the rental provider, or for anybody other than the rental provider to carry out the updating in response to that information.  Instead, as explained in Section A.2 above, the claim structure and specification make plain that the provider establishes the movie-rental queue, so it is only logical that the provider also updates that queue.

It also cannot be that the "electronic[] updating" can be accomplished by using "an electronic device . . . in whole or in part," as Blockbuster would have it.  To allow an "electronic device" to play a bit role in the updating would effectively read the modifier "electronically" out of the claims.  *See, e.g., Innova/Pure Water*, 381 F.3d at 1119 (rejecting proposed construction in part because would "read[] the term "operatively" out of the phrase "operatively connected").  For example, Blockbuster might argue that this claim element could be satisfied by a customer

20

writing down a list of new releases displayed on a video-store computer, and then prioritizing the movies by hand on the piece of paper. This has nothing to do with the invention claimed here.

**F.    "periodic fee" ('381:  34)**

| NETFLIX'S PROPOSED CONSTRUCTION | BLOCKBUSTER'S PROPOSED CONSTRUCTION |
| --- | --- |
| fee to be paid per subscription period for the right to rent | An amount incurred, paid or charged at regular intervals for a service - for example, and without limitation, an hourly, daily, monthly, or annual fee. |

The parties' proposals differ in one major way:  whether the fee must be paid for a time period that is unrelated to the items rented, as opposed to a fee that can be paid on a per-item basis.  The '381 patent's specification explains that a "periodic fee" is a fee paid at a fixed time interval determined by the rental agreement, *i.e.*, a subscription period.  The invention allows customers to rent "a specified number of movies, games, or music selections at any time, and/or in one subscription period, without rental due dates, in exchange for a *periodic rental subscription fee*."  Ramani Decl. Exh. 2 at 12:61-64 (emphasis added).  The emphasis on the subscription period can be found elsewhere in the specification, including:

- the instruction that a delivery may be made in response to "the initiation of a specified subscription period," *id.* at 6:1-2;

- the discussion of the number of items rented to a customer within "the current subscription period," *id.* at 6:10; and

- the suggestion that when certain terms of a rental agreement are not overridden, "no items are delivered to customer 102 until the next subscription period" and are "instead delivered during the subsequent subscription period."  *Id.* at 6:32-34; 6:36-37.

The problem with Blockbuster's proposal is that it could be read to apply to a fee charged for a particular item (such as a daily fee for renting a movie).  But a crucial part of the invention's purpose is to move away from per-item rental and associated late fees.  *See Flex-Rest,* 455 F.3d at 1354-55 (narrowing claim construction on basis of invention's purpose, as gleaned from specification); *Abraxis*, 2006 WL 3302663, at *6 (same).

A second point on which the parties' proposed definitions differ slightly is the purpose for which the fee is paid—for the right to rent from the rental provider (Netflix) or for a service

21

1  (Blockbuster).  Claim 34 states that it is the "rental agreement" with the customer that "provides

2  for charging . . . a periodic fee."  Ramani Decl. Exh. 2 at cl. 34.  "Periodic fee" appears in no

3  other claim.  Thus, the periodic fee is not simply a fee paid for "any service," as Blockbuster

4  would have it; the fee must relate to the "rental agreement," which of course would address

5  "renting movies to customers."  *Id.*

6  **G.    "game/item/movie selection criteria" ('450:  throughout)**

| NETFLIX'S PROPOSED CONSTRUCTION | BLOCKBUSTER'S PROPOSED CONSTRUCTION |
| --- | --- |
| characteristic(s) and/or order of items/movies/games desired by the customer | Any information used to choose a thing (or "item"), regardless of what person or device makes the choice. |

11        The parties' proposals differ in one key fashion:  whether the selection criteria are limited

12  to a certain characteristic or order that the customer desires, or can literally be anything used by

13  any person or machine to make a choice.  The patent specification specially defines the term in

14  the way that Netflix proposes.

15        When the patentee provides a special meaning for a claim term, the patentee has acted as

16  his or her own "lexicographer."  *E.g., Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,

17  340 F.3d 1298, 1306 (Fed. Cir. 2003).  Although each of the words in the phrase "item selection

18  criteria" are ordinary English words, the term "item selection criteria" does not have any

19  ordinary meaning to a person of skill in the art.  That term does not appear in any dictionary, nor

20  is that term in common usage.  While the Court should always look to the specification for

21  guidance as to the meaning of claim terms, here, looking to the specification is particularly

22  critical to determine how Netflix used the term "item selection criteria" in the patent.  The

23  section of the '450 patent titled "Item Selection Criteria" could not be more explicit:

24        The one or more *item selection criteria* provided by customer 102 to provider 104

25        *indicate the particular items that customer 102 desires to rent from provider 104*.
        Thus, the item selection criteria *define a customer-specific order queue* that is

26        fulfilled by provider 104.

27  Ramani Decl. Exh. 1 at 4:54-58.  The specification then goes on to explain that the item selection

28  criteria can encompass a broad range of attributes, but makes plain that the item selection criteria

---

22

reflect "items that customers desire to rent from a provider." Every single reference in the specification and the claims to "item selection criteria" is consistent. *See id.* at 4:22-23 (explaining that "the item selection criteria indicate items that customer desires to rent from provider"); *id.* at 8:50-52 (specifying that "customers may identify specific movies or music by the item selection criteria . . ."). Thus the specification makes plain that the item selection criteria reflect the customer's preferences, as opposed to those of some other person or device.

The specification also makes plain that the item selection criteria can, but need not, include an order in which the customer desires to receive the items. "The movie selection criteria may also specify an order or priority in which customer 502 wishes the rent the movies." *Id.* at 10:1-3 (Although this passage is specific to movies, the parties agree that the definition of "item selection criteria" is the same, regardless of whether that phrase it is modified by "movie" or "game.")

The specification is equally plain that the item selection criteria are provided by the customer to the provider, and thus cannot be generated by the provider: "Customers may specify what items to rent using one or more item selection criteria separate from deciding when to receive the specified items." *Id.* at 4:9-11. Figure 2 shows that the "customer creates item selection criteria" and then the customer "provides item selection criteria to provider," at which time the "provider provides items indicated by the item selection criteria to customer." The Abstract similarly explains that "customers specify what items to rent using item selection criteria separate from deciding when the receive the specified items." This jibes with the invention's main purposes: to ensure that customers receive what they most want in the order that they want it, and to allow customers to set and update that prioritization at any time. *See Flex-Rest,* 455 F.3d at 1354-55 (narrowing claim construction on basis of invention's purpose, as gleaned from specification); *Abraxis*, 2006 WL 3302663, at *6 (same).

Nowhere in the specification is there any discussion of item selection criteria as anything other than criteria that are specified by a customer. Indeed, permitting the system itself to select the items to be sent to the customer would run counter to the stated purpose of the invention, which is to "allow[] separation of customers' decisions of what items to rent from when to rent

23

1  the items ….." Ramani Decl. Exh. 1 at 1:35-37.

2  <center>**CONCLUSION**</center>

3  Netflix has offered constructions that stay true to the claim terms' ordinary meaning

4  (especially the many claim terms that are common English words), as reflected in the invention's

5  purpose and the claim structure.  Blockbuster, in contrast, has offered wildly expansive proposals

6  in an effort to bolster its invalidity defense.  The Court should select Netflix's proposed

7  constructions.

8

9  Dated:  December 6, 2006                         Respectfully submitted,

10                                                 KEKER & VAN NEST, LLP

11

12

13  By:   /s/ Ashok Ramani
        JEFFREY R. CHANIN
14        DARALYN J. DURIE
        ASHOK RAMANI
15        Attorneys for Plaintiff
        NETFLIX, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28