1    KEKER & VAN NEST, LLP
     JEFFREY R. CHANIN - #103649
2    DARALYN J. DURIE - #169825
     ASHOK RAMANI - #200020
3    710 Sansome Street
     San Francisco, CA 94111-1704
4    Telephone: (415) 391-5400
     Facsimile: (415) 397-7188
5
     Attorneys for Plaintiff
6    NETFLIX, INC.

7

8               UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF CALIFORNIA
9

10

11    NETFLIX, INC., a Delaware corporation,      Case No. C 06 2361 WHA (JCS)

12                     Plaintiff,    **NETFLIX'S CLAIM-CONSTRUCTION REPLY BRIEF**

13      v.                        Date:    January 31, 2007

14    BLOCKBUSTER, INC., a Delaware      Time:    1:30 p.m.
     corporation, DOES 1-50,              Dept:    Courtroom 9, 19th Floor

15                   Defendant.    Judge:   Hon. William H. Alsup

16

17

   AND RELATED COUNTERCLAIMS
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................................................1

II.   ARGUMENT .....................................................................................................3

      A.   Blockbuster's Proposed Definitions for "Item Rental Queue and Movie
           Rental Queue" Are Fatally Flawed and Should Be Rejected .................................3

           1.   Blockbuster's Construction Ignores the Common Meaning of
                the Word "Queue"...................................................................................3

           2.   Blockbuster Proposes Improper Definitions for Words That
                Require No Definition..............................................................................7

      B.   Blockbuster's Proposed Definition Improperly Reads the Word
           "Ordered" Out Of "Ordered List."........................................................................8

      C.   Blockbuster Gives No Significance To the Difference Between "Based
           Upon" and "In," While Launching A Factually Incorrect Attack On
           Netflix's Construction................................................................................9

      D.   The Preambles of Netflix's Patent Claims Were In Fact Relied Upon
           By The Examiner, Rendering Them Limiting .......................................................11

      E.   Blockbuster's Proposed Definition of Electronically Updating Is Not
           True To the Claim Structure ............................................................................12

      F.   Blockbuster Does Not Seriously Attempt To Justify Its Proposed
           Definition of "Item Selection Criteria".................................................................13

      G.   Blockbuster's Proposed Definition of "Periodic Fee" Completely
           Ignores the Patent's Purpose to Do Away With Late Fees, Due Dates
           and Per-Item Rentals.................................................................................15

III.  CONCLUSION................................................................................................15

i

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Altiris, Inc. v. Symantec Corp.,*
   318 F.3d 1363, 1372 (Fed. Cir. 2003)..................................................................14

*Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.,*
   340 F.3d 1298 (Fed. Cir. 2003)..........................................................................14

*Apple Computer, Inc. v. Articulate Systems, Inc.,*
   234 F.3d 14 (Fed. Cir. 2000)..............................................................................11

*Dow Chemical Co. v. United States,*
   226 F.3d 1334, 1341 (Fed. Cir. 2000)...................................................................6

*International Visual Corp. v. Crown Metal Manufacturing Co.,*
   991 F.2d 768, 772 (Fed. Cir. 1993).......................................................................6

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.,*
   302 F.3d 1352, 1357 (Fed. Cir. 2002)....................................................................4

*Network Commerce, Inc. v. Microsoft Corp.,*
   422 F.3d 1353, 1359, 1360 (Fed. Cir. 2005).............................................13, 14, 15

*Phillips v. AWH Corp.,*
   415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc)....................................................14

*In re Rouffet,*
   149 F.3d 1350, 1357 (Fed. Cir. 1998).....................................................................2

*Springs Window Fashions LP v. Novo Industrial, L.P.,*
   323 F.3d 989, 995 (Fed. Cir. 2003).......................................................................11

*Ventana Medical System, Inc. v. Biogenix Laboratoriess, Inc.,*
   No. 06-1074, 2006 U.S. App. LEXIS 32031 at *18 (Fed. Cir. Dec. 29, 2006).............9

## I.    INTRODUCTION

In its response to Netflix's opening brief on claim construction, Blockbuster has failed to contest Netflix's common-sense claim constructions.  Instead, having no non-infringement position, and in hopes of advancing its invalidity defense to Netflix's patents, Blockbuster has attempted to broaden the meanings of the claim terms far beyond any reasonable interpretation. It even admits its reason for doing so: "the meaning of the claims of the patents-in-suit is essential for comparing those claims to what was already in the prior art." Opp. at 2.  But the constructions Blockbuster has proposed are so impossibly broad and divorced from the context of Netflix's invention that no reasonable patent examiner interpreting the claims as Blockbuster proposes would have allowed the patents to issue -- much less the multiple patent examiners that scrutinized Netflix's patent applications in this case (including a "second pair of eyes" review of at least the '381 Patent because of the business-method classification of the claims).  For example, Blockbuster proposes that the patent examiners could have believed that an "ordered list" requires only that a single movie in a mass of movies be prioritized above the rest, leaving the rest unordered.  Netflix's proposed constructions, on the other hand, properly read the claim terms according to their ordinary and customary meaning in light of the context in which they appear and the purpose of the invention, precisely what the patent examiners did in determining that the Netflix patents should issue.

Throughout its opposition, Blockbuster attempts to denigrate the patented invention with unsupported allegations that the method pioneered and patented by Netflix "was in practice long before Netflix." Opp. at 1.  In doing so, Blockbuster attempts to confuse the Court by conflating what Blockbuster describes as long established practices with the patented invention.  However, in so doing, Blockbuster only points piecemeal to individual elements of Netflix's patented business method (for example -- subscription rental), declares that the individual element was well-known, and then jumps to the conclusion that the invention itself, as a whole, therefore must have been obvious.  That is improper; as the Federal Circuit has explained time and again: "'[V]irtually all [inventions] are combinations of old elements.' . . . If identification of each claimed element in the prior art were sufficient to negate patentability, very few patents would

1

1  ever issue." *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998) (citations omitted).

2  Blockbuster's suggestion that the patents are invalid if it can find prior art corollaries for each of

3  the claim elements also violates the rule that the invention cannot be used "as a blueprint for

4  piecing together elements in the prior art to defeat the patentability of the claimed invention." *Id.*

5      In light of Blockbuster's protestations that the patented methods were obvious, one is left

6  wondering why Blockbuster, with all of the experience acquired from its "longstanding and

7  preeminent rental business" that predates Netflix by years, Opp. at 1, failed itself to conceive of

8  and use the supposedly obvious methods later pioneered and patented by Netflix, despite having

9  had an on-line presence since the mid-1990s. This failure of conception by the industry leader,

10  followed by their copying of Netflix's specific method in its on-line business (and parts of the

11  method in its in-store business as well), speaks far louder than all of Blockbuster's rhetoric, and

12  demonstrates that Netflix's patented method was not obvious to those experienced in the movie

13  rental industry at the time it was conceived and reduced to practice by Netflix.

14      Blockbuster does not take serious issue with Netflix's assertion that it copied and

15  infringes Netflix's patented business method. Indeed, Blockbuster all but admits this when it

16  claims that "there is nothing inherently wrong about 'copying.'" Opp. at 1. Indeed, Blockbuster

17  tellingly relegates to a footnote its pregnant denial of infringement, to wit, that "some" of the

18  claims of Netflix's patents-in-suit do not "cover Blockbuster Online." Opp. at 1 n.1.

19      Blockbuster instead spends many pages of its claim-construction brief trying to entice the

20  Court to take its side, and prejudge its defenses, presumably to obtain a more favorable claim

21  construction. Blockbuster begins by making light of the protections afforded inventors, arguing

22  that it has engaged only in "aggressive competition." While Blockbuster may in the past have

23  built its nationwide enterprise on the demise of numerous local entrepreneurs from aggressive

24  competition, it overstepped the line when it slavishly copied Netflix's patented business method.

25  Fair competition is built upon innovation, not upon copying the patented works of others.

26      Blockbuster's continued mantra that, if Netflix were to prevail here, it would gain a

27  monopoly on online video rental, also should not be given credence by this Court. This

28  contention is both unsupported and unsupportable. Blockbuster has not provided one iota of

1  evidence that it could not aggressively and effectively compete in online video rental without

2  infringing Netflix's patents, for example, by not using Netflix's dynamic queue.

3          Finally, Blockbuster spends page upon page of its brief accusing Netflix of deliberately

4  failing to disclose prior art to the patent examiner (including the existence of staples of everyday

5  life such as video rental stores and gym memberships, Opp. at 5).  Blockbuster's bald allegations

6  of deliberate withholding of prior art, including the NCR patents that Blockbuster continues to

7  centerpiece in every brief, will be rebutted by Netflix at the appropriate time.  They have no

8  place in, or relevance to, the claim construction process and the Court should not be swayed to

9  Blockbuster's overbroad claim construction by such allegations.

10                          **II.     ARGUMENT**

11  **A.      Blockbuster's Proposed Definitions for "Item Rental Queue and Movie Rental
            Queue" Are Fatally Flawed and Should Be Rejected**

12
            **1.      Blockbuster's Construction Ignores the Common Meaning of the Word
13                  "Queue"**

14          Netflix demonstrated in its opening brief that the common English meaning of the word

15  "queue," as defined in dictionaries and common usage, inherently includes some sequence or

16  order.  Blockbuster has failed in its opposition to offer a *single definition* from any dictionary

17  that in any way rebuts this proposition, let alone that supports Blockbuster's overly general

18  construction of the term "queue" as merely a number ("two or more") of items or movies, with

19  no concept of any sequence, structure, or organization whatsoever.  While Americans may be

20  more unruly than their British cousins, and thus less likely to "queue up" or "mind the queue,"

21  we still both speak English and know that the term "queue" implies some kind of sequence or

22  order.

23          Instead of starting with the plain English meaning of the word, as Netflix does,

24  Blockbuster attempts to support its substitution of mere numbers for the concept of sequence or

25  order by posing rhetorical questions about the relationship of the queue to other elements of the

26  claims, which it then answers in a way designed to denigrate Netflix's proposed construction.

27  Blockbuster's answers to its rhetorical questions, however, are at times illogical, and at all times

28  unconvincing.  Those answers provide no support for adopting the meaningless construction of a

1  "queue" that Blockbuster has proposed.

2      Blockbuster begins by arguing that courts will from time to time "*depart*[] from the

3  ordinary meaning of terms within a claim to avoid redundancy," Opp. at 12 (emphasis added),

4  implicitly admitting that the ordinary meaning of the term "queue" does, in fact, include the

5  concept of a sequence or order. But the case that Blockbuster cites in asking for this "departure,"

6  *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352 (Fed. Cir. 2002), lends no support

7  for a departure here. In *Guttman*, the Federal Circuit considered the possibility of defining the

8  claim term "tortuous bend" by looking to the dictionary definition of "tortuous" -- "marked by

9  repeated twists, bends, or turns." *Id.* at 1357. Combining the two yielded a definition of

10  "tortuous bend" as a "bend marked by repeated twists, bends, or turns." The Federal Circuit

11  concluded that using the dictionary definition in such an instance would have made the claim

12  term pointlessly circular (*i.e.*, a bend marked by bends), while providing no additional

13  information about the nature of the bend.

14      In contrast, the definition of the claimed "queue" proffered here by Netflix -- "a sequence

15  of movies/items used by a rental provider to determine which movies to deliver" is neither

16  circular, nor uninformative. Rather, Netflix's construction defines exactly what the queue

17  recited in the patents is and what it does (which description Blockbuster does not contest).

18      Blockbuster next argues that it would be "redundant" to recite in the '381 Patent claims

19  that the queue "comprises an ordered list," if the queue already inherently incorporates an

20  ordered list. However, that argument mischaracterizes Netflix's definition of the term queue, as

21  well as the "ordered list" claim element actually recited in the '381 Patent. Netflix has defined

22  the queue as a sequence of movies/items used by the provider to determine which movies/items

23  to deliver, not as "an ordered list," and the ordered list element of the '381 Patent claims recites

24  more than Blockbuster suggests -- that the queue of the '381 "compris[es] an ordered list

25  *indicating two or more movies for rental to the customer*." Ramani Decl. Ex. 2 at 13:12-14

26  (emphasis added). These two things are not the same. The first generally describes a sequence,

27  the second further describes that the sequence must comprise an ordered list that specifies the

28  particular movies in the order that the customer desires to rent them. Thus, construing the queue

1   recited in the patents as something that is sequenced is not redundant with a claim element in the

2   '381 Patent that further indicates what the queue comprises -- a list of movies ordered in the

3   order that the customer desires to rent them.

4        Blockbuster next attempts to apply principles of claim differentiation as between the two

5   Netflix patents, but this attempt also misses the mark. Blockbuster asserts that the claims of the

6   '381 Patent require "that the 'queue' includes an 'ordered' list, [while] the claims of the '450

7   Patent that recite a 'queue' contain no such requirement," from which Blockbuster concludes that

8   the queue has no order or sequence. Opp. at 12. However, Blockbuster's conclusion does not

9   follow. As explained above, the independent claims of the '381 Patent require not merely that

10  the queue comprise an ordered list, but also a particular kind of list, to wit, one that "indicat[es]

11  two or more movies for renting to the customer." The modifying clause in the '381 Patent is not

12  there to convey the fact that the queue has some order, which all queues do; rather, it is there to

13  provide limiting information about what is contained in the queue of the '381 Patent. The queue

14  might contain other things. The specification indicates, for example, that a customer could

15  choose to receive horror movies released in 1999, without specifying a particular order for the

16  rental of such movies as part of the item selection criteria for such movies. Under the method

17  claimed in the '450 Patent the rental provider would still need itself to impose a sequence of

18  some sort to create a queue (for example, deciding to send the movies to the subscriber in

19  alphabetical or chronological order, or to give horror movies top priority over others), so that it

20  could "determine which movies/items" should be furnished to the customer next. In the claims

21  of the '450 Patent that Blockbuster references, the queue is still a sequence of movies or items

22  used by a rental provider to determine which movies or items to deliver. However, unlike in the

23  '381 Patent's claims, the queue is not required to comprise an "ordered list" that identifies the

24  movies in the order in which the customer desires to rent them.

25       The declaration of Neil Hunt cited by Blockbuster is not to the contrary. Mr. Hunt was

26  correct to describe a queue as establishing a "set" of movies, rather than as an "ordered list." But

27  to say that something is a set is not to say that it lacks any sequence or order. Indeed, a queue is,

28  by definition, a set of items having a sequence or order. And Blockbuster's complaint that Mr.

1    Hunt did not state that the set must contain an "ordered list" is meritless.  Mr. Hunt's declaration

2    was submitted during the prosecution of the broader '450 Patent, before Netflix submitted more

3    narrow claims in its '381 Patent to recite a queue comprising an "ordered list indicating two or

4    more movies for rental to a customer," which Blockbuster itself concedes is narrower than the

5    '450 Patent.  Opp. at 6.[1]

6         Blockbuster's attempt to rely on *Dow Chem. Co. v. United States*, 226 F.3d 1334 (Fed.

7    Cir. 2000), to advance its differentiation argument also fails.  That case expressly recognizes that

8    the doctrine of claim differentiation does no more than establish a "rebuttable presumption." *Id.*

9    at 1341.  More importantly, it emphasizes that the doctrine "cannot broaden claims beyond their

10   correct scope" -- precisely what Blockbuster seeks to do here.

11        Finally, Blockbuster argues that the claim language does not require Netflix's proposed

12   clarification that the "queue" is something "used by a rental provider."  Opp. at 14.  However,

13   Blockbuster does not contest that this is precisely the manner in which the queue is used

14   consistently throughout the patents.  Nor could it contest that this is the plain import of the term,

15   as nothing in the specification, or the structure of the claims, suggests that anyone other than the

16   rental provider makes use of the queue to determine which movies to deliver.  Indeed, the

17   functions for which the queue of the patent is used that Blockbuster recites at page 14 of its brief

---

[1] Similarly, the deposition testimony of former Netflix CTO Eric Meyer that Netflix's queue is not a FIFO queue does not lend support either for Blockbuster's proposed construction of a queue as two or more numbers having no sequence, or for its attack on Netflix's use of a computer science definition of a queue in support of its construction.  First off, Blockbuster's reliance on Mr. Meyer's testimony about Netflix's actual practices is neither relevant nor proper as an aid to claim construction. *See International Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 772 (Fed. Cir. 1993) (declaring claim construction arrived at by considering patentee's alleged commercial embodiment of patent to be improper).  Second, Mr. Meyer testified that he does not know how to read a patent, that he only glanced at the Netflix '450 Patent when it issued, and he did not purport to give any testimony about the meaning of the patent claims. *See* Declaration of Eugene Paige in Support of Netflix's Claim-Construction Reply Brief Ex. A.  Third, as Blockbuster acknowledges, neither Blockbuster nor Netflix has proposed that the queue as used in the Netflix patents should be limited to a FIFO definition.  Opp. at 14.  Thus, it remains entirely appropriate to use a definition for queue drawn from the computer science art (though not one limited to a specific FIFO implementation).  The invention of the Netflix patents, after all, is designed to be "computer-implemented" and the queue is "electronically updat[ed]" by way of information received over the Internet.  The specification also contains a lengthy discussion of the use of computers to implement the invention. *See* Ramani Decl. Ex. 2 at 10:21-12:17.  Under these circumstances, defining "queue" with a computer science data structure in mind is appropriate, and Netflix's proposed definition is entirely consonant with such

1  -- such as selecting movies to be delivered and causing them to be delivered to the customer --

2  are indisputably functions performed by the rental provider.  So, construing the queue as a

3  sequence of movies/items used by a rental provider is consistent with the claims and lends clarity

4  and accuracy to the claim term.

5      In contrast, Blockbuster's proposed definition is utterly divorced from plain meaning,

6  from the context of the claims, and from the purpose of the invention.  It would allow a jury to

7  conclude that the recited "queue" is any representation of two or more movies/items for rental --

8  including, for example, a Hertz webpage showing two or more types of cars available for rental.

9  Nothing in the patents, or in any dictionary definition of a queue, suggests such a broad meaning.

10     The Court should therefore adopt Netflix's proposed definition, which will be of far more

11  assistance to the jury in their understanding of the nature and use of the queue than

12  Blockbuster's.  Netflix's proposed definition comports with the ordinary meaning of the word

13  queue, the specification, and the structure of the claims, and avoids potential jury confusion

14  regarding who operates the queue that is part of the invention.

15     **2.     Blockbuster Proposes Improper Definitions for Words That Require No
       Definition**

16     The terms "item" and "movie" in the elements "item rental queue" and "movie rental

17  queue" carry ordinary meanings that any juror would understand.  Netflix accordingly believes

18  there is no need further to define them.  If the Court believes it is necessary to define those two

19  terms, however, it should not adopt Blockbuster's proposed constructions for two reasons.

20     *First*, Blockbuster acknowledges that the term "items" is defined expressly in the

21  specification as "any commercial goods that can be rented to customers."  *See Ramani Decl. Ex.*

22  2 at 2:36-38 ("As used herein, the term 'items' refers to any commercial goods that can be rented

23  to customers.").  If the Court wishes to define the term "item" it should use the definition clearly

24  assigned in the specification, rather than Blockbuster's definition.

25     *Second*, Blockbuster's proposed definition of "movie" does nothing but add confusion to

26  what is otherwise a common term with which jurors would surely be familiar.  Blockbuster

27

28  a computer science definition of "queue," while Blockbuster's is not.

7

1   proposes to define that word to mean "anything consisting in whole or in part of moving

2   pictures" -- an anachronistic definition that raises more questions than it answers. For example,

3   is a slide show a "moving picture"? Is a screen saver that constantly changes its position on a

4   computer monitor or television screen a "moving picture"? The far better course is to leave the

5   term with its common meaning -- one that any juror would surely find more informative and

6   intuitive than the definition Blockbuster has proposed.

7   **B.    Blockbuster's Proposed Definition Improperly Reads the Word "Ordered" Out Of "Ordered List."**

8
9           As a matter of ordinary English, and as used in the patents' specifications and claims, an

10  ordered list is a list in which the constituents making up the list are prioritized. Blockbuster

11  claims that its proposed definition "reflects the breadth of" the concept of "ordered" by requiring

12  only that a single constituent of an entire list be placed ahead of one or more other items

13  comprising that list. But the result of Blockbuster's proposed construction would be that, if a list

14  contained a half-dozen items arranged in *no* particular order, so long as one item was then set out

15  before the rest, then the entire list of items (with only one prioritized and the remaining five in no

16  particular order at all) would be defined as an ordered list. After the first item was provided,

17  how would it be possible for a rental provider to continue supplying customers with movies

18  based upon the order of the list, which list, using Blockbuster's definition, would have no order?

19  Something is amiss.

20          Blockbuster argues, nevertheless, that dependent claim 39 of the '381 Patent shows that

21  the ordered list cannot be a list specifying the customer's desired rental order, because it recites

22  determining the order based upon "preferences of the customer." In making this argument,

23  however, Blockbuster ignores the fact that dependent claim 39 does not refer to an order desired

24  by the customer; rather, it speaks of the "preferences of the customer." Such preferences, the

25  specification teaches, could include movie attributes such as nominations for an Academy

26  Award. *See* Ramani Decl. Ex. 2 at 8:36-46. Thus, the preferences in dependent claim 39 could

27  be something other than, or that supersede, the customer's desired rental order, and could require

28  a reordering by the provider of the customer's ordered list to satisfy those preference(s). The

1   fact that such preferences could be indulged by allowing the rental provider to take them into

2   account, however, does nothing to suggest that, when such preferences are not provided (or not

3   taken into account), as in claims other than dependent claim 39, the list need not specify the

4   customer's desired order as proposed by Netflix.

5        Blockbuster's reference to optional modes in the specification that discuss the possibility

6   of having a customer supply the rental provider with categories of desired movies without any

7   order, rather supplying an ordered list containing the names of the movies themselves, does not

8   lend support to Blockbuster's proposed definition of "ordered list." Again (despite its purported

9   insistence that items from the specification should not be read into the claims), Blockbuster here

10  is trying to read these optional manners of carrying out the invention described in the

11  specification such as movies within a genre or category into a claim element ("ordered list") that

12  does not embody such options, but rather embodies a different option -- in this case, a list

13  specifying the customer's desired rental order.

14       Simply because Netflix has disclosed one method in its specification by which its

15  business method could be carried out does not mean that all (or even any) of the claims must

16  reflect that potential method. *See Ventana Medical Sys., Inc. v. Biogenix Labs., Inc.*, No. 06-

17  1074, 2006 U.S. App. LEXIS 32031, at *18 (Fed. Cir. Dec. 29, 2006) ("[E]ach claim does not

18  necessarily cover every feature disclosed in the specification."). The claims of a particular patent

19  thus need not lay claim to everything mentioned in the specification, especially when the patent

20  at issue is a continuation of another patent.

21  **C.    Blockbuster Gives No Significance To the Difference Between "Based Upon" and "In," While Launching A Factually Incorrect Attack On Netflix's Construction**

22

23       Blockbuster argues at some length that the term "based upon" cannot have its plain

24  English meaning, but instead -- counterintuitively -- that a process of selecting something "based

25  upon" a list must exclusively employ only one criterion -- the order of the list itself, and nothing

26  else. In support of its position, Blockbuster argues that the Court should look to the specification

27  for guidance in determining the way the rental provider provides movies "based upon the order

28  of the list," and contends that the specification "provide[s] no reference whatsoever to use of any

NETFLIX'S CLAIM-CONSTRUCTION REPLY BRIEF
CASE NO. C 06 2361 WHA (JCS)

1   other factor" aside from the order of the list.  Opp. at 18.  Netflix agrees with Blockbuster that

2   the specification is relevant, but Blockbuster is simply wrong when it asserts that the

3   specification discloses no other factor than the order of the list.

4          On the contrary, the specification not only supports Netflix's position that "based upon

5   the order" means the order is *a* factor, but not the exclusive factor, it *expressly discusses* the very

6   factor that Netflix includes in its proposed claim construction -- the availability of movies to be

7   rented.  *See* Ramani Decl. Ex. 2 at 9:52-54 ("*[I]f a particular customer's first choice is not*

8   *available, or already rented, then the item having the next highest priority can be rented to the*

9   *particular customer.*").  Thus, the specification makes abundantly clear that there is one thing to

10  be considered when providing movies "based on the order of the list" in addition to the order

11  itself -- whether a particular movie is available.  Far from demonstrating that "there is no

12  meaningful way to permit consideration of other factors while ensuring that the order of the list

13  would indeed remain the 'main' or 'chief' factor," as Blockbuster argues, Opp. at 18, Netflix's

14  proposed definition in fact shows precisely how a factor other than the order of the list is to be

15  considered while still keeping the order of the list as the main factor:  because the order of the

16  list is followed whenever a particular movie is available, the order of the list will be the primary

17  factor in determining what movie will be delivered next.

18         Given Blockbuster's mistaken contention that "order of the list" is the only factor

19  described in the specification for determining what movie to provide, its arguments regarding

20  alleged indefiniteness, inadequate written description, or the need to "use the order of the list as

21  the ***sole factor*** in determining which movies to select for a particular customer," Opp. at 19, are

22  all without merit.  Likewise, its arguments for why "based upon" should be construed to mean

23  the same thing as "in" should be rejected, as they also are rooted in the false premise that there is

24  an "absence of any disclosure or definition of an alternative methodology" apart from strictly

25  following the order of the list.  Opp. at 20.  Because Blockbuster's contention that "based on"

26  means "in" is counterintuitive, and depends upon a mistaken reading of the specification, it

27  should be rejected.

28

NETFLIX'S CLAIM-CONSTRUCTION REPLY BRIEF
CASE NO. C 06 2361 WHA (JCS)

1  **D.    The Preambles of Netflix's Patent Claims Were In Fact Relied Upon By The Examiner, Rendering Them Limiting**

2

3       Blockbuster's contention that in the course of prosecution neither the Examiner nor the

prosecuting attorneys relied upon the preambles to Netflix's patent claims, and therefore the

4

preambles should not be construed as limitations on the claims, *see* Opp. at 23 n.15, is

5

demonstrably false.  The phrase in the preamble that both parties are seeking to construe is

6

"computer-implemented."  In Netflix's January 31, 2005 response to an Office Action by the

7

Examiner, Netflix explained that the Examiner had improperly "ignore[d] the terms 'computer-

8

implemented' and 'Internet' in the claims."  Ramani Decl. Ex. 12 at NFLIX0000685.

9

Thereafter, the Examiner allowed the patent to issue, expressly stating that Netflix's January 31

10

argument was "on point and agreed with by the Examiner."  Ramani Decl. Ex. 6 at

11

NFLIX0000903.  In so doing, the Examiner also expressly noted that the prior art did not

12

disclose a "*computer-implemented* method/system for renting movies comprising providing

13

electronic information, establishing in digital form a movie rental queue comprising an ordered

14

list, causing to be delivered to a customer a specified number of movies after delivery criteria are

15

satisfied and electronically updating the queue, in combination with the other claim language."

16

*Id.* (emphasis added).  Thus, despite Blockbuster's protestations to the contrary, it is clear that

17

the PTO did in fact rely on the limitation of the patent to a "computer-implemented" solution in

18

defining the scope of the claims and allowing the patent to issue.[2]  *Apple Computer, Inc. v.*

19

*Articulate Systems, Inc.*, 234 F.3d 14 (Fed. Cir. 2000), is distinguishable, as there was no

20

indication in that case that the examiner similarly relied upon the language of the preamble in

21

allowing the claims to issue (which, despite being lengthy, merely recited the sort of equipment

22

one would expect to be part of a Windows-based computer system).

23

       Perhaps sensing the weakness of its argument for why the preambles are supposedly not

24

25  _____

[2] Even without this express reliance, Blockbuster's argument (Opp. at 10) that the Court should

26  not consider what Netflix said to the PTO in the course of prosecuting its patents is wrong.  The prosecution history of a patent is part of the public record, and therefore provides important

evidence available to any would-be competitor regarding the scope of the claim.  *See, e.g.,*

27  *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) (referring

to the "notice function of a patent and its prosecution history.").  Given its public nature, using

28  the prosecution history to interpret the claims does not undermine their notice function.

11

1   limiting, Blockbuster attempts as a fallback to drain the preambles of any meaning at all.  It tries

2   to render them not limiting by proposing that only one or some (Blockbuster does not say which)

3   of the claim steps, rather than *all* of them, need to involve a computer.  Yet as Netflix explained

4   in its opening brief, many of the steps already expressly recite matters that would only be

5   implemented by way of computer, and therefore holding the preamble to be satisfied so long as a

6   computer is involved in only a single such step, as Blockbuster proposes, would effectively

7   negate the limitation.  Moreover, were Blockbuster's construction correct, the examiner would

8   not have been persuaded that the "computer-implemented" limitation in the preamble

9   distinguished the claims over the prior art, because computer implementation was already a part

10  of the elements recited in certain of the claims.

11          Finally, Blockbuster simply ignores Netflix's explanation regarding why the structure of

12  the claims of the '381 Patent requires the conclusion that the computer at issue is the provider's

13  computer.  It claims instead only that there is "nothing . . . in the claims to require that the

14  computer or computers referred to are solely those of the rental provider."  Opp. at 23.  As

15  Netflix explained in its opening brief, however, each of the steps recited in the '381 Patent

16  describe what happens *after* the rental provider receives information from the customer.  Thus,

17  the computer involved in facilitating those steps *must be* the provider's, not the customer's or

18  someone else's.

19  **E.      Blockbuster's Proposed Definition of Electronically Updating Is Not True To the**
           **Claim Structure**
20
            Blockbuster attacks Netflix's proposed claim construction -- "the provider's computer
21
    changing" -- for supposedly revising the meaning of "electronically updating."  Yet a quick
22
    glance at the claim structure demonstrates that the updating must be performed by the provider's
23
    computer.  The only time that the claim phrase "electronically updating" appears in the '381
24
    Patent is as part of the phrase "in response to other electronic digital information *received from*
25
    *the customer over the internet*, electronically updating the movie rental queue."  Ramani Decl.
26
    Ex. 2 at 13:21-23 (emphasis added).  To be sure, there are both provider computers and customer
27
    computers described in the specification, as Blockbuster notes, Opp. at 21, but that is because the
28

1   customer sends digital information at the outset.  As regards "electronic updating" in response to

2   digital information received from the customer, as used in the claim, this cannot possibly be

3   accomplished by the customer's computer.  The customer does not receive digital information

4   over the Internet from him or herself in order to update the queue -- especially since the queue is

5   maintained by the rental provider.

6          Even more tellingly, although Blockbuster rails against Netflix's proposed construction,

7   it is unable to come up with any argument in support of its own proposal that electronic updating

8   means changing information "in whole *or in part*," by an electronic device.  As Netflix pointed

9   out in its opening brief (and as Blockbuster cannot deny), there is no support, or qualifying

10  language, suggesting that "electronically updating" means updating only partially electronically.

11  The Court can scarcely credit Blockbuster's purported concern that Netflix's construction would

12  not cover a customer reading about a movie in an advertisement, and then adding it to his or her

13  queue.  Opp. at 21 n.14.  The electronic updating discussed in the patent claims is done by the

14  provider, not the customer.  The customer brings this about by providing digital information after

15  reading the advertisement, but he or she does not perform the updating.

16  **F.     Blockbuster Does Not Seriously Attempt To Justify Its Proposed Definition of "Item**
17  **        Selection Criteria"**

            Blockbuster offers but a single sentence in support of its proposed construction of "Item
18
    Selection Criteria" to include any information used to choose an item by *any* "person or device."
19
    It asserts that combining the ordinary meaning of each of the words in the phrase to be construed
20
    will "provide[] a plain meaning for the term as a whole."  Opp. at 24.[3]  Yet the Federal Circuit
21
    has flatly *rejected* just such an approach to claim construction.  In *Network Commerce, Inc. v.*
22
    *Microsoft Corp.*, 422 F.3d 1353 (Fed. Cir. 2005), the parties had agreed (as here with "item
23
    selection criteria") that the claim phrase "does not have a specialized meaning in the relevant
24
    art."  *Id.* at 1359.  The patentee, as Blockbuster does here, "invite[d] the court to combine
25
    individual dictionary definitions" in order to arrive at a claim construction.  *Id.* at 1360.
26

27  _____
    [3] Examples abound of why this technique will not work.  For example, no one would suggest that
28  the meaning of the term "lame duck" can be found by combining the concept of crippled with a
    waterfowl.  And a "hot dog" is someone who likes to show off or a ballpark repast, not a canine

13

1    However, the Federal Circuit looked instead to the specification to define the phrase, explaining

2    that "it is 'appropriate for a court . . . to rely heavily on the written description for guidance as to

3    the meaning of claims.'"  *Id.* (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir.

4    2005) (en banc)).  It further held that the definition that would result from cobbling together

5    standard dictionary definitions of the component terms was simply "not a tenable theory in light

6    of the specification."  *Id.*  It is no more tenable here.[4]

7        In contrast, Netflix's proposed definition, "characteristic(s) and/or order of

8    items/movies/games desired by the customer," is guided by the specification itself.  Under the

9    heading "Item Selection Criteria" the specification expressly describes that "the one or more

10   item selection criteria provided by customer 102 to provider 104 indicate the particular items that

11   customer 102 desires to rent from provider 104."  Ramani Decl. Ex. 2 at 3:22-24.

12       Yet, despite the fact that this definition does not contain the word "may," Blockbuster

13   asserts that the fact that "the specification repeatedly uses the word 'may'" in *other places*

14   somehow demonstrates that the definition of item selection criteria expressly provided in the

15   specification should not be adopted.  Opp. at 25.  This makes no sense at all!  Nor is

16   Blockbuster's attempt to rely on *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*,

17   340 F.3d 1298 (Fed. Cir. 2003), convincing.  The portion of the specification quoted by Netflix

18   does not state that the item selection criteria "should" be used to determine "the particular items"

19   that the customer desires to rent, as in *Anchor Wall Systems*; instead, the specification states,

20   without equivocation, that those criteria *do* indicate the rentals desired by the customer.

21

22   that has been out in the sun for too long.

---

[4] To be sure, in a case cited in another context by Blockbuster, *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003), the Federal Circuit stated that "simply because a phrase as a whole lacks a common meaning does not compel a court to abandon its quest for a common meaning and disregard the established meaning of the words."  *Id.* at 1372.  However, in that case (unlike here) one of the words contained in the phrase -- "flag" -- did "have a common meaning in the art."  *Id.*  And importantly, the specialized definition of a "flag" in the computer science art is far different from how one would define a "flag" using a general purpose dictionary, as Blockbuster seeks to do here.  Moreover, *Altiris* was decided two years before the Federal Circuit's landmark *en banc* decision in *Phillips* -- a case whose importance to claim construction Blockbuster acknowledges repeatedly.  To the extent *Altiris* and *Network Commerce* are in conflict, plainly *Network Commerce*, a case that not only came after *Phillips*, but also cited it in the very section upon which Netflix relies, is controlling.

NETFLIX'S CLAIM-CONSTRUCTION REPLY BRIEF
CASE NO. C 06 2361 WHA (JCS)

1

**G.    Blockbuster's Proposed Definition of "Periodic Fee" Completely Ignores the Patent's Purpose to Do Away With Late Fees, Due Dates and Per-Item Rentals**

2

3          The patents-in-suit describe how a purpose of the inventions was to move away from

4   conventional, a la carte, item-by-item rental of items that involve due dates or permit the

5   imposition of late fees. *See* Ramani Decl. Ex. 2 at 1:30-33; 1:48-51; 12:27-28. Blockbuster's

6   proposed definition, which requires only that the fee be incurred, paid or charged at (not further

7   defined) "regular intervals," however, could cover such a la carte rental methods, thereby

8   thwarting that purpose.[5] In response, Blockbuster relies on a rote reading of dictionary

9   definitions that are wholly divorced from the context of the Netflix patents. Opp. at 23-24. As

10  discussed above, *Network Commerce* explains that simply taking the dictionary definitions of

11  individual components of a phrase and melding them together is not a proper method of claim

12  construction. Instead, a court should look to the written description of the patent to arrive at a

13  proper construction. In the Netflix patents there are repeated mentions of a "subscription

14  period," and that period is expressly associated with a "periodic rental subscription fee." Br. at

15  21. These clear indications of claim scope recited within the specification of the Netflix patents

16  trump Blockbuster's improper "melding together" construction, which is wholly divorced from

17  the specification and reads the claims out of the context of the patent in which they appear.

### III.    CONCLUSION

18

19         Blockbuster's Opposition confirms that it has proposed wildly expansive and, at times,

20  absurd constructions that never would have been contemplated by the examiners who allowed

21  the Netflix patents. Netflix's proposed constructions result from accepted principles of claim

22  construction and stay true to the purposes of the invention, the context of the claims, and the

23  guidance provided by the specification. The Court should accordingly select Netflix's proposed

24  constructions.

25

26

27  _____

[5] Blockbuster is correct that the "periodic fee" limitation appears in fewer than all of the claims
28  of the patents-in-suit. That supplies no reason, however, to interpret the limitation where it does appear in a manner wholly inconsistent with the purpose of the invention.

1   Dated:  January 10, 2007                    Respectfully submitted,

2                                                KEKER & VAN NEST, LLP

3

4

5                                           By:    /s/ Eugene M. Paige
                                                Attorneys for Plaintiff
6                                               NETFLIX, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NETFLIX'S CLAIM-CONSTRUCTION REPLY BRIEF
CASE NO. C 06 2361 WHA (JCS)