## <u>NETFLIX, INC. v. BLOCKBUSTER INC.</u>

Case No. 06 2361 WHA (JCS)

### EXHIBIT A

TO

BLOCKBUSTER'S COMMENTS ON
TENTATIVE CLAIM CONSTRUCTION ORDER

*Filed on February 13, 2007*

921566_1.DOC

Dockets.Justia.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NETFLIX, INC., a Delaware corporation,

Plaintiff,

vs.

BLOCKBUSTER, INC., a Delaware corporation,

Defendant.

No.  C 06-02361 WHA

**TENTATIVE CLAIM CONSTRUCTION ORDER [WITH REVISIONS PROPOSED BY BLOCKBUSTER]**

## INTRODUCTION

This is a tentative claim-construction order for United States Patent Nos. 6,584,450 and 7,024,381 asserted herein.  This order addresses the seven phrases selected by the parties.  Counsel are invited to file a critique on **TUESDAY, FEBRUARY 13, 2007, AT NOON**.  A critique from any party must be no longer than six double-spaced pages without footnotes.  No appendices or declarations are permitted.  A response may attach a copy of this order with short proposed edits not requiring extended argument.  On **WEDNESDAY, FEBRUARY 14,  2007, AT NOON**, each side may file a four-page reply, double-spaced with no appendices or declarations.  These pages limits are designed to focus counsel on the issues of most importance to them.  The page limits are reasonable in light of the vast paperwork previously filed and considered.  The Court will then issue a final ruling.

ALSCHULER
GROSSMAN
LLP

921566_1.DOC

**STATEMENT**

Plaintiff Netflix, Inc., is the holder of the two patents in suit, which were drawn to methods for renting items, in particular for ordering digital video discs via the Internet for transmission and return by mail. Netflix's first patent, U.S. Patent No. 6,584,450 ("the '450 patent"), issued on June 23, 2003. Its second patent, U.S. Patent No. 7,024,381 ("the '381 patent"), issued on April 4, 2006. Both patents were assigned to Netflix.

Since 1999, Netflix has rented movies on DVDs on a subscription basis through its website, www.netflix.com. The DVDs have been sent and returned by mail. (This case does not involve transmission of digital movie files over the Internet.)

Defendant Blockbuster, Inc. has also rented DVDs for many years. Until 2004, Blockbuster's rentals were conducted in traditional brick-and-mortar stores. On August 11, 2004, Blockbuster launched "Blockbuster Online," a service which provided for the rental of DVDs over the Internet through its website www.blockbuster.com (Answer ¶ 30).

On the day that the '381 patent issued, Netflix filed the instant lawsuit alleging that Blockbuster infringed the two patents. On June 13, 2006, Blockbuster filed its answer and counterclaims. Defendant pleaded the affirmative defenses of inequitable conduct and patent misuse. Blockbuster counterclaimed that Netflix violated Section 2 of the Sherman Antitrust Act by committing knowing and willful fraud on the Patent and Trademark Office when applying for the two patents and by asserting these patents in bad faith in sham litigation. An order dated August 22, 2006, denied Netflix's motion to dismiss the antitrust counterclaims.

**ANALYSIS**

## 1. LEGAL STANDARD

Claim construction is a matter of law to be decided by a judge, not a jury. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996). Courts must give words in the claims their ordinary and customary meaning, which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).

Where this ordinary and customary meaning is not immediately clear, courts must

1  primarily look to intrinsic evidence (*i.e.*, the claims, the specification, and the prosecution history)

2  to determine the meaning. *Id.* at 1314. With respect to the specification, although a difficult task,

3  a court must distinguish "between using the specification to interpret the meaning of a claim and

4  importing limitations from the specification into the claim." *Id.* at 1323. The latter is not

5  permissible.

6       Although courts have the discretion to consider extrinsic evidence, including expert and

7  inventor testimony, dictionaries and scientific treatises, such evidence is "less significant than the

8  intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317

9  (citation omitted). "The construction that stays true to the claim language and most naturally

10  aligns with the patent's description of the invention will be, in the end, the correct construction."

11  *Id.* at 1315. "Nonetheless, any articulated definition of a claim term ultimately must relate to the

12  infringement questions it was intended to answer." *E-Pass Tech., Inc. v. 3Com Corp.*, ___ F.3d

13  ____, 2007 WL 80852, *4 (Fed. Cir. Jan. 12, 2007) (citing *Wilson Sporting Goods Co. v.*

14  *Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326 (Fed. Cir. 2006).

15  **2.    DISPUTED CLAIM TERMS AND PHRASES.**

16       In the fashion in style among patent lawyers, counsel have been unable to agree on any

17  definitions for any term and appear to dispute every term in the patents. Seven phrases have been

18  selected for this proceeding. (All other terms in dispute will be considered before the case

19  goes to the jury.) Those seven terms are: (1) "item rental queue" and "movie rental queue;" (2)

20  "ordered list;" (3) "based upon the order of the list," "in the desired order," and "based on the

21  desired order;" (4) "electronically updating;" (5) "computer-implemented method/steps;" (6)

22  "periodic fee;" (7) "item selection criteria," "movie selection criteria," and "game selection

23  criteria."

24      **A.    "Movie Rental Queue" and "Item Rental Queue."**

25       The meaning of the disputed terms "item/movie rental queue" and "ordered list" are

26  closely related. Both appear in **each independent claim of the '381 patent. For example,** claim

27  34 of the '381 patent< ~~which~~ > recited (col. 15:34-55):

28          34. A computer-implemented method for renting movies to

customers, the method comprising:

establishing over the Internet a rental agreement with a customer that provides for charging the customer a periodic fee;

providing electronic digital information that causes one or more attributes of movies to be displayed;

establishing, in electronic digital form, from electronic digital information received over the Internet, *a movie rental queue associated with a customer comprising an ordered list indicating two or more movies for renting to the customer*;

causing to be delivered to the customer up to a specified number of movies based upon the order of the list;

in response to one or more delivery criteria being satisfied, if the customer is current on the periodic fee, selecting another movie based upon the order of the list and causing the selected movie to be delivered to the customer; and

in response to other electronic digital information received from the customer over the Internet, electronically updating the *movie rental queue*.

Both disputed terms indicate some kind of sequence from the plain<t> meaning of "ordered" and "queue." Claim 34 recited "a movie rental queue associated with a customer *comprising* an ordered list indicating two or more movies for renting to the customer." The word "comprising" indicates that the ordered list must be part of the queue, but the queue may include other things as well.

Different factors **may** determine the sequence of items in the "queue" and the "ordered list." The "queue" may, but does not have to be, **in** the exact order specified by the customer. Claim 34 depended from claim 3<4>**9** and recited (col 16:4-7):

39. A computer-implemented method as recited in claim 34, further comprising *determining the order of the two or more movies indicated by the movie rental queue* based upon preferences of the customer.

As shown above, if the queue were already in order according to the customer's preference, claim 39 would be redundant.

The "ordered list" indicates movies for renting to the customer, but it need not necessarily be in the customer's preferred order. Claim 38 also depended from claim 34 and recited (16:1-3):

1
2

> 38.  A computer-implemented method as recited in claim 34, wherein the *two or more movies for renting to the customer are selected by the customer*.

3   From claim 34, the "two or more movies for renting to the customer" are indicated by the

4   "ordered list."  For claim 38 to add a limitation, the ordered list itself must be able to be based on

5   some sequence other than the customer's preferences.  Accordingly, in claim 34, the ordered list

6   itself may be, but is not required to be arranged in the customer's specified order.  The ordered

7   list may include items arranged in some other way such as a default order set by a computer.  The

8   rental queue has its own sequence which can contain items not found on the "ordered list."  This

9   might occur when the provider adds movies to the customer-associated queue based on the

10  customer's selected criteria.  The queue's sequence can also take into account other factors such

11  as availability, delivery constraints, preferred customer treatment, demand, and other similar

12  factors.  The provider then uses the rental queue to rent items to the customer.

13
14

### (1).    *"Item" and "Movie" Require No Definition.*

15  Turning now to a closer consideration of "item rental queue" and "movie rental queue,"

16  Blockbuster urges the court to define the terms "movie" and "item."  A district court need not

17  construe every single disputed word.  "Claim construction is a matter of resolution of disputed

18  meanings and technical scope, to clarify and when necessary to explain what the patentee covered

19  by the claims, for use in the determination of infringement."  *U.S. Surgical Corp. v. Ethicon, Inc.*,

20  103 F.3d 1554, 1568 (Fed. Cir. 1997).  As these are commonly-understood English words, they

21  need no clarification.

22  The term "item" is defined explicitly in the specification of the '450 patent, which stated

23  "[a]s used herein, the term `items' refers to any commercial goods that can be rented to

24  customers" (col. 4:1-3).  Absent that, a juror would still understand through everyday

25  experience that "item" used in this context would not include, for example "cups of coffee"

26  which cannot be rented, but could include "bowling shoes" which can be rented to customers.

27  Jurors would also understand that the term "movie," as used in the patents, was intended to

28  include media such as documentaries, television series, cartoons, music videos, concert

1  performance films, and instructional and educational programs.  This list was recited in claim 13

2  of the '381 patent (col. 13:59-64).

3          **(2).**   *"Queue" Implies an Order.*

4       For the phrase "rental queue," the parties have two primary points of contention: whether

5  "queue" implies an order, *i.e.*, sequence ~~of~~**or** priority, and whether that order is determined by

6  the provider.  Netflix defines the term as the "sequence of movies/items used by a rental provider

7  to determine which movies/items to deliver."  Blockbuster contends that this proposed definition

8  conflates the definition of "rental queue" with the concept of "ordered list," another disputed

9  term.  It proposes that "item/movie rental queue" should mean "two or more items/movies for

10 future rental or possible future rental, or the names or other representations of two or more such

11 items/movies."

12      A "queue" has a commonly-understood meaning, specifically, "a waiting line especially

13 of persons or vehicles . . . ."  Merriam-Webster, *Ninth New Collegiate Dictionary*, 1984.  This

14 definition inherently implies some kind of sequence or order, such as first come, first served.

15 Netflix also cites to a more technical, computer-programming definition of queue, which defined

16 it as "a sequence of stored data programs awaiting processing" (Ramani Decl.  Exh.  9).  Thus a

17 queue must have some sequence or order; it cannot merely be a group of things as Blockbuster's

18 proposed definition would suggest.

19      The idea that a queue must have some sequence or order finds support in the specification.

20 Specifically, the '450 patent stated that "the one or more item selection criteria provided by

21 customer 102 to provider 104 indicate the particular items that customer 102 desires to rent from

22 provider 104.  Thus the item selection criteria define a customer-specific order queue that is

23 fulfilled by provider 104" (col. 4:54-58).  In that embodiment, movies or items can be added to

24 the queue based on customer selection criteria.  The specification does not say precisely the order

25 in which those items were added to the queue.  It could be according to some other priority

26 determined by the provider.

27      Blockbuster argues that including some kind of order in the definition of "item/movie

28 rental queue" would render some claims redundant.  Specifically, defendant argues that claim

1  39 of the '381 patent, recited above, would add no limitation if this were the case.  This argument,

2  however, disregards the possibility that the provider, in arranging the queue, may take into

3  account different priorities than those used to create the "ordered list."  This is supported by the

4  claim language itself.  For example, claim 34 of the '381 patent recited "a movie rental queue

5  associated with a customer *comprising* an ordered list indicating two or more movies for renting

6  to the customer."  The ordered list is part of the queue but may contain additional items arranged

7  according to some other priority.

8       Finally, Blockbuster argues that the queue cannot have an order because during

9  prosecution of the '450 patent, Neil Hunt, Netflix's CEO and a named inventor on both patents,

10  referred to the queue as establishing a "set" of movies to be rented (Ramani Decl.  Exh.  3, ¶ 4).

11  Specifically, the Hunt declared "[t]he pay-per-rental model did not include a mechanism, such as

12  a rental queue, for establishing a set of specified movies from which initial and subsequent

13  movies were rented."  Blockbuster argues that this declaration means that the "rental queue" is a

14  "set" which inherently cannot have any order.  Hunt's statement does not, however, preclude the

15  set's having some sequence.  Hunt was trying to distinguish his invention from prior art rental

16  models by showing that his invention did not require the customer to choose the item he or she

17  wanted to rent on the spot, **because** the item would instead be chosen from a preexisting queue.

18  This statement does not mean that a queue has no order whatsoever.

19       **(3).**     *Operation of the Queue.*

20       The next point of dispute is whether the queue must be used *by the provider*.  The claims

21  make it clear that the "rental queue" is used to rent items.  No further clarification is needed on

22  that point.  The claims and specification give less guidance as to whether the *provider* is the one

23  necessarily using the queue.  The claims of both patents reveal that the queue is formed, at least in

24  part, from the customer's input in selecting movies or items.  The provider then selects the items

25  to be rented from the queue based on the customer's input and possibly other factors.  For

26  instance, the customer can rank items within the ordered list, but the provider uses the queue to

27  determine which item to send based on availability, or based on which customers have generated

28  the most revenue for them, or any number of other criteria.

1    For example, the specification indicated that customers could select movies that had not

2    yet been released.  The customer may state as an item selection criteria that he would like to

3    rent every newly-released movie starring Keanu Reeves.  The system would automatically add

4    them to his movie rental queue once they became available.  Blockbuster argues that such a

5    system would simply not place those items in any order at all within the queue.  Even though

6    those items may not be in a customer-determined order, they would still be arranged in some

7    manner for the system to rent items.  For instance, they might be placed in order *by the system*

8    based on availability, relative popularity, or even a sequence as mundane as alphabetical or

9    chronological order.  It would not merely be lumped in at random with the customer's other

10   selections.

11       At oral argument, Blockbuster contended that availability was the only criteria other

12   than customer preference that was taught or enabled by the specification.  It contended that

13   availability cannot truly be a criteria because the provider cannot rent what it does not possess.

14   This neglects the possibility that the system could delay sending the top-ranked item until is it

15   available.  For instance, if a customer had selected a certain movie as his top choice but that

16   movie was not available, the system could simply wait until a copy of the customer's top choice

17   was returned to send that customer the movie.  Availability can constitute a criteria for ordering

18   the queue.

19       Accordingly, this order holds that "item/movie rental queue" will mean the sequence from

20   which the provider selects movies or items to be rented.  A queue has an order.  It includes the

21   ordered list but may also include other items.  The queue's sequence can be determined in part by

22   customer preferences but may also use other priorities such as availability, demand, popularity,

23   and delivery constraints.  "Items" and "movies" will be given their common meanings with

24   "items" being limited to those things that can be rented.

**B.    "Ordered List."**

25       The term "ordered list" was used in each independent claim of the '381 patent.

26   For example, claim 14 recited (col. 13:64-~~5~~**14:17**):

27       14.  A computer-implemented method for renting movies to
         customers, the method comprising:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

providing electronic digital information that causes one or more
attributes of movies to be displayed;

establishing, in electronic digital form, from electronic digital
information received over the Internet, a movie rental queue
associated with a customer comprising an *ordered list*
indicating two or more movies for renting to the customer.

causing to be delivered to the customer up to a specified number of
movies based upon the order of the list, wherein the
customer is not required to return the movies within a
specified time associated with delivery;

in response to one or more delivery criteria being satisfied,
selecting another movie based upon the order of the list and
causing the selected movie to be delivered to the customer;
and

in response to other electronic digital information received from the
customer over the Internet, electronically updating the
movie rental queue.

Netflix proposes that the term "ordered list" should mean a "list specifying the customer's desired

rental order" while Blockbuster contends that it should mean "names or other representations of

two or more items, arranged so that one or more of the items is before or after one or more other

items."

Like all the other disputed terms, "ordered list" has a commonly-understood meaning.

Any juror, having likely done grocery shopping in his or her life, is familiar with a list: a series of

items.  The term "ordered" indicates that the arrangement of items on the list is dictated by some

logic, rule, or governing principle.  Taken by themselves, these terms are easily understood by the

layperson.  They need no clarification.

The question now becomes whether or not the use of the term "ordered list" in the claims

and specification indicates the *customer's* desired rental order.  This order holds that it does not.

First, the use of the term within the claims is instructive.  As shown above, claim 34 recited "a

movie rental queue associated with a customer comprising an *ordered* list indicating two or more

movies for renting to the customer."  The ordered list is a component of the queue that has its

own sequence.  Second, as mentioned above, reading the limitation that the ordered list must be

according to the customer's desired order would render claim 38 of the '381 patent redundant.

ALSCHULER
GROSSMAN
LLP

921566_1.DOC

9

1    Patent terms must be construed in light of the invention's purpose.  *Nystrom v. TREX Co.,*

2    *Inc.*, 424 F.3d 1136, 1144 (Fed. Cir. 2005).  Netflix argues that it would defeat the invention's

3    purpose if any order other than the one specified by the customer were used in the

4    ordered list.  The '450 patent stated that the invention's purpose was to ensure that "the greatest

5    number of customers are provided with their most preferred items.  For example, customers may

6    specify priorities for the items indicated by the item selection criteria" (col. 11:17-21).  This

7    purpose, however, does not absolutely demand that the only sequence in the ordered list is that

8    specified by the customer.  The use of the term "may" indicates that the customer has the ability,

9    but is not required, to rank the items in the ordered list in his or her preferred sequence.  Indeed,

10   items in the ordered list may merely appear in some computer-assigned default order such as the

11   chronological order in which they were added to the list.

12   The prosecution history of the '381 patent also supports this construction.  The examiner

13   rejected all pending claims for not meeting the statutory subject matter requirement under 35

14   U.S.C. 101.  The applicants overcame the examiner's rejection by arguing that the useful,

15   tangible result of their invention was to rent movies to customers based on the order of the

16   customer's preference.  That result brought the invention within the scope of the technological

17   arts (Ramani Decl. Exh. 11).  As discussed below, plaintiffs distinguish between the use of the

18   term "based on" an "in" when ordering items.  Again, the use of the phrase "based on" indicates

19   that the ordered list may reflect the customers preferences exactly, but need not necessarily do

20   so.

21   Finally, Blockbuster argues at length that Netflix's proposed definition of this term

22   conflates it with the term "movie/item rental queue."  Netflix's proposed definition of

23   "movie/item rental queue" is "sequence of items/movies used *by a rental provider* to determine

24   which items/movies to deliver."  Both terms refer to a grouping of items placed in some kind of

25   sequence or order.  The rental queue <~~reflects~~>**may reflect** the provider's priorities in addition to

26   customer preferences, while the ordered list includes items for possible rental to the customer, the

27   order <~~of which is~~>**may be** determined in **whole or in** part by the customer, but may **also** be

28   based on some default **or other** order.

1    To borrow from the example Blockbuster used in its brief, the provider could

2  automatically add all adventure movies starring Harrison Ford to the rental queue based on the

3  customer's selected criteria ('450 patent, col. 8:54-60). The customer can then see that these

4  movies were added to her rental queue and decide that she prefers *The Empire Strikes Back to*

5  *Indiana Jones and the Temple of Doom*. Accordingly, she can place one ahead of the other within

6  the queue set up by the system, resulting in her "ordered list." She might choose to put them in

7  some order with respect to her other selections, She might also choose to leave *Patriot Games*,

8  another selection added to her queue, in the order in which the provider added it. The provider, in

9  selecting a movie to rent, may discover that it has no copies of *Empire Strikes Back*, and will

10  accordingly rearrange the queue to select another movie to rent to the customer.

11    This order holds that the term "ordered list" will be given its plain meaning. The ordered

12  list may be, but is not required to be, ordered precisely according to the customer's preferences; it

13  could also include some other **or** default order.

14    **C.**    **"Based Upon The Order Of The List," "Based Upon The Desired Order," and**

15         **"In The Desired Order."**

16    Parties dispute the meaning of the above three terms. Essentially, Blockbuster argues that

17  these three terms are interchangeable in the context of the patents in suit. The first term appeared

18  in claim 14 of the '381 patent which recited in pertinent part (col. 13:64-14:1<4>**7**):

19         14. A computer-implemented method for renting movies to
20         customers, the method comprising:

21         providing electronic digital information that causes one or more
             attributes of movies to be displayed;

22         establishing, in electronic digital form, from electronic digital
             information received over the Internet, a movie rental queue
23           associated with a customer comprising an ordered list
             indicating two or more movies for renting to the customer;

24         causing to be delivered to the customer up to a specified number of
             movies based upon the order of the list, wherein the
25           customer is not required to return the movies within a
             specified time associated with delivery;

26         in response to one or more delivery criteria being satisfied,
             selecting another movie *based upon the order of the* list and
27           causing the selected movie to be delivered to the customer.

28  The second and third terms were used in claims 4 and 5 of the '450 patent (col. 14:64-15:19):

4.  A method as recited in claim I, wherein

the one or more item selection criteria indicates a desired order for the one ore more items that a customer desires to rent,

the step of providing to the customer up to a specified number of the one or more items indicated by the one or more item selection criteria includes providing to the customer up to a specified number of the one or more criteria *in the desired order* indicated by the item selection criteria; and

the step of providing to the customer one or more other items indicated by the one or more item selection criteria includes providing to the customer one or more other items indicated by the one or more selection criteria *in the desired order* indicated by the one or more item selection criteria.

5.  A method as recited in claim 4, further comprising if a particular item from the one or more items indicated by the one or more item selection criteria is not available, then providing another item from the one or more items *based upon the desired order* indicated by the one or more item selection criteria.

Here, Netflix proposes that "based upon the order of the list" should mean "so as to provide the next-available movie in the order specified by the list." Blockbuster proposes that the same term should mean "in the same sequence as that of the `ordered list' referred to earlier in the claim." As to "based upon/in the desired order," Blockbuster argues that both terms should have the same meaning, "tin the same sequence in which any person wants the items to be provided." Netflix proposes that "based upon the desired order" should mean "so as to provide the next-available movie in the rental sequence specified by the customer," and that "in the desired order" should mean "in the rental sequence specified by the customer."

The question of whether or not the order in the "list" is the customer's order has already been addressed. As stated above, it may be the customer's order but need not be so restricted. The real dispute is over the meaning of "in" versus "based upon." Had the inventors chosen to do so, they could have used the same term, either "in" or "based upon," in both claims. They did not. The use of two different terms in close proximity gives rise to the inference that two different meanings were intended for the two different terms. *Bancorp Serv., L.L.C.  v. Hartford Life Ins.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004). Looking to commonly-understood meanings, "based upon" allows some deviation from the exact, specified order, while "in" requires that the

1    order must be followed.  This inference could possibly be defeated, of course, by showing

2    evidence to the contrary.  Blockbuster fails to do so.

3        The use of the terms in the claims is instructive.  Claim 4 of the '450 patent recited "the

4    step of providing to the customer one or more other items indicated by the one or more item

5    selection criteria includes providing to the customer one or more other items indicated by the one

6    or more selection criteria *in the desired order* indicated by the one or more item selection criteria"

7    (col. 15:8-12).  Claim 5 depended from claim 4, and recited "further *comprising if a particular*

8    *item from the one or more items indicated by the one or more item selection criteria is not*

9    *available, then providing another item* from the one or more items based upon the desired order

10   indicated by the one or more item selection criteria" (col. 15:13-18).  Here, if the first item on the

11   customer's list was unavailable, the system would select another item from the list.  When the

12   provider chooses an item "based upon" the order of the list, the provider does not necessarily

13   follow the list's precise order.

14       Indeed, if "based upon" and "in" were given the same meaning in these two claims, the

15   provider would have no way to continue renting items to the customer until the first item on the

16   list were available.  This reflects the reality that the provider cannot rent what it does not

17   currently have.  The specification also supports this construction.  The '381 patent stated

18   "[c]ustomers may specify priorities for the items indicated by the item selection criteria.  Thus, if

19   a particular customer's first choice is not available, or already rented, then the item having the

20   next highest priority can be rented to the particular customer" (col. 11:18-23).  Blockbuster's

21   argument under the written-description requirement of 35 U.S.C.  1 12, ¶ 1 fails because of this.

22   Blockbuster argues that the specification teaches no other criteria for selecting movies other than

23   those that the customer selected.  The above statement shows that this is not the case.  The

24   specification explicitly contemplated considering the availability of items before renting them and

25   does not exclude the use of other factors.

26       The requirement that "based upon" necessarily means the next-available item, however, is

27   without support.  Reading this limitation into the definition would render claim 5 redundant

28   because the concept of sending the next-available item was specifically recited.  Accordingly,

1    this order holds that "based upon the order of the list" allows for some deviation from the exact

2    order of the list.  "Based upon" need not be strictly based on availability; it could be based on

3    other factors.  "In the desired order" refers to the precise order the customer selected, while

4    "based upon the desired order" allows for some deviation from the desired order that need not be

5    solely based on availability.

6        **D.    "Electronically Updating."**

7        This term was used at least once in each independent claim of the '381 patent.  For

8    example, claim 34 recited (col.  15:34-55):

9            34.  A computer-implemented method for renting movies to
             customers, the method comprising:
10
             establishing over the Internet a rental agreement with a customer
11               that provides for charging the customer a periodic fee;

12           providing electronic digital information that causes one or more
                 attributes of movies to be displayed;
13
             establishing, in electronic digital form, from electronic digital
14               information received over the Internet, a movie rental queue
                 associated with a customer comprising an ordered list
15               indicating two or more movies for renting to the customer;

16           causing to be delivered to the customer up to a specified number of
                 movies based on the list;
17
             in response to one or more delivery criteria being satisfied, if the
18               customer is current on the periodic fee, selecting another
                 movie based upon the order of the list and causing the
19               selected movie to be delivered to the customer; and

20           in response to other electronic digital information received from the
                 customer over the Internet, *electronically updating* the
21               movie rental queue.

22   The same final limitation appeared in each of the independent claims of the '381 patent.  Netflix

23   and Blockbuster seem to agree that "updating" means "changing."  They part company on the

24   meaning of "electronically."  Specifically, Netflix contends that "electronically," when read in

25   the context of the claims and the specification, requires that the provider's computer perform

26   the updating function.  Blockbuster argues that the updating function can be performed by "any

27   device that uses a flow of electrons in a vacuum, in gaseous media, or in a semiconductor."

28

ALSCHULER
GROSSMAN
LLP

Here, the independent claims of the '381 patent are instructive because the phrase was not used in the specification. The claims indicated that information is received from the customer. This indicates that the device doing the updating receives information; it does not address exactly which device performs the updating function.

The specification and claims of the '381 patent simply do not teach the requirement that only the *provider's computer* can be used to update the information. In fact, the specification goes to great lengths to state that (col. 10:12-19):

> [t]he approach described herein for renting items to customers is applicable to any type of rental application and (without limitation) is *particularly well suited* for Internet-based rental applications for renting movies and music to customers. The invention may be implemented in hardware circuitry, in computer software, or a combination of hardware circuitry and computer software and *is not limited to a particular hardware or software implementation*.

Other portions of the specification teach a variety of computer hardware and software systems and specifically do not confine the system itself to a computer in any particular location or under any particular entity's control. For instance, the specification contemplates the use of software that could operate on the customer's computer or in some other remote setting.

The use of the term in the claims does limit the term "electronically updating" further than what Blockbuster would propose. The claim itself required that the updating be done "in response to other electronic digital information received from the customer over the Internet." Clearly, the device that performs the function must be able to receive information in this manner. This limitation does not, however, mean that the only device capable of doing so is the provider's computer. Netflix is attempting to confine this phrase to the embodiment of the invention that it practices which is expressly not allowed in claim construction. On the other hand, "electronic" is a commonly-understood word which needs no clarification. Blockbuster's proposed definition's discussion of electrons and vacuums would likely cause more confusion than leaving the term to its common meaning.

Accordingly, this order holds that "electronically updating" means changing <based on information received from the customer via the Internet>using an electronic device. "Electronic" is given its plain-language meaning.

1

E.    **"Computer-Implemented Method/Steps."**

2    The term "computer-implemented method" appeared in the preamble of each of claims 1-

3    43 of the '381 patent.  The preamble recited "[a] *computer-implemented method* for renting

4    movies to customers."  The term "computer-implemented steps" was recited in the preamble of

5    independent claims 1, 16, and 31 of the '451 patent.  Each of those claims recited "[a] method for

6    renting items to customers, the method comprising the *computer-implemented steps* of ...."

7                    **(1)    *Limiting Claim Preambles.***

8    The first issue is whether the preamble to these claims is limiting.  "In general, a preamble

9    limits the invention if it recites essential structure or steps, or if it is `necessary to give life,

10   meaning, and vitality' to the claim.  Conversely, a preamble is not limiting where a patentee

11   defines a structurally complete invention in the claim body and uses the preamble only to state a

12   purpose or intended use for the invention."  *Catalina Marketing Int'l Inc.  v. Coolsavings.com,*

13   *Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (internal citations omitted).  Clear reliance on the

14   preamble in prosecution history transforms the preamble into a claim limitation because it

15   indicates that the patentee used the preamble to define the claimed invention.  *Invitrogen, Corp.*

16   *v. BioCrest, L.G.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003).

17   The file history of the '381 patent is instructive in this instance.  In an office action dated

18   October 29, 2004, the examiner rejected the application under 35 U.S.C.  101 for being drawn to

19   non-statutory subject matter.  The examiner explained (Ramani Decl.  Exh.  11):

20              In the present case, claims 55-94 only recite an abstract idea.  The
             recited steps of establishing, causing to be delivered, selecting and
21           updating does [sic] not apply, involve, use or advance the
             technological arts since all of the recited steps can be performed in
22           the mind of the user or by use of a pencil and paper.  The terms
             "computer-implemented" and "Internet," as claimed, do not obviate
             this line of reasoning . . .  The *computer need not be present to*
23           *execute these steps*, and if executed may merely be given by hand
             (digital data) or orally.

24   It is worth noting that the phrase "computer-implemented" was present from the beginning of the

25   prosecution of the '381 patent; it was not added in response to this rejection.  The applicants

26   traversed the examiner's rejection in the remarks saying that the examiner did not heed the

27   express limitation that all steps of the process were performed by a computer.  Specifically, they

28   argued (*Id*. at Exh.  12):

> Technology is used to provide electronic digital information that causes attributes of movies to be displayed to the user, to establish multiple, electronic movie rental queues each associated with a particular customer, to store the movie rental queue information, to update the movie rental queue, and to cause the selection of movies to be delivered to the customer, *all without any human mediation on the part of the renting enterprise*.

With this statement, the applicants disclaimed any inventions teaching the use of anything other than electronic means to carry out the claimed steps.

Blockbuster argues that the specifications of both patents show that the method is not limited to rental using computers. They quote ('450 patent at col. 14:24–34; '381 patent at col. 12:54–64):

> In the foregoing specification, the invention has been described as applying to an *implementation anticipating Internet-based ordering and mail or other long-distance delivery* of the items, where the special advantages of the method are very attractive. However, the same invention may be applied in a more conventional video, games, or music rental-store setting, where subscription customers may be allowed rentals of a specified number of movies, games, or music selections at any time, and/or in one subscription period, without rental return due dates, in exchange for a periodic rental subscription fee.

It is true that Netflix has not limited itself to ordering and delivery over the Internet. The above passage anticipates having the customer input information to the system in ways other than from their *own* computer. It does not indicate that any of the *claimed steps* of selecting items, causing items to be sent, etc., are performed by anything other than a computer. This passage addresses ordering and delivering the items; these are steps performed by the customer, not by the system. Accordingly, this order holds that the preamble reciting "computer-implemented method/steps" adds a limitation to the claims.

Blockbuster argues that some of the steps, such as delivery, cannot be performed by a computer, so the preamble should not be held to be a limitation on all of the recited steps. Defendant misstates the claims. Modern technology has of course not developed a computer that can physically deliver a DVD by itself. A computer can, however, *cause* a DVD to be delivered and it can *select* a DVD to be delivered as taught in the '381 patent. It can even *provide* a DVD by giving an order for it to be sent to a customer, as taught in the '450 patent.

1    **(2)**     *Construction.*

2    Secondly, as with the disputed term "electronically updating," **the** parties disagree over

3    whether the updating function is performed by the provider's computer or by some other device

4    under someone else's control.  As with "electronically updating" term, it is clear that the

5    information is coming in from the customer.  The claims and the specification do not make clear

6    that the steps are being carried out by the provider's computers.  Again, Netflix reads a limitation

7    from its preferred embodiment into the claims.  Netflix's argument omits a crucial step.  It

8    contends that because all the steps occur after information is received from a customer, it

9    necessarily follows that the steps are performed by the provider's computer.  The argument fails

10   because the specification and the claims did not exclude the use of all other computers in

11   performing the steps.  Accordingly, this order will not import that limitation into the meaning of

12   "computer-implemented."

13   Finally, Blockbuster argues that the Court should define the term "computer," another

14   commonly-used word from the English language.  As such, the term is understood to mean a

15   programmable device that can electronically process, store and retrieve information.  Merriam-

16   Webster, *Ninth New Collegiate Dictionary*, 1984.  Blockbuster's proposed definition would cause

17   more confusion than it would clear up.  The above definition of "computer" will be used.

18   "Implemented" is generally understood to mean "carried out" or "accomplished."

19   Accordingly, this order holds that "computer-implemented" adds a limitation to each

20   element of the claims in which it appears in the preamble.  "Computer-implemented" will have its

21   ordinary meaning, but will not be confined to the provider's computer.

22   **F.     "Periodic Fee."**

23   The term "periodic fee" was used only in claim 34 of the '381 patent.  It recited in

24   pertinent part (col. 15:34–38):

25           34.  A computer-implemented method for renting movies to
             customers, the method comprising:

26       establishing over the Internet a rental agreement with a customer
             that provides for charging the customer a *periodic, fee.*

27       providing electronic digital information that causes one or more
             attributes of movies to be displayed;

28

> establishing, in electronic digital form, from electronic digital information received over the Internet, a movie rental queue associated with a customer comprising an ordered list indicating two or more movies for renting to the customer;
>
> causing to be delivered to the customer up to a specified number of movies based upon the order of the list;
>
> in response to one or more delivery criteria being satisfied, if the customer is current on the *periodic fee*, selecting another movie based upon the order of the list and causing the selected movie to be delivered to the customer;

The parties disagree over whether the fee must be associated with the items rented. Blockbuster proposes that "periodic fee" should mean "an amount incurred, paid, or charged at regular intervals for a service — for example, and without limitation, an hourly, daily, monthly, or annual fee." Netflix contends that the term should mean "fee to be paid per subscription period for the right to rent." Blockbuster contends that the fee could be for any period of time, while Netflix contends that the fee must be associated with the subscription period.

As with all other terms construed in this order, both of these terms are commonly-understood English words. Any juror would understand a "fee" to be an amount charged. "Periodic" means "occurring or recurring at regular intervals." Merriam-Webster, *Ninth New Collegiate Dictionary*, 1984.

Netflix argues that the term should be narrowed to indicate that the periodic fee is a subscription fee and that it is paid for the right to rent. The latter requirement is more or less already found in claim 34 as recited above. The paragraph of the claim in which the term "periodic fee" appeared recited "establishing over the Internet a rental agreement." It is clear from the claim language that the fee is paid for the right to rent items.

As to the subscription requirement, plaintiff cites several places in the specification of the '381 patent that refer to a "subscription period," but none of these passages defined the term "periodic fee" or specifically required that the fee cannot be separated from the concept of a subscription (col. 6:1-2, 9-10, 32-34, 36-37). The subscription model is an attribute of a preferred embodiment that the plaintiff attempts to read into the claims as an additional limitation.

1    In any event, plaintiff's proposed definition would add little to the claim.  The claim at

2  issue indicated that the periodic fee was not charged per item as in traditional a la carte rental

3  programs.  Specifically, claim 34 recited that the customer will only be sent an additional item if

4  they are current on their periodic fee.  That claim separated the concept of the fee, which is based

5  on time, from sending another item.  This order will not go so far as to adopt Netflix's overly-

6  narrow definition, but it will make clear that the "periodic fee" at issue is not charged per item

7  rented but for a specific time period.

8    Accordingly, this order holds that the term "periodic fee" will have its ordinary meaning,

9  a fee charged or collected at regular intervals, based on time, and not calculated per item rented.

10    **G.    "Item Selection Criteria," "Movie Selection Criteria," and "Game Selection**

11        **Criteria."**

12    These terms were used many times throughout the claims of the '450 patent, but not the

13  '381 patent.  By way of example, claim I recited (14:43-55):

14        1.  A method for renting items to customers, the method comprising
          the computer-implemented step**s** of:

15        receiving one or more *item selection criteria* that indicates
16            <del>one</del>**two** or more items that a customer desires to rent;

17        providing to the customer up to a specified number of the
            <del>one</del>**two** or more items indicated by the one or more *item*

18            *selection criteria*; and

19        in response to receiving any of the items provided to the customer,
            providing to the customer one or more other items indicated
            by the one or more *item selection criteria*, wherein a total

20            current number of items provided to the customer does not
            exceed the specified number.

21

22  The usage of the terms "movie selection criteria" and "game selection criteria" was similar.

Claim 31 recited (col.  19:6–19):

23        31.  A method for renting movies to customers, the method

24        comprising the computer-implements steps of:

25        receiving one or *more movie selection criteria from a customer* that
            indicates <del>one</del>**two** or more movies that the customer
            desires to rent;

26        providing to the customer up to a specified number of the

27            <del>one</del>**two** or more movies indicated by the *one or more*
            *movie selection criteria*; and

28        in response to a return of any of the movies provided to the

customer, providing to the customer one or more other movies indicated by the one or more *movie selection criteria*, wherein a total current number of movies provided to the customer does not exceed the specified number.

Similarly, claim 50 recited in part (col. 21:56–65):

50.  A computer-readable medium as recited in claim 36, wherein:

the <~~one~~>**two** or more items are <~~one~~>**two** or more games,

the one or more item selection criteria are one or more game selection criteria,

the step of receiving one or more item selection criteria that indicates <~~one~~>**two** or more items that a customer desires to rent includes receiving *one or more game selection criteria that indicates* <~~one~~>**two** *or more games that* <~~the~~>**a** *customer desires to rent.*

Netflix proposes that "item/movie/game selection criteria" should mean "characteristics and/or order of items/movies/games desired by the customer."  Blockbuster proposes that the term should mean "any information used to choose a thing (or "item"), regardless of what person or device makes the choice."  The sum of parties' disagreement is over who or what entity makes choice – Blockbuster maintains that it could be any person or thing, while Netflix requires that it must be the customer.

As shown above, the claims use the term in the context of "receiving one or more item selection criteria that indicates one or more items that a *customer* wants to rent."  This shows that the criteria is linked to or reflects the customer's preferences.

Netflix argues that the specification defines the term "item selection criteria" as explicitly being selected by the customer.  "[T]he presumption in favor of the ordinary meaning of claim language as understood by one of ordinary skill in the art may be overcome where the patentee chooses to be his or her own lexicographer by clearly setting forth a definition for a claim term in the specification."  *Anchor Wall Sys., Inc.  v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003).  In the specification, Netflix points to language such as "[t]he one or more item selection criteria *provided by the customer* to provider indicate the particular items that customer desires to rent from provider.  Thus, the item selection criteria define a customer-specific order queue that is fulfilled by provider" ('450 pat.  col.  4:54-58).

ALSCHULER
GROSSMAN
LLP

921566_1.DOC

21

1    Additionally, "the item selection criteria indicate items that customer desires to rent from

2    provider" (col. 4:22-23). This seems to make clear that the item selection criteria are chosen by

3    the customer. The specification also distinguishes between the item selection criteria and the

4    actual order in which the items will be sent to the customer. The specification taught that the

5    customer can select categorical criteria, such as movies directed by Wes Andersen, that would

6    select items the customer wanted to rent, but would not put them in the customer's desired,

7    specified order. Thus, the use of the term in the specification indicated that the customer chose

8    the selection criteria.

9        Blockbuster relies mistakenly on Netflix's use of the word "may" in conjunction with

10   specifying item selection criteria. For example, they cite that customers "may specify what items

11   to rent using one or more item selection criteria . . ." ('450 patent at col. 4:9-11). This

12   language refers to an embodiment that gives customers the option of selecting criteria that would

13   add groups of items to their queues. Customers may still select items to rent for no other reason

14   than personal whim. The specification simply does not show that the criteria could be selected by

15   any entity other than the customer.

16       Accordingly, "item/movie/game selection criteria" will mean the characteristics used by

17   the customer to select items.

## CONCLUSION

19       The Court will consider the parties' responses to this tentative claim-construction

20   ruling. The final claim-construction order will issue shortly thereafter.

21       **IT IS SO ORDERED.**

22

23   Dated: February __, 2007

24                                   _____
                                     WILLIAM ALSUP
                                     UNITED STATES DISTRICT JUDGE

25

26

27

28

Document comparison done by DeltaView on Tuesday, February 13, 2007 10:40:08 AM

| Input: | |
| --- | --- |
| Document 1 | iManageDeskSite://DMS1/DOCS/921520/2 |
| Document 2 | iManageDeskSite://DMS1/DOCS/921520/3 |
| Rendering set | AGSK |

| Legend: |
| --- |
| **Insertion** |
| <Deletion> |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
| --- | --- |
| | Count |
| Insertions | 29 |
| Deletions | 20 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 49 |

| Redline options: | |
| --- | --- |
| | Status |
| Redline Statistics at End of Document | ON |
| Include Redline Comparison Summary | OFF |
| Show Line Numbering | OFF |
| Show Change Numbers | OFF |
| Show Change Bars On Left | ON |
| Show Hidden Text | OFF |
| Detect List Numbering Changes | ON |
| Compare Headers/Footers | ON |
| Compare Footnotes | ON |
| Display DeltaView Footers | OFF |
| Ignore Embedded Objects/Images | OFF |

| | |
|---|---|
| Compare at Character Level | ON |
| Compare Numbers at Character Level | ON |
| Show Moved Deletions | OFF |
| Show Changes to Spaces | OFF |
| Show Paragraph Changes | OFF |
| Ignore Case Changes | OFF |
| Ignore Textboxes | OFF |
| Ignore Field Codes | OFF |
| Ignore Tables | OFF |