# EXHIBIT A
# (Part 1 of 2)

Dockets.Justia.com

## BAKER BOTTS L.L.P.

2001 ROSS AVENUE
DALLAS, TEXAS
75201-2980
214.953.6500
FAX 214.953.6503

AUSTIN
BAKU
DALLAS
HOUSTON
LONDON
MOSCOW
NEW YORK
RIYADH
WASHINGTON

March 9, 2004

**PRIVILEGED AND CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION**

*Via Hand Delivery*

Richard Frank
Senior Vice President,
Senior Corporate Counsel and Assistant Secretary
Blockbuster Inc.
1201 Elm Street, Suite 2100
Dallas, Texas 75270

Re:    Investigation of U.S. Patent No. 6,584,450

Dear Mr. Frank:

This letter sets forth our opinion concerning the invalidity of all claims of United States Patent No. 6,584,450 ("*Hastings*"), which was filed on April 28, 2000 and was issued to W. Reed Hastings, et al. on June 24, 2003. A copy of *Hastings* is attached as Exhibit A, and the *Hastings* prosecution file history is attached as Exhibit B. At your request, we have investigated the validity of the claims in *Hastings*. As a result of our investigation and analysis, it is our opinion that a court and/or a properly instructed jury would find that all claims of *Hastings* are invalid based upon previously published documents. This opinion relies upon our analysis of *Hastings*, its prosecution history, and various prior art references.

As an initial step in our investigation, we performed searches of readily available prior art and quickly discovered a number of relevant references, including the *Reference Guide* and the *Functional Requirements*. These two references predate *Hastings* by well over a decade and detail systems focused on precisely the same functionality recited in the claims of *Hastings*. The *Reference Guide* and the *Functional Requirements* were not considered by the Examiner during prosecution, yet each of these documents expressly and unequivocally contradicts the Examiner's reasons for allowing the *Hastings* claims. Moreover, each of these two references alone discloses every important aspect described or claimed within *Hastings*.[1]

---

[1] Also, it should be noted that while we provide this opinion primarily using the *Reference Guide* and the *Functional Requirements* as the relevant prior art, these documents are only two out of the vast body of related references that

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299570

**BAKER BOTTS** LLP

*Opinion of Invalidity*                                    2                                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

    After the initial prior art search, we performed a detailed comparison of *Hastings'*
claims to various prior art references.  To aid us in the comparison, we analyzed the
specification, claims, and the prosecution history of *Hastings*.  After careful consideration of the
applicable legal standards regarding the validity of a United States patent, we conclude that a
court and/or properly instructed jury would find all claims of *Hastings* invalid under 35 U.S.C.
§ 102 and/or 35 U.S.C. § 103 based upon either the *Reference Guide* or the *Functional
Requirements*.  The following description addresses in greater detail specific aspects of our
analysis.

---

we discovered within days of initiating our search.  For example, these references each relate to a national program
for the blind established in 1931 and existing in the fifty states and beyond, and we uncovered these two references
by mining the information of only a single state.  As another example, a number of small, subscription-based web
sites, such as the "Audio Diversions" web site at www.audiodiversions.com, also existed and operated similar
programs well before *Hastings'* filing date.

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299571

**BAKER BOTTS** LLP

*Opinion of Invalidity*                                    3                                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

For your convenience, the following Table of Contents provides a quick reference
to various portions of this opinion:

I.  LEGAL STANDARDS ................................................................................................5

    A.   CLAIM CONSTRUCTION ...............................................................................5
    B.   VALIDITY ...................................................................................................8
        1. *Qualifying Prior Art* ..........................................................................9
        2. *Anticipation: 35 U.S.C. § 102* ........................................................11
        3. *Obviousness: 35 U.S.C. § 103* .......................................................13

II.  *HASTINGS* ........................................................................................................15

    A.   OVERVIEW ...............................................................................................15
    B.   PROSECUTION HISTORY OF *HASTINGS* .....................................................24

III.  SCOPE AND INTERPRETATION OF *HASTINGS*' CLAIMS ................................31

    CLAIM 1 - MAX OUT ......................................................................................31
    CLAIM 2 - TIME-BASED ITEM LIMIT .................................................................37
    CLAIM 3 - ROLLOVER .....................................................................................39
    CLAIM 4 - DESIRED ORDER .............................................................................40
    CLAIM 5 - SKIP UNAVAILABLE .........................................................................41
    CLAIM 6 - PREFERRED ITEM ATTRIBUTES .........................................................41
    CLAIM 7 - ITEM RENTAL QUEUE ......................................................................44
    CLAIM 8 - CUSTOMER NOTIFICATION ...............................................................45
    CLAIM 9 - EXPIRATION OF TIME ......................................................................46
    CLAIM 10 - SPECIFIED DATE ...........................................................................47
    CLAIM 11 - RECEIPT OF FEE ...........................................................................47
    CLAIM 12 - MAIL ..........................................................................................48
    CLAIM 13 - DELIVERY AGENT .........................................................................49
    CLAIM 14 - MOVIES ......................................................................................49
    CLAIM 15 - GAMES .......................................................................................51
    CLAIM 16 - TIME-BASED ITEM LIMIT ...............................................................53
    CLAIM 17 - MAX OUT ...................................................................................54
    CLAIM 18 - ROLLOVER ..................................................................................55
    CLAIM 19 - DESIRED ORDER ..........................................................................55
    CLAIM 20 - SKIP UNAVAILABLE ......................................................................56
    CLAIM 21 - PREFERRED ITEM ATTRIBUTES ......................................................56
    CLAIM 22 - ITEM RENTAL QUEUE ...................................................................57
    CLAIM 23 - CUSTOMER NOTIFICATION ............................................................57
    CLAIM 24 - EXPIRATION OF TIME ...................................................................58
    CLAIM 25 - SPECIFIED DATE ..........................................................................58
    CLAIM 26 - RECEIPT OF FEE ..........................................................................59
    CLAIM 27 - MAIL ..........................................................................................59
    CLAIM 28 - DELIVERY AGENT .........................................................................60
    CLAIM 29 - MOVIES ......................................................................................60
    CLAIM 30 - GAMES .......................................................................................61
    CLAIMS 31-35 .............................................................................................62
    CLAIMS 36-50 .............................................................................................63
    CLAIMS 51-65 AND 66-80 .............................................................................64
    CLAIMS 81-95 .............................................................................................66

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299572

**BAKER BOTTS** LLP

*Opinion of Invalidity*                                4                              March 9, 2004
*Re: U.S. Patent No. 6,584,450*

| | | |
|---|---|---|
| CLAIMS 96-100 | | 67 |
| IV. DESCRIPTION OF PRIOR ART REFERENCES | | 68 |
| A. THE *REFERENCE GUIDE* | | 68 |
| B. THE *FUNCTIONAL REQUIREMENTS* AND THE *TEXAS PROGRAM* | | 69 |
| V. INVALIDITY ANALYSIS | | 71 |
| CLAIM 1 - MAX OUT | | 72 |
| CLAIM 2 - TIME-BASED ITEM LIMIT | | 78 |
| CLAIM 3 - ROLLOVER | | 79 |
| CLAIM 4 - DESIRED ORDER | | 79 |
| CLAIM 5 - SKIP UNAVAILABLE | | 81 |
| CLAIM 6 - PREFERRED ITEM ATTRIBUTES | | 82 |
| CLAIM 7 - ITEM RENTAL QUEUE | | 85 |
| CLAIM 8 - CUSTOMER NOTIFICATION | | 85 |
| CLAIM 9 - EXPIRATION OF TIME | | 86 |
| CLAIM 10 - SPECIFIED DATE | | 87 |
| CLAIM 11 - RECEIPT OF FEE | | 87 |
| CLAIM 12 - MAIL | | 88 |
| CLAIM 13 - DELIVERY AGENT | | 89 |
| CLAIM 14 - MOVIES | | 89 |
| CLAIM 15 - GAMES | | 90 |
| CLAIM 16 - TIME-BASED ITEM LIMIT | | 91 |
| CLAIM 17 - MAX OUT | | 92 |
| CLAIM 18 - ROLLOVER | | 92 |
| CLAIM 19 - DESIRED ORDER | | 93 |
| CLAIM 20 - SKIP UNAVAILABLE | | 93 |
| CLAIM 21 - PREFERRED ITEM ATTRIBUTES | | 94 |
| CLAIM 22 - ITEM RENTAL QUEUE | | 94 |
| CLAIM 23 - CUSTOMER NOTIFICATION | | 95 |
| CLAIM 24 - EXPIRATION OF TIME | | 95 |
| CLAIM 25 - SPECIFIED DATE | | 95 |
| CLAIM 26 - RECEIPT OF FEE | | 96 |
| CLAIM 27 - MAIL | | 96 |
| CLAIM 28 - DELIVERY AGENT | | 96 |
| CLAIM 29 - MOVIES | | 97 |
| CLAIM 30 - GAMES | | 97 |
| CLAIMS 31-35 | | 98 |
| CLAIMS 36-50 | | 98 |
| CLAIMS 51-65 AND 66-80 | | 99 |
| CLAIMS 81-95 | | 100 |
| CLAIMS 96-100 | | 100 |
| VI. CONCLUSION | | 101 |

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

**BAKER BOTTS** LLP

*Opinion of Invalidity*                              5                        March 9, 2004
*Re: U.S. Patent No. 6,584,450*

# I.    LEGAL STANDARDS

In performing the following invalidity analysis, we applied legal principles based upon decisions of the federal courts charged with rendering opinions regarding patents and patent-related laws. The discussion below briefly sets forth selected legal principles of the law of patent validity upon which we have based our opinion.

Determining whether a patent claim is valid normally requires a two-step analysis. First, the claim must be properly construed to determine its scope and meaning.[2] Second, the claim as properly construed must be compared to the prior art. The first step, claim construction, is a question of law in which various sources are used to determine the proper construction of a claim. *See Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Such sources include both intrinsic and extrinsic evidence. *See Vitronics*, 90 F.3d at 1582. The second step, comparing the properly construed claims to the prior art, is a question of fact. *See Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods. Inc.*, 21 F.3d 1068, 1071 (Fed. Cir. 1994); *Atlas Powder Co. v. E.I. duPont de Nemours & Co.*, 750 F.2d 1569, 1573 (Fed. Cir. 1984).

## A.    Claim Construction

A patent claim is construed in light of the claim language itself, other claims in the same patent, the patent specification, and the prosecution history including the prior art. *SRI Int'l v. Matsushita Elect. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (*in banc*); *Markman*, 52 F.3d at 979. The patent – including its claims and specification – and the patent's prosecution history are considered intrinsic evidence. "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term."[3] *Vitronics*, 90 F.3d at 1583.

Among the sources of intrinsic evidence, the claims are clearly the most important. On this point, the Court of Appeals for the Federal Circuit has stated, "[W]ithin the intrinsic evidence . . . there is a hierarchy of analytical tools. The actual words of the claim are the controlling focus." *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir.

---

[2]  The same claim interpretation is used for determining both validity and infringement. *See Kegel Co. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1429 (Fed. Cir. 1997) (citing *SmithKline Diagnostics v. Helena Labs. Corp.*, 859 F.2d 878, 882 (Fed. Cir. 1988)); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1279 (Fed. Cir. 1988).

[3]  If, following an examination of the intrinsic evidence, the meaning of the language of the claims is sufficiently clear, resort to extrinsic evidence, such as expert testimony, is unnecessary and improper. *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 870 (Fed. Cir. 1998); *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998); *Bell & Howell Document Management Products Co. v. Altek Systems*, 132 F.3d 701, 706 (Fed. Cir. 1997). In any case, even where a court considers evidence extrinsic to the patent file, it should never consider the accused device in interpreting the claims.

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299574

**BAKER BOTTS** LLP

1998); *accord, e.g., Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). Courts resort initially to the relevant dictionary definitions to determine the ordinary meaning of claim terms. *See E-Pass Technologies, Inc. v. 3Com Corp.*, 2003 WL 21976381 *3 (Fed. Cir. 2003) (using Merriam-Webster's Dictionary to define the claim term "card" as "a flat stiff usu. small and rectangular piece of material (as paper, paperboard, or plastic)" (citing *Merriam-Webster's Collegiate Dictionary* 172 (10th ed. 1999) and additionally referencing Random House Dictionary and the Oxford English Dictionary to provide a relevant definition of the term "card"). "[T]he language of the claim frames and ultimately resolves all issues of claim interpretation." *Thermalloy, Inc. v. Aavid Engineering, Inc.*, 121 F.3d 691, 692 (Fed. Cir. 1997).

    For interpretation, all limitations are considered meaningful. *See Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562-63 (Fed. Cir. 1991). Accordingly, claim language should not be interpreted so as to render various limitations meaningless. *Id.* In general, the terms in the claims are given their ordinary meaning to one of ordinary skill in the art unless it appears from the patent and prosecution history that the inventor used these terms differently. See, *e.g., Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (noting that the "words in a claim are generally given their ordinary and customary meaning"); *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387 (Fed. Cir. 1992); *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 882 (Fed. Cir. 1988). In addition, a claim term used in more than one claim of a patent should be interpreted consistently in all claims. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir.) (citing *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 632 (Fed. Cir.), *cert. denied*, 484 U.S. 1027 (1988)), *cert. denied*, 516 U.S. 987 (1995).

    The patent's specification provides additional guidance in interpreting the claim terms. "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. In some cases, the specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication. *Id.* The Court of Appeals for the Federal Circuit has admonished, however, that "the specification should never trump the clear meaning of the claim terms." *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir.), *cert. denied*, 488 U.S. 986 (1988); *accord, e.g., Intervet America, Inc. v. Kee-Vet Laboratories, Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989).

    The patent's prosecution history is also a valuable tool in determining the scope of the claims. In particular, the prosecution history "limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs.*, 54 F.3d at 1576. For example, statements and arguments made during prosecution are used to interpret the scope and meaning of the patent claims. *Pall Corp. v. PTI Tech. Inc.*, 259 F.3d 1383 (Fed. Cir. 2001). "Those arguments, and other aspects of the prosecution history, as well as the specification and other claims, must be examined to ascertain the true meaning of what the inventor intended to convey in the claims." *E.I. Du Pont de Nemours & Co.*, 849 F.2d at 1438 (citing *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867 (Fed. Cir. 1985)). The arguments made

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

**BAKER BOTTS** L.L.P.

during prosecution may shed light on what the applicant meant by various terms regardless of whether the examiner placed any reliance on the arguments.  *Id.*  This includes arguments contained in an Information Disclosure Statement. *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1991).

        Related to the prosecution history, a patent examiner's statements made during the prosecution history can be critical to the claim construction issue.[4]  *See also Abbott Laboratories v. Baxter Pharmaceutical Products, Inc.*, 334 F.3d 1274, 1281 (Fed. Cir. 2003) (expressing that an Examiner's reasons for allowance are part of the file history and, thus, are relevant in determining claim construction issues).  With respect to this issue, the Federal Circuit holds that:  "To be sure, failure to object to an examiner's interpretation of a claim ordinarily disclaims a broader interpretation." *Inverness Medical Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1379 (Fed. Cir. 2002) (citations omitted).  *Accord, Inverness Medical Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1372 (Fed. Cir. 2002) ("A broader [claim interpretation] may be disclaimed, for example, where the examiner adopts a narrow definition and the applicant does not object."); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999), *cert. denied*, 529 U.S. 1066 (2000) (holding that failure to respond to an examiner's reason for allowance functioned as a disavowal of a different interpretation of the claim); *Ampex Inc. v. Raritan Computer, Inc.*, 187 F. Supp.2d 141, 155 (S.D.N.Y. 2002) ("The Examiner's reasons for allowance are absolutely binding on the patentee, absent an objection by the patentee thereto.").

        Section 112, ¶ 6 of 35 U.S.C., provides that "an element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof."  Claim language drafted using this format is typically referred to as "means plus function" language.  "A means-plus-function limitation contemplated by 35 U.S.C. § 112 ¶ 6 (1994) recites a function to be performed rather than definite structure or materials for performing that function." *Chiuminatta Concrete Concepts v. Cardinal Indus's.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998) (emphasis in original).  Drafting claim language in this format, however, invokes "a mandatory procedure for interpreting the meaning of a means- or step-plus-function claim element." *Al-Site Corp. v. VSI Int'l., Inc.*, 174 F.3d 1308, 1230 (Fed. Cir. 1999).  In particular, § 112, ¶ 6 requires that these claim elements shall be construed to cover only "the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶6 (2003).

        In certain situations, the preamble of a claim may be interpreted as a limitation.  No litmus test defines when a preamble limits claim scope.  *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989).  Whether to treat a preamble as a limitation is a determination "resolved only on review of the entirety of the patent to gain an

---

[4] Patent examiners are instructed that, "If the examiner believes that the record of the prosecution as a whole does not make clear his or her reasons for allowing a claim or claims, the examiner may set forth such reasoning." 37 C.F.R. § 1.104(e).

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299576

**BAKER BOTTS** L.L.P.

understanding of what the inventors actually invented and intended to encompass by the claim."
*Id.*; *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). In
general, a preamble limits the claimed invention if it recites essential structure or steps, or if it is
"necessary to give life, meaning, and vitality" to the claim. *Catalina Mktg.*, 289 F.3d at 808
(quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999)). Clear
reliance on the preamble during prosecution to distinguish the claimed invention from the prior
art may indicate that the preamble is a claim limitation because the preamble is used to define the
claimed invention. *In re Cruciferous Sprout Litigation*, 301 F.3d 1343, 1347 (Fed. Cir. 2002)
(citing *Catalina Mktg.*, 289 F.3d at 808; *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246
F.3d 1368, 1375 (Fed. Cir. 2001)).

The guiding principles and cannons outlined above may be used by a court to
determine issues of claim construction. Additionally, courts are generally called upon to resolve
matters of patent validity, as patent invalidity is a defense that is frequently asserted in response
to a complaint of patent infringement. Thus, claim construction and patent validity are essential
elements to be used in evaluating the scope and viability of any issued patent.

**B.    Validity**

According to 35 U.S.C. § 282, a United States Patent is presumed valid. 35
U.S.C. § 282 (2003). This presumption, however, is only a procedural device. *See Stratoflex,
Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983). It is a presumption of law, not
fact, and does not constitute "evidence" to be weighed against a challenger's evidence. *See Avia
Grove Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1562 (Fed. Cir. 1988). The presumption
simply places the burden of persuasion on the party challenging validity. *See Stratoflex*, 713
F.2d at 1534.

Both patent infringement and validity analyses must be performed on a claim-by-
claim basis. *See, e.g., Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir.
2000); *accord, e.g. Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 942 (Fed. Cir. 1992) (concluding
that all grounds of invalidity must be evaluated against individual claims, as required by the plain
language of 35 U.S.C. §282 (1994)). If possible, claims are to be construed to sustain their
validity. *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed. Cir. 1984). This,
however, does not permit courts to broaden or narrow the claims to give the patentee something
different than what is set forth in the claims. *See, e.g., Autogiro Co. of America v. United States*,
384 F.2d 391, 396 (Ct. Cl. 1967).

One who challenges a patent must establish invalidity by "clear and convincing"
evidence. *See Ryco, Inc. v. Ag-Bag Corp.*, 857 F.2d 1418, 1423 (Fed. Cir. 1988). Although not
susceptible to precise definition, "clear and convincing evidence" is evidence that "produces in
the mind of the trier of fact an abiding conviction that the truth of the factual contentions are
highly probable." *Buildex, Inc., v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988).

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299577

**BAKER BOTTS** LLP

*Opinion of Invalidity*                          9                          March 9, 2004
*Re: U.S. Patent No. 6,584,450*

Even under this standard, though, proof need not be "airtight." *Id.* at 1464. The law requires persuasion, not perfection. *See id.*

The patent challenger's burden is more difficult when all the challenger has to offer is the prior art that was before the United States Patent and Trademark Office (the "PTO"). *See Cent. Soya Co. v. Geo A. Hormel & Co.,* 723 F.2d 1573, 1577 (Fed. Cir. 1983). Conversely, when the challenger offers new prior art that is more relevant than that which was available to the PTO, the burden is more easily carried. *See Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1566 (Fed. Cir. 1983). In such a case, it is generally easier to rebut the presumption, and the offering party is more likely to meet its burden of persuasion. *See id.*

To be valid, a patent must satisfy the requirements of all relevant laws, including Title 35 of the United States Code, Chapter 10, which sets forth legal standards for the patentability of inventions. This chapter includes 35 U.S.C. § 102 and 35 U.S.C. § 103, which relate, respectively, to the "novelty" and the "obviousness" of an invention. These two sections each relate to whether an invention is patentable when viewed in light of information and activities that pre-date the filing date and/or invention date. Novelty, under Section 102, generally requires that an inventor be first to invent (and that the inventor not unduly delay filing of an application for patent). For purposes of this analysis, Section 102 establishes what types of materials and activities qualify as "prior art" that may be used to challenge the novelty a patent. Obviousness, under Section 103, generally requires that an invention, in addition to being novel, must also be non-obvious with respect to the prior art. All references that qualify as prior art under Section 102 may also be used for purposes of the analysis under Section 103.

1.    **Qualifying Prior Art**

Not all references that teach some or all of the subject matter of an issued patent are germane to an invalidity analysis. Thus, determining which references qualify as prior art is a critical preliminary question that must be addressed in the course of any validity challenge. Information or activities that predate the filing of a patent by less than one year may qualify as prior art and be used to invalidate the claims of an issued patent. *See* 35 U.S.C. § 102 (a) (2003). For example, under Section 102(a), a patent is invalid if, before the invention by the applicant, the invention was known or used by another in this country, or patented or described in a printed publication in this country or in a foreign country. The relevant date of a patent under Section 102(a) is normally the date of filing. Note that an inventor's own work may not be cited against him for invalidity purposes under Section 102(a). *See Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 990 n.9 (Fed. Cir. 1988); *see also In re Costello,* 717 F.2d 1346, 1349 (Fed. Cir. 1983).

Information or activities that predate the filing of a patent by more than one year may also qualify as prior art for use in anticipation and obviousness inquiries. Under Section 102(b), a patent may be invalid if prior art or some activity reflects the notion that the invention was "patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299578

**BAKER BOTTS** LLP

*Opinion of Invalidity*                    10                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

United States." 35 U.S.C. § 102(b) (2003). The relevant date of a patent under Section 102(b) is normally the date of issuance of the United States or foreign country patent. The relevant date for a printed publication under Section 102(b) is the date the publication is distributed to persons of skill in the art. *See generally Ethicon, Inc. v. U.S. Surgical Corp.*, 762 F. Supp. 480 (D. Conn. 1991). The relevant date of public use or sale in the United States under Section 102(b) is the date evidencing that the invention was first used in public, or sold or offered for sale to the public. "Public use" may be defined as any commercial use of the claimed invention by a person who is not under any limitation, restriction, or obligation of secrecy to the inventor. The "on-sale bar" may include a definite sale or a commercial offer to sell the invention. *See Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1046 (Fed. Cir. 2001). The on-sale bar is not limited to sales by the inventor but may result from activities of a third party. *See JA LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1581 (Fed. Cir. 1986).

Some patents and publications, while not publicly available until after the filing date of a patent, may still qualify as prior art for use in anticipation and obviousness inquiries. Under 35 U.S.C. § 102(e), a patent is invalid if, before the invention applicant's invention, the same invention was described by another in a patent application that was later granted or published. Therefore, subsections (a), (b), and (e) of Section 102 create a filter for identifying potential prior art.

In evaluating a printed publication that is being used to invalidate one or more claims of an issued patent, a determination must be made as to whether the printed publication qualifies as prior art under Section 102. To serve as a "printed publication" under Section 102(b) a document must be generally available. *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 936 (Fed. Cir. 1990). A "printed publication" is a unitary concept. The traditional dichotomy between "printing" and "publication" is no longer valid. *See In re Wyer*, 655 F.2d 221, 226 (C.C.P.A. 1981). There are three elements of publication, for purposes of defeating patentability by establishing prior publication: (1) the date of the publication; (2) the sufficiency of the description; and (3) the extent of the distribution. *Canron, Inc. v. Plasser Am. Corp.*, 474 F. Supp. 1010, 1013 (E.D. Va. 1978). Under Section 102(b), it is sufficient that a description in a printed publication impart to a person of ordinary skill sufficient information which, coupled with disclosures of prior art, would enable that person to devise an invention without further genuine inspiration or undue experimentation. *See Regents of Univ. of Cal. v. Howmedica, Inc.*, 530 F. Supp. 846, 859 (D.N.J. 1981). A printed publication is to be tested by the same rules as those applicable to a prior patent. *McCullough Tool Co. v. Well Surveys, Inc.*, 343 F.2d 381, 398 (10th Cir. 1965).

A printed document may qualify as a "publication" sufficient to bar issuance of a patent, even where accessibility to it is restricted to a "part of the public," so long as the accessibility is sufficient to "raise a presumption that a public concerned with the art would know of the invention." *Application of Bayer*, 568 F.2d 1357, 1361 (C.C.P.A. 1978) (quoting *Camp Bros. & Co. v. Portable Wagon Dump & Elevator Co.*, 251 F. 603, 607 (7th Cir. 1918)); *accord Universal Athletic Sales Co. v. Am. Gym, Recreational & Athletic Equip. Corp.*, 546 F.2d

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299579

**BAKER BOTTS** LLP

*Opinion of Invalidity*                    11                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

530, 541 (3d Cir. 1976). A "printed publication," for purposes of a publication bar to patentability, need only be printed and so disseminated as to provide wide public access to it; the key factor is not access by specific segments of the public or the number of persons or even by any specific means, but simply distribution to any segment of the public. *Popeil Bros., Inc. v. Schick Elec., Inc.*, 494 F.2d 162, 166 (7th Cir. 1974); *accord Pickering v. Holman*, 459 F.2d 403, 407 (9th Cir. 1972).

Thus, anything printed and accessible by the public is a "printed publication" within the meaning of Section 102(b) even though, for example, it may be a single typed copy of a college thesis provided in the library of the college. 35 U.S.C. § 102(b) (2003); *see also Potter Instrument Co. v. ODEC Computer Sys., Inc.*, 370 F. Supp. 198, 212 (D.R.I. 1974). For purposes of determining whether a reference is prior art, a single catalogued doctoral dissertation is sufficiently accessible to one interested in the art to constitute a "printed publication." *Baxter Diagnostics, Inc. v. AVL Scientific Corp.*, 924 F. Supp. 994, 1007 (C.D. Cal. 1996), *modified*, 954 F. Supp. 199 (C.D. Cal. 1996).

Prior art references or activities that qualify under Section 102 may be combined and cited under Section 103 to bar patentability as obvious in light of the combination. For example, activity such as publicly using, selling, or offering to sell a device may be combined with the disclosure of a patent document or printed publication to render a claim obvious in view of the combined teaching of the prior art.[5] *See Labounty Mfg., Inc. v. United States ITC*, 958 F.2d 1066, 1071 (Fed. Cir. 1992); *In re Corcoran*, 640 F.2d 1331, 1333 (C.C.P.A. 1981).

Therefore, Section 102 acts as a filter for identifying prior art. This prior art may then be used to undermine the validity of patent claims based on either anticipation under Section 102 or obviousness under Section 103.

2.     **Anticipation: 35 U.S.C. § 102**

A patent is invalid if the invention is anticipated by any one of subsections (a) through (g) of 35 U.S.C. § 102. "Anticipation" under Section 102 requires that each and every element of the claimed invention be disclosed in a single prior art reference or embodied in a single prior art device or practice. 35 U.S.C. § 102 (2003); *see also In re Spada*, 911 F.2d 705, 708 (Fed. Cir. 1990); *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopedics, Inc.*, 976 F.2d 1559, 1565 (Fed. Cir. 1992). If a claim is anticipated, its subject matter would also be obvious under 35 U.S.C. § 103, discussed below, because anticipation is the "epitome of obviousness." *See In re Fracalossi*, 681 F.2d 792, 794 (C.C.P.A. 1982).

---

[5] A caveat in Section 103(c) provides that subject matter which qualifies as prior art only under one or more of subsections (e), (f), and (g) may not be used in combinations with other art if, at the time the invention was made, the subject matter and the invention were owned by the same person or subject to a common obligation of assignment. 35 U.S.C. § 103(c) (2003).

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299580

**BAKER BOTTS** LLP

An anticipatory reference need not duplicate word for word what is in the claims, nor must the reference disclose explicitly every element. Rather anticipation may occur if a claimed limitation is "inherent" or otherwise implicit in the reference. *See Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369 (Fed. Cir. 1991). If the reference is silent about an asserted inherent characteristic, extrinsic evidence must make clear that "the missing descriptive matter is necessarily present in the thing described in the reference and that it would be so recognized by persons of ordinary skill." *See Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991) (citations omitted). Such an element or characteristic must exist as a matter of scientific fact and flow naturally from the disclosure. *See Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631-33 (Fed. Cir. 1987), *cert. denied*, 484 U.S. 827.

Under subsections of Section 102, such as Section 102(a) and Section 102(e), a patentee may overcome anticipatory prior art dated less than one year prior to the filing date of a claimed invention by establishing an earlier date of invention with corroborating evidence. *See* 37 C.F.R. § 1.131 (2003).[6] In accordance with the principles of Section 102(b), however, no patent reference, public use, or publication dated more than one year prior to such filing date can be overcome. *See id.* If a single reference discloses each element of a claim and predates the priority date of the claim at issue by more than one year, the analysis ends: the claim is invalid.

Under Section 102(a), "public use" invalidation of a patent occurs when the claimed invention is used more than a year before the filing date of an application by someone other than the inventor who is not under any limitation or obligation of secrecy and not for the purposes of experimentation of the claimed invention. 35 U.S.C. § 102(a) (2003); *see also Am. Cyanamid Co. v. U.S. Surgical Corp.*, 833 F. Supp. 92, 129 (D. Conn. 1992). Generally, any nonsecret use of a completed and operative invention in its natural and intended way is a "public use" within the meaning of Section 102(a). *Electro-Nucleonics, Inc. v. Mossinghoff*, 593 F. Supp. 125, 128 (D.D.C. 1984). The purpose of the prior use statute is to force an inventor, even if he or she is the first inventor, to proceed diligently to the patent office after commercial or public use of the invention. *Spalding & Evenflo Cos. v. Acushnet Co.*, 718 F. Supp. 1023, 1032 (D. Mass. 1989).

The application of Section 102(b) for purposes of anticipation in a patent validity challenge is stringent. A printed publication, even by the inventor, will render a disclosed invention unpatentable if it is published more than one year before the date of application on which the patent issues. 35 U.S.C. § 102(b) (2003); *Sampson v. Ampex Corp.*, 333 F. Supp. 59, 62 (S.D.N.Y. 1971). A catalogue or a booklet describing a device may be regarded as a "publication" of the invention or discovery, rendering the patent invalid. 35 U.S.C. § 102(b)

---

[6] Oral testimony regarding a date of invention must be corroborated. See e.g. *Hitzeman v. Rutter*, 243 F.3d 1345, 1356 (Fed. Cir. 2001) ("[T]he inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure."). In addition to providing corroborating evidence of conception of the complete invention, the inventor must further show diligence between the conception and a subsequent reduction to practice. 35 U.S.C. § 102(g) (2003).

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299581

**BAKER BOTTS** ᴸᴸᴾ

*Opinion of Invalidity*                                13                                March 9, 2004
*Re: U.S. Patent No. 6,584,450*

(2003); *see also Jno. T. McCoy, Inc. v. Schuster*, 44 F. Supp. 499, 500 (S.D.N.Y. 1942). Before any publication can amount to a statutory bar to the grant of patent, its disclosure must be such that a skilled artisan could take its teachings in combination with his own knowledge of particular art and possess the invention. *Application of LeGrice*, 301 F.2d 929, 936 (C.C.P.A. 1962).

In short, the test for anticipation under Section 102 asks whether a single prior art reference teaches, either expressly or inherently, all elements of a claim. If so, that claim is invalid.

3.    **Obviousness: 35 U.S.C. § 103**

According to 35 U.S.C. § 103(a), a person is not entitled to a patent even though the invention is not identically disclosed or described in a single reference as set forth in Section 102, "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *See* 35 U.S.C. § 103(a) (2003).

In *Graham v. John Deere Co.*, the United States Supreme Court set the objective standard for determining obviousness under Section 103. 383 U.S. 1, 17 (1966). Obviousness requires a factual determination to ascertain: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; and (3) the differences between the claimed subject matter and the prior art. *Id.* Based on these factual inquiries, it must then be determined as a matter of law whether the claimed subject matter as a whole would be obvious to one of ordinary skill in the art at the time the alleged invention was made. *See id.* Secondary considerations such as commercial success, long-felt but unsolved needs, failure of others, and unexpected results, if present, must also be considered. *See Stratoflex*, 713 F.2d at 1538-39. Such factual inquiries need to be addressed in the context of a Section 103 analysis. *See id.* Although these factors must be considered, they do not control the obviousness conclusion. *See Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988).

In considering the secondary factors of Section 103, the proposed prior art, or prior art combinations, must create a reasonable expectation of success, rather than an absolute prediction, in producing the claimed invention. *See In re O'Farrell*, 853 F.2d. 894, 903-04 (Fed. Cir. 1988). Both the suggestion and the expectation of success must be in the prior art, outside of the applicant's disclosure. *See Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1207 (Fed. Cir. 1991) (citing *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988)). Further, the implicit and inherent teachings of a prior art reference may invalidate a claimed invention under Section 103. *See In re Napier*, 55 F.3d 610, 613 (Fed. Cir. 1995).

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299582

**BAKER BOTTS** LLP

*Opinion of Invalidity*                          14                          March 9, 2004
*Re: U.S. Patent No. 6,584,450*

     In short, the test for obviousness under Section 103 asks whether one or more prior art references, properly combined, teach or suggest all elements of a claim. If so, that claim is invalid.

     We have used the process and legal standards outlined above to determine the scope of the claims of *Hastings,* and to conduct our analysis of the validity of the claims of *Hastings.* Please note that our conclusions involve doctrines, such as claim construction, which are amenable to subjective and equitable considerations. Moreover, the question of validity, as noted above, is a question of fact. Therefore, the comparison of prior art to the claims may be relegated to a jury at trial. These and other considerations make outcomes difficult to predict with absolute certainty.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299583

**BAKER BOTTS** LLP

## II. *HASTINGS*

### A.    Overview

    *Hastings* issued to W. Reed Hastings, et al. on June 24, 2003, from Application Serial No. 09/561,041, which was filed on April 28, 2000 (the "*Hastings* Application"). *Hastings* is assigned on its face to Netflix.com, Inc., of Los Gatos, California.

    *Hastings* is entitled "*Method and Apparatus for Renting Items*" and relates to techniques for renting items to customers. In its background, *Hastings* describes "conventional inventory rental models" that require customers to shop at video rental stores and select movies based on current inventory in the stores. *Hastings*, at column 1, lines 10-29.[7] *Hastings*, in its background, fails to mention any other types of then-existing rental systems.

    In the "Detailed Description of the Invention," *Hastings* first provides a broad functional overview and then details specific aspects of the "invention." The functional overview begins with reference to FIGURE 1, which is reproduced below.

## FIG. 1



---

[7] All subsequent references to *Hastings* will be made in the form "Column X, lines XX," without explicitly referencing *Hastings*.

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

**BAKER BOTTS** ᴸᴸᴾ

FIGURE 1 shows, in a relatively simple representation, the relationship and interaction between a customer 102 and a provider 104.[8] To rent items, the customer provides item selection criteria to the provider over a link 106. Column 4, lines 14-16. Based on the item selection criteria, the provider delivers items indicated by these criteria to the customer over a delivery channel 108. Column 4, lines 22-27.

For communication of the selection criteria from the customer to the provider, *Hastings* contemplates using any suitable link. Column 4, lines 16-18. *Hastings* provides examples for this link, "such as a LAN, WAN or the internet, a telecommunications link, a wire or optical link or a wireless connection." Column 4, lines 18-21. *Hastings* contemplates a similarly broad definition for the delivery channel, providing examples such as "mail delivery, courier delivery or delivery using a delivery agent." Column 4, lines 31-32.

After introducing the general relationship between the customer and the provider, *Hastings* describes two particular approaches for renting items to the customer: a "Max Out" approach and a "Max Turns" approach. The Max Out approach allows up to a specified number of items to be rented simultaneously to the customer by the provider. Column 4, lines 35-37. The Max Turns approach allows up to a specified number of item exchanges to occur during a specified period of time. Column 4, lines 37-40.

After introducing these broad functional concepts, *Hastings* describes in greater detail the aspects of item selection criteria, item delivery, the Max Out approach, and the Max Turns approach. With respect to item selection criteria, *Hastings* states:

> The one or more item selection criteria provided by customer 102 to provider 104 indicate the particular items that customer 102 desires to rent from provider 104. Thus, the item selection criteria define a customer-specific order queue that is fulfilled by provider 104. According to one embodiment, the item selection criteria specify attributes of items to be provided by provider 104 to customer 102. Item selection criteria may specify any type of item attributes and the invention is not limited to particular item attributes. Examples of item attributes include, without limitation, identifier attributes, type attributes and cost attributes. Item selection criteria may be changed at any time to reflect changes in items that customers desire to rent from a provider.

---

[8] Of the other six figures, FIGURES 2, 3, 4, and 6 are flowcharts that simply reflect operations described in the text; FIGURE 5 illustrates a slightly more detailed view of the provider/customer relationship; and FIGURE 7 illustrates general computer elements, such as memory and a processor. Thus these figures, similar to FIGURE 1, add little to the Detailed Description section of *Hastings*. Therefore, the description of *Hastings* focuses primarily on the Detailed Description without reference to other particular figures.

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299585

**BAKER BOTTS** LLP

Column 4, lines 54-67 (sic). Thus *Hastings* broadly defines item selection criteria to include virtually any information provided by the customer that indicates one or more items to rent. In a later description of system operation, *Hastings* again addresses the selection criteria, stating:

> The item selection attributes may include any attributes that describe, at least in part, movies, games or music that customers 502 desire to rent. For movies, example attributes include, without limitation, title, category, director name, actor name and year of release. For games, example attributes include, without limitation, title and category. For music, example attributes include, without limitation, title, category, artist/group name and year of release. Customers 502 may identify specific movies or music by the item selection criteria, or may provide various attributes and allow provider 504 to automatically select particular movies and music that satisfy the attributes specified. For example, customers 502 may specify item selection criteria that include horror movies released in 1999 and let provider 504 automatically select horror movies that were released in 1999. As another example, customers 502 may specify item selection criteria that include adventure movies starring Harrison Ford. Customers 502 may also specify an order or priority for the specified item selection criteria. For example, customers 502 may specify specific movie titles and the order in which they want to receive them. As another example, customers 502 may specify that they want to receive a particular number of movies of different types.

Column 8, lines 43-65. This reinforces the broad definition of item selection criteria used by *Hastings*.

With respect to item delivery, *Hastings* details the concepts of the delivery channel and item delivery criteria. Column 5, lines 2-4. As noted above, the delivery channel simply provides a mechanism, such as postal service, for delivering identified items to the customer from the provider. The item delivery criteria detail triggering events for delivering items from the provider to the customer. Column 5, lines 5-6. In particular, *Hastings* states:

> [T]he delivery of items from provider 104 to customer 102 is triggered by item delivery criteria being satisfied. The item delivery criteria may include a wide range of criteria and the invention is not limited to any particular item delivery criteria. Examples of item delivery criteria include, without limitation, customer request/notification, customer notification that an item is being returned, customer return of an item, the occurrence of a specified date, the elapsing of a specified period of time or a customer payment.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299586

**BAKER BOTTS** LLP

*Opinion of Invalidity*                              18                              March 9, 2004
*Re: U.S. Patent No. 6,584,450*

Column 5, lines 4-13. Thus as with the discussions of item selection criteria, *Hastings* defines item delivery criteria broadly, in this case to encompass virtually any type of triggering event.

After providing specifics regarding item selection and item delivery, *Hastings* then details the Max Out and Max Turns approaches to renting items. The Max Out approach, as previously noted, allows up to a specified number of items to be rented simultaneously to a customer by a provider. With respect to this approach, *Hastings* states:

> According to the "Max Out" approach, up to a specified number of items may be rented simultaneously to a customer. Thus, the "Max Out" approach establishes the size of an inventory of items that may be maintained by customers. The specified number of items may be specific to each customer or may be common to one or more customers. In the present example, if the specified number of items is three, then up to three items may be rented simultaneously by provider 104 to customer 102. If the specified number of items are currently rented to customer 102 and the specified item delivery criteria triggers the delivery of one or more additional items, then those items are not delivered until one or more items are returned by customer 102 to provider 104.

Column 5, lines 34-48. Therefore, the "Max Out" approach limits the number of items simultaneously rented by a customer to a specified number.

According to the Max Turns approach, the provider permits a customer to perform a specified number of item exchanges during a specified period of time. *Hastings* provides the following particular illustration:

> According to the "Max Turns" approach, up to a specified number of item exchanges may be performed during a specified period of time. For example, referring to FIG. 1, suppose that provider 104 agrees to rent items to customer 102 with a "Max Turns" limit of three items per month. This means that customer 102 may make up to three item exchanges per month. This approach may be implemented independent of the number of items that a customer may have rented at any given time under the "Max Out" approach. The approach is also independent of the particular item delivery criteria used.

Column 5, lines 37-44. After detailing the Max Out and Max Turns approaches, *Hastings* further explains that these two approaches may be combined into a single approach for item rental, stating:

> In this situation, up to a specified number of total items are simultaneously rented to customer 102 and up to a specified number of item exchanges

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299587

**BAKER BOTTS** LLP

*Opinion of Invalidity*                    19                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

may be made during a specified period of time. Thus, using the "Max Out" and the "Max Turns" approaches together essentially establishes a personal item inventory for customer 102 based upon the "Max Out" limit that may be periodically refreshed based upon the "Max Turns" limit selected.

Column 6, lines 47-55.

The other figures of *Hastings* provide additional clarification of the described operations. Therefore, we address each of the remaining six figures of *Hastings* briefly.



*Hastings*, FIGURE 2. This flowchart quickly summarizes steps for the customer to create and provide item selection criteria, and for the provider to deliver items to the customer based on these criteria.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299588

**BAKER BOTTS** LLP

*Opinion of Invalidity*                    20                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

## FIG. 3



*Hastings*, FIGURE 3. This flowchart illustrates the ongoing process of maintaining a customer's inventory of items based upon the delivery criteria for the customer. This process, as illustrated, limits the number of items delivered based upon the specified number, but allows for an override of this limit. Therefore, this flowchart demonstrates a particular embodiment of the Max Out approach.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299589

**BAKER BOTTS** LLP

*Opinion of Invalidity*                                 21                                 March 9, 2004
*Re: U.S. Patent No. 6,584,450*

## FIG. 4



Hastings, FIGURE 4. This flowchart also illustrates the ongoing process of maintaining a customer's inventory, but in this case, shows aspects of the Max Turns delivery approach. This operational flow also details the potential override of an existing subscriber agreement based upon payment of a surcharge.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299590

**BAKER BOTTS** ᴸᴸᴾ

*Opinion of Invalidity*                     22                     March 9, 2004
*Re: U.S. Patent No. 6,584,450*

### FIG. 5



Hastings, FIGURE 5. This diagram illustrates *Hastings'* approach to renting items "in the context of renting to customers audio/video (A/V) items, such as movies, games and music, stored on various media." Column 8, lines 6-8. This associated description, at column 8, line 6 to column 9, line 63, details aspects of the Max Out and Max Turns concepts with particular focus on movies and games as the items in question.

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299591

**BAKER BOTTS** LLP

*Opinion of Invalidity*                                    23                                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*



**FIG. 6**

*Hastings*, FIGURE 6. "FIG. 6 is a flow diagram that illustrates an approach for renting A/V items 512, e.g., movies, to customers over a communications network such as the Internet using both Max Out and Max Turns according to an embodiment. Column 9, lines 48-51 (quotes removed). While not explicit in the depicted steps of the flowchart, Hastings describes the operation of the steps as a combination of the Max Turns and the Max Out approaches. *See* column 9, line 48 - column 10, line 65.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299592

**BAKER BOTTS** LLP

*Opinion of Invalidity*                    24                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

FIG. 7



*Hastings*, FIGURE 7. "FIG. 7 is a block diagram that illustrates a computer system 700 upon which an embodiment of the invention may be implemented."  Column 11, lines 57-59. *Hastings* continues the description of this figure with broad definitions for the computer elements, but with little discussion as to the actual application of these elements to *Hastings* rental concepts.

Thus in summary, *Hastings* purports to teach an item rental system with two general approaches towards delivering items to customers.  According to the Max Out approach, the customer may rent up to a specified number of items at any one time.  The customer's inventory of items is then refreshed based upon triggering events, such as the return of previously rented items.  The Max Turns approach permits the customer up to a specified number of item exchanges during a specified period of time.  In the Max Turns approach, similar to the Max Out approach, item delivery can be triggered based upon any suitable occurrence, such as the return of previously rented items.

**B.      Prosecution History of *Hastings***

The *Hastings* Application was filed by Hastings, et. al. (the "Applicants") on April 28, 2000.  The Applicants failed to submit any prior art to the Examiner at the time of

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299593

**BAKER BOTTS** LLP

*Opinion of Invalidity*                          25                          March 9, 2004
*Re: U.S. Patent No. 6,584,450*

filing or at any other time during prosecution of the *Hastings* Application.[9]  As filed, the *Hastings* Application contained eighty total claims, with six independent claims - Claims 1, 16, 31, 36, 51, and 66.  These claims, both independent and dependent, attempt to cover various aspects of the Max Out and Max Turns rental approaches.  For example, Claim 1 generally addresses the Max Out concept, reciting as filed:

> *1.    A method for renting items to customers, the method comprising the computer-implemented steps of:*
>
> > *receiving one or more item selection criteria that indicates one or more items that a customer desires to rent;*
> >
> > *providing to the customer up to a specified number of the one or more items indicated by the one or more item selection criteria; and*
> >
> > *in response to one or more delivery criteria being satisfied, providing to the customer one or more other items indicated by the one or more item selection criteria, wherein a total current number of items provided to the customer does not exceed the specified number.*

As another example, Claim 16 generally addresses the Max Turns concept, reciting as filed:

> *16.    A method for renting items to customers, the method comprising the computer-implemented steps of:*
>
> > *receiving one or more item selection criteria that indicates one or more items that a customer desires to rent;*
> >
> > *providing to the customer up to a specified number of the one or more items indicated by the one or more item selection criteria; and*
> >
> > *in response to one or more delivery criteria being satisfied, providing to the customer one or more other items indicated by the one or more item selection criteria, wherein a total number of items provided to the customer within a specified period of time does not exceed a specified limit.*

### First Office Action

On April 19, 2002, the United States Patent and Trademark Office ("PTO") issued a first Office Action (the "*First Office Action*") rejecting all claims in the *Hastings* Application. In the *First Office Action*, the Examiner rejected all claims as anticipated under 35 U.S.C. § 102 based upon any one of three references: (1) the Applicants' web site, (2) U.S. Patent No. 5,664,110, issued to Green, et al. on September 2, 1997 ("*Green*"), and (3) U.S. Patent No.

---

[9] An applicant for a patent must, under 37 C.F.R. §1.56, disclose any information that they are aware of that is material to the issue of patentability.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299594

**BAKER BOTTS** LLP

5,918,231, issued to Bernard, et al. on June 29, 1999 ("*Bernard*"). Copies of *Green* and *Bernard* are attached as Exhibits C and D, respectively.

Both *Green* and *Bernard* deal generally with electronic systems for purchasing products. Neither of these references contemplates techniques for renting or otherwise temporarily providing items to customers. Moreover, neither *Green* nor *Bernard* detail any techniques for handling the return of items previously provided to a customer. Rather, these references each teach techniques for electronically enabled shopping and order fulfillment.

With respect to the first reference, the Examiner asserted: "The applicant's web site at www.netflix.com admits to providing the claimed business method to the public since 1998. Since the filing date of the application is April 28, 2000, this constitutes prior use more than one year before the filing of the application." *First Office Action*, at 2 (sic). With respect to the second and third references, *Green* and *Bernard*, the Examiner simply stated that each reference "clearly anticipated" all claims. *Id.*

### First Response

In response to the *First Office Action*, the Applicants filed an Amendment and Response on June 27, 2002 (the "*First Response*"), which was accompanied by a Declaration of Neil D. Hunt (the "*Declaration*"). In the *First Response*, the Applicants amended Claim 65 and added new Claims 81-100. The Applicants' amendment to Claim 65 fixed a typographical error by removing and replacing "A computer-readable medium" with "An apparatus." The twenty new claims included two independent claims, Claims 81 and 96, and provided additional variations on the previously filed claims.

In the remarks section of the *First Response*, the Applicants addressed the Examiner's rejections. With respect to the rejection based upon the Netflix web site, the Applicants referenced the *Declaration*, stating that "although Netflix Corporation was founded in 1998, the Netflix video rental service was not in public use or offered for sale more than one year before the filing date of April 28, 2000 of the present application."[10] *First Response*, at page 11.

In response to the rejection based upon *Green*, the Applicants initially argued the patentability of Claim 1, making two specific arguments. First, the Applicants claimed that *Green* failed to "provid[e] rental items to customers based upon the satisfaction of one or more delivery criteria." *Id.*, at page 12. Second, the Applicants asserted that *Green* failed to teach any limits on a total current number of items provided to a customer. The Applicants then argued the patentability of Claims 2-15 based on their dependency from Claim 1.

---

[10] Specifically, the Declaration states, in part: "The Netflix Unlimited Rental Service for subscription-based rental of movies was put into public use after [April 14, 1998], but not more than one year prior to the filing date of April 28, 2000 of the [*Hastings*] application."

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299595

**BAKER BOTTS** LLP

*Opinion of Invalidity*          27          March 9, 2004
*Re: U.S. Patent No. 6,584,450*

Next the Applicants addressed the patentability of Claim 16 with respect to *Green*. The Applicants stated:

> Claim 16 recites a method for renting items to customers that contains limitations similar to Claim 1. It is therefore respectfully submitted that Claim 16 is patentable over Green for at least the reasons set forth herein with respect to Claim 1.

*Id.*, at page 13. The Applicants continued, arguing that Claim 16 "further requires that a total number of items provided to the customer within a specified period of time does not exceed a specified limit." *Id.* (quotes and emphasis removed). The Applicants then argued the patentability of Claims 17-30 based on their dependency from Claim 16.

In response to the rejection based upon *Bernard*, the Applicants once again provided specific arguments only focusing on independent Claims 1 and 16. These specific arguments tracked, almost verbatim, the arguments presented with respect to *Green*.

In the *First Response*, the Applicants also provided groupings of claims that recited similar limitations. Specifically, the Applicants provided the following statements:

> Claims 36-50 recite limitations similar to Claims 1-15, except in the context of a computer-readable medium. . . .

> Claims 51-65 and 66-80 recite limitations similar to Claims 1-15, except in the apparatus context. . . .

> New Claims 81-100 contain limitations similar to Claims 16-35, except in the context of a computer-readable medium.

*Id.*, at page 17. Based upon these assurances, the Applicants argued that all of the claims should be allowable in light of the arguments presented with respect to Claims 1 and 16.

### Final Office Action

The Examiner once again rejected all claims of the *Hastings* Application in an Office Action dated August 13, 2002, which was made final by the Examiner (the "*Final Office Action*"). The Examiner once again rejected all claims under 35 U.S.C. § 102 based upon any one of (1) the Applicants' web site, (2) *Green*, and (3) *Bernard*. In the *Final Office Action*, the Examiner deemed the submitted *Declaration* insufficient and the Applicants' arguments unpersuasive.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299596

**BAKER BOTTS** LLP

*Opinion of Invalidity*                                    28                                March 9, 2004
*Re: U.S. Patent No. 6,584,450*

### Second Response

In response to the *Final Office Action*, the Applicants filed an Amendment and Request for Continued Examination dated October 22, 2002 (the "*Second Response*"), which was accompanied by another Declaration of Neil D. Hunt (the "*Supplemental Declaration*"). In the *Second Response*, the Applicants amended a number of claims, including all independent claims.

Applicants amended independent Claims 1, 16, 36, 51, 66, and 81 by modifying the triggering event for delivering subsequent rentals to a customer. Specifically, the Applicants amended Claims 1, 16, 36, 51, and 66 to operate "in response to receiving any of the items provided to the customer" rather than "in response to one or more item delivery criteria being satisfied."[11] In an apparent mistake, the Applicants amended Claim 81 to add the same triggering event as added to the other claims, but failed to delete any limitations. The Applicants also made various amendments to other claims in the Application, largely to alter dependent claims impacted by changes to the independent claims.

In the remarks section of the *Second Response*, the Applicants addressed the Examiner's rejections in a manner nearly identical to the *First Response*. With respect to the rejection based upon the Netflix web site, the Applicants now referenced the *Supplemental Declaration*. The *Supplemental Declaration* maintained that the invention recited in Claims 1-100 was first publicly implemented in Netflix's Marquee Program, which was put into public use on or around December 16, 1999.[12] The Applicants argued that the Netflix web site thus did not implement the claimed invention more than one year prior to filing and could not be used to reject the claims.

In response to the rejection based upon *Green,* the Applicants first argued the patentability of Claim 1. In support of Claim 1, the Applicants pointed to a number of limitations, including (1) the use of the same selection criteria for the first and subsequent delivery, (2) the return of items as the triggering event for delivering subsequent items, and (3) the specified limit on the number of items provided to a customer at any one time. *Second Response*, at pages 24-25. The Applicants claimed that *Green* failed to show these limitations. The Applicants then argued the patentability of Claims 2-15 based on their dependency from Claim 1.

Next the Applicants addressed the patentability of Claim 16 with respect to *Green*. The Applicants once again stated:

---

[11] The other independent claims, Claim 31 and 96, already included this more narrow type of triggering event prior to the submission of the Second Response.

[12] The commercial use of this technology prior to filing likely precludes any patent protection in most foreign jurisdictions. The United States, in contrast to most foreign jurisdictions, provides a one year grace period from the first such use and the filing date of the patent. 35 U.S.C. § 102(b) (2003).

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299597

**BAKER BOTTS** LLP

> Claim 16 recites a method for renting items to customers that contains limitations similar to Claim 1. It is therefore respectfully submitted that Claim 16 is patentable over Green for at least the reasons set forth herein with respect to Claim 1.

*Second Response*, at page 26. The Applicants continued, arguing again that Claim 16 "further requires that a total number of items provided to the customer within a specified period of time does not exceed a specified limit." *Id.* (quotes and emphasis removed). The Applicants then argued the patentability of Claims 17-30 based on their dependency from Claim 16.

In response to the rejection based upon *Bernard,* the Applicants provided specific arguments only focusing on independent Claims 1 and 16. These specific arguments tracked, almost verbatim, the arguments presented with respect to *Green*. The Applicants also reiterated the groupings of claims as provided in the *First Response*.

### Notice of Allowance

The Examiner issued a Notice of Allowance and Examiner's Amendment on April 7, 2003 (the "*Notice of Allowance*"). The Examiner entered amendments authorized by the Applicants' attorney that purported to change all instances in the claims of "one or more" with "two or more." *Hastings*, however, fails to reflect these amendments to the claims.[13]

In the *Notice of Allowance*, the Examiner also provided reasons for his allowance, stating:

> The claims are allowable over the prior art of record because the prior art of record does not show or teach a method of renting items to a customer wherein the customer indicates a number of items they desire to rent, providing the customer with a specified number of those rental items, then providing the customer with additional rental items upon return of the originally provided rental items. The closest prior art is the Netflix web site, with was discussed in earlier Office Actions.

*Notice of Allowance*, at page 2 (sic). Such statements are permitted under 37 C.F.R. § 1.104(e), which states: "If the examiner believes that the record of the prosecution as a whole does not make clear his or her reasons for allowing a claim or claims, the examiner may set forth such reasoning."

---

[13] This change affects only the numbers of items identified or provided and thus does not affect the basic interpretation or operation of the other claim limitations. Therefore, if these amendments are later incorporated into the claims, the analysis will likely remain substantively unchanged.

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299598

**BAKER BOTTS** LLP

*Opinion of Invalidity*                                30                                March 9, 2004
*Re: U.S. Patent No. 6,584,450*

### Remarks Regarding Examiner's Amendment

In response to the *Notice of Allowance*, the Applicants submitted Remarks Regarding Examiner's Amendment on April 16, 2003 (the "*Remarks*"). The *Remarks* correctly point out a minor error in the Examiner's comments regarding amendments. However, the *Remarks* do not address or controvert in any way the Examiner's statements regarding reasons for allowance.

### Summary of Prosecution History

To summarize, the Applicants submitted no art, and the Examiner uncovered and used only two U.S. patent references and the Netflix web site to support rejections of the Applicants' claims. Neither of these references address rental systems or systems providing for temporary delivery of items.

Using claim groupings, the Applicants argued all claims based upon the limitations of:

1. The use of the same selection criteria for the first and subsequent delivery;

2. The return of items as the triggering event for delivering subsequent items; and

3. The specified limit on the number of items provided to a customer at any one time.

*Second Response*, at pages 24-25.

The Examiner allowed all 100 claims because the art in his possession did not show:

1. A customer indicating a number of items they desire to rent;

2. Providing the customer with a specified number of those rental items; and

3. Providing the customer with additional rental items upon return of the originally provided rental items.

*Notice of Allowance*, at page 2. The Applicants acquiesced, by silence, with the Examiner's reasons for allowance.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299599

**BAKER BOTTS** LLP

*Opinion of Invalidity*                                    31                                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

### III.   SCOPE AND INTERPRETATION OF *HASTINGS*' CLAIMS

*Hastings* contains 100 claims, of which Claims 1, 16, 31, 36, 51, 66, 81, and 96 are independent. This section analyzes each claim and presents portions of the specification and prosecution history particularly relevant in determining the scope of *Hastings*' claims. In analyzing the claims, this section first addresses Claims 1-15 and 16-30 in detail, and then applies this analysis to the remaining claims, taking into account the minor variations in claim language. This comports with the general groupings of claims that the Applicants presented during prosecution and the Applicants' statements regarding similar limitations in various claims.

**Claim 1 - Max Out**

*1.      A method for renting items to customers, the method comprising the computer-implemented steps of:*

*receiving one or more item selection criteria that indicates one or more items that a customer desires to rent;*

*providing to the customer up to a specified number of the one or more items indicated by the one or more item selection criteria; and*

*in response to receiving any of the items provided to the customer, providing to the customer one or more other items indicated by the one or more item selection criteria, wherein a total current number of items provided to the customer does not exceed the specified number.*

**A.     *receiving one or more item selection criteria that indicates one or more items that a customer desires to rent***

The first step[14] of Claim 1 introduces the phrases "item selection criteria" and "items that a customer desires to rent."

**1.     "item selection criteria"**

With respect to item selection criteria, *Hastings'* specification states:

The one or more item selection criteria provided by customer 102 to provider 104 indicate the particular items that customer 102 desires to rent

---

[14] This claim is drafted as a computer-implemented method for performing a number of steps. However, because these steps (along with steps in other method claims) detail acts, this claim does not invoke 35 U.S.C. § 112 ¶ 6. *See Masco Corp. v. U.S.*, 303 F.3d 1316, 1326 (Fed. Cir. 2002).

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299600

**BAKER BOTTS** L.L.P.

*Opinion of Invalidity*                    32                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

> from provider 104. Thus, the item selection criteria define a customer-specific order queue that is fulfilled by provider 104. According to one embodiment, the item selection criteria specify attributes of items to be provided by provider 104 to customer 102. Item selection criteria may specify any type of item attributes and the invention is not limited to particular item attributes. Examples of item attributes include, without limitation, identifier attributes, type attributes and cost attributes. Item selection criteria may be changed at any time to reflect changes in items that customers desire to rent from a provider.

Column 4, lines 54-67 (sic). Hastings provides a broad definition of item selection criteria and specifies that the criteria may include attributes. *Hastings* addresses these attributes in another section of the specification, stating:

> The item selection attributes may include any attributes that describe, at least in part, movies, games or music that customers 502 desire to rent. For movies, example attributes include, without limitation, title, category, director name, actor name and year of release. For games, example attributes include, without limitation, title and category. For music, example attributes include, without limitation, title, category, artist/group name and year of release. Customers 502 may identify specific movies or music by the item selection criteria, or may provide various attributes and allow provider 504 to automatically select particular movies and music that satisfy the attributes specified. For example, customers 502 may specify item selection criteria that include horror movies released in 1999 and let provider 504 automatically select horror movies that were released in 1999. As another example, customers 502 may specify item selection criteria that include adventure movies starring Harrison Ford. Customers 502 may also specify an order or priority for the specified item selection criteria. For example, customers 502 may specify specific movie titles and the order in which they want to receive them. As another example, customers 502 may specify that they want to receive a particular number of movies of different types.

Column 8, lines 43-65. Thus *Hastings* broadly defines item selection criteria to include virtually any information provided by the customer that indicates one or more items.

2.      **"items that a customer desires to rent"**

With respect to items, *Hastings* states:

> As used herein, the term "items" refers to any commercial goods that can be rented to customers. Examples of items include movies, music and

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299601

**BAKER BOTTS** LLP

*Opinion of Invalidity*                                    33                                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

> games stored on a non-volatile memory such as a tape, other magnetic
> medium, optical medium, read-only memory or the like, and the invention
> is not limited to any particular type of item.

Column 4, lines 1-7. Thus the term "items" refers to virtually any goods.

The phrase "that a customer desires to rent" further clarifies the particular items
addressed by the claim. This phrase incorporates the word "rent," which *Hastings* uses
extensively yet never directly defines. These uses, as with other terms in the specification,
evidence an intent to broadly define "rent." Moreover, while use of the word rent often connotes
the temporary use of an item in exchange for payment,[15] the *Hastings* specification provides
examples that evidence an intent to use the term rent more broadly.

*Hastings* rarely addresses the concept of payments or fees within its description.
However, those portions of *Hastings* that deal with payments indicate that these payments are
typically not tied to the receipt of particular items. Rather, in normal operation, *Hastings* will
provide items to a customer at no charge based upon limits set within a subscription agreement.
When a customer wishes to deviate from the limits established by that agreement, a fee or
surcharge may be associated with that deviation. *Hastings* provides examples of these extra fees
with respect to the Max Out and Max Turns approaches. With respect to the Max Out approach,
*Hastings* states:

> [T]he specified number of items may be overridden by increasing the
> specified number of items, i.e., the "Max Out" limit, to allow additional
> items to be delivered to customer 102 and charging a fee to customer 102.

Column 6, lines 23-25. With respect to the Max Turns approach, *Hastings* states:

> In some situations, customer 102 may wish to exchange more than the
> specified number of items during a specified period. According to one
> embodiment, in this situation, provider 104 agrees to rent additional items
> above the specified number to customer 102 and to charge customer 102
> for the additional items. For example, suppose that provider 104 agrees to
> rent items to customer 102 with up to three item turns (exchanges) per
> month. If, in a particular month, customer 102 requires two additional
> turns, then the two additional items are provided to customer 102 and a
> surcharge is applied to customer 102 for the additional two items.

Column 6, lines 56-67.

---

[15] For example, The American Heritage College Dictionary, Third Edition, defines rent as: "to obtain occupancy or
use of (another's property) in return for regular payments" or "to grant temporary occupancy or use of (one's own
property or a service) in return for a regular payment."

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299602

**BAKER BOTTS** LLP

To govern customer requests for items under either the Max Out or Max Turns approaches, *Hastings* envisions a customer first entering into an agreement defining the terms under which the customer will receive items. For example, *Hastings* states:

> [C]ustomers 502 enter into a rental agreement with provider 504 to rent audio/video (A/V) items 512 from provider 504 according to the "Max Out" and/or "Max Turns" approaches described herein. The invention is not limited to any particular approach for entering into the rental agreement. For example, customers 502 and provider 504 may enter into a rental agreement by mail, telephone or over the Internet, by customers 502 logging into a web site associated with provider 504.

Column 8, lines 24-31. *Hastings* further states:

> Once customers 502 and provider 504 have entered into a rental agreement and customers 502 have provided item selection criteria to provider 504, then A/V items 512 are rented to customers 502 over delivery channels 514 in accordance with the terms of the rental agreement.

Column 8, line 66 - column 9, line 3.

Thus *Hastings* contemplates a subscription based program that delivers items that a customer desires to rent according to any terms specified by an agreement between the customer and the provider. While the customer may pay for a periodic rental subscription, that customer is not required to pay for particular rented items. Therefore, when interpreted in light of the specification, the phrase "items that a customer desires to rent" refers to any goods that a customer wishes to borrow on a temporary basis, potentially subject to the terms of an associated agreement.

3.      **Interpretation and Scope of the Step**

The entire step requires, "receiving one or more item selection criteria that indicates one or more items that a customer desires to rent." *Hastings* addresses this process at several locations. For example, *Hastings* states:

> According to one embodiment, a customer 102 provides one or more item selection criteria to a provider 104 over a link 106. Link 106 may be any medium for transferring data between customer 102 and provider 104 and the invention is not limited to any particular medium. Examples of link 106 include, without limitation, a network such as a LAN, WAN or the Internet, a telecommunications link, a wire or optical link or a wireless connection.

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299603

**BAKER BOTTS** LLP

*Opinion of Invalidity*                    35                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

Column 4, lines 14-21. Therefore, this limitation uses a broadly defined process incorporating expansively defined phrases. The limitation is thus properly interpreted as the receipt of any information identifying any number of goods that a customer wishes to temporarily borrow.

> **B.** *providing to the customer up to a specified number of the one or more items indicated by the one or more item selection criteria*

The second step of Claim 1 requires that the method provide a customer up to a specified number of indicated items. As previously noted, *Hastings* broadly defines providing to include virtually any type of delivery channel. For example, *Hastings* recites:

> The item selection criteria indicate items that customer 102 desires to rent from provider 104. In response to receiving the item selection criteria from customer 102, provider 104 provides the items indicated by the item selection criteria to customer 102 over a delivery channel 108. Delivery channel 108 may be implemented by any mechanism or medium that provides for the transfer of items from provider 104 to customer 102 and the invention is not limited to any particular type of delivery channel. Examples of delivery channel 108 include, without limitation, mail delivery, courier delivery or delivery using a delivery agent. Provider 104 may be centralized or distributed depending upon the requirements of a particular application.

Column 4, lines 22-34. In light of the plain language of the claim and the description in the specification, this claim element simply requires providing, by any suitable mechanism, up to a specified number of the items indicated by the one or more item selection criteria. In short, the step requires the delivery of a limited number of the goods identified by the customer in the first step.

> **C.** *in response to receiving any of the items provided to the customer, providing to the customer one or more other items indicated by the one or more item selection criteria, wherein a total current number of items provided to the customer does not exceed the specified number*

The third step of Claim 1 begins with a recitation of the conditional statement, "in response to receiving any of the items provided to the customer." As originally filed, this limitation recited "in response to one or more item delivery criteria being satisfied." As discussed above, *Hastings* defines item delivery criteria broadly to encompass virtually any type of event, such as "customer request/notification, customer notification that an item is being returned, customer return of an item, the occurrence of a specified date, the elapsing of a specified period of time or a customer payment." Column 5, lines 10-13.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299604

**BAKER BOTTS** LLP

In the *Second Response, Hastings* narrowed the originally filed limitation such that, instead of responding to one or more item delivery criteria being satisfied, the claim now triggers on the specific occurrence of, "receiving any of the items provided to the customer." The Applicants then argued the patentability of all claims based upon this particular feature, and the Examiner indicated that the claims were allowable in part because of this feature. Because of these changes during prosecution and the language of the claims and the specification, this conditional event should be interpreted to exclude other conditional events specifically contemplated by the *Hastings* specification. Therefore, to satisfy the conditional clause of this step, a method must trigger in response to receiving any of the items that were provided to the customer in the second step.

When the conditional clause is satisfied, Claim 1 responds by "providing to the customer one or more other items indicated by the one or more item selection criteria." As with similar language in the second step of this claim, this phrase will likely be given a broad interpretation to encompass virtually any techniques for delivering the indicated items to the customer. However, the particular items delivered must be "indicated by the same item selection criteria" as provided in the first step of the claim. *See, e.g., Second Response,* at page 25.

A final portion of this step recites, "wherein a total current number of items provided to the customer does not exceed the specified number." This limitation establishes that, no matter how many items are returned or delivered, Claim 1 will limit the total number of items delivered to the customer at any particular time-based upon the specified number introduced in the second step of this claim. *Hastings* addresses this type of operation with respect to the Max Out rental approach, stating:

> According to the "Max Out" approach, up to a specified number of items may be rented simultaneously to a customer. Thus, the "Max Out" approach establishes the size of an inventory of items that may be maintained by customers. The specified number of items may be specific to each customer or may be common to one or more customers. In the present example, if the specified number of items is three, then up to three items may be rented simultaneously by provider 104 to customer 102. If the specified number of items are currently rented to customer 102 and the specified item delivery criteria triggers the delivery of one or more additional items, then those items are not delivered until one or more items are returned by customer 102 to provider 104.

Column 5, lines 34-48.

Thus to summarize, this claim attempts to cover certain aspects of the Max Out approach detailed within the *Hastings* specification. Specifically, the claim details the Max Out approach that uses the return of items as a triggering event for delivering additional items to a customer. The claim requires three steps: the receipt of information identifying items (step 1)

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299605

**BAKER BOTTS** LLP

and two subsequent deliveries of items indicated by that information (steps 2 and 3). The first delivery restricts the number of items provided using a limit. The second delivery triggers on the return of items from the first delivery, and also restricts the number of items provided using the limit applied in the first delivery.

### Claim 2 - Time-based Item Limit

> 2.    A method as recited in claim 1, wherein a total number of items provided to the customer within a specified period of time does not exceed a specified limit.

This claim further restricts the elements of Claim 1 and introduces the terms "a total number of items," "a specified period of time," and "a specified limit." The plain meaning of these terms seems clear, and the *Hastings* specification does not attempt to ascribe any special meanings to any of these terms. Thus for purposes of interpreting the scope of this claim, "a total number of items" and "a specified limit" are treated broadly as any appropriate number, and "a specified period of time" is broadly interpreted as any suitable indication of a time period. Therefore, the plain language of Claim 2 simply requires that, in providing items to the customer, the customer will not receive more than a specified limit of items within a period of time.

The language of Claim 2 also evokes aspects of the Max Turns approach described in the specification. *Hastings* describes the Max Turns concept, stating:

> According to one embodiment, a "Max Turns" approach is used to rent items to customers. According to the "Max Turns" approach, up to a specified number of item exchanges may be performed during a specified period of time. For example, referring to FIG. 1, suppose that provider 104 agrees to rent items to customer 102 with a "Max Turns" limit of three items per month. This means that customer 102 may make up to three item exchanges per month. This approach may be implemented independent of the number of items that a customer may have rented at any given time under the "Max Out" approach. The approach is also independent of the particular item delivery criteria used.

Column 6, lines 33-44. This language is consistent with other descriptions of the Max Turns concept, in that *Hastings* describes the limits with respect to a maximum number of exchanges. Moreover, the addition of the Max Turns approach with the Max Out approach comports with portions of the *Hastings* specification. For example, *Hastings* describes a combination of Max Turns and Max Out, stating:

> According to one embodiment, the "Max Turns" approach is implemented in combination with the "Max Out" approach to rent items to customers. In this situation, up to a specified number of total items are simultaneously

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299606

**BAKER BOTTS** LLP

*Opinion of Invalidity*                    38                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

> rented to customer 102 and up to a specified number of item exchanges
> may be made during a specified period of time. Thus, using the "Max
> Out" and the "Max Turns" approaches together essentially establishes a
> personal item inventory for customer 102 based upon the "Max Out" limit
> that may be periodically refreshed based upon the "Max Turns" limit
> selected.

Column 6, lines 45-55.

However, the description of the Max Turns approach contrasts with the language and operation of Claim 2. That is, Claim 2 does not use the term exchanges, but rather provides a specified limit on the number of items provided to the customer during a period of time. Claim 2 can limit the number of item exchanges, however this exchange limit will not be "specified," but rather will result from the operation of the various limits and based upon the sizes of deliveries.

For example, consider Claim 2 having values for terms of: "specified number" (from Claim 1) equal to three and "specified limit" (from Claim 2) equal to four. If the first delivery provides two items to the customer,[16] then the customer may exchange both items during the time period for the second delivery. This comports with all of the requirements of Claim 2, since the total current number after the second delivery remains at two (does not exceed the specified number from Claim 1), and the total number of items provided within the specified period is four (does not exceed the specified limit of Claim 2). Thus in this scenario, two exchanges are permitted.

Assume the same values for the specified number and specified limit terms, but now consider a delivery of three items in the first delivery. The customer may now only exchange a single item during the time period for the second delivery, since any more items delivered will exceed the specified limit of four. Thus in this scenario, only a single exchange is permitted. Therefore, Claim 2 does not limit the number of exchanges to a specified number.

*Hastings* perhaps contemplates the language of Claim 2 at one point, stating with respect to operation of the Max Turns approach:

> In step 408, in response to one or more delivery criteria being satisfied, a
> determination is made whether additional items can be provided to
> customer 102 within the terms of the "Max Turns" agreement. For
> example, if the number of items rented to customer in the current
> subscription period is less than the agreed-upon "Max Turns," then
> additional items can be rented to customer 102 within the terms of the
> "Max Turns" agreement.

---

[16] Providing only two out of three possible is permitted by the "up to a specified number" language in Claim 1.

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299607

**BAKER BOTTS** LLP

*Opinion of Invalidity*                39                March 9, 2004
*Re: U.S. Patent No. 6,584,450*

Column 7, lines 38-45. Thus *Hastings* contemplates the Max Turns approach being implemented using a limit on total number of items rather than a limit on exchanges.

Therefore, the limit in Claim 2 is interpreted as a limit on the total number of items provided to the customer in the first or second deliveries, and not as an exchange limit. Thus in addition to the requirements of Claim 1, Claim 2 further provides a limit on the number of items provided to the customer within a specified period of time.

### Claim 3 - Rollover

> 3.      A method as recited in claim 2, further comprising if the total number of items provided to the customer within the specified period of time is less than the specified limit, then increasing the specified limit for another specified period of time.

The elements of this claim introduce an additional step to the Max Out/Max Turns combination established by Claim 2. This additional step includes a conditional clause that is satisfied by the customer using less than the specified limit of items during the specified time period. When the conditional clause is satisfied, Claim 2 provides for "rolling over" unused portions of the limit into another time period. The *Hastings* specification addresses a similar type of operation with respect to item exchanges, stating:

> In other situations, customer 102 may not use all of its allotted turns during a specified period. According to one embodiment, customers lose unused turns during a subscription period. For example, if customer 102 has a "Max Turns" limit of four item exchanges per month and only makes two item exchanges in a particular month, then the two unused exchanges are lost and cannot be used. At the start of the next month, customer 102 would be entitled to four new item exchanges.

> According to another embodiment, customers are allowed to carry over unused turns to subsequent subscription periods. For example, if customer 102 has a "Max Turns" limit of four item exchanges per month and only makes two item exchanges in a particular month, then the two unused exchanges are lost and cannot be used. At the start of the next month, customer 102 would be entitled to six new item exchanges, two from the prior month and four for the current month.

Column 7, lines 1-18. As discussed above with respect to Claim 2, Claim 3 does not provide a limit on item exchanges, but rather provides a limit on the total number of items provided to the customer during the time period. However, the rollover concept described by *Hastings* applies similarly to the total number limit. For example, if the customer receives only three items and has a four item total limit, then the total item limit during the next time period is increased.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299608

**BAKER BOTTS** ᴸᴸᴾ

*Opinion of Invalidity*                    40                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

Therefore, the language of Claim 3 provides for rollover of unused portions of the specified limit into another time period.

**Claim 4 - Desired Order**

> 4.    *A method as recited in claim 1, wherein*
>
> *the one or more item selection criteria indicates a desired order for the one or more items that a customer desires to rent,*
>
> *the step of providing to the customer up to a specified number of the one or more items indicated by the one or more item selection criteria includes providing to the customer up to a specified number of the one or more items indicated by the one or more item selection criteria in the desired order indicated by the item selection criteria, and*
>
> *the step of providing to the customer one or more other items indicated by the one or more item selection criteria includes providing to the customer one or more other items indicated by the one or more item selection criteria in the desired order indicated by the one or more item selection criteria.*

This claim provides further limitations upon Claim 1 and introduces the concept of ordered delivery. Specifically, this claim further limits each of the steps in Claim 1 with the introduction of, "a desired order for the one or more items that a customer desires to rent." The *Hastings* specification addresses ordered delivery with respect to selection criteria provided by the customer. Specifically, *Hastings* recites:

> Customers 502 may also specify an order or priority for the specified item selection criteria. For example, customers 502 may specify specific movie titles and the order in which they want to receive them.

Column 8, lines 60-63. Thus by requiring that "the one or more item selection criteria indicates a desired order for the one or more items that a customer desires to rent," Claim 4 simply requires the selection criteria to indicate an ordering of the items.

Claim 4 continues by further limiting the two delivery steps recited in Claim 1. Specifically, the claim requires each of the delivery steps to provide items "in the desired order indicated by the item selection criteria." While the *Hastings* specification does not explicitly detail techniques for providing ordered delivery of items, the plain language of this claim simply requires the delivery to adhere to an order that is established by the item selection criteria.

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299609

**BAKER BOTTS** LLP

### Claim 5 - Skip Unavailable

> 5.    *A method as recited in claim 4, further comprising if a particular item from the one or more items indicated by the one or more item selection criteria is not available, then providing another item from the one or more items based upon the desired order indicated by the one or more item selection criteria.*

This claim further limits Claim 4 with an additional step related to the ordered delivery of items. Specifically, Claim 5 recites a conditional phrase with the initial clause stating the condition of, "if a particular item from the one or more items indicated by the one or more item selection criteria is not available." Given this event, Claim 5 "provid[es] another item from the one or more items based upon the desired order indicated by the one or more item selection criteria."

The *Hastings* specification fails to describe this operation or otherwise indicate any deviation from the plain language of the claim. An examination of this language reveals that, when providing ordered delivery, a customer's selection criteria will indicate a "next" item to deliver. However, because inventories of items may be limited, the next item may be unavailable. When encountering this condition, Claim 5 provides for skipping the unavailable item and selecting an alternate item. However, this alternate item must also be selected "based upon the desired order."

### Claim 6 - Preferred Item Attributes

> 6.    *A method as recited in claim 1, wherein*
>
> *the one or more item selection criteria specifies one or more preferred item attributes,*
>
> *the step of providing to the customer up to a specified number of the one or more items indicated by the one or more item selection criteria includes automatically selecting and providing to the customer up to a specified number of one or more items that have one or more of the one or more preferred item attributes specified by the one or more item selection criteria, and*
>
> *the step of providing to the customer one or more other items indicated by the one or more item selection criteria includes automatically selecting and providing to the customer one or more other items that have one or more of the one or more preferred item attributes specified by the one or more item selection criteria.*

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299610

**BAKER BOTTS** LLP

*Opinion of Invalidity*                          42                          March 9, 2004
*Re: U.S. Patent No. 6,584,450*

Claim 6 establishes further limitations upon the item selection criteria of Claim 1. Specifically, this claim introduces the concepts of "preferred item attributes" and "automatically selecting."

### A.    "preferred item attributes"

The *Hastings* specification uses the word preferred in only a single location other than the claims. In using the term, *Hastings* states:

> The approach described herein for renting items to customers provides superior inventory management to prior approaches. Specifically, the use of an item selection criteria provides for efficient inventory management by allowing the greatest number of items to be rented at any given time. Moreover, the greatest number of customers are provided with their most *preferred* items. For example, customers may specify priorities for the items indicted by the item selection criteria. Thus, if a particular customer's first choice is not available, or already rented, then the item having the next highest priority can be rented to the particular customer. According to one embodiment, customers may indicate items that are not yet available for rent. Then, the items are delivered to customers when they become available.

Column 11, lines 13-25 (emphasis added). This use of the word preferred does not appear to completely describe the concept contemplated by Claim 6. The phrase "preferred item attributes" is better understood with respect to item attributes. *Hastings* states:

> The item selection attributes may include any attributes that describe, at least in part, movies, games or music that customers 502 desire to rent. For movies, example attributes include, without limitation, title, category, director name, actor name and year of release. For games, example attributes include, without limitation, title and category. For music, example attributes include, without limitation, title, category, artist/group name and year of release. Customers 502 may identify specific movies or music by the item selection criteria, or may provide various attributes and allow provider 504 to automatically select particular movies and music that satisfy the attributes specified. For example, customers 502 may specify item selection criteria that include horror movies released in 1999 and let provider 504 automatically select horror movies that were release in 1999. As another example, customers 502 may specify item selection criteria that include adventure movies starring Harrison Ford.

Column 8, lines 43-60. As is evident by this description, the *Hastings* specification contemplates customers providing attributes that do not uniquely identify only a single item. Rather, *Hastings*

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299611

**BAKER BOTTS** LLP

*Opinion of Invalidity*                    43                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

permits a customer to provide general attributes that indicate types or genres of items that the customer may prefer to receive.

Thus the claim limitation reciting, "the one or more item selection criteria specifies one or more preferred item attributes," simply requires that the customer provide general attributes of items to be received.

### B.    "automatically selecting"

The *Hastings* specification describes automatic selection processes with respect to the item selection criteria.  Specifically, *Hastings* states:

> Customers 502 may identify specific movies or music by the item selection criteria, or may provide various attributes and allow provider 504 to automatically select particular movies and music that satisfy the attributes specified.   For example, customers 502 may specify item selection criteria that include horror movies released in 1999 and let provider 504 automatically select horror movies that were release in 1999. As another example, customers 502 may specify item selection criteria that include adventure movies starring Harrison Ford.

Column 8, lines 50-60 (sic).   The *Hastings* specification also addresses preferences and automatic selection with reference to movies in particular, stating:

> Instead of identifying particular movie titles, the movie selection criteria may specify movie preferences for customer 502, e.g., types of movies, directors, actors, or any other movie preferences or attributes.  In this situation, provider 504 automatically selects particular titles that satisfy the movie selection criteria.  For example, the movie selection criteria may specify a preference for action movies starring a particular actor, with a preference for "new release" movies.  Provider 504 attempt to provide movies to customer 502 that best satisfy the preferences indicated by the movie selection criteria.

Column 10, lines 3-14 (sic).  Therefore, the language of "automatically selecting . . . items that have one or more of the one or more preferred item attributes specified by the one or more item selection criteria" encompasses the automated selection of items based upon defined attributes. That is, Claim 6 requires automated selection of particular items that satisfy attributes identifying general types of items.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299612

**BAKER BOTTS** LLP

*Opinion of Invalidity*          44          March 9, 2004
*Re: U.S. Patent No. 6,584,450*

### Claim 7 - Item Rental Queue

7.      *A method as recited in claim 1, further comprising:*

*establishing, based upon the one or more item selection criteria, an item rental queue for the customer, wherein the item rental queue contains one or more entries that specify the one or more items that the customer desires to rent; and*

*in response to receiving back any of the items provided to the customer, selecting the one or more other items from the item rental queue.*

Claim 7 further limits the operation of Claim 1 with the introduction of "an item rental queue for the customer." Specifically, Claim 7 adds one additional step to Claim 1 and alters the operation of the final step of Claim 1.

A.      *establishing, based upon the one or more item selection criteria, an item rental queue for the customer, wherein the item rental queue contains one or more entries that specify the one or more items that the customer desires to rent*

The *Hastings* specification uses the term "queue" in only a single location outside of the claims. This use details:

The one or more item selection criteria provided by customer 102 to provider 104 indicate the particular items that customer 102 desires to rent from provider 104. Thus, the item selection criteria define a customer-specific order queue that is fulfilled by provider 104.

Column 4, lines 54-58. However, this description adds virtually nothing to the plain language of Claim 7. The scope and meaning of Claim 7 thus may be understood without straying beyond the plain language.

The first portion of Claim 7 requires the establishment of an item rental queue based on the item selection criteria. The Mc-Graw Hill Dictionary of Scientific and Technical Terms, fourth edition, defines a queue as: "a list of items waiting for attention in a computer system, generally ordered according to some criteria." Thus Claim 7 requires the creation of an item rental list, likely having some order. This rental list differs slightly from the desired order of Claim 4, in that the order of Claim 4 relies upon the customer to provide a *desired* order. Thus Claim 4 implicates a customer driven order not required for the creation of the list implicated by the item rental queue.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299613

**BAKER BOTTS** LLP

Claim 7 creates the item rental queue using the item selection criteria. Because of the broad definition afforded to item selection criteria, this claim may thus encompass any number of techniques for deriving the particular queue from the general item selection criteria. Therefore, this step is broadly interpreted such that the customer may provide any level of detail with the item selection criteria such that the method may identify a list of particular items to maintain in a queue. For example, it is assumed that the item selection criteria may detail particular items for placement into the queue, a specific order for the items, and/or general attributes for selecting items to fill the queue.

> **B.**     *in response to receiving back any of the items provided to the customer,*
> *selecting the one or more other items from the item rental queue*

This step further limits the operation of Claim 1 such that the second delivery selects items from the customer's item rental queue. Thus this step services the item rental queue established in the first step of this claim. As previously noted, a queue generally denotes a particular order in which elements will be serviced. For example, common queuing methods include first in first out (FIFO) and last in first out (LIFO). In this step, the plain claim language does not indicate any particular type of ordering or selection mechanism. Thus for purposes of this discussion, the scope of this step encompasses any queue servicing schedule that may be contemplated.

### Claim 8 – Customer Notification

> 8.     *A method as recited in claim 1, further comprising in response to*
> *receiving a customer notification, providing to the customer a second set*
> *of one or more other items indicated by the one or more item selection*
> *criteria.*

Claim 8 adds a step to those provided in Claim 1. More specifically, the step of Claim 8 provides a third delivery of items (second set of other items) indicated by the item selection criteria, in this case triggered by "a customer notification." The *Hastings* specification introduces the concept of customer notifications with respect to item delivery criteria. *Hastings* recites:

> According to one embodiment, items are delivered by provider 104 to customer 102 over delivery channel 108 based upon item delivery criteria. More specifically, the delivery of items from provider 104 to customer 102 is triggered by item delivery criteria being satisfied. The item delivery criteria may include a wide range of criteria and the invention is not limited to any particular item delivery criteria. Examples of item delivery criteria include, without limitation, customer request/notification, customer notification that an item is being returned, customer return of an

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299614

**BAKER BOTTS** LLP

item, the occurrence of a specified date, the elapsing of a specified period
of time or a customer payment.

Column 5, lines 2-13. Therefore, *Hastings* contemplates a customer notification acting as a
triggering event for delivering items indicated by the item selection criteria. The American
Heritage College Dictionary, Third Edition, defines notification as: "the act or an instance of
notifying," and defines notify as "to give notice to, inform." Thus customer notification likely
defines any suitable information received from the customer.

In the originally filed claims, Claim 1 included the broadly defined triggering
event of satisfying any item delivery criteria. Claim 8, as originally filed, narrowed this broad
triggering event by specifying a customer notification as the particular triggering event. Along
with the narrowing of the triggering event in Claim 1 to focus only on the return of previously
delivered items, the Applicants also amended Claim 8 to add a third delivery of items triggered
upon a customer notification.

Therefore, Claim 8 requires three separate deliveries of items. The first and
second deliveries are governed by the steps in Claim 1. The first delivery simply provides items
indicated by item selection criteria. The second delivery provides items indicated by the item
selection criteria and triggers upon receipt of one or more items from the first delivery. The third
delivery of items, specified by Claim 8, delivers items indicated by the item selection criteria and
triggers upon a customer notification. Claim 8 places no limits, such as the specified number or
the specified limit, on this third delivery.

### Claim 9 - Expiration of Time

9.      *A method as recited in claim 1, further comprising in response to
expiration of a specified amount of time, providing to the customer a
second set of one or more other items indicated by the one or more item
selection criteria.*

Claim 9, like Claim 8, adds another delivery to the two deliveries specified in
Claim 1. Also like Claim 8, Claim 9 as originally filed simply limited the broad item delivery
criteria specified in Claim 1 as originally filed. When narrowing the triggering event of Claim 1,
the Applicants also amended Claim 9 to provide for a third delivery of items triggered upon a
specified event. In Claim 9, however, the specified triggering event for the third delivery is the
"expiration of a specified amount of time." *Hastings* includes "the elapsing of a specified period
of time" in the laundry list of potential delivery criteria. *Hastings* also provides an example of
this operation, stating:

For example, additional A/V items 512 may be delivered upon . . . the
expiration of a specified period of time, e.g., fifteen days.

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299615

**BAKER BOTTS** LLP

*Opinion of Invalidity*                                    47                                    March 9, 2004
*Re: U.S. Patent No. 6,584,450*

Column 9, lines 9-14. Therefore, the plain language and the specification are clear with respect to this relatively simple triggering event for the third delivery.

Thus as with Claim 8, Claim 9 requires three separate deliveries of items. The steps of Claim 1 govern the first and second deliveries, and Claim 9 governs the third delivery, with the third delivery triggering upon the expiration of a specified amount of time and providing additional items specified by the originally submitted selection criteria. Like Claim 8, Claim 9 places no limits, such as the specified number or the specified limit, on this third delivery.

### Claim 10 - Specified Date

> 10.     *A method as recited in claim 1, further comprising in response to a specified date being reached, providing to the customer a second set of one or more other items indicated by the one or more item selection criteria.*

Claim 10, like Claim 8 and Claim 9, adds another delivery to the two deliveries specified in Claim 1. Also like the previous two claims, Claim 10 as originally filed simply limited the broad item delivery criteria specified in Claim 1 as originally filed. When narrowing the triggering event of Claim 1, the Applicants also amended Claim 10 to provide for a third delivery of items triggered upon a specified event. In Claim 10, however, the specified triggering event for the third delivery is "a specified date being reached." *Hastings* includes "the occurrence of a specified date" in the laundry list of potential delivery criteria and provides an example of this operation, stating:

> For example, item delivery criteria may specify a particular date, i.e., the third Wednesday of every month, for all item deliveries.

Column 5, lines 26-28. Therefore, the plain language and the specification are clear with respect to this relatively simple triggering event for the third delivery.

Thus as with the previous two claims, Claim 10 requires three separate deliveries of items. The steps of Claim 1 govern the first and second deliveries, and Claim 10 governs the third delivery, with the third delivery triggering upon the occurrence of a particular date and providing additional items specified by the originally submitted selection criteria. Claim 10 places no limits, such as the specified number or the specified limit, on this third delivery.

### Claim 11 - Receipt of Fee

> 11.     *A method as recited in claim 1, further comprising in response to a specified fee being received, providing to the customer a second set of one or more other items indicated by the one or more item selection criteria.*

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299616

**BAKER BOTTS** LLP

Claim 11, like the previous three claims, adds another delivery to the two deliveries specified in Claim 1. Also like the previous claims, Claim 11 as originally filed simply limited the broad item delivery criteria specified in Claim 1 as originally filed. When narrowing the triggering event of Claim 1, the Applicants also amended Claim 11 to provide for a third delivery of items triggered upon a specified event. In Claim 11, however, the specified triggering event for the third delivery is "a specified fee being received." *Hastings* does not mention fees or payments in the laundry list of potential item delivery criteria but does provide examples of these extra fees with respect to the Max Out and Max Turns approaches. With respect to the Max Out approach, *Hastings* states:

> [T]he specified number of items may be overridden by increasing the specified number of items, i.e., the "Max Out" limit, to allow additional items to be delivered to customer 102 and charging a fee to customer 102.

Column 6, lines 23-25. With respect to the Max Turns approach, *Hastings* states:

> In some situations, customer 102 may wish to exchange more than the specified number of items during a specified period. According to one embodiment, in this situation, provider 104 agrees to rent additional items above the specified number to customer 102 and to charge customer 102 for the additional items. For example, suppose that provider 104 agrees to rent items to customer 102 with up to three item turns (exchanges) per month. If, in a particular month, customer 102 requires two additional turns, then the two additional items are provided to customer 102 and a surcharge is applied to customer 102 for the additional two items.

Column 6, lines 56-67 (sic). *Hastings* describes and uses this concept of fees/charges consistently throughout the description. This implies that the fee is a "surcharge" levied in addition to any subscription fees that may already have been paid. The third delivery in Claim 11 triggers upon receipt of this fee.

However, despite the precise interpretation of the nature of the fee, Claim 11 requires three separate deliveries of items. The steps of Claim 1 govern the first and second deliveries, and Claim 11 governs the third delivery, with the third delivery triggering upon receipt of a payment and providing additional items specified by the originally submitted selection criteria. Claim 11 places no limits, such as the specified number or the specified limit, on this third delivery.

**Claim 12 – Mail**

> 12.    A method as recited in claim 1, wherein items are provided to the customer by mail.

BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY

BB01299617

**BAKER BOTTS** ᴸᴸᴾ

*Opinion of Invalidity*           49           March 9, 2004
*Re: U.S. Patent No. 6,584,450*

         Claim 12 provides a further limitation on the process for delivering items in Claim 1. Specifically, Claim 12 details the delivery channel used for providing items to the customer, specifying that the delivery take place "by mail." The *Hastings* specification speaks to available delivery mechanisms, stating:

> Delivery channel 108 may be implemented by any mechanism or medium that provides for the transfer of items from provider 104 to customer 102 and the invention is not limited to any particular type of delivery channel. Examples of delivery channel 108 include, without limitation, mail delivery, courier delivery or delivery using a delivery agent.

Column 4, lines 27-32. *Hastings* thus introduces three particular types of delivery channels, including mail, courier, and delivery agent. Because *Hastings* does not further define mail delivery, the language of this claim must be broadly interpreted to include any particular type of mail delivery, but to exclude courier or agent delivery. Thus, for example, the language of this claim contemplates any delivery of items using a public carrier, such as the United States Postal Service.

### Claim 13 - Delivery Agent

     13.     *A method as recited in claim 1, wherein items are provided to the customer by a delivery agent.*

         Claim 13, like Claim 12, provides a further limitation on the process for delivering items in Claim 1. Specifically, Claim 13 details the delivery channel used for providing items to the customer, specifying that the delivery take place "by delivery agent." As noted above, *Hastings* introduces three particular types of delivery channels, including mail, courier, and delivery agent. Because *Hastings* does not further define delivery by delivery agent, the language of this claim must be broadly interpreted to include any particular type of agent delivery, but presumably to exclude courier or mail delivery. Thus, for example, the language of this claim contemplates any delivery of items using a common, non-public carrier, such as United Parcel Service.

### Claim 14 - Movies

     14.     *A method as recited in claim 1, wherein:*

        *the one or more items are one or more movies,*

        *the one or more item selection criteria are one or more movie selection criteria,*

BLOCKBUSTER INC. CONFIDENTIAL -- DO NOT COPY

BB01299618

**BAKER BOTTS** LLP

*Opinion of Invalidity*                              50                              March 9, 2004
*Re: U.S. Patent No. 6,584,450*

> the step of receiving one or more item selection criteria that indicates one or more items that a customer desires to rent includes receiving one or more movie selection criteria that indicates one or more movies that a customer desires to rent,
>
> the step of providing to the customer up to a specified number of the one or more items indicated by the one or more item selection criteria includes providing to the customer up to a specified number of the one or more movies indicated by the one or more movie selection criteria, and
>
> the step of in response to receiving any of the items provided to the customer, providing to the customer one or more other items indicated by the one or more item selection criteria, wherein a total current number of items provided to the customer does not exceed the specified number includes in response to receiving any of the movies provided to the customer, providing to the customer one or more other movies indicated by the one or more movie selection criteria, wherein a total current number of movies provided to the customer does not exceed the specified number.

Claim 14 further limits the operation of Claim 1 by specifying that the items are "movies" and the selection criteria are "movie selection criteria." *Hastings* references movies when describing the concept of items, stating:

> Examples of items include movies, music and games stored on a nonvolatile memory such as a tape, other magnetic medium, optical medium, read-only memory or the like, and the invention is not limited to any particular type of item.

Column 4, lines 3–8. Thus Claim 14, by limiting the items particularly to movies, likely excludes other types of items such as music and games.

Despite using the term movie(s) liberally throughout the description and claims, *Hastings* does not choose to define or ascribe any special or particular meaning to this term. The American Heritage College Dictionary, third edition, defines movie as: "a sequence of images projected onto a screen with sufficient rapidity to create the illusion of motion and continuity." Also, *Hastings* describes movies with respect to information encoded on a storage medium. Thus the term "movie(s)" is interpreted to broadly encompass any recording that, upon playback, can provide a series of visual images that form a moving picture.

With respect to movie selection criteria, *Hastings* describes the use of movie selection criteria by reference to a flowchart, stating:

**BLOCKBUSTER INC. CONFIDENTIAL – DO NOT COPY**

BB01299619