# EXHIBIT C

Dockets.Justia.com

**EXHIBIT C**

# EXPERT REPORT OF JASON SALZETTI
## Deloitte Consulting LLP

## IN THE MATTER OF:

## NETFLIX, INC.  V.
## BLOCKBUSTER, INC.

United States District Court
Northern District of California
Case No. C 06 2361 WHA

**May 4, 2007**

It is my understanding that Netflix filed its original patent application on April 28, 2000, and filed its second application on May 14, 2003, as a "continuation" of the first application. Therefore, I understand that anything that existed in any of the above forms on or before April 28, 1999, is prior art.

Further, I understand that, under Section 103 of Title 35, a patent claim is invalid if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. In this case, a person skilled in the art should, at minimum, have experience in computer technology, the Internet and business practices in rental of items such as movies. Further, I understand that, for purposes of this analysis, the "person having ordinary skill in the art" is presumed to have knowledge of all relevant prior art.

I understand the courts have said that factors to be considered in analyzing obviousness should include the scope and content of the prior art, differences between the prior art and the patent claims, the level of ordinary skill in the pertinent art, and "secondary considerations" or "objective indicia," such as commercial success, long felt but unsolved needs, failure of others, copying, surprising results, acclaim, or the lack of them.

I understand that, in analyzing whether a patent claim is obvious, it is important to avoid hindsight and look at the issue from the point of view of someone who did not already know about the patents-in-suit. I understand that, in analyzing whether it would have been obvious to combine features from different items of prior art or to modify features in prior art, I should consider such things as the established functions and predictable uses of the prior art elements and whether there would have been an apparent reason to combine prior art elements in the fashion claimed in the patents-in-suit.

I understand that, once a patent has been issued, proof that a claim of the patent is invalid requires "clear and convincing evidence." I understand that the court in this case has ruled on the construction of certain claim terms, and I have used those constructions in the Netflix

Among other things, I have analyzed the specifications, drawings, and claims of the Netflix patents, including the claim elements that I have summarized and discussed below.   In addition, I have attached as exhbits to my report specific charts which analyze the elements of each claim at issue with reference to prior art relevant to that claim.

### A.     eBusiness Skills and Practices

As a consultant in the computer technology and Internet fields at the time of Netflix's claimed inventions, I know about practices in those fields at that time.  For purposes of my analysis, I have used the time frame 1998-1999.  (My analysis and conclusions would be essentially the same for any particular time during that period.)

Commercialization of the World Wide Web ("Web") began to occur around 1996.  By 1998-1999 there was a flurry of activity across industries on the part of numerous start-up and established companies that were racing to build an online presence.  Seemingly everyone that had an Internet-based business idea was able to obtain venture capital funding to try to launch their online business.  Individuals without ideas looked at everything in the offline world and considered how they could "web-enable" it.  The majority of these businesses were attempts to take a product or service already available in a brick and mortar store and sell, rent or trade it on the web.  The span and reach of the Internet appeared to offer instant access to millions of customers, dramatic cost efficiencies and unfettered growth.  The euphoria during that time period had several labels, including the "Internet Revolution," the "New Economy" and "e" everything.

Like many industries, the movie rental business was the focus for many web entrepreneurs and established movie rental companies.  Several brick and mortar movie rental retailers and pure-play startups launched websites and began renting movies over the web as early as 1996.  While increasingly widespread use of the web opened up offline business models to a broad set of customers, those customers had a larger choice of websites with which to transact business.  Web pioneers quickly learned that they had to devise tactics to retain customers, measured using the metric of "eyeballs" and "stickiness" at that time, sometimes at the expense of profits.  Some of these tactics included: using subscriptions models to lock

6<br>
Expert Report of Jason Salzetti<br>
May 4, 2007

Business Training Library rented business training courses and materials on audio media to financial institutions on a subscription basis.

Tape Rental Library (TRL)'s customers who paid an annual subscription fee were allowed to rent two audio tapes, which were delivered by mail with a postage pre-paid return envelope. Subscribers were allowed to keep the tapes as long as they wanted with no due date and without incurring late fees. When they finished with the tapes, they could return one or two tapes back to TRL in the envelope provided by TRL, and replacement tape(s) would be mailed to them as long as they had no more than two tapes at any given time. A customer could fill out in advance a customer-specific "Time Saver List" with multiple titles (or product numbers) of the tapes that the customer wanted to listen to in the future, listing them in the order desired by the customer. As tape(s) were returned, TRL would mail to the customer the next tape(s) on the customer's Time Saver List.

Subscription was and remains recognized today as one of the best means by which a company can secure recurring sales while building brand loyalty. Because a subscriber is investing in the service upfront, subscription models tend to promote return business. Additionally, there are deterrent factors to a subscriber's leaving a company once he or she has entered into a subscription arrangement -- such as switching costs. Such costs can include early cancellation or termination fees, costs associated with finding and signing up with another company, partial or no refunds of advance payments made or just general time-costs involved in the process of leaving. A subscription model can greatly reduce uncertainty and risk and provide a predictable, recurring revenue stream. It was only natural that this model would be used online to achieve the same benefits.

c.    **Limits on Numbers of Items**

A general characteristic of rental business models, on or off-line, is that the rental company must balance the satisfaction of any particular customer against the company's need to maintain adequate stocks with which to meet overall customer demand. It is readily apparent

---

[8] Video Software Dealer's Alliance (VSDA), "A History of Home Video," www.idealink.org/Resource.phx/vsda/pressroom/history-of-industry.htx

Expert Report of Jason Salzetti
May 4, 2007

that placing limits on the rental items used by each customer helps a rental company ensure availability of a steady supply of merchandise. Additionally, not allowing customers to rent everything they could possibly want at one time helps to encourage their return business. This dynamic applies to the rental of virtually any consumer goods. From libraries to sites that rent recreational merchandise, imposing limits is an obvious way to ensure the ongoing viability of a rental business.

Among the best known subscription models are those that include limits on the items a customer may have at one time (what the Netflix patents refer to as "Max Out") or on the items a customer may exchange during a particular period of time (what the patents refer to as "Max Turns"). Claims of the Netflix patents recite both kinds of limits. Further, they recite providing additional items in response to receiving items back from a customer. That is inherent in a Max Out arrangement, because a customer at his or her limit in such an arrangement, upon returning any items will generally become entitled to receive an equal number of additional items.

These claimed features are obvious ways, as a matter of common knowledge and common sense, to achieve certain obvious goals of a subscription service such as preventing customers from obtaining an excessive number of items, ensuring that an adequate selection remains for other subscribers, and controlling the cost of the service. Historically, there have been numerous models both off-line and online that have set limits on rentals. Much as a car rental business will limit its risk by restricting the number of vehicles any one individual can rent at one time, media renting businesses often set limits either on the number of items that can be rented, on the duration for which the items can be rented, or both, to allow for the widest range of titles to be available to subscribers and ensure a constant circulation and refreshment of materials.

Additionally, these features were used in the prior art. For example, the Reference Guide describes a "Turn-Around Service," which "[p]rovides for circulation of a new item to a borrower for each checked-out item that is returned by that borrower." (Page 61.) "[W]ith Turn-Around Service borrowers, the number of books to be sent at a given time matches the number of returned items, unless provision is made for some exception." (Page 192.) The Reference

In December 1994, Scientific Atlanta, Inc. applied for McMullan, et al., U.S. Patent No. 5,654,746 filed Dec. 1, 1994) ("McMullan '746") for the "*Secure authorization and control method and apparatus for a game delivery service.*" McMullen '746 allowed for a maximum playtime limit or particular time-of-day restriction to be set on a video game rented from a video game store or in an arcade. Bakoglu, et al., U.S. Patent No. 5,632,681 "*Universal electronic video game renting/distributing system*" (filed March 7, 1995) ("Bakoglu '681") reinforced the need to build-in limiters or max-outs on rentals. Bakoglu '681, controlled by a computer/microcontroller/processor, offered a rental model with limited time based on decremented frame counts the rental expired when no frame count remained, forcing the user to either pay another rental fee or quit using the game.

InterTrust Technologies, applied for Ginter et al. U.S. Patent No. 5,892,900 "*Systems and methods for secure transaction management and electronic rights protection*" on August 30, 1996. The patent described a rights management program utilizing a computer-readable medium that allowed subscribers to purchase user rights to intellectual properties. The system had a built-in limit-setting mechanism so that only so many properties could be ordered at any one time; or if a particular dollar-limit threshold was approached the system allowed no further purchases for that transaction.

### d.     Use of the Internet

All claims of Netflix's '381 patent require use of the Internet in performing various claimed steps. The prior art included similar and analogous uses of the Internet. For example, Reel.com and HomeFilmFestival.com rented movies on the Internet more than a year before Netflix applied for its first patent. So did Netflix itself. Its own a la carte (fee per movie) Internet video rental service began in 1998 and is therefore prior art to the Netflix patents.

More generally, as discussed above, there was a flurry of activity across industries by 1998-1999 to build an online presence. There was an interest in taking virtually any brick-and-mortar business model to the Internet. Well known advantages of doing business on the Web

included obtaining access to millions of additional customers, customer convenience, cost efficiency, increased geographical scope, and expanded growth potential.

Subscriptions began to migrate to the Internet in the mid-1990's as the World Wide Web made it easier for people to use the Internet. The large portals, MSN, AOL, and others like them, began as subscription-based businesses and became some of the first commercial enterprises online. AOL started out in 1983 known as Quantum Computer Services (QCS), offering a subscription-based game rental. QCS offered an online service, known as "Gameline," for the Atari 2600 video game console. Subscribers who purchased a modem from QCS and paid a set-up fee could then temporarily download games for the Atari at the cost of approximately $1/an hour. AOL ultimately became one of the largest subscription-based Web portals in the world. From the mid-1990's onward, numerous brick-and-mortar companies, from rental car agencies such as Avis to newspapers, began to establish themselves on the Internet as a new means by which to build presence in the marketplace.

Homefilmfestival.com began to rent videocassettes online in October 1995 utilizing a subscription model. Other Internet businesses, such as Reel.com, sought to provide exclusive subscription-based access to title lists or other customized data libraries of media.

In the late 1990's, an obvious Internet business model was to apply the well-known subscription model to any new site that was seeking to distribute media in whatever form. A recognized challenge at this time was to hold onto new website users once they had been attracted to a site for the first time or had used it for a few times. To succeed, a new eBusiness generally needed to create a sustained user audience and to use this as a base upon which to build by attracting new users. This was generally a struggle for new eBusinesses. The subscription model provided a known and obvious solution to this problem and an obvious potential to enhance stability and provide a predictable, recurring revenue stream.

Additionally, as the economy and culture have shifted from the mass market in the off-line world, the online world has sought to cater to millions of specialized niche markets. The term for this niche specialization online is "The Long Tail." The underlying concept is that while the

16
Expert Report of Jason Salzetti
May 4, 2007

bulk of the popularly demanded items caters to a wide swath of consumers, those seeking specialized genres or products can best be catered to in the online world where those seeking a particular niche can congregate and a handful of sites can become quite profitable catering to them and their tastes. Seemingly infinite "shelf-space" in the online world makes this possible. Online media-renting outlets can cater to rare tastes by culling data from customer-generated "want" lists to stock films far too obscure for most brick-and-mortar stores.[9]

### e.      Attributes and Selection Criteria

The claims of the Netflix patents include numerous references to item, movie, or game attributes and item, movie, or game selection criteria. These references include claim features such as providing a digital display of movie attributes, receiving one or more item selection criteria that indicate one or more items the customer desires to rent, and providing to the customer up to a specified number of the one or more items indicated by one or more selection criteria.

The patents broadly define attributes as "includ[ing], without limitation, identifier attributes, type attributes and cost attributes" and say that "[i]tem selection criteria may specify any type of item attributes and the invention is not limited to particular item attributes. ('450 Pat., col. 4, lns. 55-67). In the Claim-Construction Order issued on February 20, 2007 in the Netflix vs. Blockbuster action (hereafter "Claim-Construction Order"), the Court construed "item/movie/game selection criteria" as "the characteristics used by the customer to select items." Accordingly, both attributes and selection criteria can include title, actor, director, year, genre, and description. Using computer systems to send, receive and display, and use such item selection attributes and criteria was well developed by the early 1990s.

To begin with, item attributes and selection criteria are obvious and, indeed, inherent in the rental of movies, games, or other items. Unless the selection process is completely random

---

[9] "*The Long Tail and libraries,*" Online Computer Library Center (OCLC) Newsletter, April/May/June 2005, http://www.oclc.org/worldcat/open

updating" the queue and, specifically, to adding movies, deleting movies, and changing the order of movies in the queue.

The Claim-Construction Order construed the terms "movie rental queue" and "item rental queue" to "mean the sequence from which the provider selects movies or items to be rented." The Claim-Construction Order also gave plain meaning to the term "ordered list" which "may be, but is not required to be, ordered precisely according to the customer's preference; it could also include some other default order." The Claim-Construction Order further construed the term "electronically updating" to mean "changing based upon information received from the customer via the internet using an electronic device," where the term "electronic" was given its plain-language meaning.

Use of an "ordered list" or "queue" in a business model involving the rental of media items is not a new one. Looking back to the off-line subscription libraries, maintaining lists of titles patrons desire to rent in the future is a common procedure. Request and reserve data is widely used in rental businesses to plan for stock on-hand and identify the most popular items that are most in demand from subscribers.

The Reference Guide emphasizes the importance of structuring data systems to capture request and reserve information, including the item identification number, the date of the request, requestor, number of items requested, and number of titles held in reserve. The University of California library system designed the MELVYL system, which allowed members of the UC system to locate items within the greater pool of university libraries, reserve them and order their delivery to the appropriate campus, department and office. The MELVYL system allows users to change the titles requested and prioritize them. This system was one of the first to provide online access to a rental system of this type, commencing in 1981. A March-April 1997 article on SIRSI's "Unicorn" library automation system described search results being displayed in "a numbered list . . . for operator selection. Further, records in the list could "be sorted into a customer-defined sequence." (Page 243.)

Another excellent example of a queue is the one used by Tape Rental Library. In response to a customer's preferences, TRL would ship two cassettes to the customer in the order they had

The text of Claim 1 of the '450 Patent, like the other claims of that patent, is broken down in the attached Claim Charts. The method of Claim 1 can be summarized as including:

**A.    Computer implemented rental**

**B.    Receiving item selection criteria**

**C.    Providing a specified number of items**

**D1.    In response to receiving items back, providing additional items without exceeding a specified total current number of items provided to the customer**

As I have described above, all of these features were present in the prior art. A "person of ordinary skill" aware of the relevant prior art as of April 28, 1999, would have found the combination of features in Claim 1 to be present in that art and, further, would have found it obvious to combine or modify prior art to obtain that combination of features. My bases for this conclusion include:

- The Reference Guide had all of the claimed features. In reaching this conclusion, I am interpreting "rental" as used in the patent claims as including the lending activities described in the Reference Guide. Under a contrary interpretation, Claim 1 would still be obvious in view of the Reference Guide. Reasons for this include:
  - A person of ordinary skill as of April 28, 1999, would have found it obvious that the methods in the Reference Guide could be applied to the rental model of the '450 patent, whether for books, audio, or video in view of, for example:
    - Common knowledge
    - Prior art renting books by subscription
    - Prior art renting books by mail
    - The close relationship and overlap between books and video rental

- The Roehl and Varian article pointing out similarities between traditional circulating libraries for books and the video rental business.

- The Yoshida patent application had all of the claimed features. Yoshida described a computerized movie rental kiosk that had a limit on the number of movies a customer could have out at one time. This inherently means that, when a customer who had reached his or her limit returned an item, the customer could obtain another item.

- Each of several prior-art movie and video subscription rental services used the same business model described in Claim 1 and had all of the features of Claim 1 with the possible exception of computer implementation of each step of the method. These included:
  - o Multi Video
  - o Pop*Card
  - o Video Hit
  - o Cine Club
  - o Campus Video
  - o BVS

- Each of several prior-art audio subscription rental services used the same business model described in Claim 1 and had all of the features of Claim 1 with the possible exception of computer implementation of each step of the method. These included:
  - o Tape Rental Library
  - o Business Training Library
  - o Talking Book World

- It would have been obvious to use a computer system to perform the steps of Claim 1's method. Reasons for this include:
  - o Common knowledge. The use of computers was widespread and well known and use of largely, if not entirely, computerized processes was necessary for operation on the Internet.
  - o Use of computers as described in Reference Guide and Functional Requirements

Expert Report of Jason Salzetti
May 4, 2007

### 1.    Independent Claims

The '381 Patent has 5 independent claims:

#### Claim 1

The text of Claim 1 of the '381 Patent, like the other claims of that patent, is broken down in the attached Claim Charts.  The method of Claim 1 can be summarized as including:

A.    **Movie rental over the Internet (computer-implemented)**
B.    **Digital display of movie attributes**
C.    **Queue (list of movies for rental to a customer)**
D.    **Selection and delivery based on the order of the list**
E.    **Updating the queue**

A person of ordinary skill aware of the relevant prior art as of April 28, 1999, would have found all of these features in the prior art and would have found it obvious to combine or modify prior art to obtain the method set forth in Claim 1.  My basis for this conclusion include:

Movie rental over the Internet (which was computer implemented) was in progress in prior art such as:

- Netflix's own a la carte service.
- Audio rental over the Internet (which was computer implemented) was in progress in prior art such as Books on Tape.
- The prior art provided numerous examples of Internet businesses (such as Amazon and eBay) that had adapted preexisting brick-and-mortar businesses to the Internet.  In 1998-99, there was a strong trend towards making such adaptations.
- Use of telecommunications networks to distribute movies, audiotapes, books, and other materials was taught in prior art like the NCR '526 patent.
- For these and other reasons, a person of ordinary skill as of April 28, 1999, would have found it obvious to adapt various movie and video rental models to the Internet, including the subscription movie rental models of prior art such as:

- o  Multi Video
- o  Pop'Card
- o  Video Hit
- o  Cine Club
- o  Campus Video
- o  BVS

- It would have been obvious that, just as subscription provided an alternative to a la carte rental in brick-and-mortar stores; it provided an alternative to a la carte Internet rental by Netflix and others.

- Further and alternatively, this would have been obvious in view of audio subscription rental prior art, such as:
  - o  Tape Rental Library, which had all of the claimed features except for renting audio cassettes instead of movies and features related to using the Internet.
  - o  Business Training Library.
  - o  Talking Book World.
  - o  A person of ordinary skill as of as of April 28, 1999, would have found it obvious to apply to movies these methods for renting audio cassettes, for reasons including:
    - ▪  Common knowledge
    - ▪  Prior art renting movies by subscription
    - ▪  Prior art renting movies by mail
    - ▪  The close relationship and overlap between audio and video rental

- Further and alternatively, it would have been obvious to apply audio and book library subscription models to Internet movie rental. Such prior art includes:
  - o  Reference Guide
  - o  Functional Requirements
  - o  Circulating book libraries (as described, for example in the Roehl and Varian article).
  - o  A person of ordinary skill as of as of April 28, 1999, would have found it obvious to apply to movies this method for book and audio libraries, for reasons including:
    - ▪  Common knowledge

- Prior art renting books by subscription
- Prior art renting books by mail
- The close relationship and overlap between books and video rental
- The Roehl and Varian article pointing out similarities between traditional circulating libraries for books and the video rental business.

- A person of ordinary skill as of as of April 28, 1999, would have found it obvious, in adapting subscription models to the Internet, to use a queue or list of movies for rental to each customer, for reasons including:

  o The list used by Tape Rental Library.
  o The list used on the Internet by Books on Tape.
  o The Borrower's Request List in the Reference Guide. (Page 195.)
  o Queues and lists in the Functional Requirements.
  o The reminder list used by Netflix's a la carte service.
  o The interest lists in the NCR '526 patent.
  o Other wish lists, reminder lists, and the like on Amazon and other e-commerce sites.
  o The shopping carts used for Netflix's a la carte service, Amazon, and other e-commerce sites.
  o Common knowledge.
  o The nature of the problem to be solved.
  o In developing the processes to operate an online subscription program, it would have been readily evident that customers on the website would identify movies they wanted to rent. In a typical a la carte service, a customer identifying such a movie could add it to a shopping cart or a reminder list. The obvious analogy for a subscription service would be a list from which to select movies for shipment to the customer over time according to the terms of his or her subscription program.
  o In developing the processes to operate an online subscription program, it would have been readily evident that, upon receiving a movie or other item back from a customer, the system would need to select another item to ship to the customer. Using a list is an obvious solution. It would have been obvious that other alternatives, such as contacting the customer or having the customer

identify a replacement at the time of making a return, are likely to have disadvantages with respect to efficiency, speed of fulfillment, customer convenience, and ensuring that the system will have something to ship.

- A person of ordinary skill as of as of April 28, 1999, would have found it obvious to deliver movies based on the order of the queue or list, for reasons including:
  - o The use of such an order by Books on Tape and Tape Rental Library.
  - o Common knowledge.
  - o The nature of the problem to be solved.
  - o Standard business process design, user interface, and programming practices.
  - o In creating a list, it would have been obvious to consider the order in which to draw items from the list.
  - o Following the order of the list is the most obvious method.
  - o It would have been obvious that ordering the list according to customer preference, and selecting items from the list in that order, would permit the customer to receive them in the same order in which he or she wished to receive them and thus promote customer satisfaction.
  - o It would have been obvious that departing from this order might be a source of customer dissatisfaction.
- A person of ordinary skill as of as of April 28, 1999, would have found it obvious to provide for updating of the list and, specifically, for customers to add items to, delete items from, and change the order of their lists, for reasons including:
  - o Books on Tape.
  - o NCR '526 patent.
  - o Common knowledge.
  - o The nature of the problem to be solved.
  - o Standard business process design, user interface, and programming practices.
  - o As a general matter, it would have been obvious that, in creating and maintaining their lists, customers would make mistakes, change their minds, and obtain new and different information.
  - o It would have been contrary to good practice to create lists that could not be changed.
  - o Adding, deleting, and re-ordering items are obvious changes to permit.

56
Expert Report of Jason Salzetti
May 4, 2007

- See the discussion below of these specific types of updates.

**Claims 14 and 24**

The methods of Claims 14 and 24 can be summarized as including:

A-E.    **Features similar to those in Claim 1**

F.    **No specified return time**

A person of ordinary skill aware of the relevant prior art as of April 28, 1999, would have found all of these features in the prior art and would have found it obvious to combine or modify prior art to obtain the method set forth in Claims 14 and 24.  My bases for this conclusion include:

- Prior-art movie and rental with no return date, such as:
  - Multi Video
  - Pop*Card
  - Video Hit Parade
  - Cine Club
  - Campus Video
- Prior-art audio rental with no return date, such as:
  - Tape Rental Library
  - Business Training Library
  - Talking Book World
  - A person of ordinary skill as of April 28, 1999, would have found it obvious to apply to movies these methods for renting audio cassettes, for reasons including:
    - Common knowledge
    - Prior art renting movies by subscription
    - Prior art renting movies by mail
    - The close relationship and overlap between audio and video rental
- Prior-art audio and book libraries with no return date, such as:
  - Reference Guide

57
Expert Report of Jason Salzetti
May 4, 2007

- o   Functional Requirements
- o   Circulating book libraries (as described, for example in the Roehl and Varian article).
- o   A person of ordinary skill as of April 28, 1999, would have found it obvious to apply to movies these methods for book and audio libraries, for reasons including:
  - ▪   Common knowledge
  - ▪   Prior art renting books by subscription
  - ▪   Prior art renting books by mail
  - ▪   The close relationship and overlap between books and video rental
  - ▪   The Roehl and Varian article pointing out similarities between traditional circulating libraries for books and the video rental business.

## Claim 34

The method of Claim 34 can be summarized as including:

A-E.   **Features similar to those in Claim 1**

G.   **Rental agreement for periodic fee**

A person of ordinary skill aware of the relevant prior art as of April 28, 1999, would have found all of these features in the prior art and would have found it obvious to combine or modify prior art to obtain the method set forth in Claims 14 and 24.  My bases for this conclusion include:

- •   Prior-art movie and video rental with rental agreements providing for a periodic fee, such as:
  - o   Multi Video
  - o   Pop*Card
  - o   Video Hit
  - o   Cine Club
  - o   Campus Video
  - o   BVS

- Prior-art audio rental with rental agreements providing for a periodic fee, such as:
  - o Tape Rental Library
  - o Talking Book World
  - o A person of ordinary skill as of April 28, 1999, would have found it obvious to apply to movies these methods for renting audio cassettes, for reasons including:
    - Common knowledge
    - Prior art renting movies by subscription
    - Prior art renting movies by mail
    - The close relationship and overlap between audio and video rental
- Prior-art libraries with rental agreements providing for a periodic fee, such as:
  - o Circulating book libraries (as described, for example in the Roehl and Varian article.
  - o A person of ordinary skill as of April 28, 1999, would have found it obvious to apply to movies these methods for book and audio libraries, for reasons including:
    - Common knowledge
    - Prior art renting books by subscription
    - Prior art renting books by mail
    - The close relationship and overlap between books and video rental
    - The Roehl and Varian article pointing out similarities between traditional circulating libraries for books and the video rental business.

### Claim 44

Claim 44 can be summarized as including:

B-E.    A method similar to that of Claim 1, performed by

H.    A computer system for renting movies to customers

I.    A computer coupled to a telecommunications network

J.    Electronic memory with computer program instructions

A person of ordinary skill aware of the relevant prior art as of April 28, 1999, would have found all of these features in the prior art and would have found it obvious to combine or modify prior art to obtain the system set forth in Claim 44.

My bases for this conclusion include:

- The method performed by the system in Claim 44 would have been obvious for the reasons I provided in connection with Claim 1.
- It would have been obvious as a matter of common knowledge to use a system, computer, and memory as described in Claim 44 to perform such a method.
- In fact, I can see no way of performing the method as claimed without using such a system, computer, and memory.
  - The Internet is a telecommunications network. Use of the Internet, as specified in the claimed steps, implies use of a telecommunications network.
  - Use of the Internet requires a "computer" as I understand that term. (PDAs and cell phones capable of using the Internet contain processors making them "computers" in this context.) Certainly, computers were in 1999 the best-known and obvious devices for using the Internet.
  - It was common knowledge in 1999 that computers have memory.
  - It was common knowledge in 1999 that computers operate by executing program instructions stored in memory.
- Use of computers for performing comparable functions over the Internet was exemplified in prior art including:
  - The NCR patents
  - Netflix's a la carte service
  - Books on Tape

### 2.    Dependent Claims

The dependent claims of the '381 Patent can be summarized as adding the following additional features:

Expert Report of Jason Salzetti
May 4, 2007

<u>Claims 2, 15, 25, 35, and 45</u>

**Changing the order of the list.**

It would have been obvious to add this feature to the features of each of the applicable independent claims for reasons including:

- Common knowledge
- The nature of the problem to be solved. The goal of any eCommerce site is to facilitate its customer's transactions so as to entice them into repeat business. One of the considerations in building out an online venue devoted to renting online, in addition to providing subscribers with a means by which to select an item to rent, would have been a means by which they could change their order of preference. I have spoken to the computer-assisted means already, but would emphasize again that in designing a methodology for an online business model, especially around rentals, one of the key questions to be answered would have been how can customers effectively change their minds and have those changes be captured and responsive to their changes.
- Standard business process design, user interface, and programming practices
- It would have been obvious that customers would want to change the order of their lists, for reasons including:
  - They may grow impatient to see a particular movie and want to move it to the top of the list.
  - They may change their minds about the order for any reason
  - When items are added to the list, the default order in which they are listed is likely to be different from the customer's preferred order. For example, additional items may appear by default at the end of the list, while the customer may want a newly selected item first.
- Disclosures of this feature in prior art referring to movie distribution or rental, such as NCR's '526 Patent
- Disclosures of this feature in audio rental prior art:
  - Tape Rental Library.
  - Books on Tape. (E.g., Page – BB00012214.)

61
Expert Report of Jason Salzetti
May 4, 2007

- o  BVS
- o  Business Training Library
- Disclosures of this feature used for sound recordings on a DVD in Cook '068 (col. 4, Ln. 7-20; col. 7, ln. 31-38).

**Claims 3, 16, 26, 36, and 46**

**Adding a movie to the list**

It would have been obvious to add this feature to the features of each of the applicable independent claims for reasons including:

- Common knowledge.
- The nature of the problem to be solved. One of the most basic questions that any eCommerce methodology would have addressed in designing a web-site devoted to the rental of media would have been the means by which a customer could make known the items they wished to rent. It would have been an obvious step to create a feature that allowed customers to add movies to a list in order to specify what they desired to rent.
- Standard business process design, user interface, and programming practices
- It would have been obvious that customers would want to add movies for reasons including:
    - o  New movies become available
    - o  The customer learns about additional movies
    - o  The size of the customer's list is growing low and, if the list runs out of movies, the customer won't receive anything for his or her subscription fees.
    - o  Changing needs and tastes (e.g., as children grow older)
- Tape Rental Library
- Books on Tape
- BVS
- Business Training Library
- NCR '526 Patent. (See, e.g., Figs. 56-59.)

Disclosures of this feature used for sound recordings on a DVD in Cook '068: (col. 4, Ln. 7-20; col. 7, ln. 31-38).

**Claims 4, 17, 27, 37, and 47**

**Removing movies from the list**

It would have been obvious to add this feature to the features of each of the applicable independent claims for reasons including:

- Common knowledge
- The nature of the problem to be solved. The goal of any eCommerce site is facilitate their customer's transactions so as to entice them into repeat business. One of the obvious considerations in building out an online venue devoted to renting online, in addition to providing subscribers with a means by which to select an item to rent, would have been the corresponding means by which to de-select the item. In designing a methodology for an online business model, especially around rentals, one of the key questions to be answered would have been how customers can effectively change their minds and remove items as well as add them so as to simplify the transaction process, which is obviously subject to customer mistakes and changing customer preferences.
- Standard business process design, user interface, and programming practices
- It would have been obvious that customers will want to remove movies for reasons including:
  - Selecting the wrong movie
  - Seeing a movie on the list by some other means and not wanting to see it a second time
  - Hearing something negative about a movie they previously wanted to see
  - Changed needs and tastes (e.g., a child has gotten older and no longer wants to watch Barney)
- Books on Tape (see, e.g., Page BB00012216)
- Tape Rental Library
- BVS

63
Expert Report of Jason Salzetti
May 4, 2007

- Pop*Card
- Video Hit Parade
- Cine Club
- Campus Video
- Netflix a la carte service
- NCR '526 Patent
- Yoshida
- BVS
- Talking Book World
- Business Training Library
- Reference Guide
- Functional Requirements

**Claims 7, 20, 30, 40, and 48**

**Delivery by mail**

It would have been obvious to add this feature to the features of each of the applicable independent claims for reasons including:

- Common knowledge
- The nature of the problem to be solved
- Mail was a standard method of delivery of items ordered over the Internet.  As discussed above for the '450 patent, a web-site (as opposed to a physical store) seeking to rent or sell merchandise via the Internet had a limited number of option for getting the goods to the consumer.  Delivery by the USPS was an obvious way – and usually the least expensive way – for a company to accomplish mass deliveries.   Many eCommerce sites used the USPS to deliver their goods prior to 1999.
- Disclosures of this feature in movie and audio rental prior art, library art, and related art including:
  - o  Netflix a la carte service

- o  NCR '526 Patent
- o  Tape Rental Library
- o  BVS
- o  Books On Tape
- o  Business Training Library

**Claims 8, 21, 31, 41, 49**

**Delivery by mail on optical media**

It would have been obvious to add this feature to the features of each of the applicable independent claims for reasons including:

- Common knowledge.
- The nature of the problem to be solved.
- See above discussion of delivery by mail.
- DVDs (and, before them, laser discs) becoming a standard format for movies.
- The shift from VHS tapes to DVD.
- Because of their small size and weight, DVDs were particularly suitable for economical distribution by mail.
- Disclosures of this feature in movie and audio rental prior art, library art, and related art including Netflix's a la carte site.
- All the reasons stated above in connection with Claims 7, 20, 30, 40, and 48.

**Claims 9, 22, 32, 50, and 42**

**Mail receipt is a delivery criterion**

It would have been obvious to add this feature to the features of each of the applicable independent claims for reasons including:

- Common knowledge.

67
Expert Report of Jason Salzetti
May 4, 2007

- The nature of the problem to be solved.  As discussed above, there were a limited number of means by which to deliver a physical good to a customer who is not at a physical store.   Short of providing rental movies via a file transfer protocol, the only means by which to get a physical good to a customer from a virtual location was to utilize some physical delivery method whether it be the USPS or a courier service.
- Use of this feature in movie and audio rental prior art, library art, and related art including:
    - Reference Guide
    - Functional Requirements

<u>**Claims 10, 23, 33, 43, and 51**</u>

**Number delivered and not returned does not exceed specified number**

As explained above, this "Max Out" feature was well known in the prior art.  It also would have been obvious to add this feature to the features of each of the applicable independent claims for reasons including:

- All the reasons stated in connection with Claim 1 above.
- Max Out movie and video rental, including:
    - Yoshida
    - Cine Club
    - Pop*Card
    - Multi-Video
    - Campus Video
    - Video Hit Parade
    - BVS
- Max Out audio rental, including:
    - Tape Rental Library
    - Talking Book World
    - Business Training Library
- Reference Guide

68<br>
Expert Report of Jason Salzetti<br>
May 4, 2007

- It is implicit in delivery via an Internet platform. Establishing an eCommerce business by its very nature necessitates use of electronic digital information as the Internet is an electronic and digital-dependent medium. The selection criteria must be electronic and digital because the customer makes his or her selections online.
- Common knowledge
- The nature of the problem to be solved
- Disclosures of this feature in movie and audio rental prior art, library art, and related art including:
  - NCR '526 Patent
  - Netflix a la carte service
  - Reference Guide.
  - Books On Tape

## Claim 13

**The movies are any of motion pictures, television series, documentaries, cartoons, music videos, video recordings of concert performances, instructional programs, and educational programs**

It would have been obvious to add this feature to the features of each of the applicable independent claims for reasons including:

- The listed items were all well known.
- Motion pictures were what was most commonly thought of as movies. The dictionary definition of "movie" states that it is synonymous with "motion pictures."
- Common knowledge
- The nature of the problem to be solved
- Disclosures of this feature in movie and audio rental prior art, library art, and related art including:
  - Netflix a la carte service
  - Multi Video

VII.    SUMMARY

Based on the above, it is my opinion that the matters claimed by Netflix would have been obvious to a person of ordinary skill in the field of computer technology and the Internet familiar with the relevant prior art as of any time in the 1998-1999 time frame – including, without limitation, as of April 28, 1999.  In my opinion, from the perspective of such a person at any such time:

1.  Every feature in at least Claims 1, 4-8, 12, 31-32, 36, 39-43, 47, 51, 54-58, 62, 66, 69-73, 77, 96, and 97 of the '450 patent were present in at least the Yoshida patent application and/or the Reference Guide and/or Tape Rental Library as detailed above and are therefore invalid for anticipation;

2.  Every claim of the '450 patent was obvious in view of relevant prior art (in other words, the differences between the claims and the prior art were obvious); and

3.  Every claim of the '381 patent was obvious in view of relevant prior art (here again, the differences between the claims and the prior art were obvious).

In forming these and the other opinions expressed in my report, I have considered prior art cited in Blockbuster's Invalidity Contentions in this case as well as other prior art that I was already aware of or became aware of during my research and analysis.  None of my opinions in this report depends on any prior art not cited in the Invalidity Contentions.  All of my opinions are amply supported by the cited art in the contentions.