# EXHIBITS I-P

Dockets.Justia.com

**EXHIBIT I**

# Circulating Libraries and Video Rental Stores

Hal R. Varian[*]
University of California, Berkeley
Richard Roehl
University of Michigan, Dearborn

December 1996

## 1  Introduction

In this note we describe some interesting parallels between circulating libraries in England circa 1750-1850 and video rental stores in the U.S. circa 1980-1990. Both institutions evolved in a similar manner, which suggests that common economic and social forces were at work. What happened twice before in these two instances may happen yet again, and we think that the histories of these two industries may be helpful in understanding current and future developments in computer- and Internet-related media.

## 2  The rental market for books

According to Loomis [1994], "the history of libraries, particularly in the United States and Great Britain, during the 18th and much of 19th centuries is dominated by subscription libraries." He distinguishes 3 types of "subscription libraries:" book clubs or societies, private subscription libraries, and commercial circulating libraries. Book clubs were essentially discussion groups and did not maintain permanent collections. Private subscription libraries were primarily the ". . . purview

[*]Research support from NSF grant SBR-9320481 is gratefully acknowledged. We also thank Michael Buckland for providing helpful comments and references.

1

NFLIX0001905
NFLIX0001905

of an affluent minority." As such, "most attempted to collect standard works of permanent value in history, biography, travel, and natural science."

Circulating libraries, on the other hand, were profit-seeking enterprises. According to Loomis [1994], the first circulating library specifically created for rental was started by the bookseller Allan Ramsay in Edinburgh in 1725. By 1800, there were at least a thousand such libraries in Great Britain.

Circulating libraries, unlike the other forms of subscription libraries, specifically appealed to the popular taste, particular that of women. In part this was due to their interest in fiction and in part it was due to the fact that women were often not allowed to patronize other libraries.

The economic history of circulating libraries in Britain is remarkably similar to the history of video stores in the US. Both institutions were profit-seeking libraries, of a sort, which led to common patterns in their evolution.

## 3  The rental market for videos

The VCR was first viewed as a device for "time shifting" television shows to more convenient viewing hours. However, it soon became clear that there was a significant market in pre-recorded videos.

The first company to sell pre-recorded videos was Andre Blay's Video Club of America. He acquired fifty titles from Twentieth Century Fox studios that had all been previously sold to network TV. At the time of his first ad (in an October 1977 issue of *TV Guide*), there were fewer than 200,000 VCR owners and 9,000 of them joined Blay's video club.

By December of that year competition between RCA and Sony had pushed video machine prices to below $1,000 for the first time. By the end of March 1978 Blay had sold 40,000 cassettes, and by the end of the year he had sold over 250,000.

While Blay explored the video *sale* market, the first individual to see the possibilities for a video *rental* market was one George Atkinson who ran a "Mickey Mouse little business" in Los Angeles called Home Theater Systems. Atkinson rented Super Eight film projectors, screens and old movies for $25 a night. He bought one Beta and one VHS copy of each of the fifty Fox titles sold by Blay. In order to raise capital quickly he charged fifty dollars for an annual membership and one hundred dollars for a "life membership." Members could rent videos for $10 a day. (Lardner [1987], p 176-7)

Atkinson encountered many skeptics. Most studio executives thought that

NFLIX0001906
NFLIX0001906

American audiences preferred to buy rather than rent. At the time, video machines were a luxury that were only affordable by the wealthy who could easily afford to buy videos at the $50 or so prices that were then charged. Since the video machine was widely expected to remain a luxury item, most Hollywood executives did not anticipate the emergence of a mass rental market. Atkinson's great insight was that that video machines would continue to decline in price and become a mass market item . . . and middle class users would prefer renting a video at $3 to buying one at $50.

The analog of the video rental store was the English ''circulating library'' mentioned above. These seem to have started in the early 1700s. By 1720 there were a few booksellers advertising books for hire in London and by 1740--50 there were at least 9 such ''circulating libraries.'' This number grew to 19 between 1770--80 and 26 from 1790--1800. (Hanlyn [19xx]) *The Monthly Magazine* of April 1801 estimated there were ''not less than one thousand'' circulating libraries in England, many of which were located in spas and other vacation spots. (Hanlyn [19xx], p. 198.)

## 4   Cost of purchase versus rental

The primarily trade of the circulating libraries was renting light fiction. The motivation for the circulating library was the same as that of the video store: affordability. The early editions of *Tom Jones* cost more than an ordinary worker's weekly wage. Middle class people would not pay for novels, but they would happily rent them. According to McKillop [19xx], the primarily stimulus for the growth of circulating libraries was that the ''increasing demand for light reading forced the adoption of some new device for rapid circulation.'' Circulating libraries provided this new economic model in the latter half of the eighteenth century, just as video rental stores provided a new economic model two hundred years later.

According to Plant [1974] ''[During the sixteenth and seventeenth century] the reader had to rely on his own private library and those of his friends'' since there were no public libraries. Most of the works available in private libraries were on serious topics such as religion, law, and the classics. A library of forty works or so was substantial.'' (Plant [1974])

The circulating libraries changed all this. By 1761 it was noted that ''the reading female hires her novels from some country Circulating Library, which consists of about a hundred volumes.'' (Plant [1974])

NFLIX0001907
NFLIX0001907

**EXHIBIT J**

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                    1

1           UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4    NETFLIX, INC., a Delaware corporation,

5         Plaintiff,                    COPY

6

7         vs.                    CASE #:
                                 C 06 2361 WHA (JCS)
8

9    BLOCKBUSTER INC., a Delaware
     corporation, DOES 1-50
10
          Defendants.
11

12

13

14              VIDEOTAPED

15       DEPOSITION OF LINDA VERIN

16

17       The Videotaped Deposition of LINDA

18    VERIN was taken before Lori E. Defnall,

19    on Thursday, April 5, 2007, at Najjar

20    Denaburg, P.C, Birmingham, Alabama,

21    commencing at 9:00 a.m., pursuant to the

22    stipulations set forth herein:

23

24

25

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

4/5/2007 Verin, Linda V1

1  point. and to be recorded  But
2  nonetheless. you still answer my question.
3       A.  Okay.
4       Q.  Thank you  Now, let's take a
5  look at the Exhibit 168 first  Could you
6  describe this Exhibit 168  copy of the
7  color brochure for us. please?
8       A.  Yes.  This was my brochure to
9  present the idea of the franchise. Pop
10  Card. to potential franchisees  And
11  briefly. just to explain the business
12  idea.
13       Q.  Now. when was this color
14  brochure produced?
15       MR. PAIGE:  Object to the form
16       A.  Well it says that it was
17  copyrighted in 1984.  So. my assumption is
18  maybe that's when it was produced. Again.
19  the dates are a little bit foggy. it has
20  been 20 something years
21       Q.  Right  Absolutely
22       A.  It was all around '83. '84
23       Q.  So. it is during the timeframe
24  of 1983 and '84 while you had Pop Card
25  business?

21

4/5/2007 Verin, Linda V1

1       A.  Yes. sir.
2       Q.  And the purpose of producing
3  this brochure was to make presentation to
4  potential franchisees?
5       A.  Yes. sir.
6       Q.  Now. what was your involvement
7  in producing this brochure?
8       A.  Well. I wrote it. I hired
9  people to do the photography. to do the
10  layout. to do the printing.  So. I mean
11  basically it was my brochure.  I had an
12  in-house ad agency.  So I used. other than
13  probably hiring a photographer. I used my
14  own people to produce it.
15       Q.  So. you wrote the contents of
16  this brochure. correct?
17       A.  Yes.
18       Q.  And. if you would like to take
19  a look at the page marked at the bottom
20  right-hand corner  it's VR00000003.
21       A.  Okay
:       Q.  And you see at the bottom
23  left-hand corner. you have compared --
24  well. let me ask you this:  What is the --
25  the portion on the lower left-hand corner

22

4/5/2007 Verin, Linda V1

1  describes. on this page?
2       A.  It describes the basic idea of
3  Pop Card. which was that you get two tapes
4  at a time, that you can keep them as long
5  as you want. and that you can return them
6  as often as you'd like
7       Q.  And was that a rental plan you
8  used for Pop Card in 1983 and '84?
9       A.  Yes. sir.
10       Q.  And was that the rental plan
11  used in all of the Pop Card stores?
12       A.  Yes.
13       Q.  And that plan. basically
14  charges a monthly fee to your customer. to
15  each customer, and allows the customer to
16  take two tapes out at any given time?
17       MR. PAIGE:  Object to the form
18  Leading.
19       A.  Yes
20       Q.  All right.  Now. do you
21  remember. approximately. how many
22  customers of Pop Card were on this plan?
23       A.  No.
24       Q.  Do you have a estimate?
25       A.  I believe that there was

23

4/5/2007 Verin, Linda V1

1  between a hundred and three hundred per
2  store
3       Q.  And at the time when it had --
4  most stores you had about five. six
5  stores?
6       A.  Yes
7       Q.  So. an average of between one
8  hundred to three hundred per store?
9       A.  Yes
10       Q.  And the customers will be on
11  your plan?
12       A.  Yes.
13       Q.  Now. was that a subscription
14  plan?
15       MR. PAIGE:  Object to the form
16       A.  Yes
17       Q.  And under that plan. each
18  customer will pay a monthly fee?
19       A.  Yes
20       Q.  And you said the monthly fee
21  was about. how much a month?
22       A.  It was a dollar a day. 30
23  dollars a month
24       Q.  All right  So it's basically.
25  roughly calculated based on dollar per

24

4/5/2007 Verin, Linda V1

1   day. So it's 30 dollar -- around 30

2   dollar monthly plan?

3      A.  Yes.

4      Q.  And each customer would pay 30

5   dollars per month, for the plan?

6      A.  Yes.

7      Q.  And under the plan, each

8   customer could, at any time, take two

9   tapes out?

10     A.  Yes.

11     Q.  And also, at any time, a

12   customer could return one or two of those

13   tapes and exchange for more tapes?

14     A.  Yes.

15     Q.  But the limit for each

16   customer, at any given time, would be two

17   tapes out?

18     A.  Yes.

19     Q.  And there was no limit as to

20   how many times a customer could exchange

21   the tapes during the month, were there?

22     A.  No. There was no limit.

23     Q.  All right. And there was no

24   limit on how long a customer could keep

25   the tapes, right?

4/5/2007 Verin, Linda V1

1      A.  That's correct.

2      Q.  Now, the customers on this

3   subscription plan were not charged for any

4   late fees, right?

5      A.  Correct.

6      Q.  And there was no due date under

7   this plan, correct?

8      A.  Correct.

9      Q.  And that was the plan Pop Card

10   used at the beginning, from the beginning,

11   when you had this video rental business,

12   correct?

13     A.  Yes.

14     Q.  And the plan was used

15   throughout the two year period of 1983 to

16   '84, while you had the Pop Card stores?

17     A.  Yes.

18     Q.  In your store, in 1983 and '84,

19   for video rentals, did you use any

20   computer to facilitate your rental

21   business?

2      MR. PAIGE: Object to the form.

23     A.  Yes.

24     Q.  And how did you use -- could

25   you describe how the computer was used?

4/5/2007 Verin, Linda V1

1      A.  Sure. We had all of our

2   inventory on computer and we had bar codes

3   on the tapes. And so, when people would

4   check them in and check them out, that was

5   all done on the computer. And then we had

6   customer records, like, you know, their

7   information, their names, their addresses,

8   their phone numbers, and when their due

9   date was for their monthly payment.

10     Q.  So, on your computer, you had

11   databases?

12      MR. PAIGE: Object to the form.

13     A.  I don't -- you know, I don't

14   know if it was called that at that time,

15   but we had them all in the computer. I

16   can't remember the word database being

17   used then, but maybe it was.

18     Q.  So you had computerized record

19   of your customers rental?

20     A.  Yes, sir.

21     Q.  So, for each customer, you had

22   a record on your computer system for the

23   customers, for example: The contact

24   information, rental histories?

25     A.  Yes.

4/5/2007 Verin, Linda V1

1      Q.  Now --

2      A.  We had to keep track of the

3   tapes, which tapes they had out.

4     Q.  Okay. Now, so at any given

5   time, by looking up on the computer, you

6   would know what tapes the customer had at

7   a time?

8     A.  Yes.

9     Q.  And you would also know the

10   payment histories of the customers?

11     A.  Yes.

12     Q.  Okay. Do you, at any time, use

13   any kind of a list in your rental

14   business, for the customers?

15      MR. PAIGE: Object to the form.

16     A.  I'm not sure what you mean.

17   What do you mean by a list?

18     Q.  All right. Now, let's say --

19   did any of your customer ever come in

20   store and want a set -- wanted movies to

21   rent and wants to have multiple movies to

22   rent, but put it on a list?

23      MR. PAIGE: Object to the form,

24   lacks foundation, calls for speculation

25   hypothetical.

4/5/2007 Verin, Linda V1

1    A.    No.  I think that there was a
2    list in our computer of tapes that people
3    wanted us to buy, but there was not a list
4    of tapes that were out on loan, that
5    somebody wanted to check out.
6    Q.    I see.
7    A.    So the buyer tried to keep a
8    list to see what tapes to order.  You
9    know, and how many people had asked for
10   maybe martial arts tapes, or whatever type
11   action/adventure, chick flicks.
12   Q.    I see.  Now, did Pop Card enter
13   into a rental agreement with your
14   customers?
15   A.    Yes.
16   Q.    For entering into this monthly
17   subscription plans?
18   A.    Yes.
19   Q.    Now, was the rental agreement
20   in writing?
21   A.    It was in writing, but I no
22   longer have a copy of it, I don't think.
23   I mean, I might, but I didn't find it
24   easily.
25   Q.    The customer would sign a --

33

4/5/2007 Verin, Linda V1

1    A.    They would sign an agreement,
2    but they could -- every month -- I mean,
3    they could decide to drop out at any time.
4    They didn't have to sign up for a year.
5    Q.    I see.  So, then there would
6    keep being a subscription plan customer by
7    paying the monthly fees?
8    MR. PAIGE:  Object to the form.
9    A.    Yes.
10   Q.    All right.  So as long as a
11   customer's paying his or her monthly
12   rental fees, he or her would be a customer
13   on the plan?
14   A.    Yes.
15   Q.    I see.  Now, you said you had
16   about five to six franchise stores?
17   A.    Yes.
18   Q.    Now all the stores use the same
19   plan you described earlier, right?
20   A.    Yes.
21   Q.    And each store had a computer,
22   used as you described earlier?
23   A.    Yes.
24   Q.    With a computer network?
25   MR. PAIGE:  Object to the form.

34

4/5/2007 Verin, Linda V1

1    A.    No.
2    Q.    Not in '83 or '84?
3    A.    No.
4    Q.    All right.  Now, let me show
5    you some of the documents.  We will mark
6    as Exhibit 172, a document previously
7    identified as BB00012976.
8
9    (Whereupon, Defendant's Exhibit
10   Number 172 was marked for
11   identification.)
12
13   Q.    Ms. Verin, could you take a
14   look at this document?
15   A.    (Witness reviewing document.)
16   Okay.
17   Q.    Now, did you see at the bottom
18   of this page, there's a word that says
19   "Video Store January 1985"?
20   A.    (Witness reviewing document.)
21   Okay.  Uh-huh.
22   Q.    Do you remember seeing this
23   article before?
24   A.    No.
25   Q.    All right.  Do you know the

35

4/5/2007 Verin, Linda V1

1    magazine, "Video Store"?
2    A.    No.
3    Q.    All right.  In the picture in
4    the middle of the page, there's a Pop Card
5    on it.  Is that a picture of one of your
6    stores?
7    MR. PAIGE:  Object to the form.
8    A.    Yes.
9    Q.    Do you recognize that picture?
10   A.    Yes.
11   Q.    Could you tell us what that
12   picture shows?
13   A.    That's the picture of the
14   prototype store, I believe.  That was the
15   store that I owned.
16   Q.    That was the store that you
17   were in?
18   A.    Uh-huh.
19   Q.    Okay.
20   A.    Yes.
21   Q.    Now, if you see the paragraph
22   I'm sorry this print is maybe a little
23   hard to read, the paragraph -- the column
24   above the picture.  It starts to say, "the
25   flagship store as 13 hundred titles and

36

4/5/2007 Verin, Linda V1

1    350 club members." do you see that?
2        A    Yes
3        Q    Now the flagship store. is the
store that you were in?
        MR. PAIGE:  Object to the form.
6        A    Yes
7        Q    Was that the flagship store
8    referenced to your original store?
9        MR. PAIGE:  Object to the form.
10   lacks foundation
11       A.   Yes. It's a flagship store.
12   right
13       Q    That's the store picture below?
14       A.   Yes. sir
15       Q    Okay   And the column to the
16   left. in the middle. start. let's see.
17   right around the middle part it says.
18   "club members can check out one or two
19   tapes when they join and keep the tapes as
20   long as they want "  Do you see that?
21       A    Yes
22       Q    Does that accurately describe
23   the subscription plan you described for us
24   before. used by Pop Card?
25       MR. PAIGE:  Object to the form

37

4/5/2007 Verin, Linda V1

1        A    I believe so
2        Q    All right   Then it keeps --
3    then it says. "when they return them. they
4    simply exchange them for one or two more
5    tapes "  Do you see that?
6        A.   [Witness reviewing document.]
7        Q    It just right after sentence I
8    just read earlier
9        A    Uh-huh
10       Q    So. that describe the plan you
11   told us earlier of Pop Card  right?
12       A    Yes
13       Q    Okay   Now let's go to the next
14   one   I would like to mark it as Exhibit
15   173. a document previously identified as
16   B800013058
17
18       (Whereupon  Defendant's Exhibit
19       Number 173 was marked for
20       identification )
21
2        Q    Ms Verin. can you -- do you
recognize this document?
24       A    [Witness reviewing document.]
25   Well I remember that -- I mean. I don't

38

4/5/2007 Verin, Linda V1

1    recognize this specific newspaper story.
2    but I remember the information
3        Q    Or the event described in
4    there?
5        A    Yes
6        Q    Could you tell us about the
7    event described in there. as you remember?
8        A    Sure   This was -- I sold my
9    first franchise to. he wasn't a medical
10   doctor. but I believe he was doctor. a
11   PhD. was the professor and he was
12   retiring   And he and his wife bought the
13   franchise as sort of their retirement
14   plan   And they bought it for Edmond.
15   Oklahoma. which is a suburb north of
16   Oklahoma City
17       Q    And that became one of the
18   franchise stores of Pop Card?
19       A.   Yes.
20       Q    And for video rentals?
21       A    Yes
22       Q    And do you remember they use
23   same plan as you use in the original Pop
24   Card store?
25       A.   Yes   There was a requirement

39

4/5/2007 Verin, Linda V1

1    of the franchise. like most franchises.
2    you have a way to do business. and that
3    was the requirement
4        Q    I see. Thank you.  Next
5    document is going to be Exhibit Number
6    174. please.
7
8        (Whereupon. Defendant's Exhibit
9        Number 174 was marked for
10       identification )
11
12       Ms. Verin. could you take a
13   look at this document and see if you
14   recognize it?
15       A    [Witness reviewing document.]
16   Yes   It's an ad that we produced for the
17   franchises. And actually. this isn't the
18   original store on the address. but it
19   might have been in one of our other stores
20   or could have been a franchise  I don't
21   recall  But the ad was. you know.
22   standard ad that we produced in-house and
23   gave to the franchisees to run
24       Q    Now. was it an ad on the
25   newspaper?

40

**EXHIBIT K**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3

 4     --------------------------------

 5     NETFLIX, INC., a Delaware         )

 6     corporation,                      )

 7                     Plaintiff,        )

 8          vs.                          ) No. C 06 2361 WHA

 9     BLOCKBUSTER, INC., a Delaware     )

10     corporation, DOES 1 - 50,         )

11                     Defendants.       )

12     --------------------------------

13

14          THIS TRANSCRIPT IS CONFIDENTIAL

15     ATTORNEYS' EYES ONLY, PURSUANT TO PROTECTIVE ORDER

16

17

18          Videotaped Deposition of TOM ADAMS, taken

19          at Three Embarcadero Center, 28th Floor,

20          San Francisco, California, commencing at

21          9:02 a.m., Friday, June 1, 2007, before

22          Cynthia Manning, CSR No. 7645.

23

24

25     PAGES 1 - 249
```

                                                                    1

**REDACTED**

Pursuant to Civil Local Rules 7-11, 79-5, Paragraph 10 of the Protective Order entered October 23, 2006 and Blockbuster's Administrative Request to File Under Seal, Exhibit K to the Declaration of William J. O'Brien in Support of Blockbuster's Motion for Summary Judgment of Invalidity and Non-Infringement is redacted and lodged conditionally under seal.

**EXHIBIT L**

Page 2 ▼ The West Side Spirit ● Through December 23, 1985

# Exclusive in New York



$29.95 monthly

## 7,000 Video Titles "Take Home 3, 5, or 7 at Will!"

### HOW TO JOIN

Select one of our three *exclusive* package memberships. Then take home as many as 3, 5 or 7 cassettes on your first visit. Exchange them all year round, as often as you want. No more weekend jams. No late charges.

### BONUS

For as low as $10.00 extra per month—take home a cassette player from *Cine Club Video*. The player becomes your property after 2 years.

### 3 MEMBERSHIPS 3 PRICES*

| | |
|---|---|
| • 3 Cassettes at home permanently | 29⁹⁵ |
| • 5 Cassettes at home permanently | 39⁹⁵ |
| • 7 Cassettes at home permanently | 49⁹⁵ |

*monthly

### SATISFACTION GUARANTEED

Your monthly club fee can be cancelled any month with a written notice. Simply notify our office one month in advance by mail. No hassle. No penalty.

### JOIN NOW

Whether its comedy, mystery, western or musical. Videos for the entire family. *Cine Club Video* has it all.

And for your convenience— *Cine Club Video* has two new locations in the New York City area.

So don't hesitate. Take advantage of our exclusive package memberships today.



**A Title Wave of Movie Entertainment**
201 East 42nd Street at Third Avenue, NYC 818-1660
1345 Avenue of the Americas at 54th Street, NYC 247-5300



EXHIBIT
150
Hunt 3-23-07

150

depobook.com

BB00013030

**EXHIBIT M**

It-had-to-happen department: Newest ways to rent videos
Anonymous
*Changing Times (pre-1986);* Oct 1985; 39, 010; ABI/INFORM Global
pg. 9

## THE MONTHS AHEAD

### ONE-STOP SHOPPING FOR TRAVELERS

In addition to traveler's checks and credit cards, you'll soon have a third payment option for vacation travel: vouchers issued by Visa, MasterCard and Diners Club and sold through travel agents. To use them, you pay your agent in advance for hotel accommodations or car rentals and receive a voucher to be handed over when you use the service. Travel agents get commissions on the sale of vouchers; you get to fix your exchange rate, save your credit line for other purchases and carry less in traveler's checks. But you also have to tie up your cash in advance, and you lose some flexibility. You can get a refund on unused vouchers, but you may have to pay a cancellation fee.

Some travel agents will also begin selling travel irons, voltage converters, luggage and guidebooks, possibly at a discount, as a way to increase revenues.

### IT-HAD-TO-HAPPEN DEPARTMENT: NEWEST WAYS TO RENT VIDEOS

Progress marches on in the battle for your videotape rental dollar.
► Crediton Video Centers, 24-hour credit card-activated vending machines that hold an average of 45 titles, are showing up throughout the country at convenience stores and other high-traffic locations.
► Video Hit Parade of Red Bank, N.J., specializes in setting up supermarket and convenience store video departments with a new twist: For a one-time fee of $49 and dues of $9.75 a month, you can take out as many tapes as you want (although only one per night) at no additional charge. An extra tape costs 75 cents more.
► Membership at Manhattan's Cine Club Video, which carries 7,000 titles, can cost from $29.95 to $49.95 a month and entitles you to borrow three to seven tapes at a time at no extra charge and keep them as long as you want.

Not every new video venture gets off the ground. In the Washington, D.C., area one tape-rental service offered delivery to a convenient location in your neighborhood. Called Video-to-Go, it went . . . out of business.

### INTEREST RATES AREN'T AS LOW AS THEY SEEM

You may feel shortchanged if you're earning only 7% in the money-market fund that used to spew out 10% plus. But when you consider the real interest rate—nominal rate less inflation—you're probably earning as much on your money as savers have earned in the past.

For example, today's money-fund rate of around 7%, less about 4% for inflation, means a real return of 3%. Back in the mid 1960s most short-term savings were held in passbook accounts paying 4% and inflation was running at about 2%, for a pretax real return of 2%. If your first factor in an average tax rate of about 25% then and 32% now, the final yields are about equivalent—1% versus 0.76%.

Of course, the higher your tax bracket, the worse you're faring. But the saver's heyday of the early 1980s—when inflation plummeted, interest rates ran high and real returns briefly topped 12% by one measure—was a historical aberration.

Even so, before-tax real returns on corporate bonds and three-month Treasury bills are still running substantially higher in this economic recovery than they have on average during the last five recoveries, according to the Center for International Business Cycle Research.



### THERE'S SOMETHING FISHY ABOUT THIS CRABMEAT

If the price seems too good to be true, chances are it isn't crabmeat at all but surimi (pronounced su-ree-mee), a Japanese import made from fish, usually pollock, that's washed and ground into a paste, then shaped and flavored to look and taste like crabmeat. Surimi can also mimic other kinds of shellfish, such as shrimp, lobster and scallops.

Nutritionally, surimi is slightly inferior to the shellfish it's imitating and the fin fish from which it's made: 100 grams of surimi furnish about 28% of your recommended daily intake of protein, versus 33% for king crab legs and 30% for pollock. Surimi products are also higher in calories because sugar is often added as a preservative; 100 grams of scallops have 80 calories, compared with 97 for surimi.

But what surimi has going for it is the fact that it's usually less expensive than real shellfish. Industry experts predict a burgeoning U.S. market for surimi-based products, including snack foods.

How to tell if you're getting the real thing? FDA regulations require that surimi products be labeled *imitation* if package wording or pictures represent them as natural seafood. Surimi-based foods sold at deli counters or restaurants aren't covered by labeling regulations, except in Maine. But if you're offered "crabmeat salad" for $3.25 a pound, it's probably a fish story.

OCTOBER 1985 9

EXHIBIT ✓
1163
4-3-07  Hastings
BB00004581

Reproduced with permission of the copyright owner. Further reproduction proh

163

**EXHIBIT N**

DEFENDANT'S EXHIBIT

## REGIONAL REPORTS

### CENTRAL REGION







## Videos that earn a healthy profit.

$29.95
exp. retail

- National provider
- Packaging that sells
- Full four-color presentation
- High-profit and reduced support
- Priced to sell • High margins

Wise Hyperinfern Video, Suite 203V,
77 Ives St., Providence, RI 02906.

Or order a sample copy
TOLL-FREE 1-800-453-3322
Only $23.50
INCLUDING free shipping C.O.D.

Circle 37 on Reader Action Card

KIWI DELIVERS PROFITMAKERS

Converts to
BACKPACK

KIWI
CAMERA AND VIDEO BAGS

Circle 24 on Reader Action Card

"Video Transfer Centers will be the next boom business," says Photo Weekly.

Circle 31 at Reader Action Card

VIDEO STORE/JANUARY 1983

BB00012976

**EXHIBIT O**

Ad - Id=450 :

Publication:The Oklahoman;Date:Apr 2, 1982;Section:None;Page Number:17



http://olive.newsok.com/Repository/ml.asp?Ref=RE91LzE5ODIvMDQvMDIjQWQwMTc     9/8/2006

DEFENDANT'S
EXHIBIT
174

BB00013052

**EXHIBIT P**

```
 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA

 3

 4   ------------------------------

 5   NETFLIX, INC., a Delaware        )

 6   corporation,                     )

 7              Plaintiff,            )

 8              vs.                    )  No. C 06 2361

 9   BLOCKBUSTER INC., a Delaware     )    WHA (JCS)

10   Corporation, DOES 1-50,          )

11              Defendant.            )

12   ------------------------------

13

14

15        Videotaped deposition of MARK RAMM,

16        at 416 Park Street, Charlottesville,

17        Virginia, commencing at 10:02 a.m.,

18        Friday, March 23, 2007, before

19        Nancy J. Martin, CSR No. 9504.

20

21

22

23

24

25   PAGES 1 - 189
```

                                                          1

1    us about your educational background, starting from
2    college, if you may.
3        A. I attended University of Virginia,
4    engineering department, graduated with a bachelor of
5    science in computer science engineering.
6        Q. And when was that, sir?            10:09:32
7        A. Graduated in '83.
8        Q. With the bachelor of science degree in '83    10:09:38
9        A. (Nods head.)
10       Q. And after your graduation; what did you do,    10:09:47
11   sir?
12       A. I worked for IBM from 1983 to 1989.
13       Q. Now, what was your position at IBM at that    10:10:01
14   time period?
15       A. Systems analysis and performance of mid-range
16   processors.
17       Q. And could you tell us about your work    10:10:12
18   experience after '89.
19       A. I went to work for Tape Rental Library as an
20   office manager.
21       Q. That begins in 1989?            10:10:26
22       A. Yes.
23       Q. And you have been with Tape Rental Library    10:10:32
24   since then?
25       A. Yes.

6

1        Q. So you started as a -- an office manager?    10:10:37
2        A. That's right.
3        Q. Could you tell us your employment history    10:10:44
4    with Tape Rental Library, change of titles and so on?
5        A. Sure. I didn't research this. I don't
6    remember the years exactly. But I started as an
7    office manager and in, I think it was 1995 or '96 my
8    wife and I purchased the business from the owners at
9    that time, and I became president at that time.
10       Q. So in around 1995, 1996 you became owner, you    10:11:23
11   and your wife became owners of the Tape Rental
12   Library?
13       A. Yes.
14       Q. And you remained the owner of Tape Rental    10:11:33
15   Library since that time?
16       A. Yes.
17       Q. Thank you. And other than Tape Rental    10:11:39
18   Library, did the business use other names?
19       MR. PAIGE: Objection to form.
20       THE WITNESS: We do business on the Internet as
21   AudioQueue, also.
22   BY MR. CHEN
23       Q. AudioQueue, that's --            10:12:11
24       A. A-u-d-i-o-q-u-e-u-e.
25       Q. That's one word or just --        10:12:11

7

1        A. Yes. That's one word.
2        Q. So that's the name you use -- your business    10:12:15
3    use on the Internet?
4        A. That's one. We also use Tape Rental Library
5    on the Internet.
6        Q. When did you start using AudioQueue on the    10:12:23
7    Internet?
8        A. Another good question. I didn't research the
9    exact dates of some of those things. I would have to
10   say it was around 2001.
11       Q. All right. Mr. Ramm, could you tell us what    10:12:40
12   was your main duties and obligations as an office
13   manager when you started with Tape Rental Library in
14   '89?
15       A. To run the office, the daily operations,
16   including hiring and firing people, managing the
17   people, performance reviews, the daily operation of
18   the mail coming in and going back out, handling the --
19   the rental operation.
20       Q. So you had personal knowledge of Tape Rental    10:13:21
21   Library's business operations during that time period,
22   since '89?
23       MR. PAIGE: Object to the form.
24       THE WITNESS: Yes.
25   BY MR. CHEN

8

1        Q. And since you and your wife became owners of    10:13:42
2    the Tape Rental Library in 1995, 1996, what was your
3    main functions or job obligations at Tape Rental
4    Library?
5        MR. PAIGE: Object to the form.
6        THE WITNESS: I continue as office manager to
7    this day, but added on other areas, such as managing
8    the finances of the company, managing the production
9    of the catalog and the sales.
10   BY MR. CHEN
11       Q. All right. And so you would have personal    10:14:21
12   knowledge as to the business operations of Tape Rental
13   Library since 1995, 1996 to present time?
14       A. Yes.
15       Q. Mr. Ramm, could you tell us what was Tape    10:14:40
16   Rental's business, Tape Rental Library's business in
17   1989?
18       MR. PAIGE: Object to the form.
19       THE WITNESS: We rented audiotapes. I don't
20   think audio CDs were around at that point. We rented
21   audiotapes, videotapes to companies and to
22   individuals.
23   BY MR. CHEN
24       Q. What were -- what were the contents of the    10:15:17
25   audio or videotapes rented to its customers?

9

**Page 18**

1  video, but we don't offer that. So it's mainly -- the
2  video goes to mainly the company accounts.
3      Q. On the weekly basis plan?                10:25:29
4      A. Yes.
5      Q. That would be similar to what you described    10:25:34
6  earlier that a company may authorize multiple users?
7      MR. PAIGE: Object to form.
8      THE WITNESS: Yes. Exactly that.
9  BY MR. CHEN
10     Q. I think you're doing just fine, and we are    10:25:41
11 like carrying a conversation, but before you answer my
12 question, if you could pause a couple of seconds.
13 Give Mr. Paige some time to make his objection on the
14 record.
15     A. Okay.
16     Q. Let's go back to the -- the annual plans. So    10:26:00
17 you said once a customer entered into an annual plan,
18 it will give you a list of the titles the customer
19 wants for the tapes that they want to get?
20     A. Typically, yeah. They would give us a list
21 of titles.
22     Q. And the -- and the list was written on order    10:26:27
23 form?
24     A. Yes.
25     Q. And how -- once -- once your company received    10:26:32

**Page 20**

1  list, and it would keep it on file for them.
2      Q. When did the company start to use the    10:28:00
3  computer program?
4      MR. PAIGE: Object to the form.
5      THE WITNESS: 1985.
6  BY MR. CHEN
7      Q. 1985. Do you remember the name of the    10:28:10
8  computer program, the company used?
9      A. The computer program?
10     Q. Right. What program was that?    10:28:18
11     A. It's a database program called Unify.
12     Q. "Uni"?    10:28:23
13     A. Unify.
14     Q. The company was using that program in 1989    10:28:29
15 when you joined the company?
16     A. Yes.
17     Q. And was the program used since 1989,    10:28:33
18 throughout the years?
19     A. Yes.
20     Q. Until present time?    10:28:39
21     A. Yes.
22     Q. And the -- the database used in conjunction    10:28:42
23 with that program would have data for each customer?
24     MR. PAIGE: Object to the form.
25     THE WITNESS: Yes.

**Page 19**

1  that list, what do you do with it?
2      MR. PAIGE: Object to the form.
3  BY MR. CHEN
4      Q. In other words, do you put the list into    10:26:41
5  computers or do you keep a hard copy of it?
6      MR. PAIGE: Object to the form. Leading.
7      THE WITNESS: We put the list into our computer
8  system, and we keep a hard copy for one year. There
9  may be some other cases where we would keep hard copy
10 longer than that, but typically, if it was just a
11 standard order, we would keep it in our files for a
12 year, and then they're purged after a year.
13 BY MR. CHEN
14     Q. So the hard copy would be kept about the same    10:27:18
15 length as the annual plan?
16     MR. PAIGE: Object to the form.
17     THE WITNESS: Yes.
18 BY MR. CHEN
19     Q. And when you say you also put it -- the list    10:27:25
20 in the computer, what do you mean?
21     A. We have a computer program that allows us to
22 track the tapes in and out of the library, and it has
23 an account for each person, and each person's account
24 has a place to enter the tapes that they want, and we
25 would type in the tapes that they ordered into that

**Page 21**

1  BY MR. CHEN
2      Q. When you said earlier that each individual    10:29:00
3  customer would have an account, could you describe
4  that to us, please?
5      MR. PAIGE: Object to the form.
6      THE WITNESS: Well, the database would have
7  several tables in it to keep track of different
8  things, and one of the tables in the database would be
9  for the customer's information, such as their name and
10 address, and so there would be a record in that table
11 for each customer.
12 BY MR. CHEN
13     Q. And so for each customer, you would have data    10:29:32
14 or information of its address and contacts and so on
15 and so forth?
16     A. Yes.
17     MR. PAIGE: Object to the form.
18 BY MR. CHEN
19     Q. And also for each customer, you would have a    10:29:48
20 record on the computer system for the titles that they
21 want ordered?
22     MR. PAIGE: Object to the form.
23     THE WITNESS: Yes.
24 BY MR. CHEN
25     Q. You said earlier that once you received the    10:30:02

Pages 18 to 21

BY MR. CHEN

Q. Do you know as a fact that since April of    10:46:36
1998, a customer could use E-mail to change orders?

MR. PAIGE: Object to the form. Asked and
answered. Lacks foundation.

THE WITNESS: Yes.

BY MR. CHEN

Q. So once a request for changing an order was    10:46:55
received, what would the company do with such a
request?

MR. PAIGE: Object to the form.

THE WITNESS: We would print it out and make the
change that the customer had requested.

BY MR. CHEN

Q. When you say made the changes, do you mean    10:47:13
someone at your company would make the change on your
company's computer database?

MR. PAIGE: Object to the form. Lacks
foundation. Calls for speculation.

THE WITNESS: Yes.

BY MR. CHEN

Q. All right. So one of your staff would, based    10:47:29
on the request, make the changes on the existing
record for that particular customer?

MR. PAIGE: Object to the form. Lacks

34

foundation. Calls for speculation. Incomplete
hypothetical.

THE WITNESS: Yes.

BY MR. CHEN

Q. All right. Now, you said earlier that the    10:47:57
customer would -- in the beginning, typically
indicating about 12 tapes that they would want.

A. Yes.

Q. All right. And then you would send out the    10:48:12
first two from the tape -- from the list to a
customer?

MR. PAIGE: Object to the form.

THE WITNESS: Yes.

BY MR. CHEN

Q. So what -- could you describe how the plan    10:48:27
goes that -- that they will receive the first two and
then they would make returns and they will send them
additional tapes? Could you describe that process for
us?

MR. PAIGE: Object to the form.    10:48:44

THE WITNESS: Sure. I'm not sure what additional
description you're looking for. It sounds like -- I
mean, it's exactly what you just said. I'm not sure
what --

BY MR. CHEN

35

Q. All right. Did a customer have -- have any    10:48:54
limits on how long they could keep a tape in their
possession in listening or viewing?

A. No.

Q. They --    10:49:08

A. Well, let me qualify that. They signed up
for a year. The year was the limit. If they renewed
at the end of the year, they could keep the same ones.
So if the rental period was a year and they stopped at
the end of the year, they would be required to return
them at that point. So within the year's subscription
there was no limit to how long they could keep an
individual item.

Q. I see. Was there a limit on the number of    10:49:31
tapes that the -- a particular customer can have at
hand at any given time?

MR. PAIGE: Object to the form.

THE WITNESS: Yes.

BY MR. CHEN

Q. And that limit would be two tapes?    10:49:43

A. Yes. If they signed up for a two-tape
subscription, the limit would be two tapes.

Q. I see. So was there a different plan offered    10:49:50
to the customer in terms of the number of tapes they
could have at hand in a given time?

36

A. What time frame are we talking about?

Q. All right. Say a customer signs up on an    10:50:05
annual plan --

A. No. I mean what year? Where are we in the
years?

Q. Oh, I see. We're talking about prior to    10:50:15
1998.

A. Prior to 1998. There was a variety of ways
over the years that they could get additional material
out, and again, I didn't research when this was
changed. In -- in 1996, 1997 the way that they could
get additional material out would be to buy an
additional subscription. So if they wanted to buy two
subscriptions, they could have four out at a time. If
they wanted to buy three subscriptions, they could
have six out at a time. Prior to that -- and, again,
I'm not sure how far back it goes, but it was after
1989 when I started and before 1996 when I know we
changed it, there was a process where they could have
out additional tapes above their subscription level
and pay for them at the weekly rate.

BY MR. CHEN

Q. So there would be a combination of annual and    10:51:27
weekly plans?

A. Yes.

37

Pages 34 to 37

1  BY MR. CHEN
2      Q.  Okay.  Now, on Page 4 of this document, it    11:08:52
3  looks like it's a blank form.  Was that used -- the
4  form used by your company to send to a customer for
5  renewal purposes?
6      A.  Yes.
7      Q.  All right.  When you send this form to a    11:09:08
8  customer for renewal, this form could be used by a
9  customer indicating whether he or she wants to renew
10 the plan with the company -- with an annual plan with
11 the company?
12     A.  Yes.
13     Q.  All right.  Were there other forms to send to    11:09:35
14 customer, as well?
15     MR. PAIGE:  Object to the form.
16     THE WITNESS:  Yes.  There is a form on the -- the
17 part is that is a copy of several pages of the
18 catalog.  It says, "Audio Cassettes" on the front.
19 It's a catalog cover.
20     MR. CHEN:  All right.  Let's first mark this
21 document as Exhibit No. 25.
22     (The Reporter marked the document referred to
23      as Deposition Exhibit No. 25 for
24      identification.)
25     THE WITNESS:  There's four pages here.  The last

50

1  page is the last page in that catalog, and that has
2  more of an -- an initial form that they would use to
3  start up.
4  BY MR. CHEN
5      Q.  So the bottom half of the last page of    11:11:03
6  Exhibit 25 is a form that's used by your company to
7  send to a customer?
8      A.  This was from a catalog of 1987.  So this
9  would be, at that time, the initial form that we were
10 using for someone to start out.
11     Q.  All right.    11:11:24
12     A.  So when you asked if there were any other
13 kinds of forms that people would use, this is the
14 other kind.
15     Q.  Now, looking at the first page of this    11:11:31
16 Exhibit 25, it says, "Audio Cassettes."
17     A.  Uh-huh.
18     Q.  Are these four pages true and correct copies    11:11:40
19 of one of Tape Rental Library's catalog?
20     A.  Yes.
21     MR. PAIGE:  Object to the form.  I don't believe
22 it's a complete catalog, is it?
23     THE WITNESS:  I didn't copy all the pages.
24 BY MR. CHEN
25     Q.  So this is only the four pages of the    11:12:01

51

1  catalog?
2      A.  These are four pages out of that catalog.
3      Q.  Now, you indicated that that was a catalog    11:12:09
4  used in 1987?
5      A.  1987.  It's on the third page.  It's written
6  at the top, but it's also printed at the bottom on the
7  left.
8      Q.  On the bottom left of the third page it says,    11:12:24
9  "1987 Catalog"?
10     A.  Yes.
11     Q.  Okay.  Do you still have an original catalog?    11:12:29
12     A.  Yes.  I have one copy.
13     Q.  You have one copy retained in your company's    11:12:36
14 record?
15     A.  Yes.
16     Q.  And this Exhibit 24 is a true and correct    11:12:42
17 copy of four of the pages from that original catalog;
18 correct?
19     A.  Yes.
20     Q.  And so if we want, we could have all the    11:12:55
21 pages copied from the catalog.  You still have the
22 original; correct?
23     A.  Yes.
24     Q.  I see.  Mr. Ramm, let me show you a few of    11:13:13
25 the documents that we received from you before.  I'm

52

1  handing you a document for marking as Exhibit 25, a
2  document previously Bates numbered as BB 00012242
3  through BB 00012309.  Let me give you a copy of this.
4      MR. PAIGE:  I think it should be 26, Tony.
5      MR. CHEN:  I'm sorry.  Exhibit 26.  Thank you,
6  Mr. Paige.
7      (The Reporter marked the document referred to
8       as Deposition Exhibit No. 26 for
9       identification.)
10 BY MR. CHEN
11     Q.  So we have marked that as Exhibit 26.  I have    11:15:26
12 a few.  Let's just mark them together so we can talk
13 about them all together.
14     The next one is a document previously
15 identified Bates numbered as BB 00012311, 0 --
16 BB 00012363, and that will be marked as Defendants'
17 Exhibit 27.
18     (The Reporter marked the document referred to
19      as Deposition Exhibit No. 27 for
20      identification.)
21     MR. CHEN:  Next one, I'd like to have it marked
22 as Exhibit 28, previously identified by Bates
23 No. BB 0001234- -- -364 through BB 00012426.  That
24 would be 28.
25     ///

53

Pages 50 to 53

1  shown in the fifth page of Exhibit 34 -- 33 that has
2  one out of the sleeve and one inside the sleeve?
3      A. Yes.
4      Q. And then on the second and third line, it    13:58:12
5  keeps saying, "or use our convenient Time Saver List."
6  Is the Time Saver List referred there similar to the
7  one shown on the last page of Exhibit 30?
8      MR. PAIGE: Object to the form.
9      THE WITNESS: Yes.
10 BY MR. CHEN
11     Q. And also similar to the one shown -- the    13:58:45
12 photo in the middle of Page 4 of Exhibit 33?
13     MR. PAIGE: Same objection.
14     THE WITNESS: Yes.
15 BY MR. CHEN
16     Q. So you said the reason for calling that a    13:59:03
17 Time Saver List was because the customer -- customers
18 didn't have to, each time when they return a tape,
19 indicate what they wanted next?
20     MR. PAIGE: Object to the form. Leading.
21     THE WITNESS: Correct.
22 BY MR. CHEN
23     Q. But rather, they had a list on file with you,    13:59:24
24 with Tape Rental Library, which has the next tapes
25 listed there so the Tape Rental Library would know
                                                        106

1  what tape to send to the customer; correct?
2      MR. PAIGE: Objection to the form. Leading.
3  Misstates prior testimony.
4      THE WITNESS: Yes.
5  BY MR. CHEN
6      Q. All right. Counsel made an objection to my    13:59:46
7  question saying I'm leading. I said something --
8  anyway, he made his objection. Could you describe in
9  your own words as to the reasons of using a so-called
10 Time Saver List?
11     A. Sure. We felt that giving the customer an
12 opportunity to order more than one -- or more than two
13 cassette items at a time would be an advantage to them
14 and to us. It would be time savings to them to sit
15 down with the catalog less frequently and go through
16 and pick out 12 items or more or less that they wanted
17 and send that all in at one time, and then they could
18 go through several exchanges without having to go back
19 and pick up the catalog and find where they left off
20 and place another order.
21     And it was an advantage to us because if
22 somebody were busy, they might put off the next order.
23 So this way, if they ordered more in advance, then
24 they have it on file and they can just keep going
25 through the order. It's less disruptive to the
                                                        107

1  process that way.
2      Q. Could you also describe how that list was    14:01:08
3  followed in -- by Tape Rental Library in providing
4  subsequent replacement to customers?
5      A. When the list came in, we would enter the
6  list onto the customer's account, specifically on the
7  part of the database that maintained that customer's
8  list of items that they wanted to get next, and they
9  would be maintained in the same order that the
10 customer asked for it on the written list, and as the
11 customer would return an item, they would get the next
12 item sequentially in their list if that one was
13 available to send.
14     Q. All right. And when you say, "entered into    14:01:57
15 the database," you meant the computer database;
16 correct?
17     A. Correct.
18     Q. All right. Now -- and you also indicated    14:02:03
19 earlier that a customer can make changes to the list
20 in a number of ways?
21     MR. PAIGE: Objection. Leading.
22     THE WITNESS: Yes.
23 BY MR. CHEN
24     Q. Now, tell us what happened when a customer    14:02:2(
25 changed -- made changes to the list.
                                                        108

1      MR. PAIGE: Object to the form. Vague and
2  ambiguous.
3      THE WITNESS: There -- there were many ways that
4  they could make a change to a list. They could --
5  some of the simpler ways is they could write back a
6  note with the tape that they returned saying, "I don't
7  like this series. Stop sending it," which would
8  simply mean discontinuing the series that they're in
9  and -- and removing that from the list and -- and
10 continuing with whatever was next.
11     They might say that they know they ordered a
12 tape on how to learn Spanish, and they want to move
13 that up to the top because they need it sooner rather
14 than later. So we would move that to the top of the
15 list for them and send that next. They might return
16 one of the selection cards with an order on it, even
17 though they had an order on file with us, which would
18 indicate that they want that ahead of the list on
19 file, and so we would -- depending on how many there
20 was, we might just send that so we would never even
21 get the list.
22     But if it was -- what they ordered on the
23 selection card was like a six-tape series, that would
24 need to be put on the list and the first part of that
25 sent, and that would be moved to the top of the list
                                                        109

Veritext National Court Reporting Services
213 623-5005